UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRADLEY HEPPNER,<br>        Defendant. | No. 1:25-CR-00503 |

## OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTIONS

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ...........................................................................................................................1

    A.    The Parties and Their Business Relationship.............................................................1

    B.    GWG's Subsequent Investments in Beneficient........................................................2

ARGUMENT .................................................................................................................................2

I.    THE COURT SHOULD STRIKE PARAGRAPHS 3, 4, 10, 11, 13(A) AND 15 FROM THE INDICTMENT BECAUSE THE ALLEGATIONS ARE IRRELEVANT AND HIGHLY PREJUDICIAL ...............................................................2

    A.    Legal Standard ..........................................................................................................3

    B.    Argument...................................................................................................................4

        1.    Allegations regarding GWG's bankruptcy and investor losses are irrelevant and highly prejudicial. ...............................................................4

            a.    The Bankruptcy Allegations in Paragraphs 3, 4, and 15 of the Indictment Are Irrelevant to Any Charged Offense .................4

            b.    The Bankruptcy Allegations in Paragraphs 3, 4, and 15 of the Indictment Are Highly Prejudicial ..................................6

        2.    Paragraphs 10 and 11 Are Irrelevant to the Charged Scheme and Prejudicial .....................................................................................................7

        3.    Paragraph 13(a) Describes a Loan, Not a Securities Transaction ...............7

            a.    The May 2019 Transaction Was a Loan, Not a Securities Transaction ..................................................................................8

            b.    The Government Cannot Rely on a "Scheme" Theory to Cure the Deficiency ..................................................................8

II.    THE COURT SHOULD DISMISS COUNTS ONE, TWO, AND THREE OF THE INDICTMENT BECAUSE THEY ARE DUPLICITOUS .........................................9

    A.    Legal Standard ........................................................................................................10

    B.    Argument.................................................................................................................11

        1.    The Indictment is Impermissibly Duplicitous Because it Prejudices Mr. Heppner.............................................................................................12

            a.    Mr. Heppner is Deprived of His Right to a Unanimous Verdict ..................................................................................12

            b.    Mr. Heppner Faces Double Jeopardy Prejudice .............................13

III.    THE COURT SHOULD DISMISS COUNT TWO OF THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE...................................................................14

A.  Legal Standard ........................................................................................... 14

B.  Argument.................................................................................................... 15

    1.  *United States v. Weimert* Establishes that Deception about
Negotiating Positions Cannot Support Wire Fraud .................................... 15

    2.  The Alleged Misrepresentations Concern Negotiating Positions ............. 16

    3.  The Indictment's Own Allegations Establish that the Alleged
Misrepresentations Concern Negotiating Positions ................................... 17

IV.  THE COURT SHOULD DISMISS COUNT FOUR OF THE INDICTMENT
BECAUSE IT FAILS TO STATE AN OFFENSE AND THE APPLICABLE
LIMITATIONS PERIOD HAS ELAPSED ......................................................... 20

A.  Factual Background ................................................................................... 20

B.  Legal Standard ........................................................................................... 23

C.  Argument.................................................................................................... 24

    1.  The Court Should Dismiss Count Four Because it Fails to Allege
an Offense ................................................................................................... 24

    2.  The Court Should Dismiss Count Four Because the Applicable
Limitations Period Has Elapsed ................................................................. 26

        a.  Count Four is Time-Barred by 18 U.S.C. § 3282 ........................... 26

        b.  Count Four Does Not Charge a "Securities Fraud Offense"
and, as a Result, 18 U.S.C. § 3301 Does Not Apply ...................... 27

V.  THE COURT SHOULD DISMISS COUNT FIVE FOR FAILURE TO
ESTABLISH VENUE IN THE SOUTHERN DISTRICT OF NEW YORK ................... 31

A.  Factual Background ................................................................................... 31

B.  Legal Standard ........................................................................................... 32

C.  Argument.................................................................................................... 33

CONCLUSION ................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abouammo v. United States*,
No. 25-5146, 2025 WL 3493156 (Dec. 5, 2025)..........................................................................33

*Alvarez v. Garland*,
33 F.4th 626 (2d Cir. 2022) .............................................................................................................5

*Blockburger v. United States*,
284 U.S. 299 (1932) .......................................................................................................................11

*Hilbert v. Dooling*,
476 F.2d 355 (2d Cir. 1973) ..........................................................................................................24

*HTC Corp., v. Tech Props. Ltd.*,
No. 5:08-CV-00882, 2013 WL 4782598 (N.D. Cal. Sept. 6, 2013) ...........................................6

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991) ....................................................................................................22, 32

*Baliga ex rel. Link Motion Inc. v. Link Motion Inc.*,
385 F. Supp. 3d 212 (S.D.N.Y. 2019) ...........................................................................................8

*Mescall v. United States*,
2018 WL 325309 (W.D.N.C. Jan. 8, 2018) .................................................................................30

*Neder v. United States*,
527 U.S. 1 (1999) ...........................................................................................................................15

*SEC v. Zanford*,
535 U.S. 813 (2002) .....................................................................................................................8, 9

*Solow v. Citigroup, Inc.*,
507 F. App'x 81 (2d Cir. 2013) ......................................................................................................8

*Tab Partnership v. Grantland Financial Corp.*,
866 F. Supp. 807 (S.D.N.Y. 1994) .................................................................................................8

*United States v. Abouammo*,
122 F.4th 1072 (9th Cir. 2024) .....................................................................................................33

*United States v. Aleynikov*,
676 F.3d 71 (2d Cir. 2012) ............................................................................................................15

*United States v. Anderson*,
    328 U.S. 699 (1946) ...........................................................................................32, 33

*United States v. Archer*,
    355 F. Supp. 981 (S.D.N.Y. 1972) ...................................................................................3

*United States v. Bases*,
    2020 WL 2557342 (N.D. Ill. May 20, 2020) ................................................................30

*United States v. Beech-Nut Nutrition Corp.*,
    871 F.2d 1181 (2d Cir. 1989) ......................................................................................32

*United States v. Bergstein*,
    2018 WL 2417845 (S.D.N.Y. May 29, 2018) ...............................................................30

*United States v. Bridges*,
    346 U.S. 209 (1953) ...............................................................................................29, 30

*United States v. Cabrales*,
    524 U.S. 1 (1998) ...................................................................................................32, 34

*United States v. Calderon*,
    944 F.3d 72 (S.D.N.Y. 2019) ......................................................................................15

*United States v. Carollo*,
    2011 WL 3875322 (S.D.N.Y. Aug. 25, 2011) ..............................................................24

*United States v. Coffman*,
    94 F.3d 330 (7th Cir. 1996) ........................................................................................19

*United States v. Colello*,
    2022 WL 220216 (S.D.N.Y Jan. 25, 2022) ..................................................................23

*United States v. Doost*,
    2019 WL 1560114 (D.D.C. Apr. 10, 2019) ..................................................................29

*United States v. Downing*,
    297 F.3d 52 (2d Cir. 2002)............................................................................................5

*United States v. Filer*,
    2021 WL 4318087 (N.D. Ill. Sept. 23, 2021) ..............................................................16

*United States v. Fisher*,
    No. 4:24-CR-10, 2025 WL 3723459 (N.D. Miss. Dec. 23, 2025) ...............................33

*United States v. Gentile*,
    235 F. Supp. 3d 649 (D.N.J. 2017) ..............................................................................30

*United States v. Gotti,*
    457 F. Supp. 2d 411 (S.D.N.Y. 2006) ........................................................................23

*United States v. Gotti,*
    459 F.3d 296 (2d Cir. 2006) ....................................................................................5

*United States v. Grainger,*
    346 U.S. 235 (1953) ........................................................................................29, 30

*United States v. Heicklen,*
    858 F. Supp. 2d 256 (S.D.N.Y. 2012) ..................................................................23, 24

*United States v. Ingarfield,*
    2022 WL 16700068 (S.D.N.Y. Nov. 3, 2022) ............................................................30

*United States v. Kandic,*
    134 F.4th 92 (2d Cir. 2025) .................................................................................12, 13

*United States v. Kemper,*
    503 F.2d 327 (6th Cir. 1975) ....................................................................................3

*United States v. Lewis,*
    2013 WL 6407885 (N.D. Tex. Dec. 9, 2013) ............................................................30

*United States v. Margiotta,*
    646 F.2d 729 (2d Cir. 1981) ....................................................................................13

*United States v. Martino,*
    No. S1 00 CR 389, 2000 WL 1843233 (S.D.N.Y. Dec. 14, 2000) ............................32

*United States v. McIntosh,*
    23 F.3d 1454 (8th Cir. 1994) ....................................................................................3

*United States v. Miller,*
    26 F. Supp. 2d 415 (N.D.N.Y. 1998) ..........................................................................3

*United States v. Murray,*
    618 F.2d 892 (2d Cir. 1980) .................................................................................10, 12

*United States v. Nachamie,*
    101 F. Supp. 2d 134 (S.D.N.Y. 2000) ......................................................................10

*United States v. Pace,*
    314 F.3d 344 (9th Cir. 2002) ..................................................................................33

*United States v. Rodriguez-Moreno,*
    526 U.S. 275 (1999) ......................................................................................32, 33, 34

*United States v. Saavedra*,
    223 F.3d 85 (2d Cir. 2000)..........................................................................32

*United States v. Saint Clair*,
    2021 WL 3076677 (S.D.N.Y. July 20, 2021) ...........................................30

*United States v. Sampson*,
    371 U.S. 75 (1962) ....................................................................................14

