```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    -v-<br><br>BRADLEY HEPPNER,<br><br>         Defendant. | 25 Cr. 503 (JSR)<br><br>MEMORANDUM |

JED S. RAKOFF, U.S.D.J.:

At a pretrial conference in this matter held on February 10, 2026, the Court, after hearing the arguments of counsel, granted from the bench the Government's motion for a ruling that certain written exchanges that defendant Bradley Heppner had with a generative artificial intelligence ("AI") platform were not protected from Government inspection by either the attorney-client privilege or the work product doctrine. See ECF No. 22 ("Gov't Mot."). This Memorandum sets forth the reasons for the Court's ruling.

I.   Background and Procedural History

Generative artificial intelligence tools have become increasingly prevalent across various domains of human activity. It has reliably been estimated, for instance, that more than half of United States households have adopted AI in some form. See Bond, Trends – Artificial Intelligence (2025), https://www.bondcap.com/report/pdf/Trends_Artificial_Intelligence.pdf at 59 (accessed February 12, 2026). Only three years after its release, one prominent AI platform is being used by more than 800 million people worldwide every week. Id. at 55. Yet the implications of AI for the law are only beginning to be explored.

1

Thus, the Court's ruling in this case appears to answer a question of first impression nationwide: whether, when a user communicates with a publicly available AI platform in connection with a pending criminal investigation, are the AI user's communications protected by attorney-client privilege or the work product doctrine?[1] For the reasons that follow, the answer is no.

On October 28, 2025, a grand jury in this District returned an indictment charging Heppner with securities fraud, wire fraud, conspiracy to commit securities fraud and wire fraud, making false statements to auditors, and falsifying corporate records. ECF No. 3. The indictment was unsealed on November 4, 2025, see ECF No. 4, and Heppner was arrested the following day in the Northern District of Texas. On November 10, 2025, Heppner pleaded not guilty before this Court to all the charges against him and was released on bond. See ECF Nos. 16, 18. Trial is set to commence April 6, 2026. See ECF No. 16.

The charges against Heppner arise from his alleged misconduct as an executive of several corporate entities, including the publicly traded company GWG Holdings, Inc. ("GWG"). See generally ECF No. 3. At a high level, the indictment charges that Heppner defrauded GWG's investors out of more than $150 million by making false representations about, and causing GWG to enter into undisclosed self-serving

---

[1] The Court is unaware of, and the parties have not identified, any case to date that has presented this issue. Most published decisions involving generative artificial intelligence have had to do with attorneys' misuse of that technology. That set of concerns is plainly not present here.

2

transactions concerning, two privately held companies that Heppner controlled, Beneficial Company Group, L.P. and Highland Consolidated L.P. See id. ¶¶ 1-3.

In connection with Heppner's arrest on November 4, 2025, agents with the Federal Bureau of Investigation executed a search warrant at Heppner's home and seized numerous documents and electronic devices. See Gov't Mot. at 3; ECF No. 23-1 at 1. Heppner's counsel later represented to the Government that among the seized materials were approximately thirty-one documents that memorialize communications that Heppner had with the generative AI platform "Claude," which is operated by the private company Anthropic. See Gov't Mot. at 3; ECF Nos. 23-1 23-2. According to Heppner's counsel, the documents represent communications between Heppner and Claude that took place "in 2025, after Mr. Heppner had received a grand jury subpoena [and] after it was clear with discussions with the government that Mr. Heppner was the target of this investigation." Transcript, February 10, 2026 ("Tr.") at 4. Without any suggestion from counsel that he do so, Heppner "prepared reports that outlined defense strategy, that outlined what he might argue with respect to the facts and the law that we anticipated that the government might be charging." Id. Thus, counsel asserted, Heppner "was preparing these reports in anticipation of a potential indictment." Id.

