UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | **25 Cr. 503 (JSR)** |
| BRADLEY HEPPNER, | |
| Defendant. | |

# GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE DEFENDANT'S PRETRIAL MOTIONS

JAY CLAYTON
United States Attorney for the
Southern District of New York

Daniel G. Nessim
Alexandra N. Rothman
Kyle A. Wirshba
Assistant United States Attorneys
*Of Counsel*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

BACKGROUND ........................................................................................................................ 2

    I. The Defendant's Scheme to Defraud ...................................................................... 2

        A. The Creation of the HCLP Debt .................................................................. 3

        B. Heppner's Marketing of Beneficient to Investors ............................................ 4

        C. Heppner's Misrepresentations to the GWG Special Committee ...................... 4

        D. Heppner's Lies to the Auditor ....................................................................... 6

        E. Heppner's Falsified Board Minutes ............................................................... 7

    II. The Charges ......................................................................................................... 8

    III. Defense Motions ................................................................................................. 8

ARGUMENT .............................................................................................................................. 8

    I. The Court Should Deny the Defendant's Motion to Strike Language from the Indictment ... 8

        A. Applicable Law .............................................................................................. 9

        B. Discussion ...................................................................................................... 10

    II. The Court Should Deny the Defendant's Motions to Dismiss ............................. 14

        A. Applicable Law .............................................................................................. 14

        B. Counts One, Two, and Three Are Not Duplicitous ......................................... 15

        C. Count Two Properly Alleges Wire Fraud ....................................................... 18

        D. Count Four Properly Alleges False Statements to Auditors ........................... 22

        E. Count Five Properly Alleges Venue ............................................................... 29

CONCLUSION ........................................................................................................................... 34

**TABLE OF AUTHORITIES**

Page(s)

<u>**Cases**</u>

*Blockburger v. United States*, 284 U.S. 299 (1932)........................................................ 17

*Burgess v. United States*, 553 U.S. 124 (2008)............................................................ 27

*Costello v. United States*, 350 U.S. 359 (1956) ........................................................... 15

*Kousisis v. United States*, 605 U.S. 114 (2025) ........................................................... 21

*Neder v. United States*, 527 U.S. 1 (1999).............................................................. 12, 18

*Parker Drilling Mgmt. Svcs., Ltd. v. Newton*, 587 U.S. 601 (2019)............................. 27

*Pharaohs GC, Inc. v. U.S Small Business Admin.*, 990 F.3d 217 (2d Cir. 2021) ......................... 27

*Rayner v. E\*TRADE Fin. Corp*, 899 F.3d 117 (2d Cir. 2018)....................................... 13

*Romano v. Kazacos*, 609 F.3d 512, 521 (2d Cir. 2010)................................................. 13

*SEC v. DiMaria*, 207 F. Supp. 3d 343 (S.D.N.Y. 2016)................................................ 26

*SEC v. Espuelas*, 579 F. Supp. 2d 461 (S.D.N.Y. 2008) .............................................. 26

*SEC v. Standard*, No. 06 Civ. 7736 (GEL),
   2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ............................................................. 26

*SEC v. Zandford*, 535 U.S. 813 (2002) .................................................................. 12, 13

*United States v. Abouammo*, 122 F.4th 1072 (9th Cir. 2024)................................... 32, 33

*United States v. Bankman-Fried*, 680 F. Supp. 3d 289 (S.D.N.Y. 2023) ..................... 30

*United States v. Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000).................................. 9

*United States v. Brennan*, 183 F.3d 139 (2d Cir. 1999)............................................ 31, 33

*United States v. Brian*, 198 F.3d 255 (9th Cir. 1999) .................................................... 27

*United States v. Butler*, 351 F. Supp. 121 (S.D.N.Y. 2004) .......................................... 10

*United States v. Coffey*, 361 F. Supp. 2d 102 (E.D.N.Y. 2005)....................................... 9

*United States v. Courtright*, 155 F.4th 941 (7th Cir. 2025) ........................................................ 20

*United States v. Daugerdas*, 837 F.3d 212 (2d Cir. 2016) .......................................................... 14

*United States v. Daugerdas*, No. 09 Cr. 581 (WHP),
    2010 WL 4967878 (S.D.N.Y. Nov. 22, 2010) ...................................................................... 11

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ............................................................ 15

*United States v. Filer*, 56 F.4th 421 (7th Cir. 2022) ................................................................. 20

*United States v. Gabriel*, 920 F. Supp. 498 (S.D.N.Y. 1996) ...................................................... 15

*United States v. Gagalis*, No. 04-CR-126-0106-PB,
    2006 WL 931909 (D.N.H. Apr. 7, 2006) ............................................................................ 27

*United States v. Gonzales*, No. 09 Cr. 136 (D. Conn. Dec. 22, 2010) ......................................... 32

*United States v. Gonzalez*, No. 06 Cr. 726 (WHP),
    2008 WL 3914877 (S.D.N.Y. Aug. 26, 2008) ..................................................................... 17

*United States v. Gramins*, 939 F.3d 429 (2d Cir. 2019) ............................................................ 29

*United States v. Gunn*, 162 F.4th 319 (2d Cir. 2025) ................................................................ 17

*United States v. Helmsley*, 941 F.2d 71 (2d Cir. 1991) ............................................................. 12

*United States v. Johnson*, 323 U.S. 273 (1944) ....................................................................... 31

*United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007) ................................................................. 15

*United States v. Kandic*, 134 F.4th 92 (2d Cir. 2025) ............................................................... 16

*United States v. Kwok*, No. 23 Cr. 118 (AT),
    2024 WL 1407057 (S.D.N.Y. Apr. 2, 2024) ....................................................................... 18

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ........................................................... 18, 21

*United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) .................................................................. 21

*United States v. Maxwell*, 534 F. Supp. 3d 299 (S.D.N.Y. 2021) .............................................. 9, 10

*United States v. Milton*, No. 21 Cr. 478 (ER),
    2021 WL 5304328 (S.D.N.Y. Nov. 15, 2021) ..................................................................... 30

*United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) .............................................. 9, 10

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001)................................................................. 9, 10

*United States v. Naranjo*, 14 F.3d 145 (2d Cir. 1994)................................................................. 30

*United States v. Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010) ................................................. 30, 32

*United States v. Payne*, 591 F.3d 46 (2d Cir. 2010) .................................................................... 31

*United States v. Percoco*, No. 16 Cr. 776 (VEC),
   2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ......................................................................... 30

*United States v. Peterson*, 357 F. Supp. 2d 748 (S.D.N.Y. 2005) ................................................ 30

*United States v. Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y. Nov. 16, 2020) ...................................... 24

*United States v. Ralston*, No. 19 Cr. 774 (JSR),
   2022 WL 769257 (S.D.N.Y. Mar. 14, 2022) ........................................................................... 16

*United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005) ............................................................... 31

*United States v. Reed*, 773 F.2d 477 (2d Cir. 1985) .................................................................... 31

*United States v. Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003)............................................... 17

*United States v. Rowe*, 414 F.3d 271 (2d Cir. 2005) ................................................................... 31

*United States v. Saavedra*, 223 F.3d 85 (2d Cir. 2000) ............................................................... 31

*United States v. Scarpa*, 913 F.2d 993 (2d Cir. 1990)................................................................... 9

*United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014) .................................................... 10

*United States v. Stein*, 429 F. Supp. 2d 633 (S.D.N.Y. 2006) ..................................................... 30

*United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001)......................................................... 15, 16

*United States v. Sullivan*, No. 02 Cr. 1144 (VEC) (S.D.N.Y. Aug. 28, 2002) ............................. 27

*United States v. Torres*, No. 20 Cr. 608 (DLC),
   2021 WL 1947503 (S.D.N.Y. May 13, 2021) .......................................................................... 14

*United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989)........................................................... 16, 17

