UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

BRADLEY HEPPNER,

                              Defendant.

25 Cr. 503 (JSR)

<br>

**THE GOVERNMENT'S MOTIONS *IN LIMINE***

JAY CLAYTON
United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

Daniel G. Nessim
Alexandra Rothman
Kyle A. Wirshba
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

FACTUAL BACKGROUND ............................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.    Certain Evidence Is Admissible as Direct Evidence or Pursuant to Rule 404(b) ............... 3

    A.    Applicable Law .................................................................................................... 3

    B.    Discussion ............................................................................................................ 6

        1. Evidence of Misrepresentations to Paul Capital Is Admissible ................................. 6

        2. Evidence of the Defendant's Substantial Personal Expenses and Compensation Is Admissible ....................................................................................................... 9

II.   Statements of the Defendant's Coconspirators and Agents Are Not Barred by the Rule Against Hearsay .......................................................................................................... 11

    A.    Applicable Law .................................................................................................. 11

    B.    Discussion .......................................................................................................... 13

III.  Minutes of Board Meetings Are Admissible as Business Records............................... 19

IV.   The Court Should Preclude Unnoticed Expert Testimony ........................................... 21

V.    The Court Should Preclude the Defendant from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial ................................................................... 23

    A.    The Court Should Not Permit the Defendant to Blame His Victims............................ 24

    B.    The Court Should Exclude Evidence and Claims That the Defendant Believed GWG Would Ultimately Profit from His Scheme ........................................................ 26

    C.    The Court Should Preclude Argument Based on a Claim of Right ............................. 27

    D.    The Court Should Preclude Argument About Advice or Presence of Attorneys ......... 28

    E.    The Court Should Preclude Argument that GWG's Bankruptcy Was Caused by the SEC Investigation or Judicial Acts in Texas ................................................................ 30

    F.    The Court Should Preclude Argument Regarding the SEC Investigation .................... 32

    G.    The Court Should Exclude Evidence of the Defendant's Good Acts to Prove His Innocence ........................................................................................................ 34

    H.    The Court Should Exclude Evidence and Argument About the Defendant's Personal Circumstances and Potential Punishment ............................................................ 36

VI.   The Court Should Preclude the Defendant from Cross-Examining Witnesses on Irrelevant and Prejudicial Topics ................................................................................ 36

CONCLUSION.................................................................................................................. 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bourjaily v. United States*, 483 U.S. 171 (1987) ................................................................ 12, 13, 16

*Busher v. Barry*, No. 14 Civ. 4322 (NSR),
  2019 WL 6895281 (S.D.N.Y. Dec. 18, 2019) ................................................................. 20

*Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994) ..................................................................... 12

*Carter v. HealthPort Techs, LLC*, 822 F.3d 47 (2d Cir. 2016)...................................................... 18

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) .......................................................................... 39

*Eletson Holdings, Inc. v. Levona Holdings, Ltd.*, No. 23 Civ. 7331 (LJL),
  2026 WL 84510 (S.D.N.Y. Jan. 12, 2026) ..................................................................... 19

*Fed. Trade Comm'n v. Vyera Pharms., LLC*, No. 20 Civ. 706 (DLC),
  2021 WL 5236333 (S.D.N.Y. Nov. 10, 2021)................................................................. 20

*Feis v. United States*, 394 F. App'x 797 (2d Cir. 2010) ................................................................ 12

*George v. Celotex Corp.*, 914 F.2d 26 (2d Cir. 1990) ................................................................... 11

*In re Reserve Fund Sec. Litig.*, No. 09 Civ. 4346 (PGG),
  2012 WL 12354233 (S.D.N.Y. Oct. 3, 2012) ................................................................. 17

*Major League Baseball Props, Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) ...................... 20

*Morgan Guar. Tr. Co. v. Hellenic Lines Ltd.*, 621 F. Supp. 198 (S.D.N.Y. 1985) ....................... 20

*Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534 (2d Cir. 1992).......................................... 12

*Purgess v. Sharrock*, 33 F.3d 134 (2d Cir. 1994) ....................................................................... 19

*Saldarriaga v. United States*, No. 99 Civ. 4487 (WK),
  2002 WL 449651 (S.D.N.Y. Mar. 21, 2002) .................................................................. 40

*SEC v. Stoker*, No. 11 Civ. 7388 (JSR) (S.D.N.Y. July 23, 2012) ............................................... 30

*SEC v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013)................................................................. 30

*United States v. Adelekan*, 567 F. Supp. 3d 459 (S.D.N.Y. 2021) ............................................. 24

*United States v. Adelglass*, No. 23-6248,
  2024 WL 5087519 (2d Cir. Dec. 12, 2024) ................................................................... 11

*United States v. Agne*, 214 F.3d 47 (1st Cir. 2000) ........................................................... 17

*United States v. Agostini*, 280 F. Supp. 2d 260 (S.D.N.Y. 2003) ..................................... 40

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ................................................. 35

*United States v. Amico*, 486 F.3d 764 (2d Cir. 2007) ...................................................... 24

*United States v. Avenatti*, No. 19 Cr. 374 (JMF),
    2022 WL 457315 (S.D.N.Y. Feb. 15, 2022) ................................................................. 28

*United States v. Bailey*, 444 U.S. 394 (1980) ................................................................... 24

*United States v. Bakhtiari*, 913 F.2d 1053 (2d Cir. 1990) ................................................ 24

*United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK),
    2023 WL 6283509 (S.D.N.Y. Sept. 26, 2023) ............................................................. 24

*United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK),
    2024 WL 477043 (S.D.N.Y. Feb. 7, 2024) ............................................................ 29, 30

*United States v. Benchick*, No. 13 Cr. 20453 (RHC),
    2014 WL 4181970 (E.D. Mich. Aug. 21, 2014) .......................................................... 25

*United States v. Benedetto*, 571 F.2d 1246 (2d Cir. 1978) ............................................... 35

*United States v. Berger*, 188 F. Supp. 2d 307 (S.D.N.Y. 2002) ....................................... 26

*United States v. Binday*, No. 12 Cr. 152 (CM),
    2013 WL 12154927 (S.D.N.Y. Sept. 16, 2013) .......................................................... 27

*United States v. Blake*, 558 F. App'x 129 (2d Cir. 2014) ................................................. 28

*United States v. Bulgin*, 563 F. App'x 843 (2d Cir. 2014) ............................................... 11

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) ....................................................... 4

*United States v. Carton*, No. 17 Cr. 680 (CM),
    2018 WL 5818107 (S.D.N.Y. Oct. 19, 2018) .............................................................. 26

*United States v. Chambers*, 800 F. App'x 43 (2d Cir. 2020) ............................................ 36

*United States v. Colasuonno*, 697 F.3d 164 (2d Cir. 2012) .............................................. 29

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991) .................................................... 4

*United States v. Crowley*, 318 F.3d 401 (2d Cir. 2003) .................................................... 39

*United States v. Daly*, 842 F.2d 1380 (2d Cir. 1988) ......................................................... 4

*United States v. Dames*, No. 04 Cr. 1247 (PAC),
2007 WL 1129323 (S.D.N.Y. Apr. 12, 2007)..................................................... 34

*United States v. Daugerdas*, No. 09 Cr. 581 (WHP),
2010 WL 4967878 (S.D.N.Y. Nov. 22, 2010)..................................................... 33

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999)................................................... 4, 5, 7

*United States v. Donovan*, No. 20 Cr. 374 (PKC),
2021 WL 6065767 (E.D.N.Y. Dec. 22, 2021) ..................................................... 40

*United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013) ................................................... 11

*United States v. Dupree*, 870 F.3d 62 (2d Cir. 2017) ..................................................... 5

*United States v. Evangelista*, 122 F.3d 112 (2d Cir. 1997) ............................................ 29

*United States v. Fazio*, No. 11 Cr. 873 (KBF),
2012 WL 1203943 (S.D.N.Y. Apr. 11, 2012) ..................................................... 35

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ................................................ 6

*United States v. Fiore*, 779 F. Supp. 3d 1160 (D. Nev. 2025)........................................ 33

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995)..................................................... 6

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) ................................................... 12

*United States v. Gole*, 158 F.3d 166 (2d Cir. 1998)....................................................... 28

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ............................................ 3, 4

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2014) ................................................... 13

*United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012)......................................................... 4

*United States v. June*, No. 10 Cr. 30021 (MAP),
2012 WL 245243 (D. Mass. Jan. 25, 2012)....................................................... 25

*United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010)..................................................... 5

*United States v. Kirk*, 844 F.2d 660 (9th Cir. 1988) ..................................................... 18

*United States v. Knox*, 687 F. App'x 51 (2d Cir. 2017)................................................. 33

*United States v. Kwong*, 69 F.3d 663 (2d Cir. 1995)..................................................... 24

*United States v. Lange*, 834 F.3d 58 (2d Cir. 2016) ..................................................... 26

iv

*United States v. Mattera*, No. 24-CR-117 (LAP),
  2025 WL 2841162 (S.D.N.Y. Oct. 7, 2025) ........................................................... 28

*United States v. Miller*, 626 F.3d 682 (2d Cir. 2010) ................................................... 24

*United States v. Mrabet*, 703 F. Supp. 3d 442 (S.D.N.Y. 2023) ................................... 22

*United States v. Mustaga*, 753 F. App'x 22 (2d Cir. 2018) ........................................... 36

*United States v. Nekritin*, No. 10 Cr. 491 (KAM),
  2011 WL 2462744 (E.D.N.Y. June 17, 2021) ...................................................... 26

*United States v. Nelson*, 365 F. Supp. 2d 381 (S.D.N.Y. 2005) .................................... 39

*United States v. Padilla*, 203 F.3d 156 (2d Cir. 2000) ................................................. 13

*United States v. Paul*, 110 F.3d 869 (2d Cir. 1997) ..................................................... 24

*United States v. Paxson*, 861 F.2d 730 (D.C. Cir. 1988) ............................................. 17

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) ............................................ 11

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007) ................................................ 4

*United States v. Ramirez*, 894 F.2d 565 (2d Cir. 1990) ................................................. 5

*United States v. Ray*, No. 20 Cr. 110 (LJL),
  2022 WL 558146 (S.D.N.Y. Feb. 24, 2022) ........................................................ 13

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ...................................................... 5

*United States* v. *Rioux*, 97 F.3d 648 (2d Cir. 1996) ...................................................... 17

*United States v. Rivera*, 22 F.3d 430 (2d Cir. 1994) ..................................................... 13