*United States v. Scarpa*,
    913 F.2d 993 (2d Cir. 1990) .........................................................................3

*United States v. Scully*,
    108 F. Supp 3d 59 (E.D.N.Y. 2015)...........................................................23

*United States v. Smith*,
    525 F.3d 678 (2d Cir. 1999) .......................................................................30

*United States v. Sturdivant*,
    244 F.3d 71 (2d Cir. 2001)....................................................................10, 13

*United States v. Swetz*,
    2019 WL 545005 (D. Nev. Jan. 2, 2019),
    *report and recommendation approved*,
    2019 WL 539022 (D. Nev. Feb. 11, 2019) .................................................27

*United States v. Tournant*,
    No. 22-CR-276-LTS, 2023 WL 8649893 (S.D.N.Y. Dec. 13, 2023) ..........3

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013).............................................................................5

*United States v. Weimert*,
    819 F.3d 351 (7th Cir. 2016) ............................................................. *passim*

*United v. Jones*,
    123 F.2d 56 (2d Cir. 1990)..........................................................................30

*In re Walt Disney Co. Derivative Litig.*,
    825 A.2d 275 (Del. Ch. 2003) .....................................................................19

## Rules and Statutes

15 U.S.C. § 77q(a) ...................................................................................................30

15 U.S.C. § 77x........................................................................................................27

15 U.S.C. § 77yyy....................................................................................................27

15 U.S.C. § 78ff ................................................................................................20, 22

15 U.S.C. § 78ff(a) ....................................................................................................27

15 U.S.C. § 78j(b) ........................................................................................................8

15 U.S.C. § 80a-48 ...................................................................................................27

15 U.S.C. § 80b-6 .....................................................................................................30

15 U.S.C. § 80b-17 ...................................................................................................27

17 C.F.R. § 240.10b-5 ........................................................................................passim

17 C.F.R. § 240.13b2-2 ......................................................................................passim

17 C.F.R. § 240.13b2-2(a) ..................................................................................passim

18 U.S.C. § 1343 .................................................................................................15, 34

18 U.S.C. § 1348 .................................................................................................27, 29

18 U.S.C. § 1519 .................................................................................................passim

18 U.S.C. § 3282 .......................................................................................................26

18 U.S.C. § 3287 .......................................................................................................29

18 U.S.C. § 3301 .................................................................................................passim

18 U.S.C. § 3301(a)(2) ..............................................................................................27

Fed. R. Crim. P.(3)(B)(v) ...........................................................................................23

Fed. R. Crim. P. 7(d) ...........................................................................................passim

Fed. R. Crim. P. 12(b)(1) ...........................................................................................23

Fed. R. Crim. P. 12(b)(3) ...........................................................................................14

Fed. R. Crim. P. 18 ....................................................................................................32

Fed. R. Evid. 201 .................................................................................................22, 31

Fed. R. Evid. 404(b) .....................................................................................................7

U.S. Const. amend. VI ...............................................................................................32

U.S. Const. art. III § 2, cl. 3 ......................................................................................32

## <u>Other Authorities</u>

1 Charles Alan Wright, et al., *Federal Practice and Procedure* § 128 (5th ed.
2025)..................................................................................................................................3

*Chicago Regional Office*, U.S. Sᴇᴄ. & Exᴄʜ. Cᴏᴍᴍ'ɴ,
https://www.sec.gov/about/regional-offices/chicago-regional-office.......................................32

## PRELIMINARY STATEMENT

Bradley K. Heppner ("Mr. Heppner"), by and through his undersigned counsel, respectfully submits this Omnibus Memorandum of Law in Support of his Motions to (i) strike Paragraphs 3, 4, 10, 11, 13(a), and 15 from Count One of the Indictment pursuant to Federal Rule of Criminal Procedure 7(d); (ii) dismiss Counts One, Two, and Three of the Indictment as duplicitous; (iii) dismiss Count Two of the Indictment for failure to state an offense; (iv) dismiss Count Four of the Indictment for failure to state an offense and because the limitations period has elapsed, and (v) dismiss Count Five of the Indictment for failure to properly allege venue.

## BACKGROUND

### A.    The Parties and Their Business Relationship

Mr. Heppner was the Chief Executive Officer and Chairman of Beneficient Company Group, L.P. ("Beneficient"), a financial services company he founded to assist individuals and institutions access liquidity from illiquid alternative assets.  ECF 3 ¶ 5.

In 2018, GWG Holdings, Inc. ("GWG"), a publicly traded financial services company, decided  to acquire an equity interest in Beneficient.  *Id*. ¶¶ 4-5.  GWG had previously raised capital through the issuance of speculative debt securities referred to as "L Bonds" and chose to invest in Beneficient to diversify its income streams.  *Id*.  Prior to GWG's investment, the existence of a $141 million loan from Highland Consolidated, L.P. Nominees, LLC ("HCLP Nominees"), as well as that entity's affiliation to Mr. Heppner, was disclosed to GWG and its advisors and to the public via securities filings.

In April 2019, Mr. Heppner became the non-executive chairman of GWG's board of directors.  *See id.* ¶ 6.

### B.    GWG's Subsequent Investments in Beneficient

Between April 2019 and March 2021, a special committee of independent GWG directors made investments in Beneficient. These investments were intended, in part, to provide Beneficient with funds to service its debt to HCLP Nominees and other creditors. *Id.*

GWG provided several tranches of funding to Beneficient during this time. In May 2019, GWG provided Beneficient with a $65 million capital infusion, structured as an unsecured loan. *Id.* ¶ 13(a). In December 2019, GWG made a $79 million equity investment in Beneficient, approximately $50 million of which was designated to pay down debt owed to HCLP Nominees. *Id.* ¶ 13(c). In 2020, GWG approved a $61 million equity investment in Beneficient, approximately $28 million of which was designated to pay down debt owed to HCLP Nominees. *Id.* ¶ 13(d). Finally, GWG made additional equity investments in Beneficient between July 2020 and March 2021, portions of which were used by Beneficient to pay down debt owed to HCLP Nominees. *Id.* ¶ 13(e).

GWG's loan to and equity investments in Beneficient are at the core of the Government's case against Mr. Heppner. The Government alleges that GWG would not have made these investments in Beneficient but for Mr. Heppner's purported misrepresentations downplaying (i) Mr. Heppner's control over HCLP Nominees and other affiliated entities and (ii) the potential for Mr. Heppner to personally obtain funds used to pay down the HCLP Nominees loan. *Id.* ¶¶ 2,13.

### <u>ARGUMENT</u>

## I.    THE COURT SHOULD STRIKE PARAGRAPHS 3, 4, 10, 11, 13(A) AND 15 FROM THE INDICTMENT BECAUSE THE ALLEGATIONS ARE IRRELEVANT AND HIGHLY PREJUDICIAL

The Court should strike Paragraphs 3, 4, 10, 11, 13(a) and 15 from the Indictment. Paragraphs 3, 4, and 15 attempt to link Mr. Heppner's alleged misconduct to GWG's eventual bankruptcy. Paragraphs 10 and 11 describe communications with prospective investors who are

not alleged victims of any charged offense and who ultimately declined to invest.  And Paragraph 13(a) bases a securities fraud charge on an unsecured loan rather than the purchase or sale of securities.  All of these allegations are irrelevant and highly prejudicial, and should be struck from the Indictment.

### A.    Legal Standard

Pursuant to Rule 7(d), a court "may strike surplusage from the indictment" upon a defendant's motion.  Fed. R. Crim. P. 7(d).  "The purpose of [Rule] 7(d) is to protect the defendant against prejudicial allegations of irrelevant or immaterial facts."  1 Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 128 (5th ed. 2025).  Surplusage consists of allegations that are "not necessary to establish a violation of [the] statute" in issue.  *United States v. McIntosh*, 23 F.3d 1454, 1457 (8th Cir. 1994).  Such allegations "may be disregarded if the remaining allegations are sufficient to charge a crime."  *Id.*

Though motions to strike surplusage are "subject to an exacting standard," they are appropriate where the challenged allegations are "not relevant to the crime charged and [are] inflammatory and prejudicial."  *United States v. Tournant*, No. 22-CR-276-LTS, 2023 WL 8649893, at *12 (S.D.N.Y. Dec. 13, 2023) (quoting *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990)).

When an indictment contains "nonessential allegations" that may "prejudicially impress the jurors," a court should grant a motion to strike.  *United States v. Kempler*, 503 F.2d 327, 329 (6th Cir. 1975).  The decision is committed to the district court's discretion.  *United States v. Archer*, 355 F. Supp. 981, 989 (S.D.N.Y. 1972); *United States v. Miller*, 26 F. Supp. 2d 415, 420 (N.D.N.Y. 1998).

**B.    Argument**

    **1.    Allegations regarding GWG's bankruptcy and investor losses are irrelevant and highly prejudicial.**

Paragraphs 3, 4, and 15 allege the following:

Once HEPPNER exhausted his ability to siphon GWG's assets for himself, he separated himself from GWG.  GWG filed for bankruptcy shortly thereafter, causing losses exceeding $1 billion to thousands of investors and bondholders. ECF 3 ¶ 3.

GWG was a Nasdaq-listed financial services company that historically operated in the secondary life insurance business.  GWG raised capital through bonds—called L Bonds—sold to retail investors, predominantly retirees seeking income-generating investments.  During the relevant period, GWG raised over $1 billion from thousands of investors.  *Id.* ¶ 4.