In exchanges with the Government, Heppner, through his counsel, asserted privilege over these documents (the "AI Documents"), arguing that (1) Heppner had inputted into Claude, among other things,

3

information that Heppner had learned from counsel; (2) Heppner had created the AI Documents for the purpose of speaking with counsel to obtain legal advice; and (3) Heppner had subsequently shared the contents of the AI Documents with counsel. See Gov't Mot. at 3-4, 11; ECF Nos. 23-2, 23-4, 23-5. Heppner's counsel conceded, however, that counsel "did not direct [Heppner] to run Claude searches." ECF No. 23-5. Pursuant to a "Privilege Protocol Stipulation," the Government and Heppner's counsel agreed that the Government would segregate the AI Documents and not inspect them pending the resolution of Heppner's claims of privilege, and Heppner's counsel listed the AI Documents in Heppner's privilege log. See Gov't Mot. at 3-4 & n.1; ECF Nos. 23-1, 23-2.

On February 6, 2026, the Government moved, in writing, for a ruling that the AI Documents are protected by neither the attorney-client privilege nor the work product doctrine. Gov't Mot. The Court heard oral argument on the Government's motion at the pretrial conference held on February 10, 2026, and, as noted, orally granted the motion.

## II. Attorney-Client Privilege

It is well established that the attorney-client privilege attaches to, and protects from disclosure, "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." United States v. Mejia, 655 F.3d 126, 132 (2d

4

Cir. 2011).[2] Courts construe the attorney-client privilege narrowly because it operates as an exception to the rule that "all relevant proof is essential" for a complete record and for "confidence in the fair administration of justice." In re Six Grand Jury Witnesses, 979 F.2d 939, 943 (2d Cir. 1992). See also, e.g., Calvin Klein Trademark Tr. v. Wachner, 198 F.R.D. 53, 55 (S.D.N.Y. 2000).

Applying these principles here, the AI Documents lack at least two, if not all three, elements of the attorney-client privilege. First, the AI Documents are not communications between Heppner and his counsel. Heppner does not, and indeed could not, maintain that Claude is an attorney. "In the absence of an attorney-client relationship, the discussion of legal issues between two non-attorneys is not protected by attorney-client privilege." E.g., In re OpenAI, Inc., Copyright Infringement Litig., 802 F. Supp. 3d 688, 699 (S.D.N.Y. 2025). Because Claude is not an attorney, see ECF No. 23-6, that alone disposes of Heppner's claim of privilege.

The Court is aware that some commentators have argued that whether Claude is an attorney is irrelevant because a user's AI inputs, rather than being communications, are more akin to the use of other Internet-based software, such as cloud-based word processing applications. But the use of such applications is not intrinsically privileged in any case, and the argument that Claude is like any other form of software

---

[2] Except where otherwise indicated, all quotations in this Memorandum omit citations, quotation marks, footnotes, brackets, ellipses, and other alterations in source material.

5

only cuts against the invocation of privilege because all "[r]ecognized privileges" require, among other things, "a trusting human relationship," such as, in the attorney-client context, a relationship "with a licensed professional who owes fiduciary duties and is subject to discipline." See Ira P. Robbins, Against an AI Privilege, JOLT Dig., Harvard L. Sch. (Nov. 7, 2025), https://jolt.law.harvard.edu/digest/against-an-ai-privilege. No such relationship exists, or could exist, between an AI user and a platform such as Claude.

Second, the communications memorialized in the AI Documents were not confidential. This is not merely because Heppner communicated with a third-party AI platform but also because the written privacy policy to which users of Claude consent provides that Anthropic collects data on both users' "inputs" and Claude's "outputs," that it uses such data to "train" Claude, and that Anthropic reserves the right to disclose such data to a host of "third parties," including "governmental regulatory authorities." See Anthropic, Privacy Policy (as of February 19, 2025), https://www.anthropic.com/legal/archive/ a2eecf43-807a-4a53-89dd-04c44c351138. The policy clearly puts Claude's users on notice that Anthropic, even in the absence of a subpoena compelling it to do so, may "disclose personal data to third parties in connection with claims, disputes[,] or litigation." Id. More generally, as another court in this District recently observed, AI users do not have substantial privacy interests in their "conversations with [another publicly accessible AI platform] which users voluntarily disclosed" to the platform and which the platform "retains in the normal course

6

of its business." In re OpenAI, Inc., Copyright Infringement Litig., No. 25 MD 3143, ECF No. 1021 at 3 (Jan. 5, 2026). For these reasons, Heppner could have had no "reasonable expectation of confidentiality in his communications" with Claude. See Mejia, 655 F.3d at 132-34. And the AI Documents are not like confidential notes that a client prepares with the intent of sharing them with an attorney because Heppner first shared the equivalent of his notes with a third-party, Claude. Cf. United States v. DeFonte, 441 F.3d 92, 95-96 (2d Cir. 2006) (per curiam).