*United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999) ........................................................... 14

iv

*United States v. Vilar*, No. 05 Cr. 621 (RJS),
  2008 WL 4298545 (S.D.N.Y. Sept. 5, 2008)................................................................. 17

*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018)................................................... 15

*United States v. Wedd*, 993 F.3d 104 (2d Cir. 2021) ........................................ 14, 18, 25

*United States v. Weimert*, 819 F.3d  (7th Cir. 2016)................................. 18, 19, 20, 21

*Yale M. Fishman 1998 Ins. Tr. v. Gen. Am. Life Ins. Co.*, No. 11 Civ. 1284 (TPG),
  2013 WL 842642 (S.D.N.Y. Mar. 7, 2013) .............................................................. 13

**Statutes**

15 U.S.C. § 78c(a)(8) ..................................................................................................... 25

18 U.S.C. § 3237(a) ................................................................................................. 31, 33

18 U.S.C. § 3301(a) ....................................................................................................... 26

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat.
  1376 (2010)............................................................................................................... 28

**Rules, Regulations, and Administrative Materials**

17 C.F.R. § 240.13b2-2(a) ................................................................... 8, 23, 24, 25

Fed. R. Crim. P. 7(c)(1) ........................................................................................... 14

SEC Release No. 26050, Improper Influence on Conduct of Audit*s*,
  (May 20, 2003), 2003 WL 21148349 ...................................................................... 25

U.S.S.G. § 2B1.1(b)(17) ............................................................................................... 28

**PRELIMINARY STATEMENT**

Bradley Heppner, the founder and CEO of the Beneficient Company Group L.P., engaged in a fraudulent scheme to enrich himself by looting GWG Holdings, Inc., a public company, through a series of misrepresentations to GWG's board of directors and its investors. For years, Heppner caused GWG to make payments purportedly satisfying debts owed by Beneficient—a GWG subsidiary—to the Highland Consolidated Limited Partnership ("HCLP"), a shell company secretly controlled by the defendant himself. By falsely representing to GWG's board that Beneficient owed legitimate obligations to HCLP as an independent third-party lender, and concealing the true nature of his involvement, the defendant caused GWG to fund lavish real estate purchases, home improvements, and other personal expenses on his behalf. At trial, the Government will prove that the defendant repeatedly made these misrepresentations to prospective and current investors; that HCLP was not the independent lender he claimed it to be; and that the defendant used this scheme to systematically divert GWG's assets for his own personal enrichment

The defendant moves to dismiss each count of the Indictment and strike surplusage but none of the motions are legally or factually sound. *First*, this Court should deny as moot the motion to strike several paragraphs of the Indictment as surplusage because the Court will not submit the Indictment to the jury. In any event, the paragraphs the defendant seeks to strike are probative of the fraud scheme the Government has alleged and intends to prove at trial.

*Second*, this Court should deny the motion to dismiss Counts One, Two, and Three of the Indictment as duplicitous because each count alleges a separate offense, which is all that is required to defeat a duplicity challenge.

*Third*, the defendant also seeks to dismiss Count Two for failure to state an offense. But Count Two more than satisfies the limited requirements of a proper pleading, and the defendant places far too much weight on a narrow, out-of-Circuit decision to argue otherwise.

*Fourth*, the defendant seeks to dismiss Count Four for failure to state an offense or, in the alternative, as time-barred. Both contentions are wrong. Count Four is properly charged and timely.

*Fifth*, the defendant seeks to dismiss Count Five for lack of venue. But Count Five properly alleges venue in the Southern District of New York, which is all that is required at this stage. The defendant's factual claims are also wrong. The determination of venue should be left to the jury.

The defendant's motions should be denied.

**BACKGROUND**

I.  The Defendant's Scheme to Defraud

The defendant was the founder and CEO of Beneficient, a financial services company. Between at least 2018 and 2021, the defendant made, and caused to be made, misrepresentations and omissions to GWG's board and other prospective investors in Beneficient concerning a debt that Beneficient owed to a purported lender, HCLP and its subsidiaries. Through this scheme, the defendant stole approximately $300 million from GWG, a public company for which the defendant also served as Chairman of the Board of Directors. The defendant personally received from GWG more than $150 million, which flowed through HCLP to several entities and trusts under the control of the defendant. The defendant, in turn, used this money to fund his extravagant lifestyle, including the payment of more than $40 million to renovate and furnish his Dallas mansion and more than $10 million for his personal credit card and private air travel expenses. Meanwhile,

2

GWG's bondholders, who thought their investments were secure, were left holding worthless bonds.

A.   The Creation of the HCLP Debt

Before launching Beneficient, in the early 2000s, the defendant sold a private equity business to Lehman Brothers for approximately $150 million. The defendant deposited the proceeds from the sale into HCLP and then used those proceeds for personal expenses, including the purchase and development of a large Texas ranch, and the means to develop various business ideas. One business idea the defendant developed was for Beneficient, which he marketed as a way of providing liquidity to holders of generally illiquid private equity investments.

Because Beneficient required capital to purchase these illiquid private equity investments, the defendant sought outside investments in his business. But the defendant first wanted to get paid back for the more than $100 million he had spent out of HCLP. In 2014, at the defendant's direction, a long-time employee, Jeff Hinkle, tallied up old, informal personal and business payments that the defendant had made out of HCLP, and papered these expenditures as debts Beneficient owed HCLP. Three years later, shortly before Beneficient purchased the assets of Paul Capital, another investment firm, the defendant caused this "debt" to be formalized as a $141 million loan to Beneficient from HCLP, which the defendant described as a third-party lender.

For most of its existence, HCLP was controlled by the defendant directly. But, as described in greater detail below, as the defendant faced increasing questions concerning his relationship with HCLP, Heppner took steps to create an appearance of distance between himself and HCLP. Among other things, the defendant appointed a childhood friend and distant cousin, Keith Martens, to serve as manager of HCLP. When the defendant realized that Martens's lack of qualifications for the role and long history with the defendant were likely to raise red flags, the defendant turned

3

to a former business associate, David Wickline, to serve as HCLP's new manager. But Martens and Wickline were frontmen for the defendant and acted, at best, as rubber stamps, permitting the defendant to wield de facto control over HCLP's actions and use of funds.

### B. Heppner's Marketing of Beneficient to Investors

In 2014, the defendant began seeking outside investments in Beneficient. But potential investors had concerns about the large amount of debt on the company's books and its connection to the defendant. In response, the defendant concocted a story to tell investors: the debt came from an independent third-party family, the Harmon Family, that had made a seed investment in Beneficient, and that repayment on the debt would go to that family's trust.

In 2018, the defendant sought investments in Beneficient from two investment firms, Oaktree and Infinedi. Both firms questioned the defendant about whether he controlled HCLP or would benefit from repayment of the debt. The defendant misled both firms about the defendant's control over, and the extent to which he would benefit from repayments on, the debt. Both investors decided not to invest.

The defendant then turned his attention to GWG, a public company with the ability to raise large amounts of capital by selling "L Bonds," a type of life insurance backed security, to retail investors. Investors purchased L Bonds, believing that GWG and Beneficient would be successful and would pay returns on their bonds. In 2018, GWG took an equity interest in Beneficient. In 2019, through an additional transaction, the defendant took control of GWG, appointing himself as Chairman and replacing GWG's existing directors with Beneficient directors.

### C. Heppner's Misrepresentations to the GWG Special Committee

Because the defendant and others were on the boards of both Beneficient and GWG, GWG's board created a special committee of non-conflicted directors to assess potential deals

4

between the two companies. Between 2019 and 2021, the defendant repeatedly sought approval from the GWG special committee for investments in Beneficient, including to pay off the HCLP debt.

In May 2019, the defendant informed GWG's special committee that Beneficient required an immediate capital infusion. The special committee, in turn, authorized a $65 million unsecured loan to Beneficient based on the defendant's representations that the debt on Beneficient's books was a debt owed to a third-party lender. In connection with this transaction, the defendant concealed his connection to the HCLP debt and deliberately omitted his personal interest.