*United States v. Rivera*, No. 13 Cr. 149 (KAM),
  2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) ...................................................... 35

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ...................................... 6

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002) ..................................................... 17

*United States v. Saneaux*, 392 F. Supp. 2d 506 (S.D.N.Y. 2005) ................................. 16

*United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990) ................................................... 34

*United States v. Scarpa*, 913 F.2d 993 (2d Cir. 1990) ................................................. 39

v

*United States v. Schlussel*, No. 08 Cr. 694 (JFK),
    2009 WL 536066 (S.D.N.Y. Feb. 27, 2009) .......................................................... 38

*United States v. Scully*, 877 F.3d 464 (2d Cir. 2017) ..................................................... 29

*United States v. Snype*, 441 F.3d 119 (2d Cir. 2006) ...................................................... 6

*United States v. Stroming*, 838 F. App'x 624 (2d Cir. 2021) ........................................ 36

*United States v. Tagliaferri*, No., 13 Cr. 115 (RA) (S.D.N.Y. 2014) ........................... 30

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988) ......................................... 13

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994) ......................................................... 4

*United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004) ................................................... 25

*United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993) ..................................................... 16

*United States v. Tussa*, 816 F.2d 58 (2d Cir. 1987) ....................................................... 6

*United States v. Viserto,* 596 F.2d 531 (2d Cir.1979) .................................................... 34

*United States v. Walker*, 191 F.3d 326 (2d Cir. 1999) .................................................... 36

*United States v. Watts*, 934 F. Supp. 2d 451 (E.D.N.Y. 2013) ...................................... 27

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) .................................................... 24

*United States v. Williams*, No. 22 Cr. 600 (LAP),
    2026 WL 366682 (S.D.N.Y. Feb. 10, 2026) ........................................................ 33

*United States v. Zackson*, 12 F.3d 1178 (2d Cir. 1993) ................................................. 5

The Government respectfully submits these motions *in limine* in advance of the trial of defendant Bradley Heppner scheduled to begin on April 21, 2026.

## FACTUAL BACKGROUND

On October 28, 2025, a Grand Jury in this District returned a five-count indictment charging the defendant with securities fraud, wire fraud, conspiracy to commit securities fraud and wire fraud, making false statements to auditors, and falsifying records. *See* Dkt. 2 (the "Indictment"). The charges arise out of the defendant's fraudulent scheme to enrich himself by making, and causing to be made, misrepresentations and omissions to the board of GWG Holdings, Inc., a public company, and other prospective investors in Beneficient, concerning a debt that Beneficient owed to a purported third-party lender, HCLP and its subsidiaries. As a result of this scheme, between in or about May 2019 and March 2021, the defendant fraudulently obtained hundreds of millions of dollars from GWG, of which the defendant misappropriated and spent in excess of $120 million. The defendant used these stolen funds for a variety of purposes, including to fund lavish real estate purchases, home improvements, and other personal expenses. To conceal this scheme, the defendant lied to Beneficient's auditors, hiding the true nature of his control of HCLP, and falsified the minutes of a meeting of Beneficient's Enterprise Risk Committee.

The Government expects that two of the defendant's co-conspirators, Jeffrey Hinkle and Keith Martens, who each have non-prosecution agreements with the Government, will testify at trial about the manner in which they assisted the defendant in committing fraud. Hinkle worked for the defendant for more than a decade, first at Crossroads (a business the defendant sold to Lehman Brothers for more than $150 million), then at the defendant's family office, and finally at Beneficient as Chief Accountability Officer and Treasurer. Hinkle also served as the independent trustee for certain of the defendant's trusts. Martens was the defendant's childhood friend and

distant cousin. These witnesses are expected to testify that, at the defendant's direction, they made

misrepresentations and omissions regarding a variety of entities controlled by the defendant.

Hinkle, for his part, is expected to testify that, beginning in or around 2015, he

misrepresented to potential investors, including Paul Capital Advisors, Infinedi Partners, and

Oaktree Capital Management, and later to the GWG Board, that Beneficient owed a $141 million

debt to HCLP, a purported third-party lender; that this debt was comprised of startup costs for the

Beneficient business; and that the defendant was not a beneficiary of the trust that owned HCLP,

which the defendant referred to as the "Harmon Trust."[1]

Martens is expected to testify that, in or around February 2019, he agreed to serve as

manager of HCLP, at the request of the defendant. In this role, Martens forwarded emails and

signed documents that he knew to be false. These false documents made it appear that Martens

had been serving as manager of HCLP since 2017 (he had not), and that HCLP was independent

of the defendant (it was not). When, in the fall of 2019, the Beneficient and GWG Boards started

asking more questions about HCLP and its relationship to the defendant, the defendant replaced

Martens with another associate, David Wickline, who appeared less closely related than Martens.

As was the case with Martens, however, Wickline remained largely uninvolved in the management

and decision making of HCLP, and the defendant remained in control.

The evidence will further establish that the defendant's scheme was aided by at least three

other co-conspirators—a lawyer ("CC-1"), a senior executive at Beneficient ("CC-2"), and a senior

executive at GWG ("CC-3"). CC-1 was the defendant's personal lawyer and served as the lawyer

for HCLP Nominees (a subsidiary of HCLP). CC-1 falsely represented to the GWG Special

---

[1] Although the defendant used the term "Harmon Trust," the trust's legal name is the Highland Investment Holdings Trust, and it is explicitly a "Trust for Brad," set up for the benefit of the defendant and his family. (GX 205 at 7).

Committees, a small group of the GWG Board, that HCLP was an independent third-party lender, in connection with the defendant's frequent requests for funding from GWG between 2019 and 2021. CC-2 was a senior executive at Beneficient and likewise misrepresented the defendant's control over HCLP and its related entities. CC-3 was a senior executive of GWG, who the defendant had installed in the role after assuming control of the GWG Board. The evidence at trial will show that CC-3, for his part, prepared a series of false and misleading documents to deceive Beneficient's auditors.

The Government further expects to call at trial, among other witnesses, employees and Board members of Beneficient and GWG, and an expert witness whose financial analysis will show the tracing of crime proceeds from GWG to the defendant. The Government also intends to introduce documentary evidence of the defendant's crimes, including Board minutes, trust and partnership records, email communications, toll records, and financial records.

## ARGUMENT

### I.     Certain Evidence Is Admissible as Direct Evidence or Pursuant to Rule 404(b)

At trial, the Government will seek to introduce (1) evidence of misrepresentations the defendant and Hinkle, acting at his direction, made to Paul Capital in or around 2015 regarding HCLP, the Harmon Trust, and the purported debt owed by Beneficient to HCLP; and (2) evidence of the defendant's substantial personal spending and compensation from Beneficient before and during the time period of the Indictment. This evidence is relevant and admissible at trial, both as direct proof of the charges and pursuant to Federal Rule of Evidence 404(b).

### A.  Applicable Law

#### 1.  Direct Evidence

Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). As the Second Circuit has explained,

"[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007).

Thus, where, as here, an indictment contains a conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999); *see United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Moreover, evidence of uncharged acts is properly admitted to provide background for the existence of a charged conspiracy, or the motive and intent for a charged crime. *Coonan*, 938 F.2d at 1561. In particular, "[b]ackground evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821 (1988)).

The Second Circuit has repeatedly affirmed the admissibility of evidence fitting one or more of these descriptions, whether it relates to conduct during the period of the charged crime or before it. *See, e.g.*, *United States v. Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012) (following conviction after trial on campaign finance related charges, affirming district court's admission, as direct

4

evidence, of testimony that defendant had engaged in a Ponzi scheme contemporaneously with, and arguably related to, the campaign finance violations); *United States v. Kaiser*, 609 F.3d 556, 570-71 (2d Cir. 2010) (in securities fraud case, holding that bad acts predating the conspiracy were admissible as direct evidence, without regard to Rule 404(b), because they had "carry-over effects" during the conspiracy); *United States v. Rigas*, 490 F.3d 208, 238-39 (2d Cir. 2007) (affirming district court's decision to permit Government to adduce evidence of uncharged fraudulent acts predating the charged conspiracy as direct proof of charged accounting fraud conspiracy because the evidence was "'inextricably intertwined with'" the proof of the charged conspiracy and "'necessary to complete the story of the crime on trial'").

### 2. Rule 404(b)

Evidence of a defendant's prior crimes, wrongs, or acts are admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit follows an "inclusionary approach" under which "prior act evidence is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017). Such evidence is admissible if (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990). Other act evidence is routinely admitted "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Dupree*, 870 F.3d at 76 (citing *Diaz*, 176 F.3d at 79).

### 3. Rule 403

Whether evidence is admitted as direct evidence or under Rule 404(b), the probative value of such evidence must not be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The touchstone of the prejudice analysis under Rule 403 is whether the proffered evidence of uncharged acts does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant is] charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). To the extent that there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice); *see generally United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.").

### B. Discussion

#### 1. Evidence of Misrepresentations to Paul Capital Is Admissible

At trial, the Government will seek to introduce evidence that the defendant and Hinkle made misrepresentations to Paul Capital, a private equity firm, regarding HCLP, the Harmon Trust, and the purported debt owed by Beneficient to HCLP, in connection with a potential investment in Beneficient. Beginning in or around 2015, in order to induce a transaction with Paul Capital, the defendant and Hinkle misrepresented that the debt on Beneficient's books was owed to a third party, "which ha[d] made a series of loans to the trust which owns [Beneficient];" that the third

party was the "Harmon Trust," which was purportedly a trust for the predominant benefit of and controlled by the family of Charlie Harmon, the defendant's purported mentor; and that the trust had "dozens of beneficiaries." (GX 851, 1105-1108). These misrepresentations served to distance Heppner from the debt (and any repayment) and made the debt seem more legitimate. The limited partners of Paul Capital rejected the deal at the time, but by September 2017, Paul Capital had entered into a new deal to sell its private equity assets, valued at nearly $500 million, to Beneficient. As part of that deal, the defendant directed Hinkle to formalize his past spending from HCLP as a debt on Beneficient's books, which formed the basis of the latter debt that the defendant misrepresented to the GWG Special Committees needed to be repaid. Evidence of the misrepresentations to Paul Capital are admissible for several reasons:

*First*, evidence of these misrepresentations is proof of how the illegal relationship and mutual trust developed between Hinkle and the defendant. *See Diaz*, 176 F.3d at 79-80 ("In this case, for example, testimony of Morales' drug dealing for Burgos was admitted because it informed the jury how the Latin Kings' racketeering and drug conspiracies evolved, and how illegal relationships and mutual trust developed between co-conspirators."). As Hinkle is expected to testify, he worked for the defendant for more than a decade, and lied for the defendant repeatedly. In 2015, acting on the defendant's orders, Hinkle made a series of misrepresentations to Paul Capital regarding HCLP, the Harmon Trust and the debt on Beneficient's books. The defendant again turned to Hinkle to lie during the charged conspiracy when seeking additional investments from prospective investors and from the GWG Board. These earlier misrepresentations are therefore illustrative of why the defendant felt that he could trust Hinkle to assist in his later scheme, and the reasons that Hinkle understood the manner in which he was expected to lie for the defendant regarding HCLP and the Harmon Trust.