While BRADLEY HEPPNER, the defendant, extracted over $150 million, GWG collapsed.  The company filed for Chapter 11 bankruptcy in April 2022, unable to satisfy more than $1 billion in obligations to more than 15,000 L-bond investors. Those losses fell primarily on retail investors, many of them retirees who had invested their savings based on representations that L-bonds constituted safe, income-generating investments.  *Id.* ¶ 15.

These allegations are realleged and incorporated by reference in Counts Two through Five.

*Id.* ¶¶ 25, 27, 32, 34.

    *a.    The Bankruptcy Allegations in Paragraphs 3, 4, and 15 of the Indictment Are Irrelevant to Any Charged Offense*

The allegations in Paragraphs 3, 4, and 15 are irrelevant because (i) GWG's bankruptcy occurred *after* the charged conduct ended; (ii) investor losses are not an element of any charged offense; and (iii) the allegations have no bearing on Mr. Heppner's conduct or state of mind.

*First*, GWG's April 2022 bankruptcy filing, *id.* ¶ 15, is *outside* the Indictment period, which extends only through 2021.  *Id.*  ¶ 24.  Whatever caused GWG to file for bankruptcy—and the causes of any corporate bankruptcy are invariably complex—the filing itself is not part of the charged scheme.  Intervening events over several years could have contributed to GWG's collapse, including market conditions, management decisions made after Mr. Heppner's departure as non-

4

executive chairman of GWG's board, and GWG's pre-existing business model challenges.  To the extent GWG's bankruptcy and the alleged scheme have any connection it is simply that one occurred after the other—a fact that is insufficient to establish relevance under Fed. R. Crim. P. 7(d).

*Second*, losses to investors are not an element of securities fraud, wire fraud, conspiracy, false statements to auditors, or falsification of records.  Securities fraud under Rule 10b-5 requires proof of a scheme to defraud or material misrepresentations in connection with the purchase or sale of securities—not proof of resulting losses.  *See United States v. Vilar*, 729 F.3d 62, 88-89 (2d Cir. 2013).  Wire fraud requires a scheme to defraud, money or property as the object, and use of the wires to further the scheme.  *United States v. Gotti*, 459 F.3d 296, 330 (2d Cir. 2006).  It does not require proof of actual loss.  *Alvarez v. Garland*, 33 F.4th 626, 642 n.23 (2d Cir. 2022).  Conspiracy requires an agreement, knowing participation, and an overt act—not proof of harm to third parties.  *United States v. Downing*, 297 F.3d 52, 57 (2d Cir. 2002).  False statements to auditors requires a materially false statement to an accountant in connection with an SEC filing or audit.  17 C.F.R. § 240.13b2-2(a).  It does not require proof that the statement caused investor losses.  And falsification of records requires altering or falsifying a document with intent to obstruct an investigation.  18 U.S.C. § 1519.  It does not require proof of downstream harm.  Because losses are not an element of the charged offenses, proof of GWG's bankruptcy and investor hardship is irrelevant to whether the Government can establish Mr. Heppner's guilt.

*Third*, GWG's bankruptcy filing—which occurred after Mr. Heppner had separated from the company—has no bearing on his conduct or state of mind during the charged period.  The Government cannot use subsequent events to prove that Mr. Heppner acted with fraudulent intent *years earlier*.

       b.     *The Bankruptcy Allegations in Paragraphs 3, 4, and 15 of the Indictment Are Highly Prejudicial*

What these allegations lack in relevance, they make up for in prejudice.  Paragraphs 3, 4, and 15 serve a single purpose:  to make Mr. Heppner the scapegoat for a corporate collapse that occurred after the charged conduct ended and that resulted from factors far beyond any scheme alleged in this case.

The prejudice is substantial.  By emphasizing that GWG's bondholders were "predominantly retirees seeking income-generating investments" who "had invested their savings," the Indictment invites the jury to determine guilt based on sympathy for victims rather than proof of the charged offenses beyond a reasonable doubt.  ECF 3 ¶¶ 4, 15.  This is precisely the kind of emotional appeal that Rule 7(d) was designed to prevent.  *See* Fed. R. Crim. P. 7(d) Advisory Committee's Note to 1944 adoption (Rule enacted to "protect[] the defendant against immaterial or irrelevant allegations in an indictment . . . which may, however, be prejudicial").

Courts have recognized that references to bankruptcy can "trigger visceral reactions among jurors" and that "such a reaction carries a risk of substantial unfair prejudice."  *HTC Corp., v. Tech Props. Ltd.*, No. 5:08-CV-00882, 2013 WL 4782598, at *2 (N.D. Cal. Sept. 6, 2013).  Here, the prejudice is compounded by the Indictment's suggestion of a causal link between Mr. Heppner's conduct and GWG's collapse—a link the Government has not charged and could not prove.

If the Court permits these allegations to remain, Mr. Heppner will be forced to defend against uncharged conduct by presenting evidence about the *actual* causes of GWG's bankruptcy—a complicated, lengthy, and ultimately irrelevant mini-trial within a trial.[1]

---

[1]  GWG's bankruptcy was in fact caused by *ultra vires* conduct by SEC enforcement staff. Should the Government be permitted to present evidence at trial regarding GWG's bankruptcy, Mr. Heppner intends to call multiple witnesses to help establish this fact.

### 2. Paragraphs 10 and 11 Are Irrelevant to the Charged Scheme and Prejudicial

As described above, Paragraphs 10 and 11 describe uncharged conduct involving non-victims. Paragraphs 10 and 11 allege that Mr. Heppner "concocted a story" about the HCLP Nominees debt and "tried out this misleading story on two prospective investors" in 2018. ECF 3 ¶¶ 10-11. The Indictment concedes that both prospective investors "decided not to invest." *Id*. ¶ 11. These allegations are textbook surplusage. The Government has charged a fraud against GWG—not the unnamed investors described in these paragraphs or any other investor Mr. Heppner may have communicated with in 2018. No count charges fraud against these prospective investors; no loss or reliance involving them is alleged; and no element of any charged offense turns on what Mr. Heppner said to parties who declined to invest and *suffered no harm*.

By including these uncharged interactions, the Government invites the jury to find Mr. Heppner guilty based on an uncharged pattern of deceptive conduct toward third parties. The resulting prejudice—the suggestion that Mr. Heppner was a serial deceiver of investors beyond GWG—substantially outweighs any probative value.[2]

### 3. Paragraph 13(a) Describes a Loan, Not a Securities Transaction

Paragraph 13(a) states:

In or about May 2019, within weeks of assuming control of GWG, HEPPNER caused a $65 million transfer of funds from GWG to Beneficient. To induce the transfer of funds to Beneficient, HEPPNER informed GWG's board that Beneficient required an immediate capital infusion. Before the special committee authorized that transfer, HEPPNER—both directly and through others—misled members of that special committee and their representatives to believe that HCLP constituted an independent third-party lender. HEPPNER also caused the special

---

[2] The Government may contend that evidence of these communications is admissible under Federal Rule of Evidence 404(b). But admissibility at trial is a different question from whether allegations are properly included in an indictment. Even if such evidence might be admitted for limited purposes with appropriate instructions, embedding these allegations in the Indictment ensures the jury will read them as charged conduct.

committee to receive materials showing that HCLP had an independent manager that directed its operations and was capable of making demands of Beneficient. In reality, the purportedly independent manager was HEPPNER's longtime friend who secretly operated HCLP pursuant to HEPPNER's directions. Based on those representations, the special committee, operating under the belief that HCLP constituted an independent third-party lender, authorized a $65 million unsecured loan to Beneficient. Beneficient transferred millions of these funds to HCLP. *Id.* ¶ 13(a).

### a. The May 2019 Transaction Was a Loan, Not a Securities Transaction

The Indictment itself characterizes the May 2019 transaction as a "$65 million unsecured *loan* to Beneficient." *Id.* (emphasis added). A loan is not a security, *see Tab Partnership v. Grantland Financial Corp.,* 866 F. Supp. 807, 809-10 (S.D.N.Y. 1994), and the Indictment does not allege that the loan *involved* the purchase or sale of securities. This deficiency is fatal. Count One charges securities fraud under Section 10(b) of the Securities Exchange Act and Rule 10b-5, which prohibit fraudulent conduct "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. This nexus requirement is an essential element of the offense. *See Baliga ex rel. Link Motion Inc. v. Link Motion Inc.,* 385 F. Supp. 3d 212, 221 (S.D.N.Y. 2019) (citing *Solow v. Citigroup, Inc.,* 507 F. App'x 81, 82 (2d Cir. 2013)). Because Paragraph 13(a) describes a loan—not a purchase or sale of securities or a transaction involving the same—the conduct it alleges does not satisfy the statutory "in connection with" requirement.

### b. The Government Cannot Rely on a "Scheme" Theory to Cure the Deficiency

The Government may argue that Paragraph 13(a) describes one act within a broader "scheme to defraud" and that the scheme *as a whole* was "in connection with" securities transactions. This argument fails for two reasons.

*First*, the Supreme Court has held that Section 10(b) should be construed "flexibly," but it has not eliminated the "in connection with" requirement. *See SEC v. Zanford*, 535 U.S. 813, 819-

20 (2002).  In *Zanford*, for example, the Court found the nexus requirement satisfied because the defendant's fraudulent scheme involved *selling* securities and misappropriating the proceeds—the "securities transactions and breaches of fiduciary duty coincide[d]."  *Id*. at 825.  Here, by contrast, the May 2019 transaction did not involve any securities transaction nor was one contemplated by the parties involved.  The Government cannot bootstrap a loan into a securities fraud charge simply by alleging that later transactions involved equity investments.