Third, Heppner did not communicate with Claude for the purpose of obtaining legal advice. This issue perhaps presents a closer call because Heppner's counsel asserts that Heppner communicated with Claude for the "express purpose of talking to counsel." ECF No. 23-5. But, as Heppner's counsel also conceded, Heppner did not do so at the suggestion or direction of counsel. See id. (noting that counsel "did not direct [Heppner] to run Claude searches"). Had counsel directed Heppner to use Claude, Claude might arguably be said to have functioned in a manner akin to a highly trained professional who may act as a lawyer's agent within the protection of the attorney-client privilege. Cf. United States v. Adlman, 68 F.3d 1495, 1498-99 (2d Cir. 1995) (citing United States v. Kovel, 296 F.2d 918 (2d Cir. 1961)). But because Heppner communicated with Claude of his own volition, what matters for the attorney-client privilege is whether Heppner intended to obtain legal advice from Claude, not whether he later shared Claude's outputs with counsel. And Claude disclaims providing legal

7

advice. Indeed, when the Government asked Claude whether it could give legal advice, it responded that "I'm not a lawyer and can't provide formal legal advice or recommendations" and went on to recommend that a user "should consult with a qualified attorney who can properly assess your specific circumstances." ECF No. 23-6 at 1-2.

Thus, the communications between Heppner and Claude were not privileged at the time they took place.[3] Moreover, even assuming that Heppner intended to share these communications with his counsel and eventually did so, it is black-letter law that non-privileged communications are not somehow alchemically changed into privileged ones upon being shared with counsel. Thus, because the AI Documents "would not be privileged if they remained in [Heppner's] hands," they did not "acquire protection merely because they were transferred" to counsel. See Gould, Inc. v. Mitsui Min. & Smelting Co., Ltd., 825 F.2d 676, 679-80 (2d Cir. 1987).

III. Work Product Doctrine

Related to but distinct from the attorney-client privilege, the work product doctrine, "[a]t its core[,] . . . shelters the mental processes of the attorney, providing a privileged area within which

---

[3] At oral argument, Heppner's counsel suggested in passing that the AI Documents may be privileged because they "incorporated information that we had conveyed to Mr. Heppner over the course of our representation." Tr. at 3. But even if certain information that Heppner input into Claude was privileged, he waived the privilege by sharing that information with Claude and Anthropic, just as if he had shared it with any other third party. Further, in light of Anthropic's privacy policy discussed above, Heppner had no reasonable expectation that the inputs would not be shared with other third parties.

8

he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238 (1975). The doctrine "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial." In re Grand Jury Subpoenas Dated March 19, 2002, and August 2, 2002, 318 F.3d 379, 383 (2d Cir. 2003). As with the attorney-client privilege, the work product doctrine is not "lightly created nor expansively construed," id. (quoting United States v. Nixon, 418 U.S. 683, 710 (1974)), and the Second Circuit has repeatedly held that the doctrine's purpose "is not generally promoted by shielding from discovery materials in an attorney's possession that were prepared neither by the attorney nor his agents," id. (citing Matter of Grand Jury Subpoenas Dated Oct. 22, 1991, and Nov. 1, 1991, 959 F.2d 1158 (2d Cir. 1992)). The doctrine's availability in reference to materials in the possession of a client "depends upon the existence of a real, rather than speculative, concern that the thought processes of [the client's] counsel in relation to pending or anticipated litigation would be exposed." Matter of Grand Jury Subpoenas, 959 F.2d at 1167 (quoting Gould, 825 F.2d at 680).