After this transaction, GWG's and Beneficient's directors began asking escalating questions about the purported debt. In the face of this pressure, the defendant arranged for David Wickline to take over the role of managing HCLP from Keith Martens. Notwithstanding Wickline's appointment, the defendant maintained control of HCLP. To obscure this fact, and ignoring the duties he owed to GWG and its board, the defendant backdated documents and helped prepare a letter for a group of Beneficient and GWG directors that made multiple false assertions: that the defendant had no control over HCLP; that most of payments would go to the Harmon Family's trust; that the defendant was only a minor contingent possible beneficiary; and that the defendant had only an extremely minimal possibility of receiving any payments from HCLP.

In late 2019, the defendant sought the GWG special committee's approval of an additional $79 million cash infusion to Beneficient from GWG, including $50 million earmarked specifically to pay down the HCLP debt. Again, the defendant misrepresented, and caused others to misrepresent, that the defendant did not control HCLP; that the defendant would not receive repayments on the debt; that the defendant had an arm's length relationship with Wickline; and that Wickline had demanded that HCLP receive a $50 million payment to waive a default provision

under the credit agreement. The GWG special committee authorized the transfer of funds to Beneficient in exchange for shares of Beneficient.

In 2020, in exchange for Beneficient shares, the GWG special committee approved an additional $61 million investment in Beneficient, at least approximately $28 million of which was specifically for HCLP debt payment. As before, the defendant gave the misimpression that these demands originated with Wickline when, in reality, the demands originated with the defendant. The special committee approved the cash transfer from GWG to Beneficient upon this misimpression, as well as the understanding that HCLP was independent of Heppner and the defendant would not benefit from debt repayments. Between July 2020 and March 2021, GWG made additional investments in Beneficient, often without consulting the special committee. Beneficient continued to use large portions of those funds to pay down the debt.

In total, the defendant received more than $150 million from GWG, which flowed from Beneficient through HCLP to several entities and trusts under the control of the defendant, and which the defendant used to pay his personal expenses.

D.  Heppner's Lies to the Auditor

Meanwhile, by the end of 2018, because GWG held a large interest in Beneficient, Beneficient's audited financials were required to be incorporated into GWG's 2018 annual report on Form 10-K. Deloitte, Beneficient's auditor, had to consider whether HCLP was independent of Heppner and Beneficient, and whether one of the people the defendant had installed to run trusts associated with Beneficient, Murray Holland, was also independent of Beneficient. Neither was true. But revealing the defendant's control over Holland and HCLP risked disfavored accounting conclusions, and exposing the defendant's fraud would have prevented him from later demanding

payments on the HCLP debt. To avoid that result, the defendant made false and misleading statements and prepared false documents to deceive Deloitte.

Specifically, and as noted above, in early 2019, the defendant approached Martens and asked him to serve as manager of HCLP. The defendant then created, and caused to be created, backdated paperwork, fake emails, and a fraudulent letter that falsely represented, among other things, that Martens had been acting as an independent manager of HCLP since July 2017. The defendant also created, and caused to be created, false documents to demonstrate the purported independence of Holland. The defendant directed Beneficient employees to send these false and misleading materials to Deloitte. By the end of the audit, in June 2019, the defendant also signed a fraudulent representation letter.

### E.   Heppner's Falsified Board Minutes

In late 2020, GWG received a subpoena from the SEC in connection with the SEC's investigation of GWG and Beneficient. As part of the investigation, the SEC requested information and documents concerning HCLP, including the defendant's relationship with HCLP and HCLP's use of funds. In April 2021, the SEC held a meeting with GWG and Beneficient, which the defendant attended. After the meeting, the SEC sent a list of questions to GWG, including a request for GWG to describe any and all compensation, incentive payments, loan repayments, or other payments of any kind which the defendant or his family received from HCLP, among other entities. In response, the defendant informed certain Beneficient employees, for the first time, that he had received millions as part of what he described as a longstanding lending relationship with HCLP.

To give the impression that the defendant had previously disclosed this receipt of funds from HCLP, the defendant falsified minutes from an October 2019 meeting of the Enterprise Risk Committee of the Beneficient Board of Directors, adding language to the minutes to make it appear

that he had disclosed to Beneficient's board that he had a "long-time financial relationship" with HCLP. The defendant then caused members of Beneficient's and GWG's boards, including at least one board member located in Manhattan, New York, to bless the minutes. In truth, the defendant had never disclosed this information to the Beneficient board and, the original minutes and related contemporaneous notes from the Enterprise Risk Committee meeting in October 2019 did not reflect any language about that lending relationship. The defendant then caused the falsified minutes, and other related information, to be submitted to the SEC.

## II.  The Charges

A grand jury sitting in this District returned Indictment 25 Cr. 503 (JSR) (the "Indictment") charging the defendant in five counts with (i) securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b5, and 18 U.S.C. § 2 ("Count One"); (ii) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 ("Count Two"); (iii) conspiracy to commit securities and wire fraud, in violation of 18 U.S.C. § 371 ("Count Three"); (iv) making false statements to auditors, in violation of 15 U.S.C. § 78ff, 17 C.F.R. § 240.13b2-2(a), and 18 U.S.C. § 2 ("Count Four"); and (v) falsifying records, in violation of 18 U.S.C. §§ 1519 and 2 ("Count Five").

## III.  Defense Motions

On February 6, 2026, the defendant filed motions seeking (a) to strike surplusage from the Indictment; (b) to dismiss Counts One, Two, and Three as duplicitous; (c) to dismiss Count Two for failing to state an offense; (d) to dismiss Count Four for failing to state an offense and because it is time-barred; and (e) to dismiss Count Five for failure to allege proper venue. (Dkt. 25).

**ARGUMENT**

## I.  The Court Should Deny the Defendant's Motion to Strike Language from the Indictment

The defendant asks the Court to strike from the Indictment three categories of information: (i) references to GWG's sale of L Bonds, the GWG bankruptcy, and investor losses;

8

(ii) misrepresentations made to two prospective investors who did not invest in Beneficient; and (iii) evidence of the first loan to Beneficient that the GWG special committee authorized in May 2019. Mot. 2-9. The defendant's motion is moot, meritless, and should be denied.

A.  Applicable Law

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, it has long been the policy of courts within the Southern District to refrain from tampering with indictments." *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) (quotation marks, alterations, and citations omitted). "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory or prejudicial." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (quotation marks omitted). "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Id.* (quotation marks omitted); *see also United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001) (quoting *Scarpa*, 913 F.3d at 1013). "Given this exacting standard, such motions [to strike] are rarely granted." *United States v. Coffey*, 361 F. Supp. 2d 102, 123 (E.D.N.Y. 2005). And when motions are made, courts typically defer rulings until trial.  *See, e.g.*, *United States v. Maxwell*, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021) ("Courts in this District generally delay ruling on any motion to strike until after the presentation of the Government's evidence at trial, because that evidence may affect how specific allegations relate to the overall charges.").

In setting forth allegations in a charging instrument, the Government is not limited to an enumeration of the bare elements of a crime; instead, a charging instrument may be used to provide background to the charged criminal conduct, to describe the circumstances, means, and methods, of an offense, and to describe evidence that is otherwise admissible at trial. *See United States v.*

*Mostafa*, 965 F. Supp. 2d 451, 466 (S.D.N.Y. 2013) (citing *Mulder*, 273 F.3d at 99). Where there is any doubt about the connection between the allegations and the evidence that will be admitted at trial, "[c]ourts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike." *Id.* at 467; *see also Maxwell*, 534 F. Supp. 3d 322 ("The Court will follow the well-worn path of others in this District and reserve the issue [of striking surplusage] for trial."). As multiple courts have concluded, "'[t]here is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.'" *United States v. Smith*, 985 F. Supp. 2d 547, 612 (S.D.N.Y. 2014) (brackets in original) (quoting *United States v. Butler*, 351 F. Supp. 121, 124 (S.D.N.Y. 2004)).