7

*Second*, evidence of these misrepresentations to Paul Capital is direct proof of the falsity of Hinkle's later statements, as part of the fraud on GWG's Board, concerning HCLP and its funds being controlled by the Harmon Trust and Harmon Family. At all times, Hinkle knew that the entity referred to as the Harmon Trust was neither (a) associated with the Harmon Family in any material, ongoing sense, nor (b) would repayment of the purported debt benefit in any way the Harmon Family. Proving the later falsehoods requires evidence of when Hinkle was first directed to lie to potential investors concerning HCLP, the purpose of those lies, and the reasons why those statements were false.

*Third*, evidence of these misrepresentations is necessary context for, and proof of, lies and deception during the charged conspiracy. As alleged in the Indictment, the defendant engaged in a scheme to deceive the GWG Board and prospective investors about the nature of the debt that Beneficient purportedly owed to HCLP. *See* Dkt. 2 ¶ 26. As necessary context for those lies, the jury should be permitted to understand the genesis of the debt, which arose from Hinkle's repackaging of the defendant's personal spending as a formal debt on the eve of the Paul Capital deal. As explained above, Paul Capital entered the transaction only after being presented with misinformation about the debt. The jury should be permitted to hear the relevant background and context with Paul Capital as they explain the events that follow.

*Fourth*, the defendant's assertion that he lacked fraudulent intent and did not knowingly make false statements to GWG's Board opens the door to precisely this type of evidence under Rule 404(b). Evidence that the defendant made materially similar false statements to Paul Capital, or caused Hinkle to do so, is admissible to prove knowledge, intent, and an absence of good faith or mistake—each of which the defendant has indicated he intends to place at issue by his defense. The evidence is particularly compelling here because it does not merely show prior similar

8

conduct; it shows that Heppner was directly confronted about it. Hinkle is expected to testify that, in or around 2015, he confronted the defendant regarding certain of the misrepresentations the defendant had directed him to make to Paul Capital. (GX 852). The defendant dismissed these concerns and directed Hinkle to continue on, which he did. That sequence—awareness of the falsity, explicit warning, and deliberate continuation—is probative of the fact that when Heppner later made the same kinds of misrepresentations to GWG's Board, he did so with full knowledge that his conduct was wrongful. A defendant who has been put on notice that his representations are false cannot later claim he acted in good faith when he repeats them.

Finally, the probative value of this evidence substantially outweighs any risk of unfair prejudice to the defendant under Rule 403. As described above, evidence of Hinkle's and the defendant's misrepresentations to Paul Capital are highly probative of the essential elements of the charges. This evidence is no more prejudicial than the evidence of similar misrepresentations during the time period of the charged offenses. There is no basis to exclude, and the Government should be permitted to offer this evidence at trial.

### 2. Evidence of the Defendant's Substantial Personal Expenses and Compensation Is Admissible

At trial, the Government intends to offer evidence of the defendant's personal spending, both before and during the charged scheme, as well as his compensation from Beneficent. Such evidence is admissible for several reasons:

*First*, evidence of the defendant's spending prior to his fraud on GWG's Board is necessary to explain the origin of the $141 million debt that was purportedly owed to HCLP by Beneficent. The evidence will show that in 2003, the defendant earned more than $150 million through the sale of his Crossroads business to Lehman Brothers. Over the following decade, the defendant spent this money, using it to purchase and improve a Texas ranch, to purchase real estate, to pay

9

for his living expenses, to pay for his family office staff, and, to a lesser degree, to develop the Beneficient business. When the money ran out, he did not stop spending. Instead, he devised a scheme to retroactively record those expenditures as "debt" owed by Beneficient, laundering his own extravagance into a purported corporate obligation. Evidence of this past spending is necessary to explain both the creation of the debt, and the defendant's motivation and intent for engaging in the scheme. Without it, the jury cannot understand why the HCLP debt existed, where it came from, how the defendant misrepresented it to various investors, or why the defendant was so determined to extract repayment from GWG.

*Second*, evidence of the defendant's spending of the money he obtained from GWG is direct evidence of the fraud itself. The defendant told GWG that Beneficient needed funds to, among other things, sustain its business operations and pay back its "senior lender." The evidence will also establish that the scheme involved misrepresentations that repayments on the HCLP debt would not be received by the defendant or his entities. In truth, the defendant took the funds and used them to fund his lavish lifestyle, including by paying for private jet travel and other luxuries. Evidence that the defendant personally received and spent the proceeds he claimed would go elsewhere is not merely probative of the scheme, it *is* the scheme. It goes to the falsity of his representations, the mechanics of the fraud, his knowing participation in it, and his motivation. This evidence is plainly admissible as direct evidence.

*Third*, evidence of the defendant's compensation is direct evidence of the crimes charged and the defendant's motive. The evidence at trial will show that the defendant received a salary of $700,000 per quarter from Beneficient. This sum, while generous by all accounts, was insufficient to cover his personal expenses. To plug the gap, the defendant's family office routinely used money from HCLP (which came from GWG) to cover the defendant's expenses. Evidence of the

defendant's salary is thus relevant to prove the defendant's motives for engaging in the scheme. *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (affirming Rule 403 analysis admitting evidence of compensation as probative of motive) (collecting cases); *United States v. Adelglass*, No. 23-6248, 2024 WL 5087519, at *2 (2d Cir. Dec. 12, 2024) (Rule 404(b) permitted Government to introduce evidence of the defendant's "lavish spending," which was "probative of his motive."); *United States v. Bulgin*, 563 F. App'x 843, 846 (2d Cir. 2014) ("[W]e have upheld a district court's decision to allow evidence of monetary gain when a defendant is on trial for a crime in which pecuniary gain is the usual motive") (internal quotation marks omitted).

## II.    Statements of the Defendant's Coconspirators and Agents Are Not Barred by the Rule Against Hearsay

### A.    Applicable Law

The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is admissible only if it falls within an enumerated exception. Fed. R. Evid. 802. However, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note. Thus, a statement offered to show its effect on the listener is not hearsay. *Id.*; *see also United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

11

### 1.  Rule 801(d)(2)(D)

Federal Rule of Evidence 801(d)(2)(D) provides that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." To admit a statement under this rule, the court must find "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Feis v. United States*, 394 F. App'x 797, 799 (2d Cir. 2010) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992)). An agency relationship requires "the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994) (superseded by statute on other grounds) (quoting *Restatement (Second) of Agency* § 1, cmt. b (1958)). As the Second Circuit has explained, "admissibility under this rule should be granted freely," and there is a "liberal" standard for admissibility rooted in the understanding that agents and employees are usually the people "best informed about certain acts committed in the course of [their] employment." *Pappas*, 963 F.2d at 537.

### 2.     Rule 801(d)(2)(E)

Federal Rule of Evidence 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: (1) that a conspiracy that included the defendant and the declarant existed; and (2) that the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence

12

and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). When determining whether the predicate conspiracy has been established, the district court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181). To be in furtherance of a conspiracy, a statement "must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Under this standard, a coconspirator statement is admissible if it "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

### B. Discussion

At trial, the Government will seek to introduce certain out-of-court statements by Beneficient and GWG employees, all of whom were agents of the defendant, and some of whom were co-conspirators of the defendant, including Hinkle, Martens, CC-1, CC-2, and CC-3. In addition, the Government will seek to offer statements from employees and/or agents of the defendant, including Timothy Evans, Bruce Topott, Kevin Mackenroth, in-house attorney Art Damoulakis, and outside attorneys representing the defendant. To the extent these statements are offered for their truth, they are not barred by the rule against hearsay.[2]

---

[2] In addition to being admissible non-hearsay statements, many of the out-of-court statements will be offered not "to prove the truth of the matter asserted" in the statement, Fed. R. Evid. 801(c)(2), but rather for some other purpose that does not implicate the rule against hearsay. By way of example, many of the representations offered to the Special Committee concerning HCLP are false statements not offered for their truth and therefore not hearsay at all. *See, e.g., United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 558146, at *4 (S.D.N.Y. Feb. 24, 2022).

As representative examples:

- In or about 2018, CC-3 told Jon Sabes, the then-CEO of GWG about Heppner's background and his relationship with Charlie Harmon, with whom Heppner had a close relationship and who had funded some of Heppner's businesses.

- In or about December 2018, CC-1 emailed representatives of Paul Capital that the "senior lender is real and is acting independently"; threatened that HCLP would foreclose on its collateral; and made other false and misleading representations in order to induce Paul Capital to forego collecting money it was owed. (GX 1146, 1147, 1148, 1150).

- In between February 2019 and June 2019, Hinkle, CC-3, Evans, and other Beneficient employees made statements to Deloitte auditors on Heppner's behalf.

- In or about March 2019, CC-1 emailed GWG executives that HCLP would call a default on its note if GWG continued with actions that would be harmful to Beneficient. (GX 1180).

- In or about May 2019, during negotiations involving the GWG Special Committee, CC-3 and Evans relayed information to the Special Committee on Heppner's behalf, including for example, that HCLP was an unrelated third-party. (GX 1195).

- In or about September and October 2019, CC-1 and CC-2 exchanged communications relating to restructuring HCLP and crafting a letter that would conceal Heppner's powers over and benefits from HCLP and contained false representations later conveyed to GWG and Beneficient directors. (*E.g.*, GX 1208, 1219, 1228, 1229).

- CC-2 corresponded with U.S. Trust, a financial advisor specializing in trust administration, in order to conduct business on behalf of Heppner and Heppner's entities, including the Harmon Trust. For example, on or about October 28, 2019, CC-2 emailed U.S. Trust to update paperwork establishing CC-2 as the independent trustee of the Harmon Trust. (GX 1241).

- On or about November 15, 2019, CC-1 told the Special Committee's legal counsel, in substance, that Heppner did not control HCLP, had an extremely qualified ability to obtain any money from the Harmon Trust, and that none of the debt repayments on the HCLP loan would go to Heppner or his affiliates.