Second, even under a scheme theory, the jury must understand which specific acts constitute the charged offense.  Including Paragraph 13(a)—which describes conduct that does not itself satisfy the statutory elements—creates improper confusion about what conduct is criminal. The jury may conclude that the May 2019 loan was unlawful because it appears in the Indictment and is presented at trial, even though that transaction does not violate Rule 10b-5.

### A. Paragraph 13(a) is Prejudicial Because it Artificially Expands the Alleged Pattern

The inclusion of Paragraph 13(a) embellishes the Government's theory by suggesting a longer pattern of misconduct than the evidence will support.  This prejudice is not merely theoretical.  The Indictment's structure invites the inference that Mr. Heppner engaged in *four* fraudulent transactions (May 2019, December 2019, 2020, and July 2020-March 2021, *see* ECF 3 ¶ 13(a)-(e)), when the Government can at most prove securities fraud as to the equity investments. The resulting prejudice substantially outweighs any probative value Paragraph 13(a) might have.

## II.   THE COURT SHOULD DISMISS COUNTS ONE, TWO, AND THREE OF THE INDICTMENT BECAUSE THEY ARE DUPLICITOUS

Mr. Heppner has been charged in five counts with:  (1) securities fraud (Count One); (2) wire fraud (Count Two); (3) conspiracy to commit securities fraud and wire fraud (Count Three); (4) false statements to auditors (Count Four); and (5) falsification of records (Count Five).  ECF

3.  Count One spans Paragraphs 1-24 and contains the Indictment's primary factual allegations. Counts Two, Three, and Four incorporate these allegations by reference.  ECF 3 ¶¶ 25, 27, 32.

The problem is this:  Paragraphs 16 through 20, titled "Heppner's Lies to Auditors," allege that Mr. Heppner made false and misleading statements to Beneficient's auditor.  *Id.* ¶¶ 16-20. These same allegations from the *exclusive* factual basis for Count Four, which charges false statements to auditors under 17 C.F.R. § 240.13b2-2(a).  And Paragraphs 21 through 23, titled "Heppner Falsifies Records and Separates Himself from GWG," allege that Mr. Heppner falsified board minutes in May 2021 to obstruct an SEC investigation.  *Id.* ¶¶ 21-23.  These allegations form the exclusive factual basis for Count Five, which charges falsification of records under 18 U.S.C. § 1519.  *Id.* ¶ 34-35.  Yet the Government has incorporated all these paragraphs into Counts One, Two, and Three—each of which charges entirely distinct offenses with different elements, different victims, and different conduct.  This renders the counts duplicitous.

A.      **Legal Standard**

The rule against duplicity serves fundamental constitutional interests.  "[T]wo or more distinct crimes should not be alleged in a single count of an indictment."  *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980).  "An indictment is impermissibly duplicitous where:  1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby."  *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).  Whether an indictment is duplicitous is a legal determination properly made by the district court.  *See United States v. Nachamie*, 101 F. Supp. 2d 134, 153 (S.D.N.Y. 2000) ("[A] court could conclude, as a matter of law, that the allegations in a single conspiracy count improperly charge multiple conspiracies.").

B.    Argument

The Indictment is duplicitous because it charges two separate criminal offenses into Counts One, Two, and Three.  Paragraphs 16 through 23 describe two distinct courses of criminal conduct: creating fake emails, backdating documents, and making false representations to Beneficient's auditor (ECF 3 ¶¶ 16-20); and falsifying October 2019 board minutes in May 2021 with intent to obstruct an SEC investigation (¶¶ 21-23).  This conduct forms the factual and legal basis for Count Four and Five, which charge false statements to auditors under 17 C.F.R. § 240.13b2-2(a) and falsification of records under 18 U.S.C. § 1519, respectively.  By incorporating these same paragraphs into Counts One, Two, and Three, the Government has charged both the Count Four and Count Five offenses within each of those counts.  As a result, Counts One through Three should be dismissed.

Each offense described above requires proof of facts the others do not.  *See Blockburger v. United States*, 284 U.S. 299, 304 (1932).

| ELEMENT | SECURITIES FRAUD (COUNT I) | WIRE FRAUD (COUNT II) | FALSE STATEMENTS TO AUDITORS (COUNT IV) | FALSIFICATION OF RECORDS (COUNT V) |
|---|---|---|---|---|
| *Victim/Recipient* | Purchasers/sellers of securities; investors | Victims of fraud scheme | Accountant conducting audit | Federal agency (SEC) |
| *Nexus Required* | "In connection with" purchase or sale of security | Use of interstate wires | "In connection with" audit or SEC filing | Intent to obstruct federal investigation |
| *Nature of Deception* | Material misstatement/omission to market | False pretenses to obtain money/property | False statement to accountant | Falsification of records |
| *Defendant Status* | Any person | Any person | Officer or director of issuer | Any person |
| *Temporal Focus* | 2018-2021 | 2018-2021 | 2019 | May 2021 |

11

Because each offense requires distinct proof, they must be charged separately—not bundled together through incorporation by reference. This is particularly evident with Count Five: the alleged falsification occurred in May 2021, *after* Mr. Heppner had begun "separating himself from GWG," ECF 3 ¶ 22, and resigned from GWG's Board, *id.* ¶ 23. Post-hoc obstruction conduct is conceptually distinct from the underlying fraud scheme.

The Government's own choices confirm that Paragraphs 16-23 constitute two distinct criminal offenses. The Government: (i) placed these allegations under two separate headings ("Heppner's Lies to Auditors" and "Heppner Falsifies Records and Separates Himself from GWG"); (ii) described specific criminal acts within each section; and (iii) *charged those same allegations as two separate counts* (Count Four and Five). While Federal Rule of Criminal Procedure 7(c) permits incorporation by reference, it does not authorize the Government to incorporate allegations of a separately charged offense into other charged offenses. Incorporation is intended to avoid repetitive pleading of background facts—not to expand the scope of what conduct underlies a conviction. The segregation of these allegations into their own sections, with their own headings, and their own criminal counts, demonstrates that the Government itself views this as distinct criminal conduct. Having made that determination, the Government cannot simultaneously incorporate that same conduct into Counts One through Three.

### 1. The Indictment is Impermissibly Duplicitous Because it Prejudices Mr. Heppner

#### a. *Mr. Heppner is Deprived of His Right to a Unanimous Verdict*

A duplicitous indictment creates prejudice if it deprives a defendant of his "right to a unanimous verdict." *Murray*, 618 F.2d at 898; *see also United States v. Kandic*, 134 F.4th 92, 99 n.2 (2d Cir. 2025). Here, if a jury returns a guilty verdict on Count One, Two, or Three, it will be impossible to determine whether the jury found Mr. Heppner guilty based on: (i) the alleged

misrepresentations to GWG's special committee (the core fraud allegations in Paragraphs 1-15); (ii) the alleged misrepresentations to Beneficient's auditor (Paragraphs 16-20); (iii) the alleged falsification of board minutes to obstruct an SEC investigation (Paragraphs 21-23); or (iv) some combination thereof. The result would be a general verdict that does not reflect jury unanimity as to any specific criminal act. A conviction could stand even though no single theory commanded unanimous agreement. This problem is particularly acute for Paragraphs 21-23: the obstruction conduct occurred in May 2021, after the alleged fraud scheme concluded. A juror who doubts the fraud allegations might nonetheless credit the obstruction evidence as consciousness of guilt—and vice versa—producing a verdict without unanimity on any single theory.

While the Second Circuit has recognized that unanimity concerns can sometimes be addressed through careful jury instructions, *see Kandic*, 134 F.4th at 101, that remedy is appropriate only where the duplicity is unavoidable or discovered late in proceedings. Here, the duplicity is apparent on the face of the Indictment and can be corrected pretrial. The proper course is to remedy the defect now, rather than attempt a curative instruction that may prove inadequate at trial.

### b.    *Mr. Heppner Faces Double Jeopardy Prejudice*

The rule against duplicity also protects "against double jeopardy in subsequent prosecution." *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981). As the Second Circuit has held "[p]rinciples of equity prohibit the government from benefitting from [a] prejudicial ambiguity that the government alone was responsible for creating." *Sturdivant*, 244 F.3d at 77.

Because Counts One through Three incorporate conduct that is separately charged in Count Four and Five, Mr. Heppner cannot definitively establish which conduct would form the basis for any conviction—and therefore cannot establish which conduct is protected from future prosecution. Moreover, if the jury acquits on Count Four or Five but convicts on Counts One

through Three, an irreconcilable ambiguity would result: did the jury credit the auditor-deception or obstruction allegations when convicting on the fraud counts, even while acquitting on the corresponding charges? Such contradictory verdicts would be impossible to reconcile and would undermine the integrity of the proceedings.

## III.    THE COURT SHOULD DISMISS COUNT TWO OF THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE

Count Two charges Mr. Heppner with wire fraud based on alleged misrepresentations "about the origins of the Beneficient debt, the extent to which HEPPNER would benefit from repayments on the debt, and the extent to which HEPPNER directed entities that controlled the debt." ECF 3 ¶ 26. Even accepting these allegations as true, they do not state a wire fraud offense. The Indictment's own allegations establish that GWG's special committee approved equity investments in Beneficient with full knowledge that funds would be used to pay down Beneficient's debt obligations. The alleged misrepresentations concern only what would happen to those funds *after* they were used to repay Beneficient's creditor—in other words, how the proceeds of debt repayment would be allocated among downstream stakeholders. Under *United States v. Weimert*, such statements about the allocation of value among stakeholders are negotiating positions, not material facts, and cannot support a wire fraud conviction. *See* 819 F.3d 351, 354 (7th Cir. 2016). Count Two should be dismissed.