The AI Documents do not merit protection under the work product doctrine because, even assuming, arguendo, that they were prepared "in anticipation of litigation," In re Grand Jury Subpoenas, 318 F.3d at 383, they were nevertheless not "prepared by or at the behest of counsel," id., nor did they reflect defense counsel's strategy, see Matter of Grand Jury Subpoenas, 959 F.2d at 1167. As to the former, Heppner's counsel confirmed that the AI Documents "were prepared by

9

the defendant on his own volition." Tr. at 5. That means that Heppner was not acting as his counsel's agent when he communicated with Claude. As to the latter, counsel conceded that while the AI Documents did "affect" counsel's strategy going forward, they did not "reflect" counsel's strategy at the time that Heppner created them. See id.

At oral argument, Heppner resisted these conclusions by relying on two authorities. The first, Federal Rule of Criminal Procedure 16(b)(2)(A), is inapplicable on its face. That rule provides that, where the Government provides a defendant with pretrial discovery and the defendant thereby becomes obligated to satisfy the Government's pretrial discovery requests, the defendant's obligation does not extend to "discovery or inspection of reports, memoranda, or other documents made by the defendant, or the defendant's attorney or agent, during the case's investigation or defense." Id. Here, however, the AI Documents were seized from Heppner, at the time of his arrest, pursuant to a search warrant the validity of which Heppner's counsel does not challenge. See Gov't Mot. at 3. The Government did not request them, and Heppner did not produce them, in pretrial discovery.

Heppner's second authority is Shih v. Petal Card, Inc., 565 F. Supp. 3d 557 (S.D.N.Y. 2021). In that case, a Magistrate Judge in this District authorized the plaintiff to withhold certain communications that she had with an individual who was then her lawyer, and later became her husband, that the plaintiff prepared in anticipation of litigation or for trial. The court held that the work product doctrine protected such communications, "regardless of whether [the

10

lawyer/husband] was acting as her counsel at the time, and without showing that another attorney 'directed the work.'" Id. at 574.

Shih, of course, is not binding on this Court, and this Court respectfully disagrees with its holding. As relevant here, the court in Shih principally concluded that the work product doctrine is not limited to materials prepared by or at the direction of an attorney. Id. But that conclusion undermines the policy animating the work product doctrine, which, as one of the cases cited in Shih explains, is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation.'" Parneros v. Barnes & Noble, Inc., 332 F.R.D. 482, 492 (S.D.N.Y. 2019) (quoting United States v. Adlman, 134 F.3d 1194, 1996 (2d Cir. 1998) (quoting, in turn, Hickman v. Taylor, 329 U.S. 495, 510-11 (1947))); see Shih, 565 F. Supp. 3d at 574 (citing Parneros). While it is true that the work product doctrine may apply to materials generated by non-lawyers, the Second Circuit has repeatedly stressed that the purpose of the doctrine is to protect lawyers' mental processes. See, e.g., In re Grand Jury Subpoenas, 318 F.3d at 383-85 (extensively describing doctrine's rationale and applying it to material "prepared by or for counsel"); Adlman, 134 F.3d at 1197 (similar); Adlman, 68 F.3d at 1500-02 (similar); Matter of Grand Jury Subpoenas, 959 F.2d at 1166 (doctrine "generally does not shield from discovery documents that were not prepared by the attorneys themselves, or their agents"); see also Bice v. Robb, 511 F. App'x 108, 110 (2d Cir. 2013) (summary

11

order) (declining to extend protection to documents "not the work product of an individual acting as [plaintiffs'] attorney").

Here, there is no dispute that Heppner acted on his own when he created the AI Documents. See ECF No. 23-5 (noting that defense counsel "did not direct [Heppner] to run Claude searches"); Tr. at 5 (confirming same). Because the AI Documents were not prepared at the behest of counsel and did not disclose counsel's strategy, they do not merit protection as work product.

IV. Conclusion

Generative artificial intelligence presents a new frontier in the ongoing dialogue between technology and the law. Time will tell whether, as in the case of other technological advances, generative artificial intelligence will fulfill its promise to revolutionize the way we process information. But AI's novelty does not mean that its use is not subject to longstanding legal principles, such as those governing the attorney-client privilege and the work product doctrine. Because Heppner's use of Claude fails to satisfy either of these rules, the AI Documents do not merit the protections Heppner has claimed.

New York, NY  
February 17, 2026

_____  
JED S. RAKOFF, U.S.D.J.