B.  Discussion

As a threshold matter, the defendant's motion to strike should be denied as moot because the Court has indicated that it does not intend to give the Indictment to the jury. (*See* Feb. 10, 2026 Tr. 6-7). To the extent the defendant anticipates prejudice from proof of the allegations, rather than from their inclusion in the Indictment, the defendant should move *in limine*, as he recognized at the recent conference. (*Id.*). Substantively, and in any event, there is no basis to strike these paragraphs because the allegations are relevant to the charges and not unduly prejudicial or inflammatory.

*First*, the defendant moves to strike paragraphs three, four, and fifteen of the Indictment, which describe GWG's sale of L Bonds, the bankruptcy, and investor losses. Ind. ¶¶ 3, 4, 15. The defendant argues that his actions did not cause GWG's bankruptcy, and that the bankruptcy and resulting investor losses should be excluded from trial. Mot. 4-5. The Government is not required—and does not intend—to prove the defendant caused GWG's bankruptcy. But as the

10

Government's motion *in limine* briefing will describe in more detail, the fact that GWG raised money by selling L bonds to retail investors and the fact of GWG's bankruptcy are inextricably intertwined with proof of the defendant's fraud.[1] Additionally, the financial impact of the defendant's fraud on GWG and its investors is relevant under Federal Rule of Evidence 401 to establishing materiality because it tends to show that what was concealed and misrepresented was not trivial to GWG. At the same time, the defendant has not articulated what unfair prejudice would result from evidence of the GWG bankruptcy, and in any event, any concern that jurors would draw incorrect or impermissible conclusions about the bankruptcy could be addressed in a limiting instruction. *See, e.g.*, *United States v. Daugerdas*, No. 09 Cr. 581 (WHP), 2010 WL 4967878, at *2 (S.D.N.Y. Nov. 22, 2010) (holding that "a limiting instruction to the jury is the most appropriate safeguard against potential prejudice").

*Second*, the defendant moves to strike paragraphs ten and eleven of the Indictment, which describe the defendant's attempts to solicit investments from two investment firms, Oaktree and Infinedi, in 2018. Ind. ¶¶ 10, 11. The defendant argues this language is "textbook surplusage" because the Government has "charged a fraud against GWG," "[n]o count charges fraud against these prospective investors," and both prospective investors "decided not to invest." Mot. 7. The defendant is mistaken at each turn. The Indictment alleges a broader scheme, beginning in 2018, to defraud GWG and prospective investors based on misrepresentations regarding HCLP. *See, e.g.*, Ind. ¶¶ 11 (alleging defendant provided "misleading" information regarding HCLP to "two prospective investors"); 26 (alleging, in the "to wit" clause for Count Two, the defendant engaged in a scheme to defraud "GWG and prospective investors"). While the speaking allegations of the

---

[1] The bankruptcy will be difficult to excise from trial because the Government expects to call as a witness at least one GWG board member who remained with GWG through the bankruptcy.

Indictment detail the defendant's looting of GWG's assets at length, the defendant's attempted fraud on Oaktree and Infinedi is covered by the Indictment. Nor is it relevant that these prospective investors did not invest in Beneficient. The fraud statutes punish "the scheme, not its success," *United States v. Helmsley,* 941 F.2d 71, 94 (2d Cir. 1991), and the materiality of the defendant's misrepresentations can be established without proof of "actual reliance" on those statements, *Neder v. United States*, 527 U.S. 1, 25 (1999). At the very least, this conduct is relevant and admissible evidence evincing motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident. *See* Fed. R. Evid. 404(b).

*Third*, the defendant moves to strike paragraph 13(a) of the Indictment, which describes a $65 million loan from GWG to Beneficient in May 2019. The defendant argues a "loan is not a security" and that including this language in the Indictment is "prejudicial because it artificially expands the alleged pattern" of misconduct. Mot. 9. This argument misapprehends the nature of the charged offense and the settled law governing it. The Indictment does not charge the May 2019 loan as an independent securities transaction; it is charged as part of a single, unified scheme to defraud GWG's board—a scheme that began with the loan and continued through multiple equity transactions involving Beneficient securities over the following two years. The "in connection with" requirement of Section 10(b) and Rule 10b-5 attaches to that scheme as a whole, not each individual act within it.

The Supreme Court's decision in *SEC v. Zandford*, 535 U.S. 813 (2002), is controlling. There, the Court sustained a Section 10(b) claim arising from a scheme in which the defendant broker obtained money from his clients through a combination of instruments—including large money transfers and a personal loan—alongside the fraudulent liquidation of their securities. *Id.* at 817 n.2. The Court rejected the argument that securities were "incidental" to the fraud, *id.* at

817, holding that the relevant question was whether the "securities sales and [the defendant's] fraudulent practices were not independent events," *id.* at 820. Because each act "was made to further [the] fraudulent scheme," the Court concluded the conduct was properly understood "[i]n the aggregate" as a "course of business that operated as a fraud or deceit." *Id.* at 821. The Second Circuit expanded upon this holding in *Romano v. Kazacos*, concluding that the requirement is "met where a fraudulent scheme and a purchase or sale of securities 'coincide,'" including conduct that merely "induce[s] securities transactions." 609 F.3d 512, 521 (2d Cir. 2010); *see also Rayner v. E\*TRADE Fin. Corp.*, 899 F.3d 117, 122 (2d Cir. 2018) (finding an alleged scheme arose "in connection with the purchase or sale of covered securities" because there are allegations "the fraud perpetrated by E\*TRADE [were] material to a decision by one or more individuals (other than the fraudster) to buy or to sell a covered security"); *Yale M. Fishman 1998 Ins. Tr. v. Gen. Am. Life Ins. Co.*, No. 11 Civ. 1284, 2013 WL 842642, at \*7 (S.D.N.Y. Mar. 7, 2013) ("[T]he 'in connection with' requirement is to be construed expansively to cover any conduct within the same scheme as the sale (whether actual or merely purported) of securities.").

Here, the May 2019 loan did not exist in isolation—it was the opening transaction of a continuous fraudulent course of conduct that culminated in and was inextricably intertwined with the equity purchases that followed. Those subsequent securities transactions were "not independent events," but rather, when viewed in the aggregate with the May 2019 loan and the defendant's other conduct, part of a fraudulent scheme. The defendant's proposed rule—that a non-securities transaction may not be included within a securities fraud scheme simply because the transaction did not itself involve a security—would immunize complex, multi-instrument frauds from securities law and is directly contrary to *Zandford*. In any event, the May 2019 loan remains direct proof of the wire fraud charged in Count Two, which has no similar requirement

13

that it be "in connection with" the purchase or sale of a security, and thus there is no basis to strike this allegation from the Indictment.

## II.   The Court Should Deny the Defendant's Motions to Dismiss

The defendant seeks pre-trial dismissal of the entire Indictment. But neither the law nor the facts support the defendant's motions. Rather, each count of the Indictment is properly pleaded and should be presented to the jury at trial.

### A.   Applicable Law

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must, for each count, "give the official or customary citation of the . . . law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1); *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *3 (S.D.N.Y. May 13, 2021). An indictment is sufficient under Rule 7 and the Fifth Amendment "as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (internal quotation marks and alteration omitted).

To satisfy these requirements, "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime." *Id*. That is, it need only describe the "core of criminality to be proven at trial," not "the particulars of how a defendant effected the crime." *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016).

When considering a motion to dismiss an indictment, "the facts alleged by the government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . .

14

if valid on its face, is enough to call for trial of the charges on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).

These limitations exist because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) (internal citations omitted). Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021) (internal citations omitted). "That is something [courts] do after trial." *Id.* Dismissal is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018) (internal citations omitted).

B.  Counts One, Two, and Three Are Not Duplicitous

The defendant argues that Counts One, Two, and Three are duplicitous. They are not.