- In or about December 2019, Glenn West, an attorney representing Beneficient, told the Special Committee's legal counsel that he understood from CC-3 that HCLP was not affiliated with Heppner, HCLP was managed by a third-party, and Heppner was merely a "limited contingent beneficiary" of the Harmon Trust.

- On December 31, 2019, Beneficient employee Bruce Topott gave directions to JPMorgan concerning Heppner's directives as to how HCLP funds should be

14

invested. (GX 1261). Topott and another Beneficient employee, Kevin Mackenroth, similarly made other representations concerning Heppner's assets, bills, and obligations.

- Between in or about November 2019 and in or about March 2021, CC-3 and Evans relayed information concerning the negotiations and negotiating positions on Heppner's behalf, including, for example, the amount of funding required by Beneficient, and the positions of HCLP in response to inquiries of the Special Committee. (*E.g.*, GX 1258, 1276, 1294, 1296, 1298, 1312, 1316, 1320, 1326).

- In or about July 2020, CC-1 sent a letter to Beneficient threatening that HCLP would foreclose on its collateral unless a $28 million payment was made that day. (GX 1299).

- In or about December 2020, CC-3 represented to a prospective member of GWG's Special Committee that the HCLP debt was attributable to money invested by the Harmon Trust and Charlie Harmon. (GX 601).

- In or about February and March 2021, CC-1 sent letters to Beneficient and the GWG Special Committee threatening that, unless the Special Committee authorized payments to Beneficient, HCLP would foreclose on its collateral, cause irreparable to GWG's shareholders, and otherwise representing HCLP's positions. (GX 1321, 1326, 1328).

- On April 16, 2021, Willkie Farr attorneys representing GWG, Beneficient, and Heppner circulated a set of notes memorializing a meeting Heppner and others had with the SEC, and including Heppner's statements made during the course of the meeting that "HCLP is a private lending entity" and "there has never been a distribution" from HCLP. (GX 1332).

- On May 24, 2021, Beneficient attorney Art Damoulakis wrote that a certain set of minutes would "need to go to the SEC." (GX 1346).

- In or about June 2021, CC-2 and other Beneficient employees worked out a plan to settle the funds Heppner had taken from HCLP by transferring certain real property improvements to HCLP in satisfaction of the nine-figure payments. (GX 1352).

Out-of-court statements made by the defendant's coconspirators in furtherance of the conspiracy are not hearsay, pursuant to Rule 801(d)(2)(E). The evidence at trial will readily show by a preponderance that Heppner conspired with a number of people, including Hinkle and Martens, who will be testifying pursuant to non-prosecution agreements, as well as CC-1, CC-2, and CC-3. The Court can make a preliminary ruling that statements they made in furtherance of

15

the conspiracy are admissible, subject to the introduction of trial evidence (including the statements themselves) that is sufficient to show the existence of a conspiracy. *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) ("[S]tatements proffered as co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence" establishing that a conspiracy involving the defendant existed.). Notably, the Court may consider the proffer statements of witnesses testifying pursuant to non-prosecution agreements to support a finding that a conspiracy with the defendant existed. *See United States v. Saneaux*, 392 F. Supp. 2d 506, 513-14 & n.10 (S.D.N.Y. 2005) (while proffer statements are generally not admissible at trial, the court may consider them in determining there was a conspiracy and that coconspirator statements made in furtherance of the conspiracy may be admitted); *Bourjaily*, 483 U.S. at 178 ("Rule [104] on its face allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege."). In addition, the Court may consider communications between the defendant and his conspirators showing their coordination and criminal agreement. For example, just one day before CC-1 made false representations to Paul Capital regarding the Harmon Trust, emails between the defendant and CC-1 show them planning to meet in person over breakfast because, as the defendant wrote, it is "[a]lways better to eat, laugh and plot." (GX 1143). In other instances, the defendant engaged in email communications with his conspirators as they discussed how to present false information to the GWG Special Committee and others.

With respect to statements made by Beneficient or GWG employees—both those made by conspirators and non-conspirators—as well as statements made by the defendant's personal or corporate counsel within the scope of their representations, these statements too are not hearsay because they are statements of the defendant's agents under Rule 801(d)(2)(D).

16

As for employment relationships, for the entirety of the relevant period, the defendant was both Chairman of the Board and CEO of Beneficient. From in or about April 2019 through in or about June 2021, the defendant was also Chairman of the Board of GWG. And, although the defendant was not CEO of GWG, the evidence at trial will establish that the defendant directed GWG's operations.[3] Out-of-court statements that the Government anticipates offering from these employees, such as emails and other statements made within the scope of their employment at Beneficient and GWG are therefore not hearsay. *See, e.g.*, *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) ("[T]he objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all"); *In re Reserve Fund Sec. Litig.*, No. 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7-8 (S.D.N.Y. Oct. 3, 2012) (statements made by an employee of an entity are admissible when offered against the person who controls the entity). "Where an individual defendant controls the entity that employs the declarant, and is the declarant's ultimate supervisor, the employee is an agent of the defendant for purposes of Fed. R. Evid. 801(d)(2)(D), and his statements are admissible against that individual defendant." *In re Reserve Fund Secs. & Derivs. Litig.*, 2012 WL 12354233, at *7 (S.D.N.Y. Oct. 3, 2012) (citing *United States* v. *Rioux*, 97 F.3d 648, 660 (2d Cir. 1996)). Courts thus routinely hold that where, as here, employees take their orders from the defendant, this Rule applies. *See, e.g.*, *Rioux*, 97 F.3d at 660-61; *United States v. Agne*, 214 F.3d 47, 54 (1st Cir. 2000) (admitting statements of employee against senior corporate officer); *United States v. Paxson*, 861 F.2d 730, 734 (D.C. Cir. 1988) (same, rejecting "hyper-technical construction of the rule" limiting it to corporate employers); *United States v. Kirk*, 844

---

[3] The spatial layout of the joint Beneficient and GWG offices reflected this hierarchy. The defendant sat in his corner office. Evans, who served as GWG's CFO after first serving as a Beneficient employee, sat in the adjoining office. GWG's CEO, CC-3, sat one door down.

17

F.2d 660, 663 (9th Cir. 1988) (admitting statements of employees against part owner and senior corporate officer).

In addition to these statements being generally within the scope of their employment relationships, substantial documentary evidence shows the particular agency relationships the defendant created with regard to negotiations with the Special Committee. The defendant specifically deputized and directed the statements of CC-3, Evans, and other Beneficient employees toward the GWG's Special Committees during the Special Committees' consideration of Beneficient funding. For example, in one email dated October 29, 2019, the defendant sent CC-3 and Evans a term sheet of requested funding from GWG, writing "[t]his is what I'd like to send to Special Committee." (GX 1242). Heppner's agents thereafter sent the term sheet to the Special Committee. This and other documents establish the specific agency relationship formed between Heppner and his proxies.

As for the statements of Heppner's attorneys, "[t]he relationship between a lawyer and client is one of agent and principal." *Carter v. HealthPort Techs, LLC*, 822 F.3d 47, 58 (2d Cir. 2016). Some of the statements the Government seeks to offer that are attributable to Heppner's attorneys are not offered for their truth and are thus non-hearsay. For example, both CC-1's and West's statements to the Special Committee's counsel were false and thus are not being offered for their truth.[4] In other instances, however, the attorneys' statements constitute agent admissions that are admissible as opposing party statements. For example, the April 15, 2021 document prepared by Willkie attorneys to memorialize a meeting with the SEC is itself not hearsay because it was drafted within the scope of those attorneys' representation of Heppner and his companies:

---

[4] CC-1's statements were false because, as the evidence will show at trial, CC-1 was in a conspiracy with the defendant. By contrast, West's statements were false because he relied on the false information provided by CC-1 in preparing his report for the Special Committee.

Memorializing the questions asked by the SEC and Heppner's statements during the meeting assisted Willkie in representing Heppner and responding to the SEC questions. Nor are the various statements reflected in that document hearsay: Heppner's statements are admissible as those of a party opponent; Willkie's statements are admissible as those of Heppner's agent; and the SEC's questions and statements are either non-hearsay or necessary to give context to Heppner's admissions. Similarly, in-house attorney Art Damoulakis's May 2021 statement that a set of board minutes would need to be sent to the SEC was within the scope of his agency relationship as a Beneficient attorney (to the extent it is even hearsay). *See, e.g.*, *Purgess v. Sharrock*, 33 F.3d 134, 143-44 (2d Cir. 1994) (affirming admission of attorney statements under Rule 801(d)(2)); *Eletson Holdings, Inc. v. Levona Holdings, Ltd.*, No. 23 Civ. 7331 (LJL), 2026 WL 84510, at *31 (S.D.N.Y. Jan. 12, 2026) (admitting such statements under Rule 801(d)(2)).

## III.    Minutes of Board Meetings Are Admissible as Business Records

The Government also seeks to admit minutes of certain meetings of the Boards of Beneficient, GWG, and the GWG Special Committees. These documents are admissible as business records under Rule 803(6). In addition, to the extent those documents contain embedded hearsay, those statements are admissible for non-hearsay purposes or as statements of the defendant, his co-conspirators, or his agents that are being offered for their truth.

Rule 803(6) provides that a record of regularly conducted activity meets the necessary conditions to qualify as a business record under Rule 803(6) when (1) "the record was made at or near the time by—or from information transmitted by—someone with knowledge," (2) "the record was kept in the course of a regularly conducted activity of a business," and (3) "making the record was a regular practice of that activity." Courts have held that copies of Board minutes may be admitted at trial as business records. *See Major League Baseball Props, Inc. v. Salvino, Inc.*, 542 F.3d 290, 313-14 (2d Cir. 2008) (affirming admission of meeting minutes as "plainly . . .

19

admissible as a business record under Rule 803(6)"); *Fed. Trade Comm'n v. Vyera Pharms., LLC*, No. 20 Civ. 706 (DLC), 2021 WL 5236333, at *1 (S.D.N.Y. Nov. 10, 2021) ("Documents created by and for the Board of Directors of Vyera may be admissible at trial against all defendants as business records."); *Busher v. Barry*, No. 14 Civ. 4322 (NSR), 2019 WL 6895281, at *7 (S.D.N.Y. Dec. 18, 2019) (finding board minutes admissible under business records exception); *Morgan Guar. Tr. Co. v. Hellenic Lines Ltd.*, 621 F. Supp. 198, 218 (S.D.N.Y. 1985) (same).