### A.    Legal Standard

A motion to dismiss under Fed. R. Crim. P. 12(b)(3) tests whether the indictment states an offense as a matter of law. The Court accepts the indictment's factual allegations as true and determines whether those allegations, if proven, would constitute the charged crime. *United States v. Sampson*, 371 U.S. 75, 78-79 (1962). An indictment that "fails to allege a crime" or whose

allegations, even if true, would not establish the essential elements of the crime must be dismissed. *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012).

To prove wire fraud under 18 U.S.C. § 1343, the government must establish that the defendant made a *material* false statement, misrepresentation, or promise. *Neder v. United States*, 527 U.S. 1, 25 (1999); *see also United States v. Calderon*, 944 F.3d 72, 85 (S.D.N.Y. 2019) (noting that wire fraud requires the government to prove "the *materiality* of a defendant's false statements or misrepresentations"). "Materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." *Neder*, 527 U.S. at 25. Where the indictment's own allegations demonstrate that the charged misrepresentations are not material as a matter of law, dismissal is warranted.

### B.    Argument

#### 1.    *United States v. Weimert* Establishes that Deception about Negotiating Positions Cannot Support Wire Fraud

Count Two should be dismissed under *United States v. Weimert*, which establishes that deception about negotiating positions cannot support wire fraud. In Weimert, a bank vice president negotiated the sale of his bank's interest in a real estate development but "deliberately misled" his board into believing the buyer would not close unless he was included as a minority partner. 819 F.3d at 353. The jury convicted him of wire fraud. *Id.* at 353-54.

The Seventh Circuit reversed and ordered acquittal, holding that "[d]eception about negotiating positions—about reserve prices and other terms and their relative importance—should not be considered material for purposes of mail and wire fraud statutes." *Id.* at 358. The court distinguished material fraud—misrepresentations about the transaction's subject matter that "materially alter one party's understanding of the subject of the deal"—from negotiating positions about a party's "opinions, preferences, priorities, and bottom lines," which "are

generally not considered statements of fact material to the transaction." *Id.* at 356, 358. The defendant's false statement "amounted to no more and no less than a false prediction" about the buyer's negotiating position. *Id.* at 366.

The holding is dispositive: "All terms of the transaction, including Weimert's participation as a buyer, were disclosed to all interested parties. The Government's evidence of deception do not address material facts or promises, but rather parties' negotiating positions." *Id.* at 364.

### 2.    The Alleged Misrepresentations Concern Negotiating Positions

Applying *Weimert*'s framework, Count Two fails to state an offense as a matter of law. Count Two alleges that Mr. Heppner made misrepresentations about three subjects: (i) "The origins of the Beneficient debt"; (ii) "The extent to which HEPPNER would benefit from repayments on the debt"; and (iii) "The extent to which HEPPNER directed entities that controlled the debt, including HCLP." ECF 3 ¶ 26. None of these alleged misrepresentations concerns the *terms* of what GWG received in the transactions it approved.

The alleged misrepresentations concern what would happen to funds *after* they flowed through Beneficient to its creditor. In other words, the alleged fraud relates to the downstream allocation of debt repayments among HCLP Nominees and its stakeholders—not the terms of the equity investments the special committee approved. This is precisely the type of "negotiating position" that *Weimert* held insufficient to support wire fraud. *Weimert*, 819 F.3d at 364. Whether Mr. Heppner would personally benefit from HCLP Nominees' receipt of debt payments concerns the allocation of value among downstream stakeholders. Alleged misrepresentations about the extent to which a defendant controlled or would benefit from entities involved in a transaction "are not different from *Weimert's* deception that his participation was necessary for the transaction to occur," and thus are not "material for purposes of wire fraud." *Id.* at 366; *see United States v. Filer*, 2021 WL 4318087, at *5 (N.D. Ill. Sept. 23, 2021) ("Gereg's failure explicitly to state that

Kelly's involvement could also include an interest in Capital going forward is not different from *Weimert's* deception that his participation was necessary for the transaction to occur. In both scenarios, the continued involvement of the interested party was readily apparent, even if the circumstances surrounding that involvement were not fully disclosed. For these reasons, step one of the alleged scheme was not fraud.").

The Indictment does not allege that Mr. Heppner misrepresented the *amount* of equity GWG would receive. The Indictment does not allege that Mr. Heppner misrepresented the *valuation* of Beneficient. The Indictment does not allege that Mr. Heppner misrepresented whether debt payment was a *permissible use* of the invested funds. And the Indictment does not allege that Mr. Heppner misrepresented the *priority or security* of GWG's investment position.

### 3. The Indictment's Own Allegations Establish that the Alleged Misrepresentations Concern Negotiating Positions

Applying *Weimert's* framework to the Indictment's own allegations demonstrates that Count Two fails to state an offense as a matter of law. According to the Indictment, the transactions at issue were investments by GWG in Beneficient:

- The special committee approved "additional equity investments in Beneficient or capital infusions." ECF 3 ¶ 6.

- In May 2019, "the special committee . . . authorized a $65 million unsecured loan to Beneficient." *Id*. ¶ 13(a).

- In late 2019, "HEPPNER sought an additional $79 million from GWG, this time structured as an equity investment in Beneficient." *Id*. ¶ 13(c).

- In 2020, "the GWG special committee approved a $61 million investment in Beneficient." *Id*. ¶ 13(d).

The Indictment further alleges that the special committee understood funds would be used to pay down Beneficient's debt:

- The special committee authorized investments "so Beneficient could make payments on the debt purportedly owed to HCLP." *Id*. ¶ 2.

- Beneficient used funds "to meet its supposed debt obligations." *Id*. ¶ 13(a), (d).

- Of the late 2019 investment, "nearly $50 million was designated for immediate transfer to pay down the HCLP debt." *Id*. ¶ 13(c).

- Of the 2020 investment, "approximately $28 million . . . was for debt payment." *Id*. ¶ 13(d).

Taking these allegations as true, the special committee was not deceived about whether GWG's funds would be used to repay Beneficient's debt to HCLP Nominees. The committee approved investments knowing that debt repayment was an intended use of proceeds.

The Indictment further contains no allegation that GWG received something different from what the special committee approved. The committee approved equity investments in Beneficient; GWG received equity in Beneficient. The committee approved that funds would be used for debt payment; the funds were used for debt payment. The Indictment does not allege, for example, that: (i) the investments were worth less than represented; (ii) Beneficient's debt was not actually paid as disclosed; (iii) the terms of the investments differed from what the committee approved; or (iv) GWG was deprived of the benefits of its bargain. The *Weimert* court noted that "IDI was not misled as to the nature of the asset it was selling or the consideration it received." 819 F.3d at 366. Here too, the Indictment does not allege that GWG was misled about the nature of the equity it was purchasing or the consideration it provided. The alleged misrepresentations concerned only who would ultimately benefit from debt repayments made by Beneficient—the internal allocation of funds within the creditor's corporate structure.

And the Indictment's acknowledgement of the special committee process further supports dismissal. The *Weimert* court addressed the argument that a corporate officer's fiduciary duties should heighten the standard for materiality. But even an officer with fiduciary duties may

"negotiate his or her own employment agreement as long as the process involves negotiations performed in an adversarial and arms-length manner." *Id.* at 368-69 (quoting *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 290 (Del. Ch. 2003). The Indictment itself establishes that GWG created such an adversarial process: "Because of the large overlap between GWG's and Beneficient's boards, GWG's board created a special committee, made up of independent members, to approve transactions between Beneficient and GWG." ECF 3 ¶ 6. The special committee existed specifically because of the conflicts between Mr. Heppner, GWG, and Beneficient. According to the Indictment's own allegations, GWG did not rely on Mr. Heppner to represent its interests in evaluating the Beneficient transactions. Instead, GWG established an independent body to conduct arm's-length review. Under *Weimert*, the existence of this adversarial structure supports treating the alleged deceptions as negotiating positions rather than material fraud.

Accepting the Government's theory, on the other hand, would mean that any time a corporate officer fails to disclose the ultimate beneficiaries of a transaction's proceeds, wire fraud liability would attach. Parties routinely do not disclose who will ultimately benefit from payments they receive, how funds will be allocated within their corporate structures, or what downstream stakeholders will do with transaction proceeds. Treating nondisclosure of such information as material fraud would "criminalize business conduct that is customary rather than exceptional and is relatively harmless." *Weimert*, 819 F.3d at 357 (quoting *United States v. Coffman*, 94 F.3d 330, 334 (7th Cir. 1996)).

Count Two does not allege misrepresentations about the terms of the transactions GWG approved—the equity investments, the amounts, or the permissible uses of funds. It alleges only

misrepresentations about downstream fund allocation within the creditor's structure.  As a matter of law, such allegations do not state a wire fraud offense and Count Two should be dismissed.

## IV.    THE COURT SHOULD DISMISS COUNT FOUR OF THE INDICTMENT BECAUSE IT FAILS TO STATE AN OFFENSE AND THE APPLICABLE LIMITATIONS PERIOD HAS ELAPSED

Count Four charges Mr. Heppner with making false statements to auditors, in violation of 17 C.F.R. § 240.13b2-2(a) ("Rule 13b2-2(a)").  ECF 3 ¶ 33.  Specifically, the Indictment alleges that Mr. Heppner made and caused others to make misrepresentations to Beneficient's auditor through the use of falsified and backdated documents during the course of an audit of GWG and Beneficient.  *Id.*  The fatal problem with this Count, however, is that  Rule 13b2-2(a) applies only to false statements made by a "director or officer of an issuer," and the allegations of the Indictment make clear that Mr. Heppner was not yet a director or officer of an issuer (*i.e.*, GWG) when he allegedly caused "falsified and backdated documents" to be provided to the auditor.  *Id.* ¶¶ 1, 2, 6, 16-20.   The Court should accordingly dismiss Count Four for failure to state an offense.  At the very least, the Court should dismiss the portion of Count Four that alleges Mr. Heppner violated Rule 13b2-2(a) by using falsified and backdated documents.