An indictment is impermissibly duplicitous "where: 1) it combines two or more distinct crimes into one count in contravention of [the] requirement that there be a separate count for each offense, and 2) the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (internal citations and quotation marks omitted). Conspiracy charges are duplicitous where multiple conspiracies are charged in the same count, *see United States v. Gabriel*, 920 F. Supp. 498, 504 (S.D.N.Y. 1996) (Rakoff, J.), *aff'd,* 125 F.3d 89 (2d Cir. 1997) ("Count Six . . . offend[s] the prohibition against combining multiple conspiracies within a single conspiracy count."), and substantive counts are duplicitous where multiple instances of the same crime are contained within a single count, *see Sturdivant*, 244 F.3d at 74 ("[The duplicitous] count actually included within its scope two distinct drug transactions not connected by any overarching

15

conspiracy."). To determine "whether a defendant was actually prejudiced by a duplicitous indictment, we look to whether the duplicitous count risks unfairness to the defendant" because it (i) "deprives a defendant of his right to a unanimous verdict," (ii) "implicates the Double Jeopardy Clause of the Constitution"; or (iii) "implicates his right to notice of the charge against him." *United States v. Kandic*, 134 F.4th 92, 99-100 (2d Cir. 2025) (internal citations, quotation marks, and alterations omitted).

The charges in the Indictment are not duplicitous and, in any event, none of the potential prejudices are implicated here. The substantive fraud counts charged in Counts One and Two are not duplicitous because they each charge a single scheme to defraud. *See Sturdivant*, 244 F.3d at 76 ("[A]cts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." (quoting *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989)). Similarly, the conspiracy charged in Count Three is not duplicitous because it charges a single conspiracy with, as its object, the substantive crimes alleged in Counts One and Two. *See United States v. Ralston*, No. 19 Cr. 774 (JSR), 2022 WL 769257, at *7 (S.D.N.Y. Mar. 14, 2022) ("When the charge is conspiracy, an indictment is not duplicitous simply because it alleges that the conspiracy had multiple objects, and '[a]s long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible.'" (quoting *Tutino*, 883 F.2d at 1141)). Each count specifies the approximate time frame of the offense, lays forth the elements of the offense, and provides to wit clauses with additional evidentiary detail. There is no risk that a conviction on any of the Indictment's five counts would lead to ambiguity as to the crime of conviction and expose the defendant to double jeopardy risk.

16

The defendant does not allege that Counts One, Two or Three contain multiple of the same crimes in any particular count, that is, multiple securities frauds in Count One, multiple wire frauds in Count Two or multiple conspiracies in Count Three. Instead, the defendant appears to argue that the counts are duplicitous because proof of those crimes could include the conduct underlying the crimes alleged in Counts Four and Five. Mot. 11-12. In support, the defendant cites language from the Indictment in which the Government incorporated the same factual allegations for each Count. *Id.* But the defendant fails to cite a single case where charges were found to be duplicitous on this basis, and courts in this Circuit have consistently rejected such an argument. *See United States v. Vilar*, No. 05 Cr. 621 (RJS), 2008 WL 4298545, at *2 (S.D.N.Y. Sept. 5, 2008) ("[C]ourts in this Circuit have consistently recognized that mere incorporation of previously alleged factual allegations does not make a count impermissibly duplicitous."); *United States v. Gonzalez*, No. 06 Cr. 726 (WHP), 2008 WL 3914877, at *5 (S.D.N.Y. Aug. 26, 2008) (same); *United States v. Rittweger*, 259 F. Supp. 2d 275, 289 (S.D.N.Y. 2003) (same).

In any event, there is nothing duplicitous about the Government relying on the same unlawful conduct to allege multiple counts that charge *different* crimes. A contrary rule would, for example, preclude the routine and well-settled circumstance where a defendant is convicted and sentenced on a conspiracy and substantive count based on the same underlying conduct. *See, e.g.*, *United States v. Gunn*, 162 F.4th 319, 326 (2d Cir. 2025) (allowing consecutive sentences for substantive and conspiracy Hobbs Act robbery, and noting "Congress has [also] not prohibited consecutive sentences for attempts and conspiracies that have the same object"). Because the type of offense charged in each count is distinct, *see Blockburger v. United States*, 284 U.S. 299, 304 (1932); Mot. 11-12 (acknowledging each Count is disparate under *Blockburger*), conviction on

17

any combination by a properly instructed jury would not risk double jeopardy or a non-unanimous verdict. Overlapping proof is not a basis to find otherwise.

### C. Count Two Properly Alleges Wire Fraud

The defendant also seeks the dismissal of Count Two, arguing that the defendant's misrepresentations were immaterial as a matter of law. Mot. 14-20. But the materiality of the defendant's misrepresentations is a question of fact for the jury, not a basis to dismiss at the pleading stage. In any event, the defendant's argument rests entirely—and improperly—on the Seventh Circuit's opinion in *United States v. Weimert*, 819 F.3d 354 (7th Cir. 2016), a case that has since been narrowed by the Seventh Circuit, and is premised on a legal principle since rejected by the Supreme Court and Second Circuit.

As a preliminary matter, because Count Two is adequately pleaded, the defendant's motion should be denied. Count Two tracks the statutory language, states the elements of the offense, lays out the timeframe of the offense, and provides a to wit clause with additional factual allegations. Ind. ¶ 26; *see Webb*, 993 F.3d at 120. The speaking allegations of the Indictment provide additional details concerning the defendant's misrepresentations. Ind. ¶¶ 11, 13, 13(a), 13(b), 13(c), 13(d), 13(e), 18, 20, 22. The question of materiality is one for the jury, not a basis for pretrial dismissal. *See United States v. Litvak*, 808 F.3d 160, 177-78 (2d Cir. 2015) (holding materiality is a mixed question of law and fact best reserved for the jury); *United States v. Kwok*, No. 23 Cr. 118 (AT), 2024 WL 1407057, at *6 (S.D.N.Y. Apr. 2, 2024) ("An inquiry into the materiality of the Defendants' alleged falsehoods would entail a premature 'challenge to the sufficiency of the Government's anticipated evidence.'"); *cf. Neder*, 527 U.S. at 25 (holding that materiality is an element of federal fraud offenses and must be submitted to a jury).

Moreover, while the Government need not do more at this stage than properly plead Count Two, the Government expects to offer evidence of misrepresentations at trial that go far beyond the defendant's cabined characterization of negotiating positions. The Government has alleged and will prove that the defendant made, and willfully caused others to make, numerous material misrepresentations and omissions forming the basis for the charged fraud scheme, including, but not limited to, those made during the course of negotiations.

The defendant nonetheless argues that Count Two should be dismissed, relying exclusively on the Seventh Circuit's *Weimert* decision. In *Weimert*, the defendant was an executive of a struggling regional bank who had been tasked with selling the bank's stake in a commercial real estate development. 819 F.3d at 353. To insert himself into the deal as a minority buyer and obtain a financial interest, Weimert executed triangular deception: he told the buyer that the bank required his participation, and he told the bank's board that the buyer would not proceed unless he was included as a partner. *Id.* at 353-54. Neither was true. Critically, however, his conflict of interest was disclosed to and approved by the bank's board, and all of the actual terms of the transaction were fully disclosed and subject to negotiation, with Weimert delivering a sale price approximately one-third higher than the bank's target. *Id.* at 354. He was nonetheless convicted of wire fraud at trial. A split-panel of the Seventh Circuit reversed, reasoning that that because the deception concerned only what each party insisted upon—not the objective facts or terms of the deal itself— it amounted to misrepresentation about "negotiating positions," which the court declined to treat as material for purposes of the wire fraud statute. *Id.* at 358.