Here, the Government will offer minutes from several meetings of the Boards of Beneficient, GWG, and the GWG Special Committee. (GX 101-117). These minutes reflect the regular activities of the Board, including the decisions to approve transfers of funds to Beneficient.[5] The Government expects to call attorneys for the Special Committees, including Evan Stone of Foley & Lardner LLP, to lay the proper foundation for the business record exception: namely, that the minutes were prepared "at or near the time" of the Board meeting; that the minutes were kept "in the course of a regularly conducted activity;" and that "making the record was a regular practice of that activity." Fed. R. Evid. 803(6).

In addition to recording the regular activities of the Board, the minutes also reflect certain statements by the defendant and his agents within the scope of their agency relationship or his co-conspirators in furtherance of the conspiracy. Below is a representative sample of statements:

- October 10, 2019 Enterprise Risk Committee: "Mr. Heppner described the purposes of the Harmon Trust and Mr. Heppner's personal relationship with its grantor and his prior status as a trustee or advisor, which terminated following the 2017 Transaction Agreement." (GX 117).

- November 18, 2019 GWG Special Committee: "Foley explained that the purpose [of the call with CC-1] was to gain comfort that the senior lender was unaffiliated

---

[5] These Board actions are not hearsay at all but instead verbal acts. *See* Advisory Comm. Note to Fed. R. Evid. 801(c) (explaining that "'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights" are not hearsay).

with BEN . . . such lack of affiliation had been previously represented to the Committee by BEN management – and that Mr. Heppner otherwise would not have an economic interest in proceeds received by the lender, which was an important issue to confirm for the Committee. Foley explained that [CC-1] explained the control structure of the lender (which did not include rights for Mr. Heppner or other affiliates) and represented that Mr. Heppner retained solely a limited contingent interest in distributions from the ultimate equity holder in the lender and that unequivocally no debt repayment would be received by Mr. Heppner or his affiliates." (GX 107).

- December 17, 2019 GWG Special Committee: "Foley relayed to the Committee that it had a follow up call with Glenn West . . . for the purpose of confirming Mr. West's understanding of the third party status of HCLP Nominees, the BEN senior lender…Foley reported that Mr. West had conducted a careful analysis . . . and concluded the lender was not affiliated with Mr. Heppner." (GX 108).

- December 21, 2019 GWG Special Committee: "Mr. Heppner discussed at some length BEN's negotiations with the manager (David Wickline) of the control party of HCLP Nominees and represented that, while such negotiations were ongoing, he was not optimistic that in order to achieve the Consolidation . . . that a change of control early repayment of the magnitude requested could be avoided." (GX 109).

The statements above from Heppner are admissible as the defendant's own statements under Rule 801(d)(2)(A). The statements from attorneys at Foley, Mr. West, and CC-1 are admissible as statements of a party's agent under Rule 801(d)(2)(D). And the statements from CC-1 are also admissible as co-conspirator statements under Rule 801(d)(2)(E).

## IV.    The Court Should Preclude Unnoticed Expert Testimony

To the extent the defendant seeks to offer unnoticed expert testimony, such testimony should be precluded as improper and violative of both Federal Rule of Criminal Procedure 16 and the Court's Individual Rules. Federal Rule of Evidence 702 provides that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 16 provides specific notice requirements for both the Government and Defense. *See* Fed. R. Crim. P. 16(a)(1)(G) & 16(b)(C). Rule 16, which was amended in 2022, "is intended to facilitate trial preparation, allowing the parties a fair opportunity

21

to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed." *United States v. Mrabet*, 703 F. Supp. 3d 442, 443 (S.D.N.Y. 2023) (quoting the advisory committee commentary).

As described above, the Government intends to present evidence at trial concerning the defendant's use of HCLP funds (*supra* at 3). For that reason, on March 6, 2026, the Government provided the defense with an expert notice concerning its intent to call Professor Nicole Boyson as an expert witness at trial. On March 20, 2026, the Government produced the same notice to the Court pursuant to the Court's Individual Rule 5. The defendant has not provided notice to the Government or the Court concerning any intent to offer expert testimony. On April 3, 2026, the defense, pursuant to a schedule agreed upon by the parties, produced a set of defense exhibits and its witness list to the Government. Despite an agreed up on deadline to do so, the defense represented it had no materials to produce pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure and did not make any such production.

The defense exhibits include 436 Excel sheets that appear to reflect general ledger entries for numerous accounts and entities, spanning an approximately twenty-year period, and its witness list included Michael Petron, who appears to be a President at Stout, a global advisory firm specializing in "corporate finance, valuation, [and] accounting." According to his firm biography, Mr. Petron is "an expert in the application of statistics, accounting, and finance to white collar crimes and civil litigation matters." *See* https://www.stout.com/en/professionals/michael-petron (last visited Apr. 7, 2026). As far as the Government is aware, Mr. Petron is not a percipient witness, but the defense has not provided a copy of Mr. Petron's engagement letter, hourly rate, bills or draft materials.

22

Because of the defense's insufficient disclosures, the Government does not know the scope of the testimony the defendant intends to elicit from Mr. Petron. But Mr. Petron appears to frequently testify as an expert witness, and the general ledger exhibits produced by the defendant are complex, technical, and span a large timeframe and set of accounts. It appears that Mr. Petron's testimony will involve "scientific, technical, or other specialized knowledge" that may be offered in the "form of an opinion or otherwise," which falls within the requirements of Federal Rule of Evidence 702. Trial is now less than two weeks away, and the defendant has yet to provide any expert notice for Mr. Petron (or any other witness). The defendant should be precluded from offering any expert testimony through Mr. Petron, or making use of the complex general ledgers the defense has marked as trial exhibits. To the extent the defendant seeks to offer summary testimony from Mr. Petron instead, the defense should be required to make a factual proffer of the scope of his testimony well in advance of trial to allow time for the Government to seek to preclude this testimony if it exceeds the permissible bounds of such testimony. The defense also should be required to produce Mr. Petron's engagement letter, hourly rate, bills, and any Rule 26.2 material for Mr. Petron in advance of trial and consistent with the parties' agreement.

## V.    The Court Should Preclude the Defendant from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial

Under Rule 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a

23

matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

## A. The Court Should Not Permit the Defendant to Blame His Victims

The defendant should be precluded from arguing or adducing evidence that the GWG Special Committees were negligent, insufficiently vigilant, or otherwise at fault for not detecting or preventing the defendant's fraud. "Such evidence routinely is excluded from trials on wire and mail fraud charges because 'reliance is not an element of criminal fraud,' and 'the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent.'" *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 6283509, at *3 (S.D.N.Y. Sept. 26, 2023) (quoting *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017)). Indeed, "[t]he Court of Appeals routinely has rejected a gullible victim defense for wire-fraud charges." *United States v. Adelekan*, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021) (citing *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007), and *Weaver*, 860 F.3d at 96). Accordingly, the defendant may not argue that members of the GWG Special Committees were to blame for a lack of due diligence.

In particular, the defendant should be precluded from cross-examining witnesses about whether they did adequate diligence on any particular request for funding, or whether they were reckless, negligent, or irresponsible in continuing to authorize funding for Beneficient and the senior lender. Because a defendant may not assert a victim's negligent failure to discover the fraud, *see United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004), the defendant should not be permitted to cross-examine witnesses in a manner that implies their due diligence was inadequate.

Nor should the defendant be permitted to offer evidence or argue that alleged inadequacies in due diligence undermines the materiality of the misrepresentations. *See, e.g.*, *United States v. June*, No. 10 Cr. 30021 (MAP), 2012 WL 245243, at *2 (D. Mass. Jan. 25, 2012) ("Defendant's argument that these documents would be helpful to the defense in demonstrating that the alleged misrepresentations made by Defendant were not 'material,' in the sense that they lacked the natural tendency to influence the lender's decisions merely re-clothes the forbidden 'blame the victim' defense in a slightly different costume." (citations omitted)); *see also United States v. Benchick*, No. 13 Cr. 20453 (RHC), 2014 WL 4181970, at *3 (E.D. Mich. Aug. 21, 2014) ("Defendant has not successfully shown that evidence relating to Washington Mutual's and National City's lending practices is relevant to the materiality of his alleged misrepresentations (and hence his guilt). . . . Because Defendant's allegedly false statements could influence a bank's decision whether to approve a loan, Defendant's argument on materiality and his 'blame-the-victim' approach fails."). The materiality of the misrepresentations alleged in this case is measured by an objective standard, and any suggestion that a victim was foolish, conducted insufficient diligence, or eager to credit the defendant goes, not to objective materiality, but rather to subjective reliance, which is not an element of the charged offenses.

Such evidence or argument only serves as an improper invitation for the jury to blame the victims for the crimes of the defendant. *United States v. Carton*, No. 17 Cr. 680 (CM), 2018 WL 5818107, at *4, *6 (S.D.N.Y. Oct. 19, 2018) (evidence that victim hedge fund did not exercise sufficient oversight of its investment inadmissible; "[w]hether the Hedge Fund performed due diligence or is a sophisticated investor in the ticket market is wholly irrelevant to these charges, and is merely a facile attempt to blame the victim—which is an impermissible strategy in a fraud case"); *United States v. Nekritin*, No. 10 Cr. 491 (KAM), 2011 WL 2462744, at *7 (E.D.N.Y. June

25

17, 2021) ("It is well settled that a fraud victim's negligence in failing to discover the fraudulent scheme is not a defense to a defendant's criminal conduct.").

**B. The Court Should Exclude Evidence and Claims That the Defendant Believed GWG Would Ultimately Profit from His Scheme**

The defendant should also be precluded from offering evidence or argument that he, or anyone else, believed that the expected financial success of Beneficient would prevent any losses to GWG. Based on arguments advanced by the defense, the Government anticipates these arguments may be raised in at least two ways: (1) a claim that Beneficient would have been incredibly profitable, more than making up for any losses due to HCLP payments; and (2) multiple valuation firms valued Beneficient in excess of $1 billion (and even more than $2 billion) and thus GWG was acquiring valuable securities when it was deceived into investing cash in Beneficient. Such evidence has no bearing on the materiality of the defendant's misrepresentations or the defendant's intent; it is irrelevant. *See, e.g.*, *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016) (where defendant and co-conspirators "intended to immediately deprive investors of their capital through fraud" their belief, even if truly held, "that in the long-term [their companies] would ultimately succeed," is not a defense to securities or wire fraud); *see also United States v. Berger*, 188 F. Supp. 2d 307, 329 (S.D.N.Y. 2002) ("Were a jury to find that [the defendant] intentionally caused others to issue materially false or misleading statements of the [company's] value to its investors . . . he properly would be found guilty, even if he 'firmly believed' that, in the end, his strategy would 'work out.'"). And to the extent there is any relevance, its probative value is substantially outweighed by the risk of confusing the jury and wasting time. Because it is clear prior to trial that such an argument would be based on an improper legal theory, the argument should be precluded. *See United States v. Watts*, 934 F. Supp. 2d 451, 473 (E.D.N.Y. 2013) (precluding argument that defendant believed his lies to a victim lender would cause no ultimate

harm because the lender would be repaid); *accord United States v. Binday*, No. 12 Cr. 152 (CM), 2013 WL 12154927 (S.D.N.Y. Sept. 16, 2013).