Count Four should also be dismissed because the applicable five-year statute of limitations elapsed, at the latest, in mid-2024, months before Mr. Heppner signed a tolling agreement and more than a year before the Indictment was returned.  The six-year statute of limitations in 18 U.S.C. § 3301 does not apply because false statements to auditors is not a "securities fraud offense" under the statute.

### A.    Factual Background

Count Four ("False Statements to Auditors") charges Mr. Heppner with a criminal violation of Rule 13b2-2(a).  ECF 3 ¶¶ 32-33.  Count Four also charges Mr. Heppner with a violation of 15 U.S.C. § 78ff, which criminalizes the "willful violat[ion] [of] any . . .  rule or regulation [of the

1934 Exchange Act] the violation of which is made unlawful or the observation of which is required under the terms of [the 1934 Exchange Act]." *Id.* ¶ 33.

Paragraphs 16-20 of the Indictment set forth several alleged "Lies to Auditors" that Mr. Heppner purportedly made. Some of these alleged lies involved using falsified and backdated documents:

- "[I]n or about **early 2019** . . . HEPPNER approached his childhood friend and asked him to serve as manager of HCLP. HEPPNER then created backdated paperwork that falsely represented that HEPPNER's friend had been acting as manager of HCLP since in or about July 2017. HEPPNER also created fake emails that appeared to have been exchanged between HEPPNER and his friend-turned-manager between September 2017 and December 2018, giving the false impression that the friend had been making decisions for HCLP and its related entities since 2017. And HEPPNER worked with others to draft a letter, which falsely asserted that the friend had independently supervised HCLP and its related entities since 2017." ECF 3 ¶ 18 (emphasis added).

- "BRADLEY HEPPNER, the defendant, engaged in a similar series of lies to demonstrate the independence of another one of his associates. **During the same week he created false documents concerning HCLP**, HEPPNER directed an associate to prepare misleading letters and fraudulent emails for the auditor to make it appear that the associate acted independently of HEPPNER. **In or about early February 2019**, in coordination with HEPPNER, the associate created a backdated email and fake letter that appeared to substantiate that the associate had been conducting independent oversight of the Beneficient-associated trusts. BRADLEY HEPPNER, the defendant, directed Beneficient employees to send these false and misleading materials to the auditor." *Id.* ¶¶ 19-20 (emphasis added).

The Defense does not dispute—and it does not believe the Government will dispute—that the conduct underpinning the allegations above occurred in February 2019.

The Indictment also alleges one purported "lie" that Mr. Heppner made to auditors that did not involve using falsified and backdated documents. Paragraph 20 of the Indictment alleges that Mr. Heppner "also sent a signed representation letter to the auditor in which he falsely represented that he had no knowledge of fraud involving Beneficient management and that Beneficient had provided the auditor with all relevant information." *Id.* ¶ 20. The defense does not dispute—and

it does not believe the Government will dispute—that the conduct underpinning this false-certification allegation occurred in June 2019.

The "Statutory Allegations" portion of the Indictment for Count Four alleges that, "[i]n or about 2019," Mr. Heppner "made, and caused others to make, affirmative misrepresentations to Beneficient's auditor, including through the use of falsified and backdated documents, during the course of an audit of GWG and Beneficient." *Id.* ¶ 33. The Statutory Allegations portion of the Indictment specifies that Mr. Heppner is charged with violating only subsection (a) of Rule 13b2-2.

Subsection (a) of Rule 13b2-2 applies only to a "director or officer of an issuer." 17 C.F.R. § 240.13b2-2(a) ("No director or officer of an issuer shall, directly or indirectly . . . .").

With regard to when Mr. Heppner became an officer or director of an issuer, the Indictment alleges that Mr. Heppner "installed himself as the chairman of GWG's board of directors" "in or about April 2019." ECF 3 ¶ 6. The defense does not dispute—and it does not believe the Government will dispute—that the first time Mr. Heppner became an officer or director of an issuer (GWG) was on April 26, 2019.[3]

On December 20, 2024, Mr. Heppner executed a tolling agreement with the Government. Ex. B (the "Tolling Agreement"). The Tolling Agreement applies to, among other charges, violations of 17 C.F.R. § 240.13b2-2 and 15 U.S.C. § 78ff. *Id.* ¶ 1. The Tolling Agreement operates to toll the statute of limitations for a criminal violation of Rule 13b2-2, among other

---

[3] Documents produced in discovery in this matter confirm that Mr. Heppner first became a director of GWG on April 26, 2019. *See* Ex. A, GWG Holdings, Inc., Form 10-K (Dec. 31, 2018), at 65. Pursuant to Fed. R. Evid. 201, Mr. Heppner respectfully requests that the Court take Judicial Notice of GWG Holdings, Inc., Form 10-K (Dec. 31, 2018), attached hereto as Ex. A. It is well established that courts "may take judicial notice of" such documents, a public disclosure document required by law to be filed with the SEC. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 773-74 (2d Cir. 1991).

offenses, "beginning on the date of [the] agreement and running through and including one year from the date of [the] agreement." *Id.* Finally, the Tolling Agreement provides that it "shall not be construed as a waiver of any other right or defense that Heppner may have, including the statute of limitations, if applicable, to periods of time not included in the specific aforesaid period." *Id.* ¶ 3.

The Indictment in this case, which included Count Four, was first docketed on October 28, 2025. ECF 3.

### B.    Legal Standard

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits," including that the indictment fails "to state an offense." Fed. R. Crim. P. 12(b)(1) & (3)(B)(v). A court can resolve a dispute "without trial of the general issue" when a motion to dismiss an indictment is made solely upon an issue of law, and not fact. *United States v. Heicklen*, 858 F. Supp. 2d 256, 276 (S.D.N.Y. 2012). "[W]here facts are undisputed, the Court may dismiss an indictment based on the legal insufficiency of the charges." *United States v. Gotti*, 457 F. Supp. 2d 411, 421 n.56 (S.D.N.Y. 2006).

A defendant may also "move under Rule 12(b) to dismiss an indictment for alleged violations of the statute of limitations, and a court may decide such motion when the arguments can be analyzed from the face of the indictment without resorting to any determination of evidentiary questions." *United States v. Colello*, 2022 WL 220216, at *2 (S.D.N.Y Jan. 25, 2022) (internal citations and quotations omitted). "Where, however, the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial to satisfy the jurisdictional element of the offense, a district court may evaluate the sufficiency of the evidence . . . on a pretrial motion to dismiss an indictment." *United States v. Scully*, 108 F. Supp 3d 59, 133

(E.D.N.Y. 2015) (internal citations and quotations omitted).  "Indeed, it would be a waste of judicial resources to conduct a trial, only to rule on a post-trial motion that the government's theory of criminal liability fails, no matter what facts it was able to establish a trial."  *United States v. Heicklen*, 858 F. Supp. 2d 256, 262 n.5 (S.D.N.Y 2012).

Courts have routinely dismissed counts in an indictment on a pretrial motion to dismiss where the underlying conduct, as alleged in the indictment, falls outside the applicable statute of limitations.  *See, e.g., United States v. Carollo*, 2011 WL 3875322, at *1-2 (S.D.N.Y. Aug. 25, 2011) (rejecting government's argument that a ten-year limitations period should apply to wire fraud count and dismissing count where the indictment failed to allege conduct within the applicable five-year limitations period).

Where a criminal charge is dismissed because it falls outside the applicable statute of limitations, the dismissal should be with prejudice, as there are no set of facts or circumstances which could revive conduct that is otherwise time-barred.  *Hilbert v. Dooling*, 476 F.2d 355, 361 (2d Cir. 1973) (criminal charges must be dismissed "with prejudice where . . . [the] prosecution is time barred by the statute of limitations").

## C.    Argument

### 1.    The Court Should Dismiss Count Four Because it Fails to Allege an Offense

The Court should dismiss Count Four because the charged offense—false statements to auditors, in violation of Rule 13b2-2(a)—applies only to false statements made by a "director or officer of an issuer," and the false statements that Mr. Heppner is alleged to have made occurred <u>before</u> he became a director officer of an issuer.  It therefore does not allege a crime.

Count Four charges Mr. Heppner with violating only subsection (a) of Rule 13b2-2.  ECF 3 ¶ 33.  Subsection (a) of Rule 13b2-2 applies only to a "director or officer of an issuer."  *See* 17

C.F.R. § 240.13b2-2(a).  Thus, to be guilty of violating Rule 13b2-2(a), a defendant must have made false statements to an auditor while he was an officer or director of an issuer.  *See id.*

Count Four, however, charges Mr. Heppner with false statements that he is alleged to have made to auditors before he became an officer or director of an issuer.  Specifically, the Indictment alleges that Mr. Heppner "made, and caused others to make, affirmative misrepresentations to Beneficient's auditor, *including through the use of falsified and backdated documents*, during the course of an audit of GWG and Beneficient."  ECF 3 ¶ 33 (emphasis added).  But the Indictment alleges, and the Government will not dispute, that all alleged misrepresentations to auditors by Mr. Heppner using "falsified and backdated documents" occurred in February 2019, approximately two months *before* Mr. Heppner became a director of GWG.  *See id.* ¶¶ 6, 17-20.  The Indictment further alleges, and the Government will not dispute, that GWG was an issuer, whereas Beneficient was not.  *See id.* ¶¶ 1, 2, 16.  Count Four should accordingly be dismissed.