*Weimert* does not support dismissal here. Although the Seventh Circuit in *Weimert* reversed the conviction, the court acknowledged that "[s]ome deceptions in commercial negotiations certainly can support a mail or wire fraud prosecution," in particular those that "materially alter

19

one party's understanding of the subject of the deal." *Id.* at 356. Additionally, while the *Weimert* holding was explicitly tethered to the fact that Weimert's conflict was known and approved, and therefore effectively "arms-length," the court left open the possibility that misrepresentations or material omissions could give rise to wire fraud. *Id.* at 366-67. Here, because the defendant is alleged to have made false representations to GWG about the core subject of the deal, affecting the special committee's decision to fund HCLP debt payments, and deliberately omitted and concealed facts from GWG's board, his conduct was material even under *Weimert*.

The defendant's assertion that *Weimert* removes "deception about negotiating positions" from federal antifraud laws is wrong. Mot. 15. In a subsequent decision written by *Weimert*'s author, the Seventh Circuit has referred to *Weimert*'s holding as "narrow." *United States v. Filer*, 56 F.4th 421, 430 (7th Cir. 2022); *see also United States v. Courtright*, 155 F.4th 941, 949 (7th Cir. 2025) ("Our court has warned litigants against reading too much into *Weimert*'s narrow holding. . . . *Weimert* merely stands for the proposition that, while sophisticated businesspeople are expected to hide their true goals, values, priorities, or reserve prices from their negotiating partners, they are not permitted to obfuscate material information."). In *Filer*, for which the defendant cites only the district court opinion granting judgments of acquittal while ignoring the appellate decision reversing those judgments, Mot. 16, the Seventh Circuit held that misrepresentations made during the course of a negotiation, which involved the defendant concealing the true identity of entities involved in and relevant to the transaction, were material. *Id.* at 431. This is akin to the Indictment's allegations that the defendant misrepresented and concealed from the GWG special committee his control of and benefits received from HCLP. *See* Ind. ¶¶ 11, 13, 18, 20.

To the extent *Weimert* has the broad application the defendant urges, it would also be inconsistent with Second Circuit and Supreme Court precedent. In *United States v. Litvak*, the Second Circuit rejected the argument that "misrepresentations … made to counterparties during negotiations are immaterial as a matter of law because they did not relate to the bonds' value," holding instead that the materiality of those misrepresentations were for the jury to determine. 808 F.3d 160, 175-78 (2d Cir. 2015). Following a retrial, Litvak again made this argument on appeal, citing *Weimert*, which had been decided following his first appeal. *See* Brief of Defendant-Appellant at 33-34, *United States v. Litvak*, No. 17-1464-cr, 2017 WL 3699916 (2d Cir. Aug. 24, 2017). The Second Circuit, however, once again rejected the argument that "misstatements cannot, as a matter of law, be material because they were not relevant to the intrinsic value" of the security and affected only 'the negotiation over price.'" *United States v. Litvak*, 889 F.3d 56, 67 (2d Cir. 2018). And last year, consistent with these decisions, the Supreme Court in *Kousisis v. United States*, 605 U.S. 114 (2025), impliedly rejected the statement in *Weimert* that the misrepresentation must relate to "the nature of the asset [the victim] was selling or the consideration it received," 819 F.3d at 366. Holding otherwise, the Supreme Court stated that "a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over her money or property—regardless of whether the fraudster, who often provides something in return, seeks to cause the victim *net* pecuniary loss." 605 U.S. at 118. In other words, under *Kousisis*, it is not necessary for the misrepresentation to relate to the value of the asset or consideration for it.

The defendant's motion to dismiss Count Two should be denied.[2]

---

[2] The defendant advances strawman arguments that under the Government's theory "any time a corporate officer fails to disclose the ultimate beneficiaries of a transaction's proceeds, wire fraud

21

D.  Count Four Properly Alleges False Statements to Auditors

1.  *Relevant Facts*

By the end of 2018, GWG held a large position in Beneficient and had a large loan receivable to Beneficient on its books. As a result, GWG's auditor required that information from Beneficient's 2018 audit be incorporated into GWG's 2018 Form 10-K filing and that Beneficient's audit be attached as an exhibit to the filing itself. Beneficient engaged Deloitte to conduct its audit. Deloitte considered whether several trusts established by Beneficient and integral to its business needed to be consolidated into Beneficient's financials. The defendant urged Deloitte to conclude that these trusts did not need to be consolidated.

By February 2019, on the consolidation question, Deloitte was focused on the independence of (a) Murray Holland, who served as a trustee of the trusts in question; and (b) HCLP, which purportedly exercised consent rights over any removal and replacement of the trustees. Deloitte focused on whether Beneficient lacked the ability to control the actions of Holland and HCLP. To induce his favored outcome, the defendant, then serving as Beneficient's CEO and Chairman of the Beneficient board, falsified documents and created false evidence to create the illusion of independence. With respect to Holland, the defendant directed the creation of false emails and letters that claimed Holland was controlled by others (and could not be controlled by the defendant or Beneficient). With respect to HCLP, the defendant backdated forms, created fake emails, and directed the creation of a fraudulent letter, all falsely claiming that HCLP had been independently managed by Martens since July 2017 and that Martens had zealously

---

liability would attach." Mot. 19. Not so. This argument ignores the important, but fact intensive, limitation of materiality. The determination of materiality varies depending on the facts of every given case and cannot be determined in advance for an entire class of misrepresentations.

asserted HCLP's interests (and could not be controlled by the defendant or Beneficient). The defendant then caused these fraudulent materials to be submitted to Deloitte, which considered them as part of the audit.

In April 2019, the defendant obtained control of GWG and became GWG's Chairman of the Board of Directors. The defendant appointed Holland as GWG's CEO. In June 2019, Deloitte concluded its audit. The defendant signed a management representation letter making several misrepresentations to Deloitte, including claims that Beneficient had provided Deloitte with all relevant information, had no knowledge of fraud, and had made consolidation conclusions based on complete information. By the time the audit was concluded, Deloitte had determined that some, but not all, of the Beneficient trusts needed to be consolidated in its financials.

2. *Applicable Law*

Count Four charges the defendant with making false statements to auditors. In relevant part, 17 C.F.R. § 240.13b2-2 provides:

(a) No director or officer of an issuer shall, directly or indirectly:

(1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

(2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:

(i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or

(ii) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

23

In 1979, the SEC first promulgated Rule 13b2-2 under Section 13(b) of the Securities Exchange Act of 1934. *See* 44 Fed. Reg. 10964 (Feb. 23, 1979).[3] Willful violations of Section 13(b) and Rule13b2-2 are criminal offenses. *See* 15 U.S.C. § 78ff.

To convict the defendant of making false statements to auditors or misleading the conduct of audits, the Government must prove that (1) the defendant was a director of an issuer or an officer of an issuer; (2) the defendant, directly or indirectly, made, or caused to be made, a materially false or misleading statement or omitted to state, or caused another person to omit to state, a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading; (3) the statements or omissions at issue were directed to an accountant in connection with (a) a required audit or examination of the financial statements of the company, or (b) the preparation or filing of any document or report required to be filed with the SEC; and (4) the defendant acted willfully. *Cf. United States v. Petit*, No. 19 Cr. 850 (JSR), Dkt. 191 (Jury Charge), 2499:9-2500:8 (S.D.N.Y. Nov. 16, 2020) (jury charge for conspiracy object of similar lies to auditor charge under Section 7242 and 13b2-2).

3. <u>Count Four Encompasses the Defendant's Misrepresentations While Serving as Beneficient's CEO</u>

Count Four tracks the language of Rule 13b2-2, and alleges a willful violation of those prohibitions, as required by Section 78ff. Count Four further gives the defendant notice of the timeframe and nature of the charge against him. Because these allegations are "a plain, concise, and definite written statement" of the charges as required by Rule 7 of the Federal Rules of

---

[3] In 2002, Congress enacted an additional prohibition against lying to auditors as part of the Sarbanes-Oxley Act of 2002. *See* 15 U.S.C. § 7242. The SEC promulgated Rule 13b2-2(b) in response. *See* 17 C.F.R. § 240.13b2-2(b). The Indictment does not charge a violation of Section 7242 or Rule 13b2-2(b).