### C. The Court Should Preclude Argument Based on a Claim of Right

The defendant should also be precluded from arguing that because he (or HCLP) was entitled to the funds it received from Beneficient through documented credit agreements, he did not possess the requisite *mens rea* for fraud. As an initial matter, the facts do not support any such defense. The Government alleges that Heppner defrauded GWG by inducing its Board to provide funds to Beneficient to satisfy Beneficient's purported debt. Because GWG was never a party to that debt, there can be no argument that HCLP or the defendant were entitled to GWG's money. Moreover, the evidence at trial will show that the loans on Beneficient's books were questionable at best, a fact the defendant appreciated. Much of the debt came from personal and not business startup expenses, as Heppner claimed. And Heppner had been advised by outside counsel about "certain concerns they ha[d] . . . about the enforceability of the security liens." (GX 1153). In other words, the defendant knew that, if challenged, the HCLP loan was vulnerable to attack and its collateral might be illusory.

Accepting, however, that the loans were legitimate, any argument that the defendant did not possess the requisite intent to defraud because he believed he was entitled to the funds owed would be contrary to law. The Second Circuit has squarely held that "a claim of right to funds obtained through a false statement is not a defense negating fraudulent intent." *United States v. Blake*, 558 F. App'x 129, 130 (2d Cir. 2014) (summary order) (holding that the evidence was sufficient to support conviction of a defendant who believed himself entitled to his former wife's life insurance and made false statements on insurance form); *accord United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998) ("[C]ourts have uniformly held that a claim-of-right is not a defense to mail fraud." (citing cases)). Put another way, the fraud statutes "prohibit[] obtaining money

27

through false and misleading statements even if the perpetrator holds an honest belief that he is legally entitled to the money." *United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2022 WL 457315, at *14 (S.D.N.Y. Feb. 15, 2022) (citing *Blake*, 558 F. App'x at 130). Thus, to the extent the defendant is seeking to admit evidence or argument to establish a "claim of right to investor funds," that evidence and argument should be precluded. *See United States v. Mattera*, No. 24 Cr. 117 (LAP), 2025 WL 2841162, at *1 (S.D.N.Y. Oct. 7, 2025) (precluding in limine evidence of an agreement under which the defendant claimed an entitlement to investor funds).

### D. The Court Should Preclude Argument About Advice or Presence of Attorneys

The defendant should also be precluded from admitting evidence or arguing to the jury that, in defrauding investors, lying to auditors, or altering documents sent to the SEC, he relied on the advice or presence of counsel. As described above, proof of the defendant's crimes necessarily requires the Government to offer evidence that involves the work of attorneys. Attorneys such as CC-1 were participants in the defendant's fraud scheme. Other attorneys representing the Special Committees were recipients of the defendant's misrepresentations. Other attorneys worked for the defendant or his companies and were his agents. However, any attempt by the defendant to use the presence of attorneys as the basis of a counsel-driven *mens rea* defense should be precluded.

The parties previously agreed upon a pretrial schedule for disclosure by the defendant if he intended to advance a formal advice of counsel or presence of counsel defense to any charge in the Indictment. The defendant provided no such notice to the Government. Because a presence of counsel defense or any emphasis on the presence of attorneys would almost certainly be improper, the Court should preclude the defense from arguing to the jury that an attorney's presence indicates that the defendant lacked criminal intent.

"In a fraud case . . . the advice-of-counsel defense is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true," but rather "is evidence that,

if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an 'unlawful intent.'" *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). "That said, defendants are entitled to an advice-of-counsel instruction only if there are sufficient facts in the record to support the defense." *Id.* (citing *United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997)). Specifically, "[t]here must be evidence such that a reasonable juror could find that the defendant 'honestly and in good faith sought the advice of counsel,' 'fully and honestly laid all the facts before his counsel,' and 'in good faith and honestly followed counsel's advice.'" *Id.* (quoting *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012)).

In the absence of evidence to support an advice of counsel instruction, defendants have sometimes sought to offer evidence of lawyers' involvement in allegedly inculpatory events to support an argument that the defendant lacked intent to defraud. Such evidence "can pose a substantial risk of misleading the jury." *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2024 WL 477043, at *3 (S.D.N.Y. Feb. 7, 2024). A "jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction." *SEC v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013). Such a misunderstanding would unfairly prejudice the Government because it would "give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense." *Id.*

Accordingly, even those courts that have permitted such evidence have required detailed pretrial disclosures and, consistent with Rules 401 and 403, carefully policed references to counsel in testimony and argument to ensure that the defendant does not unfairly hide behind the attorney-client privilege or attempt to mount a "disguised reliance argument." *SEC v. Stoker*, No. 11 Civ.

29

7388 (JSR) (S.D.N.Y. July 23, 2012), Trial Tr. at 973; *see also Bankman-Fried*, 2024 WL 477043, at \*2 (permitting certain lines of evidence and argument and precluding others after hearing testimony outside the presence of the jury); *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. 2014), Trial Tr. (Dkt 63) at 83-85 (limiting testimony regarding the presence of counsel to avoid the "misleading impression" that the defendant relied upon the advice of counsel).

By failing to provide the Government with notice on the parties' agreed-upon schedule, the defendant has disclaimed any intent to assert an advice of counsel or presence of counsel defense. Nor would there be a factual basis for him to assert either. Rather, the evidence at trial will show that the defendant routinely enlisted attorneys as co-conspirators in his fraud scheme (i.e., CC-1) and lied to other attorneys, including attorneys for the Special Committees, in furtherance of his scheme. The defendant therefore should be precluded from arguing to the jury or suggesting in any way that attorneys blessed his actions, or that he relied on advice from attorneys in making misrepresentations to the GWG Special Committees, auditors or SEC.

### E. The Court Should Preclude Argument that GWG's Bankruptcy Was Caused by the SEC Investigation or Judicial Acts in Texas

In April 2022, GWG filed for Chapter 11 bankruptcy protection. While the Government anticipates that witnesses will mention GWG's bankruptcy at trial, the Government does not intend to argue that the defendant's fraud caused the bankruptcy.[6] Nonetheless, the defendant has indicated an intent to put forward alternative arguments as to the causes of GWG's bankruptcy. These arguments—intended to counter a causal connection the Government will not make—

---

[6] At the Curcio hearing on April 6, 2026, the Court inquired about the relevance of the identity of the retail investors who sustained losses following the collapse of GWG. (Apr. 6, 2026 Tr. at 5). The Government does not intend to offer evidence at trial concerning the identity of retail-investor bondholders, including that many were retirees. However, the Government does intend to offer evidence that GWG went bankrupt for the reasons explained at the hearing.

should be precluded under Rules 401, 402, and 403 as irrelevant, and likely to prejudice the Government, confuse the jury, and waste time.

In their letter of April 3, 2026, counsel for the defendant asserted that the "true cause of loss to GWG's 'retail investors' was not the bankruptcy itself, but among other things, the actions of" a former bankruptcy judge and attorney who had a romantic relationship and allegedly sought to "maximize fees" during the bankruptcy process by shifting the bankruptcy from restructuring to liquidation. *See* Ltr. from B. O'Neil to J. Rakoff, at 1 (Apr. 3, 2026). The defense raised a similar claim in their motion to dismiss the Indictment, arguing that "GWG's bankruptcy was in fact caused by ultra vires conduct by SEC enforcement staff. Should the Government be permitted to present evidence at trial regarding GWG's bankruptcy, Mr. Heppner intends to call multiple witnesses to help establish this fact." Dkt. 25 at 6 n.1.

As an initial matter, the defendant's contemplated evidence about alternative causes of the bankruptcy should be precluded as irrelevant under Rule 401. Because the Government does not intend to argue that the defendant caused GWG's bankruptcy, any argument to the contrary would be irrelevant. At the recent Curcio hearing, the Court agreed, saying "I'm having a lot of trouble seeing how [an argument that the true cause of the loss was the actions of former judge David Jones and attorney Liz Freeman] would come into evidence over a relevancy objection." (Apr. 6, 2026 Tr. at 7). Indeed, none of the charges requires establishing a causal link between the defendant's actions and the bankruptcy. The elements of the offenses are not impacted by the cause of GWG's collapse. Explaining the bankruptcy away does not make any "fact . . . of consequence" any "more or less probable than it would be without the evidence." Fed. R. Evid. 401.

In addition, any attempt by the defendant to offer such evidence requiring "multiple witnesses" and any arguments based on it should be precluded under Rule 403 due to the risks of

31

unfair prejudice, juror confusion, and wasting the time of the jury and the Court. *See* Fed. R. Evid. 403. First, the defendant's arguments would waste the jury's time, placing into evidence facts that do not bear on the defendant's guilt. This is particularly true given that the defendant has indicated proving purported SEC misconduct requires the testimony of multiple witnesses. Dkt. 25 at 6 n.1. Second, these arguments would be prejudicial: attempts to shift the blame for bankruptcy (absent any argument from the Government that the defendant caused it) are likely to give the jury the misimpression that the lack of losses attributable to him absolves him of his crimes. It does not. Third, the salacious nature of the allegations—rogue SEC employees and an illicit romance—is likely to distract the jury from their evaluation of the defendant's conduct. And fourth, with respect to the theory about the SEC, such an argument is likely to confuse the jury, given the Government's probative proof that the defendant tried to deceive the SEC during its investigation.[7] At base, these arguments will do little more than extend the length of a trial and risk juror confusion without adding any relevant facts or making the defendant's guilt any more or less likely.[8]

### F. The Court Should Preclude Argument Regarding the SEC Investigation

The defendant should be precluded from making arguments or offering evidence about the SEC's decision not to bring an enforcement action against the defendant or his companies.