The fact that the Indictment alleges—in a single sentence buried in the middle of the document—that Mr. Heppner submitted a false certification letter to auditors after he became a director of GWG does not alter this analysis.  The Indictment's "Statutory Allegations" regarding Count Four make clear that the charged lies to auditors revolve around "the use of falsified and backdated documents," not false certifications.  *See* ECF 3 ¶ 33.  Because those alleged false statements using "falsified and backdated documents" occurred before Mr. Heppner became a director of an issuer, Count Four must be dismissed.

At the very least, the Court should dismiss the portions of Count Four that allege Mr. Heppner violated Rule 13b2-2(a) by using "falsified and backdated documents."  As discussed at length, Mr. Heppner's alleged misrepresentations to auditors using falsified and backdated documents all occurred before he became a director or officer of an issuer—and thus could not

violate Rule 13b2-2(a).  The Court must therefore dismiss these portions of Count Four, lest the jury believe (wrongly) that it may convict Mr. Heppner on alleged false statements that cannot constitute a crime under the regulation and statute charged.

**2.    The Court Should Dismiss Count Four Because the Applicable Limitations Period Has Elapsed**

First, Count Four is time barred under 18 U.S.C. § 3282, the general five-year statute of limitations statutes applicable to federal criminal offenses, because the conduct underpinning Count Four took place five years after the Indictment was returned in this case, inclusive of tolling.

Second, Count Four is not saved by 18 U.S.C. § 3301, which contains a six-year statute of limitations for securities fraud offenses.  This is because a criminal violation of Rule 13b2-2(a), which Count Four charges, is not a qualifying "securities fraud offense" under 18 U.S.C. § 3301.

As a result, Count Four should be dismissed, with prejudice, because it falls outside the applicable statute of limitations.

*a.    Count Four is Time-Barred by 18 U.S.C. § 3282*

The general statute of limitations for criminal offenses is 5 years.  18 U.S.C. § 3282 ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.").  The Indictment, which contains Count Four, was docketed on October 28, 2025.  ECF 3.

Under § 3282, Count Four is time-barred.  This is because the offense conduct supporting Count Four occurred in February and June of 2019, and criminal charges were initiated on October 28, 2025.  Without the tolling agreement, the Government had until June 2024 (five years) to initiate criminal charges.  Even with an additional one year of tolling provided under the Government's agreement with Mr. Heppner—which does not apply because it was executed in

December 2024, after the five-year limitations period had expired—the Government had until June

2025 to initiate criminal charges. *See* Ex. B. It failed to do so, and, as a result, Count Four should

be dismissed, with prejudice. *See United States v. Swetz*, 2019 WL 545005, at *4 (D. Nev. Jan.

2, 2019), *report and recommendation approved*, 2019 WL 539022 (D. Nev. Feb. 11, 2019)

(dismissing three counts of indictment with prejudice where counts were barred by statute of

limitations).

> **b.  Count Four Does Not Charge a "Securities Fraud Offense" and, as a Result, 18 U.S.C. § 3301 Does Not Apply**

Title 18, United States Code, Section 3301 provides: "No person shall be prosecuted, tried,

or punished for a securities fraud offense, unless the indictment is found or the information is

instituted within 6 years after the commission of the offense." *Id*. Section 3301 defines "securities

fraud offense" as a "violation of, or a conspiracy or attempt to violate" the following: (a) 18 U.S.C.

§ 1348 ("Securities and Commodities Fraud"); (b) 15 U.S.C. § 78ff(a) (the criminal penalty

provision of the Securities Exchange Act of 1934); (c) 15 U.S.C. § 77x (the criminal penalty

provision of the Securities Act of 1933); (d) 15 U.S.C. § 80b-17 (the criminal penalty provision of

the Investment Advisors Act of 1940); (e) 15 U.S.C. § 80a-48 (the criminal penalty provision of

the Investment Company Act of 1940); and (f) 15 U.S.C. § 77yyy (the criminal penalty provision

of the Trust Indenture Act of 1939).

The defense expects the Government to argue that 18 U.S.C. § 3301 extends to criminal

violations of Rule 13b2-2(a) because the offense charged in Count Four expressly includes, as it

must for the violation to be a criminal offense, a reference to the criminal penalty provision of the

Securities Exchange Act of 1934—15 U.S.C. § 78ff(a). ECF 3 ¶ 33. And it is this statutory

provision—15 U.S.C. § 78ff(a)—which is cited in 18 U.S.C. § 3301 as a "securities fraud offense."

18 U.S.C. § 3301(a)(2). As a result, the Government likely will argue that a criminal violation of

Rule 13b2-2(a) (Count Four) is covered by 18 U.S.C. § 3301, subject to a six-year statute of limitations, and thereby timely in this case because the Indictment was returned on October 28, 2025—within six years from the date of the offense (inclusive of one of year of tolling under the Tolling Agreement). This analysis, however, is incorrect.

For the following reasons, a criminal violation of Rule 13b2-2(a) <u>is not</u> a qualifying "securities fraud offense" under 18 U.S.C. § 3301. Simply put, Rule 13b2-2(a) does not require "fraud." As a result, any alleged criminal violation of Rule 13b2-2(a) is not subject to the six-year statute of limitations provided under 18 U.S.C. § 3301.

First, and as a threshold matter, 18 U.S.C. § 3301 is titled "Securities *fraud* offenses," and it extends to six-years the statute of limitations applicable only to a "securities *fraud* offense." 18 U.S.C. § 3301 (emphasis added). By contrast, Rule 13b2-2 is, by its plain terms, a false statements offense and not a fraud-based offense.

The title of Rule 13b2-2 reads: "Representations and conduct in connection with the preparation of required reports and documents." 17 C.F.R. § 240.13b2-2. The specific provision with which Mr. Heppner has been charged—subsection (a)—renders unlawful making, or causing to be made, "a materially false or misleading statement to an accountant" or omitting to state, or causing another person to omit to state to an accountant, "any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading." 17 C.F.R. § 240.13b2-2(a). There is no language in Rule 13b2-2(a) that requires the defendant to act with the purpose or intent to obtain money or property—a bedrock requirement of fraud.

The U.S. Supreme Court has clearly distinguished false statements offenses from fraud offenses, stating: "The statement of the offenses [in this case] carries with it the charge of inducing

or attempting to induce the payment of a claim for *money or property* involving the element of deceit that is the *earmark of fraud*. . .  The false statement clause [of the FCA] contains no such ingredient." *United States v. Grainger*, 346 U.S. 235, 243 (1953) (emphasis added); *United States v. Bridges*, 346 U.S. 209, 221 (1953) (holding that the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287, which tolls the statute of limitations over "fraud or attempted fraud" against the United States, applies only to offenses "involving defrauding the United States in any *pecuniary manner* or in a manner concerning *property*") (emphasis added); *see also United States v. Doost*, 2019 WL 1560114, at *13 (D.D.C. Apr. 10, 2019) (finding that the Wartime Suspension of Limitations Act did not operate to toll the statute of limitations over violations of 22 U.S.C. § 3287—"Making False Statements on a Loan Application"—because this criminal offense "required proof of fraud to secure a conviction").

Here, because there is no money or property element contained in Rule 13b2-2(a) or even the whole of Rule 13b2-2, Count Four is merely a false statements offense, not a "securities fraud offense," and is not subject to the six-year limitations period contained in 18 U.S.C. § 3301.

Second, there is no reported precedent (of which the defense is aware) in which a court has adjudicated or addressed whether 18 U.S.C. § 3301 operates to extend the statute of limitations to six years for an alleged criminal violation of Rule 13b2-2.  The Government's attempt in this case to extend a six-year statute of limitations to Rule 13b2-2(a) is novel.

Third, every reported case (of which the defense is aware) in which Section 3301 has been successfully charged and relied upon by the Government to extend the statute of limitations to six years involve plainly criminal *fraud* violations: (a) 18 U.S.C. § 1348 ("Securities and

29

Commodities Fraud")[4]; (b) 17 C.F.R. § 240.10b-5 ("Manipulative and Deceptive Devices")[5]; (c) 15 U.S.C. § 80b-6 ("Prohibited Transactions by Investment Advisors")[6]; and (d) 15 U.S.C. § 77q(a) ("Fraudulent Interstate Transactions")[7]. This is because the securities violations at issue in these cases are grounded in fraud.  *See Grainger*, 346 U.S. at 243; *Bridges*, 346 U.S. at 221.

Fourth and finally, if a criminal violation of Rule 13b2-2(a) is a "securities fraud offense" and thereby subject to Section 3301's six-year statute of limitations, every willful violation of any federal securities law, rule, or regulation that exists under the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisors Act of 1940, the Investment Company Act of 1940, and the Trust Indenture Act of 1939 is a qualifying "securities fraud offense" and thereby subject to a six-year statute of limitations under 18 U.S.C. § 3301.  This is not, and cannot, be the case.  There is a reason why only certain securities offenses have been charged and adjudicated under Section 3301; the limiting principle is "fraud."