Criminal Procedure, nothing more is required to survive a motion to dismiss. *See Wedd*, 993 F.3d at 120.

The defendant argues otherwise based on the theory the defendant's preparation of false and backdated documents took place while the defendant was CEO and Chairman of then-private Beneficient's board but not yet Chairman of then-public GWG's board. Mot. 20-26. Under the defendant's argument, the only relevant "issuer" is GWG. Mot. 20. He is mistaken.

Beneficient qualifies as an "issuer" under Rule 13b2-2. As a regulation promulgated under the Exchange Act of 1934, Rule 13b2-2(a) incorporates the Exchange Act's definition of "issuer." Under the Exchange Act, an issuer includes private companies and is defined as "any person who issues or proposes to issue any security." 15 U.S.C. § 78c(a)(8). In its rulemaking, the SEC has made clear that this definition of "issuer" applies to Rule 13b2-2. *See* SEC Release No. 26050, Improper Influence on Conduct of Audit*s*, (May 20, 2003), 2003 WL 21148349, at *2 (noting that "issuer" in Section 13b2-2 is given the Exchange Act definition, which includes private issuers of securities). Beneficient was, and remains, an issuer of securities. As of 2019, for example, Beneficient issued multiple classes of stock, including the common shares held by GWG. During the period of the alleged audit misconduct, the defendant was a director and officer of Beneficient. Accordingly, the defendant was a director and officer of an issuer—Beneficient—in February 2019 and the evidence at trial will establish that the misrepresentations were made in connection with "the preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise." 17 C.F.R. § 240.13b2-2(a).

But even if Beneficient were not an issuer (and it is), the defendant's signing of the management representation letter in June 2019 constitutes an additional basis for criminal liability because at that point he was a director of GWG. It is well-settled that "[m]isstatements in

25

management representation letters, including representations to the effect that 'all fraud had been reported'" are sufficient to establish a Rule 13b2-2 violation. *SEC v. DiMaria*, 207 F. Supp. 3d 343, 361 (S.D.N.Y. 2016) (citing *SEC v. Espuelas*, 579 F. Supp. 2d 461, 487 (S.D.N.Y. 2008); *SEC v. Standard*, No. 06 Civ. 7736 (GEL), 2009 WL 196023, at *29 (S.D.N.Y. Jan. 27, 2009)). By June 2019, when the defendant signed the management representation letter, he was an officer and director of Beneficient *and* a director of GWG. That letter incorporated and related back to the defendant's prior acts with respect to Deloitte, including his fabrication of records, backdating of documents, and creation of fraudulent documents.

    4.   <u>Court Four Has a Six-Year Statute of Limitations and Is Timely</u>

The defendant separately argues that Count Four should be dismissed as time-barred. Mot. 26-30. By his telling, Section 3301, which affords the government six years to commence a securities fraud prosecution, applies only to offenses involving, as an element, the intent to obtain money or property. The defendant claims that, as a false statements offense, Rule 13b2-2 is not a requisite "fraud" offense. In making this argument, he asks the Court to disregard the plain language of the statute and to read an atextual limitation into a clear congressional definition. He is wrong again.

Title 18, United States Code, Section 3301 is a securities-offense-specific limitations statute enacted in 2010 as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act. It establishes a six-year statute of limitations for a "securities fraud offense." 18 U.S.C. § 3301(b). The statute provides a definition for "securities fraud offense," defining the term as a "violation of, or a conspiracy or an attempt to violate" six enumerated provisions. 18 U.S.C. § 3301(a). One of those provisions is the Exchange Act's Section 32(a), which is codified at 15 U.S.C. § 78ff(a) and creates a criminal offense for all willful violations of the Exchange Act and

its regulations. 18 U.S.C. § 3301(a)(2); 15 U.S.C. § 78ff(a). Willful violations of Section 13(b) and Rule 13b2-2 are rendered criminal, and chargeable, under Section 78ff(a).

By its plain terms, criminal violations of Rule 13b2-2 fall within Section 3301's definition of a "securities fraud offense" and are subject to the provision's six-year statute of limitations. *See, e.g.*, *Burgess v. United States*, 553 U.S. 124, 129-30 (2008) ("Statutory definitions control the meaning of statutory words . . . in the usual case."). Nor is there any surprise that Congress intended for the six-year statute of limitations to apply to all criminal offenses under the securities and commodities laws. "It is commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" *Parker Drilling Mgmt. Svcs., Ltd. v. Newton*, 587 U.S. 601, 611-12 (2019); *see also Pharoahs GC, Inc. v. U.S. Small Business Admin.*, 990 F.3d 217, 227 (2d Cir. 2021) (same). At the time of Dodd-Frank's passage, the Exchange Act had been in place for more than seventy-five years. Rule 13b2-2 had been promulgated more than thirty years earlier. And criminal prosecutions of Section 13b2-2 under Section 78ff were not novel. *See, e.g.*, *United States v. Brian*, 198 F.3d 255 (9th Cir. 1999); *United States v. Gagalis*, No. 04-CR-126-0106-PB, 2006 WL 931909, at *4 (D.N.H. Apr. 7, 2006); *United States v. Sullivan*, No. 02 Cr. 1144 (VEC), Dkt. 10 (Indictment) (S.D.N.Y. Aug. 28, 2002) (charging, in prosecutions arising from the WorldCom scandal, Section 13b2-2 and 78ff as a conspiracy object). It was the intentional judgment of Congress that Section 3301's definition of a "securities fraud offense" encompass a broad variety of criminal offenses, all related to securities, commodities or investment advisors.

This textual reading is consistent with the legislative history and Congress's purpose in enacting Section 3301. Section 3301 was enacted in 2010, as part of the Dodd-Frank Act. Arising out of the 2008 financial crisis, Dodd-Frank was enacted to "promote the financial stability of the United States by improving accountability and transparency in the financial system . . . to protect

27

consumers from abusive financial services practices, and for other purposes." *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 1376 (2010). It makes good sense, and is consistent with Congress's purpose, to ensure that sophisticated financial crimes jeopardizing the financial safety of investors and markets be subject to a lengthier limitations period.

This broad congressional focus toward securities offenses and the meaning Congress ascribed the term "securities fraud" is further supported by the statute of limitations provision's placement within Dodd-Frank. Section 3301 was enacted as part of Section 1079A of Dodd-Frank, which is titled "Financial Fraud Provisions." Pub. L. No. 111-203, § 1079A(b), 124 Stat. 1376, 2077. In addition to the legislation that became Section 3301, that section of Dodd-Frank also includes a provision (subtitled "securities fraud") seeking to ensure that the sentencing guidelines for securities and financial institution-related offenses be treated with appropriate severity. *See id.* § 1079A(a). That Dodd-Frank provision cites the relevant Guidelines provision for securities offenses, which refers broadly to securities and commodities offenses. *See id.* (citing to what was then U.S.S.G. § 2B1.1(b)(17)); U.S.S.G. § 2B1.1(b)(17) (2009) ("If the offense involved a violation of securities law . . . ."). This sentencing provision being placed in the same section of Dodd-Frank as the statute of limitations provision indicates both that (a) in Dodd-Frank, Congress used the term "securities fraud" as a means of describing violations of the securities laws, without meaning to cabin its reach to particular types of securities offenses sounding in common law "fraud" and (b) Congress legislated to strengthen punishment and extend the ability to prosecute criminal violations of securities and commodities laws, without regard to whether property was an object of the offense.