---

[7] With respect to allowing this argument, the Court would also risk further delay, as the Government would then seek to admit evidence that the defendant and his co-conspirators concocted this theory in an attempt to embarrass the SEC and dissuade the Government from bringing charges against him. In particular, in 2024, CC-3 texted the defendant about a lawsuit they wished to file: "Even if it is not a party, the narrative we are crafting and finalizing is going to call a spade a spade, and SDNY will know that the lawsuit is going to come up in any criminal trial and that the SEC's crimes are going to be front-and-center as the cause of the whole disaster."

[8] To the extent the defendant is concerned the mere mention of GWG's bankruptcy could cause the jury to speculate about its cause, any concern could be addressed in a limiting instruction. *See, e.g.*, *United States v. Daugerdas*, No. 09 Cr. 581 (WHP), 2010 WL 4967878, at *2 (S.D.N.Y. Nov. 22, 2010) (holding that "a limiting instruction to the jury is the most appropriate safeguard against potential prejudice").

It is axiomatic that, in any criminal case, "the government is not on trial." *United States v. Knox*, 687 F. App'x 51, 54 (2d Cir. 2017); *see also, e.g.*, *United States v. Williams*, No. 22 Cr. 600 (LAP), 2026 WL 366682, at *1 (S.D.N.Y. Feb. 10, 2026) (collecting cases). That admonition is particularly apt where the agency that conducted the investigation that the defendant seeks to describe to the jury is different than that trying the case. Courts have recognized some relevance to arguments about, for example, the sloppiness of an investigation that results in prosecution, *see United States v. Fiore*, 779 F. Supp. 3d 1160, 1202 (D. Nev. 2025), but the same logic cannot explain the relevance of other investigations not presently before the jury.

With respect to the SEC's decision not to proceed civilly against the defendant or the entities with which he is associated, any inference that the defendant would ask the jury to draw would be improper. *See* Fed. R. Evid. 403. Courts, for example, regularly preclude defendants from admitting evidence of prior acquittals on the same facts, which are far more compelling than a different agency's prior decisions not to pursue enforcement under a different statutory regime. *See United States v. Dames*, No. 04 Cr. 1247 (PAC), 2007 WL 1129323, at *4 (S.D.N.Y. Apr. 12, 2007) ("[t]he fact of dismissal or acquittal of charges does not rebut testimony as to the underlying acts surrounding the arrests"). To the extent the SEC expressed any view of the defendant's conduct in declining to bring an action, that opinion would be irrelevant and, even if somehow relevant, would be hearsay. *See United States v. Viserto,* 596 F.2d 531, 537 (2d. Cir.1979) ("[A] judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted. Not only does the inference appellants suggest not flow from the judgment of acquittal of Solce, but also a judgment of acquittal is hearsay.").

### G. The Court Should Exclude Evidence of the Defendant's Good Acts to Prove His Innocence

The defendant should be precluded from presenting evidence or argument concerning his prior commissions of "good acts" or to offer evidence of his noncriminal activities to disprove his guilt of the crimes charged. Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Similarly, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait" of character, or the witness's opinion of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Fazio*, No. 11 Cr. 873 (KBF), 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012) ("[A] defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), *aff'd*, 770 F.3d 160 (2d Cir. 2014).

Furthermore, pursuant to Rule 403, "a district court may exclude evidence of a defendant's prior good acts if it finds that any minimal probative value of such evidence is outweighed by the likelihood of jury confusion and the risk of jury nullification." *United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (citing *United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011) ("And the trial judge was rightly concerned that, to the extent

34

any of the evidence [of prior good acts] could be construed to relate to the charged conspiracies, the jury would find it extremely confusing, if not incomprehensible.")).

The defendant should be precluded from offering evidence or argument, including in his opening statements, regarding his prior good deeds, including charity and philanthropy, or the lack of commission of other bad acts. As a specific example, the defendant should be precluded from citing to past charitable donations or his private philanthropic foundation because any prior good acts conducted by that entity have no bearing on the defendant's guilt or innocence.

The defendant should likewise be precluded from seeking to establish his good faith by introducing evidence of his financial transactions that are not the subject of the allegations in this case. Whether analyzed under the rubric of relevance, pursuant to Rule 401, or character propensity evidence, under Rule 404(b), courts uniformly hold that evidence that a defendant engaged in legal, honest business conduct on some occasions may not be introduced to rebut allegations that the defendant engaged in charged offenses involving bribery or fraud on other occasions. *See, e.g., United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) ("Chambers's argument that his running of a legitimate law practice makes it less likely that he had corrupt intent to bribe Villanueva is precisely the type of propensity inference that Rule 404(b)(1) is intended to prohibit."); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming the district court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent").

35

So too here, any evidence or argument that the defendant did not lie to investors other than those at issue in this case, or that there were occasions in which he was candid with or did not cheat others, is irrelevant to whether the defendant committed the acts charged in the Indictment.

### H. The Court Should Exclude Evidence and Argument About the Defendant's Personal Circumstances and Potential Punishment

Evidence and argument that makes a defendant appear sympathetic for reasons unrelated to the charges at issue—such as evidence relating to personal circumstances and potential punishment—should also be excluded as inviting the jury to acquit a defendant even where the evidence proves his guilt beyond a reasonable doubt. Juries are not "to act based on their . . . sympathy." *United States v. Stroming*, 838 F. App'x 624, 627 (2d Cir. 2021); *see, e.g.*, *United States v. Mustaga*, 753 F. App'x 22, 37 (2d Cir. 2018) ("The district court correctly recognized that evidence of solitary confinement could be used for the improper purpose of provoking juror sympathy.").

### VI. The Court Should Preclude the Defendant from Cross-Examining Witnesses on Irrelevant and Prejudicial Topics

The defendant should be precluded from questioning witnesses, or otherwise informing the jury, about a variety of civil matters relating to GWG and Beneficient. These include (1) civil actions and settlements involving former Board members David Chavenson and Bruce Schnitzer, and former GWG CEO Jon Sabes; (2) a civil action against Foley & Lardner LLP, counsel for the GWG Special Committee; and (3) an arbitration award in favor of former Board member Sheldon Stein relating to equity grants in Beneficient.

#### A. Relevant Facts

As noted above, in April 2022, GWG filed for Chapter 11 bankruptcy protection. Civil litigation followed, as described below:

36

In April 2024, the litigation trustee filed an adversary proceeding against former GWG officers and directors, including the defendant himself, Chavenson, and Schnitzer, alleging claims arising out of, among other things, the relationship between GWG and Beneficient. *Goldberg v. Heppner, et al.*, Adv. Pro. No. 24-3090 (S.D. Tex.). A securities class action was also filed against former officers and directors, including the defendant, Chavenson, and Schnitzer. I*n re GWG Holdings, Inc. Securities Litigation*, No. 3:22-cv-00410-B (N.D. Tex.). The defendant, Chavenson, and Schnitzer, among other directors and officers who were insured under GWG's D&O policy, entered into a $50.9 million settlement to resolve these matters. The settlement agreement provided that "[n]either this Agreement (whether or not consummated) nor any negotiations or proceedings connected with it shall be deemed or construed to be an admission by any Party to this Agreement or any Released Defendant Releasee or evidence of any fact." (Ex. A).

The litigation trustee also filed an adversary proceeding against Sabes, asserting avoidance claims arising out of GWG's payment of a dividend to shareholders in September 2018. *Goldberg v. Sabes, et al.*, Adv. Pro. No. 24-03089 (S.D. Tex.). Sabes settled this matter for $2.3 million. The settlement agreement also provided that neither party was "making any admission to any other party." (Ex. B).

The litigation trustee likewise filed an adversary proceeding against Foley & Lardner LLP, counsel for the GWG Special Committee, asserting claims for breach of fiduciary duty, professional negligence and legal malpractice, and avoidance claims. *Goldberg v. Foley & Lardner LLP*, Adv. Pro. No. 24-03199 (S.D. Tex.). Evan Stone is a partner at Foley and was counsel for the Special Committee. That case remains pending.

In addition, former Board member Sheldon Stein filed an arbitration against Beneficient alleging that Beneficient wrongfully revoked his vested equity interests in Beneficient. The

37

arbitrator ruled in Stein's favor and issued a $36 million award. The Court of Appeals for the Fifth District of Texas recently upheld the award. *Sheldon Stein v. Beneficient*, Case No. 05-24-914-CV (Tex. App. 2025). Beneficient has sought further review of the award.

### B. Applicable Law

Rule 608(b) of the Federal Rules of Evidence limits cross-examination regarding "specific instances of a witness's conduct" to situations where the conduct of the witness is "probative of the [witness's] character for truthfulness or untruthfulness." Fed. R. Evid. 608(b). Conversely, Rule 608(b) "'does not authorize inquiry on cross-examination into instances of conduct that do *not* actually indicate a lack of truthfulness.'" *United States v. Schlussel*, 08 Cr. 694 (JFK), 2009 WL 536066, at *3 (S.D.N.Y. Feb. 27, 2009) (emphasis added) (quoting *United States v. Nelson*, 365 F. Supp. 2d 381, 386 (S.D.N.Y. 2005)). Moreover, "Fed. R. Evid. 608(b) prohibits a party from presenting 'extrinsic evidence' of '[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility' unless that conduct was the subject of a criminal conviction." *United States v. Crowley*, 318 F.3d 401, 417 (2d Cir. 2003) (quoting Fed. R. Evid. 608(b)). And "under [Federal Rule of Evidence] 403, the district court may exclude even relevant evidence if it finds that the 'probative value [of the testimony] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *Id.* (internal quotation marks and citations omitted).

Furthermore, Rule 611 provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility," and that the Court should "avoid wasting time" and "protect witnesses from harassment or undue embarrassment." It is well settled that "[t]he scope and extent of cross-examination lies within the

discretion of the trial judge." *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990) (internal quotation marks omitted). As the Supreme Court has explained:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination [of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. . . . [T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted) (emphasis in original).

### C. Discussion

The defendant should be precluded from questioning witnesses—in particular, Chavenson, Schnitzer, Sabes, Stone, and Stein—or otherwise informing the jury, about the pending civil matters and settlements.