Properly understood, 18 U.S.C. § 3301 covers only criminal securities violations that sound in fraud and require, as an element of the offense, an intent to obtain some form of money or property.  Rule 13b2-2(a) contains no such requirement and, as a result, is not covered by 18 U.S.C. § 3301 and its six-year statute of limitations.

---

[4]    *United States v. Bases*, 2020 WL 2557342, at *10 (N.D. Ill. May 20, 2020); *United States v. Smith*, 525 F.3d 678, 635 (2d Cir. 1999)

[5]    *United States v. Jones*, 123 F.2d 56, 59 (2d Cir. 1990); *United States v. Ingarfield*, 2022 WL 16700068, at *2 (S.D.N.Y. Nov. 3, 2022); *United States v. Saint Clair*, 2021 WL 3076677, at *5 (S.D.N.Y. July 20, 2021); *United States v. Bergstein*, 2018 WL 2417845, at *8 (S.D.N.Y. May 29, 2018); *Mescall v. United States*, 2018 WL 325309, at *9 n.8 (W.D.N.C. Jan. 8, 2018); *United States v. Gentile*, 235 F. Supp. 3d 649, 656 (D.N.J. 2017).

[6]    *Bergstein*, 2018 WL 2417845, at *8.

[7]    *United States v. Lewis*, 2013 WL 6407885, at *6-7 (N.D. Tex. Dec. 9, 2013).

## V.    THE COURT SHOULD DISMISS COUNT FIVE FOR FAILURE TO ESTABLISH VENUE IN THE SOUTHERN DISTRICT OF NEW YORK

Count Five charges Mr. Heppner with falsifying board minutes "with the intent to impede, obstruct, and influence an investigation by the SEC," in violation of 18 U.S.C. § 1519.   ECF 3 ¶ 35.   The count should be dismissed because venue is improper here:   the alleged falsification occurred in Dallas; the SEC investigation was conducted from Chicago.   This District has no connection to Count Five.

### A.    Factual Background

According to the Indictment, in May 2021, Mr. Heppner "falsified Board minutes from October 2019 and misled members of Beneficient's and GWG's Boards into approving those minutes as accurate."   *Id*.   But, as relevant here, all relevant conduct underlying Count Five occurred in Texas.   Beneficient is headquartered in Dallas.   GWG was headquartered in Dallas. The October 10, 2019 board meeting occurred in Dallas.   The alleged falsification—an email Mr. Heppner sent on May 23, 2021 to Bruce Schnitzer (copying James Silk) with modified minutes attached—originated from Texas and was sent to Texas-based Beneficient executives.   And Mr. Heppner resides in Texas.   The Indictment does not identify any act of falsification occurring in this District.   It alleges only, in boilerplate language, that the conduct occurred "in the Southern District of New York and elsewhere."   *Id*.   This conclusory recitation is insufficient.

The SEC investigation that Mr. Heppner allegedly sought to obstruct was conducted by the SEC's Chicago Regional Office—not in New York.   On October 6, 2020, GWG received a subpoena "from the Chicago office of the SEC's Division of Enforcement."   *See* GWG Holdings, Inc., Form 10-K (Nov. 5, 2021), at 37 (Ex. C); *see also* ECF 3 ¶ 21 (noting GWG received SEC

subpoena in late 2020).[8]  The SEC's Chicago Regional Office has jurisdiction over enforcement matters in Illinois, Indiana, Iowa, Kentucky, Michigan, Minnesota, Missouri, Ohio, and Wisconsin—but, notably, not New York.  *See Chicago Regional Office*, U.S. SEC. & EXCH. COMM'N, https://www.sec.gov/about/regional-offices/chicago-regional-office (last visited Fe. 6, 2026).

### B.    Legal Standard

The Constitution requires that criminal trials "be held in the State where the said Crimes shall have been committed."  U.S. Const. art. III, § 2, cl. 3; *see also* Fed. R. Crim. P. 18.  The Sixth Amendment reinforces this protection, guaranteeing the accused a trial "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  Venue must be proper as to each count.  *United States v. Saavedra*, 223 F.3d 85, 89 (2d Cir. 2000).  The government bears the burden of proving venue.  *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).

On a pre-trial motion, the government must "allege with specificity that the charged acts support venue in this district."  *United States v. Martino*, No. S1 00 CR 389, 2000 WL 1843233, at *1 (S.D.N.Y. Dec. 14, 2000).  Conclusory allegations are insufficient.  *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998).  Where a statute lacks an express venue provision, venue is determined by "the nature of the crime alleged and the location of the act or acts constituting it."  *United States v. Anderson*, 328 U.S. 699, 703 (1946).  Courts identify the "essential conduct elements" of the

---

8    Pursuant to Fed. R. Evid. 201, Mr. Heppner respectfully requests that the Court take Judicial Notice of GWG Holdings, Inc., Form 10-K (Nov. 5, 2021), attached hereto as Ex C. It is well established that courts "may take judicial notice of" such documents, a public disclosure document required by law to be filed with the SEC. *See Kramer,* 937 F.2d at 773-74.

offense and locate where those acts occurred. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999).

### C.    Argument

Count Five of the Indictment should be dismissed because it fails to establish venue under 18 U.S.C. § 1519. Section 1519 lacks an express venue provision. Accordingly, venue "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Anderson*, 328 U.S. at 703. This requires the court to "identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *Rodriguez-Moreno*, 526 U.S. at 279. The "essential conduct elements" of the offense control. *United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002).

Two courts have addressed venue under § 1519. In *United States v. Abouammo*, the Ninth Circuit held that § 1519 creates a "continuing offense" that does not end with the obstructive act. 122 F.4th 1072, 1092-93 (9th Cir. 2024). Under this approach venue is permissible where the falsification occurred *or* where the obstructed investigation was based. *Id.* In *United States v. Fisher*, the court limited venue to the location of the falsification, reasoning that the "with the intent to" language describes *mens rea*, not an essential conduct element. No. 4:24-CR-10, 2025 WL 3723459, at *14-15 (N.D. Miss. Dec. 23, 2025). The Supreme Court granted certiorari in *Abouammo* on December 5, 2025, to resolve this question. *See Abouammo v. United States,* No. 25-5146, 2025 WL 3493156, at *1 (U.S. Dec. 5, 2025). The grant suggests doubt about the Ninth Circuit's approach.

The *Fisher* approach properly focuses on the location where the defendant physically falsified the document. Here, that location is unambiguously Texas: (i) The October 2019 board minutes were originally drafted in Dallas, (ii) the minutes were allegedly modified by Mr.

Heppner, who was located in Texas, (iii) the modified minutes were transmitted via email from Texas to Texas-based recipients, and (iv) no allegation suggests that Mr. Heppner was in New York when the alleged falsification occurred or that any document was modified in New York. Thus, under *Fisher*, venue lies only in the Northern District of Texas.  Even applying the Ninth Circuit's broader approach, venue remains improper.  *Abouammo* permits venue where the falsification occurred *or* where the obstructed investigation was based.  Neither location is the Southern District of New York.  As discussed above, the falsification occurred in Texas.  And, as to the SEC's investigation:  it was conducted by the SEC's Chicago Regional Office; an office that does not conduct investigations in this District.  Under *Abouammo*, venue would be proper in the Northern District of Texas (the location of the alleged falsification) or the Northern District of Illinois (the location of the obstructed investigation).  This District, on the other hand, has no connection to Count Five.[9]

       In its 17-page Indictment, the best the Government can muster with respect to Count Five's venue was an allegation that the conduct occurred "in the Southern District of New York and elsewhere," ECF 3 ¶ 35, which is exactly the sort of conclusory allegation the Supreme Court found insufficient in *Cabrales*.  524 U.S. at 6-7.  The Indictment identifies no specific act occurring in this District because none did—no document falsified here, no meeting held here, no email sent from or to here, no SEC investigation based here.  Simply put, the Southern District of New York

---

[9]    To the extent the Government intends to argue proper venue based on electronic transmission of the allegedly falsified minutes, this argument conflates § 1519 with wire fraud, 18 U.S.C. § 1343.  Wire fraud contains an express jurisdictional element requiring use of "wire, radio, or television communication in interstate or foreign commerce."  18 U.S.C. § 1343.  Section 1519 contains no such element.  Its focus is on the act of falsification, not transmission.  *See Rodriguez-Moreno*, 526 U.S. at 280 (venue depends on location of "essential conduct elements," not downstream effects).  The Government cannot bootstrap wire fraud venue principles into an obstruction statute that lacks any transmission element.

has no nexus to Count Five and, as a result, this count should be dismissed with prejudice for improper venue.

## <u>CONCLUSION</u>

For the reasons requested, Defendant respectfully requests that the Court grant Defendant's Omnibus Motions to (i) strike Paragraphs 3, 4, 10, 11, 13(a), and 15 from Count One of the Indictment pursuant to Federal Rule of Criminal Procedure 7(d); (ii) dismiss Counts One, Two, and Three of the Indictment as duplicitous; (iii) dismiss Count Two of the Indictment for failure to state an offense; (iv) dismiss Count Four of the Indictment for failure to state an offense and because the limitations period has elapsed, and (v) dismiss Count Five of the Indictment for failure to properly allege venue.

Respectfully submitted,

Dated:  February 6, 2026

By:  _/s/  Benjamin A. O'Neil_
Benjamin A. O'Neil
Robert Zink
Fritz Scanlon
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, DC 20005
(202) 538-8151
benoneil@quinnemanuel.com
robertzink@quinnemanuel.com
fritzscanlon@quinnemanuel.com

Christopher J. Clore
295 5th Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
christopherclore@quinnemanuel.com

*Counsel for Defendant Bradley Heppner*