In moving to dismiss Count Four, the defendant asks the Court to ignore Section 3301's plain text and congressional intent. Mot. 29. What is more, the defendant's argument would lead to absurd results. Securities fraud under the Exchange Act, pursuant to 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5, does not include as an element obtaining money or property. *See United States v. Gramins*, 939 F.3d 429, 444-45 (2d Cir. 2019) ("A conviction for securities fraud pursuant to 15 U.S.C. § 78j(b) requires the government to prove that 'in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device."); Sand, *Modern Federal Jury Instructions*, Instr. 57-20 (2026). Under the defendant's tortured reading, therefore, the securities-fraud specific limitations statute would not apply to Title 15 securities fraud.[4] Of course, Congress could not have intended such a bizarre result. A more logical—and obvious—result is that Congress meant to include in Section 3301 exactly the offenses it defined, and here that includes criminal violations of Rule 13b2-2 and Section 78ff.

Because Count Four charges an offense that is subject to Section 3301's six-year statute of limitations, the statute of limitations, with the parties' tolling agreement, would have run in June 2026. Mot. Ex. B (Dkt. 25-2). The Indictment filed in November 2025 is timely.

E. Count Five Properly Alleges Venue

The defendant finally seeks dismissal of Count Five for lack of venue. Count Five alleges that, "in or about May 2021, in the Southern District of New York, . . . the defendant falsified

---

[4] Nor does the defendant's citation to cases considering the Wartime Suspension of Limitations Act help his argument. Mot. 29. Under that statute, Congress did not explicitly define the offenses falling within the scope of the tolling provision. By contrast, Section 3301 itself defines the term "securities fraud offense" and it includes all criminal violations of the securities and commodities laws.

29

Board minutes from October 2019 and misled members of the Beneficient and GWG's Boards into approving those minutes as accurate, with the intent to impede, obstruct, and influence an investigation by the SEC." Ind. ¶ 35. Because the Indictment is facially valid and properly alleges venue, the motion should be denied.

    1. *Applicable Law*

At trial, the Government must prove that venue is proper by a preponderance of evidence. *See United States v. Naranjo*, 14 F.3d 145, 146 (2d Cir. 1994). Where venue is challenged on a pretrial motion to dismiss, the government's burden is limited to showing that the indictment alleges facts sufficient to support venue. Fed. R. Crim. P. 12(b)(3)(A)(i); *see United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 314-15 (S.D.N.Y. 2023); *United States v. Peterson*, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005); *United States v. Ohle*, 678 F. Supp. 2d 215, 231-32 (S.D.N.Y. 2010). "At this stage in the proceedings, the Government need only allege with specificity that the charged acts support venue in this district, and the Court assumes as true the allegations in the Indictment." *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *16 (S.D.N.Y. Dec. 11, 2017). Courts in this District have recognized that "as long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied." *United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006); *see also United States v. Milton*, No. 21 Cr. 478 (ER), 2021 WL 5304328, at *3 (S.D.N.Y. Nov. 15, 2021). "The question of whether there is sufficient evidence to support venue is appropriately left for trial." *Ohle*, 678 F. Supp. 2d at 231.

Although determining a single venue for "point in time" crimes—crimes in which "the unitary character of the acts constituting the crime renders its locus delicti obvious," *United States v. Saavedra*, 223 F.3d 85, 88-89 (2d Cir. 2000)—is often straightforward, in "some cases the acts

constituting a crime extend over a period of time, and occur in widely different localities." *Id*. at 89. Where "the acts constituting the crime and the nature of the crime charged implicate more than one location," the Constitution "does not command a single exclusive venue." *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985). That is, acts constituting a crime, or the nature of a crime, may implicate more than one district. *See United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005).

A defendant charged with a "continuing" offense may be tried in any district in which some part of the offense occurred. *See, e.g.*, *United States v. Payne*, 591 F.3d 46, 69 (2d Cir. 2010); *see generally United States v. Johnson*, 323 U.S. 273, 275 (1944) (continuing offense doctrine applies "over the whole area through which force propelled by an offender operates"); *United States v. Rowe*, 414 F.3d 271, 278-79 (2d Cir. 2005). In this regard, any offense "committed in more than one district" may be "prosecuted in any district in which such offense was begun, continued or completed." 18 U.S.C. § 3237(a). Put another way, "[b]ecause an offense consisted of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." *United States v. Brennan*, 183 F.3d 139, 145 (2d Cir. 1999) (quotation marks omitted).

While the Second Circuit has not explicitly held that Section 1519 is a continuing offense, *cf. United States v. Reed*, 773 F.2d 477, 486 (2d Cir. 1985) (holding venue for obstruction of justice pursuant to 18 U.S.C. § 1503 is proper in both location of obstruction and in the location of proceeding being obstructed), the Ninth Circuit has so held and has concluded that venue is proper in both the location of the acts of obstruction and the location where the effects of the obstruction are felt, *see United States v. Abouammo*, 122 F.4th 1072, 1092-93 (9th Cir. 2024), *cert granted* 2025 WL 3493156, at *1 (U.S. Dec. 5, 2025); *see also United States v. Gonzales*, No. 09 Cr. 136 (D. Conn. Dec. 22, 2010) (Tr. at 5) (citing *Reed* and holding that venue is proper under Section

31

1519 in the district where the investigation the defendant "intended to impede . . . was likely to occur").

2. *Discussion*

The Court should deny this motion based on the pleading alone. The Indictment alleges on its face that the defendant, in May 2021, falsified board minutes and misled members of the Beneficient and GWG boards into approving those minutes as accurate "in the Southern District of New York." Ind. ¶ 35. That allegation is sufficient to survive a pretrial motion to dismiss, and the factual question of whether the Government can carry its burden to prove venue by a preponderance of the evidence is properly left for trial. *See Ohle*, 678 F. Supp. 2d at 231.

The defendant's merits argument fares no better. The defendant claims that his obstructive conduct was confined to Texas. Mot. 34. The trial evidence will show otherwise. The falsification of board minutes was not a discrete act that concluded the moment the defendant altered a document. The falsification of the records depended upon securing the approval of Beneficient's Enterprise Risk Committee and board of directors so that the fabricated minutes would bear the imprimatur of authenticity. That conduct extended into several districts, including the Southern District of New York.

The facts are straightforward. On May 23, 2021, the defendant emailed the minutes to board member Bruce Schnitzer, then located in Connecticut, in order to induce Beneficient's Enterprise Risk Committee (on which Mr. Schnitzer sat) and the broader Beneficient board of directors to approve or assent to the falsified minutes as genuine. On May 24, 2021, the defendant then caused the manipulated minutes to be endorsed by the entire Beneficient board of directors, including board member David DeWeese, who joined the board meeting via Zoom from his Manhattan apartment. The approval of the minutes, by both the Enterprise Risk Committee and

32

the broader Beneficient board, were integral to their falsification and part of the act of "making" the false record. Indeed, the defendant's aim was to produce a record that had been approved by the board and that task was not complete until his fabricated minutes traveled to New York and back. Under the continuing offense doctrine, venue is proper in any district in which any part of the offense occurred. *See* 18 U.S.C. § 3237(a); *Brennan*, 183 F.3d at 145.

Moreover, venue is also proper in the Southern District of New York based on the "effects" of the defendant's obstructive acts. *See Abouammo*, 122 F.4th at 1092-93. Here, the effects of the defendant's falsification were experienced in this District. Following the defendant's manipulation of the minutes, Manhattan-based attorneys acting on behalf of Beneficient and GWG transmitted the substance of the falsified minutes as well as the actual falsified minutes themselves to the SEC. The transmittal of the falsified document into this District, and its use to mislead the SEC from this District, each anchor venue here. The question of which facts the jury ultimately credits is a matter for trial—not a basis for pretrial dismissal.

Count Five is properly charged and this motion should be denied.

**CONCLUSION**

For the reasons set forth above, the defendant's motions should be denied.

Dated: New York, New York
February 24, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _Daniel Nessim_

Daniel G. Nessim
Alexandra N. Rothman
Kyle A. Wirshba
Assistant United States Attorneys
Tel.: 212-637-2486 / -2580 / -2493