*First*, that a lawsuit was filed against a party, or that a party settled a civil lawsuit, is irrelevant to issues of credibility. *See, e.g.*, *United States v. Donovan*, No. 20 Cr. 374 (PKC), 2021 WL 6065767, at *9 (E.D.N.Y. Dec. 22, 2021) (precluding cross-examination of witness concerning lawsuit because "there has been no finding of any wrongdoing, and mere allegations are irrelevant to truthfulness and unduly prejudicial"); *United States v. Agostini*, 280 F. Supp. 2d 260, 262 (S.D.N.Y. 2003) (noting that criminal charges without a disposition are "merely allegations," and holding that it would be "improper to introduce evidence of such Arrests . . . when [the witness] might eventually be acquitted of such charges"); *Saldarriaga v. United States*, No. 99 Civ. 4487 (WK), 2002 WL 449651, at *4 (S.D.N.Y. Mar. 21, 2002) ("Unsubstantiated civil rights allegations made against [the witness] would have no bearing on his 'character for truthfulness.'"). Thus, the defendant should be precluded from asking Sabes, Chavenson, and

39

Schnitzer about their settlement agreements, or asking Stone about the pending litigation against Foley.

Indeed, such evidence would be highly prejudicial and not at all probative. It would confuse the issues and mislead the jury into simply believing that because the lawsuits exist, and were settled, that any of these individuals engaged in wrongdoing.[9]

*Second*, the Court should preclude the defendant from asking questions of Stein regarding his arbitration award against Beneficient. Questions on this topic are likely to confuse the issues and waste the jury's time, forcing the jury to wrestle with the question of whether Stein was entitled to his vested equity interests and, if so, why Beneficient revoked them. To the extent the defendant argues that such an award is relevant towards bias, that argument also fails because the adverse party in the arbitration is Beneficient, not the defendant, and there can be no credible claim that the outcome of the trial would in any way affect Stone's arbitration ward.

**CONCLUSION**

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated:  New York, New York
       April 7, 2026

                                     Respectfully submitted,

                                     JAY CLAYTON
                                     United States Attorney

                       By:  *Daniel Nessim*

                                     Daniel G. Nessim
                                     Alexandra Rothman
                                     Kyle A. Wirshba
                                     Assistant United States Attorneys
                                     Tel.: (212) 637-2486/-2580/-2493

---

[9] It would also open the door to the Government offering evidence concerning the defendant's own engagement with these civil lawsuits, which would only further extend the proceedings.

# Exhibit A

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 13, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| GWG HOLDINGS, INC., *et al.*[1] | Case No. 22-90032 (MI) (Jointly Administered) |
| Debtors. | |

## ORDER ON MOTION FOR ENTRY OF ORDER APPROVING SETTLEMENT

Upon consideration of the Motion for Entry of an Order Approving a Settlement and Compromise Pursuant to Bankruptcy Rule 9019 (the "Motion"),[2] seeking approval of the Proposed Settlement dated as of March 6, 2025, and attached hereto as Exhibit A (the "Proposed Settlement"); and upon consideration of the evidence admitted and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits; and this Court having considered the legal and factual bases for the relief requested in the Motion; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538); GWG DLP Funding IV, LLC (2589); GWG DLP Funding VI, LLC (6955); and GWG DLP Funding Holdings VI, LLC (6955). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201. Further information regarding the Debtors and these chapter 11 cases is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

[2] Unless otherwise defined herein, all capitalized terms have the same meaning as used in the Motion.

such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The matters raised in the Motion are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

C.      Venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      Proper, sufficient, and adequate notice of the Motion and the hearing on the Motion have been given in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Plan, and no other or further notice is necessary.

E.      The Litigation Trustee has consulted with The Wind Down Trustee regarding the Proposed Settlement Pursuant to Article IV.E.2 of the Plan.

F.      The Proposed Settlement includes releases for claims the Litigation Trustee has asserted against the Settling Defendants for separate alleged injuries suffered by the Debtors arising out of a series of transactions between 2019 and 2021, which are described in the Complaint and the Motion.

G.      The Proposed Settlement and the transactions, compromises, and releases provided therein are reasonable and appropriate under the circumstances, and the GWG Litigation Trust has demonstrated both (i) good, sufficient, and sound business purposes and justification for the Proposed Settlement and the transactions, compromises, and releases provided therein, and (ii) compelling circumstances for approval of the Proposed Settlement pursuant to Bankruptcy Rule 9019.

H.      Based upon the evidence and arguments, this Court has weighed the probability of success in litigation, the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending to it. This Court has also taken into account the paramount interest

of creditors and, based on all of the foregoing, has determined that the relief requested in the Motion is fair and equitable, in the best interests of the GWG Litigation Trust, and should be approved in all respects.

I.  In the absence of the Proposed Settlement, the GWG Litigation Trust faces litigation expense, risk, and delay. Even if the GWG Litigation Trust was successful in litigating its alleged claims, any recovery would not accrue to the benefit of the GWG Litigation Trust for several years. The Proposed Settlement resolves the disputes now without the need for additional and uncertain litigation.

J.  The terms of the Proposed Settlement and the transactions, compromises, and releases provided therein were negotiated and agreed to by the GWG Litigation Trust and the Settling Defendants,[3] each of whom was represented by competent counsel, in good faith, without collusion, and as a result of arm's-length bargaining.

K.  The Proposed Settlement was entered into by the GWG Litigation Trust and the Settling Defendants, each of whom was represented by competent counsel, in good faith, without collusion, and as a result of arm's-length bargaining.

Therefore, **IT IS HEREBY ORDERED, DETERMINED, ADJUDGED, AND DECREED THAT:**

---

[3] The "Settling Defendants" named in the Adversary Proceeding are Bradley K. Heppner; Beneficient f/k/a The Beneficient Company Group, L.P.; Beneficient Management, L.L.C.; Beneficient Company Holdings, L.P.; Beneficient Capital Company, L.L.C.; Beneficient Capital Company II, L.L.C.; The Beneficient Company Group (USA), L.L.C.; CT Risk Management, L.L.C.; Beneficient Fiduciary Financial, L.L.C.; The LT-1 Liquid Trust; The LT-2 Liquid Trust; The LT-5 Liquid Trust; The LT-7 Liquid Trust; The LT-8 Liquid Trust; The LT-9 Liquid Trust; The Collective Collateral Trust I; The Collective Collateral Trust II; The Collective Collateral Trust III; The Collective Collateral Trust IV; The Collective Collateral Trust V; The Collective Collateral Trust VI; The Collective Collateral Trust VII; The Collective Collateral Trust VIII; LiquidTrust Management, L.L.C.; Funding Trust Management, L.L.C.; Peter T. Cangany, Jr.; Thomas O. Hicks; Bruce W. Schnitzer; Murray T. Holland; Timothy L. Evans; David F. Chavenson; John Stahl; The LT-1 Collective Collateral Trust; The LT-1 Collective Collateral Trust; The LT-2 Collective Collateral Trust; The LT-3 Collective Collateral Trust; The LT-4 Collective Collateral Trust; The LT-5 Collective Collateral Trust; The LT-6 Collective Collateral Trust; The LT-7 Collective Collateral Trust; The LT-8 Collective Collateral Trust; and The LT-9 Collective Collateral Trust.  For the avoidance of doubt, "Settling Defendants" as used in this Order also includes other "Released Trust Action Defendants Releasees" as such term is defined in the Proposed Settlement.

1.      The Proposed Settlement is approved.

2.      The GWG Litigation Trust, Settling Defendants, and their insurers are authorized to take such steps and actions as may be necessary or appropriate to implement the terms of the Proposed Settlement and this Order.

3.      The terms and conditions of this Order shall be effective and enforceable upon its entry.

4.      This Court retains jurisdiction with respect to all matters arising from or related to the Proposed Settlement or this Order.

Signed: June 13, 2025

_____
Christopher Lopez
United States Bankruptcy Judge

# Exhibit B

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
June 13, 2025
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| GWG HOLDINGS, INC., *et al.*[1] | Case No. 22-90032 (MI) (Jointly Administered) |
| Debtors. | |

**ORDER ON MOTION FOR ENTRY OF ORDER APPROVING SETTLEMENT**

Upon consideration of the Motion for Entry of an Order Approving a Settlement and Compromise Pursuant to Bankruptcy Rule 9019 (the "Motion"),[2] seeking approval of the Proposed Settlement dated as of March 6, 2025, and attached hereto as Exhibit A (the "Proposed Settlement"); and upon consideration of the evidence admitted and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits; and this Court having considered the legal and factual bases for the relief requested in the Motion; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.	The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538); GWG DLP Funding IV, LLC (2589); GWG DLP Funding VI, LLC (6955); and GWG DLP Funding Holdings VI, LLC (6955). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201. Further information regarding the Debtors and these chapter 11 cases is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

[2] Unless otherwise defined herein, all capitalized terms have the same meaning as used in the Motion.

1

such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The matters raised in the Motion are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

C.      Venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      Proper, sufficient, and adequate notice of the Motion and the hearing on the Motion have been given in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Plan, and no other or further notice is necessary.

E.      The Litigation Trustee has consulted with The Wind Down Trustee regarding the Proposed Settlement Pursuant to Article IV.E.2 of the Plan.

F.      The Proposed Settlement and the transactions, compromises, and releases provided therein are reasonable and appropriate under the circumstances, and the GWG Litigation Trust has demonstrated both (i) good, sufficient, and sound business purposes and justification for the Proposed Settlement and the transactions, compromises, and releases provided therein, and (ii) compelling circumstances for approval of the Proposed Settlement pursuant to Bankruptcy Rule 9019.

G.      Based upon the evidence and arguments, this Court has weighed the probability of success in litigation, the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending to it. This Court has also taken into account the paramount interest of creditors and, based on all of the foregoing, has determined that the relief requested in the Motion is fair and equitable, in the best interests of the GWG Litigation Trust, and should be approved in all respects.

H.     The terms of the Proposed Settlement and the transactions, compromises, and releases provided therein were negotiated and agreed to by the GWG Litigation Trust and the Sabes Defendants, each of whom was represented by competent counsel, in good faith, without collusion, and as a result of arm's-length bargaining.

Therefore, **IT IS HEREBY ORDERED, DETERMINED, ADJUDGED, AND DECREED THAT:**

1.     The Proposed Settlement is approved.

2.     The Litigation Trust, the Sabes Defendants, and their insurers are authorized to take such steps and actions as may be necessary or appropriate to implement the terms of the Proposed Settlement and this Order.

3.     The terms and conditions of this Order shall be effective and enforceable upon its entry.

4.     This Court retains jurisdiction with respect to all matters arising from or related to the Proposed Settlement or this Order.

Signed: June 13, 2025

_____
Christopher Lopez
United States Bankruptcy Judge

3