UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

BRADLEY HEPPNER,

                    Defendant.

**25 Cr. 503 (JSR)**

 

**THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE***

JAY CLAYTON
United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

Daniel G. Nessim
Alexandra Rothman
Kyle A. Wirshba
Assistant United States Attorneys
- Of Counsel -

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

ARGUMENT .................................................................................................................... 1

I.    The Court Should Deny the Motion Concerning Bondholder Loss as Moot ...................... 1

II.   The Government Exhibits Are Admissible ........................................................... 1

III.  The Evidence Objected to As Purported Improper Other Acts Evidence Is Admissible..... 8

IV.   Evidence of False Statements to Auditors and Falsification of Board Minutes Is
      Admissible for All Counts............................................................................... 15

V.    The Defendant Should Be Precluded From Offering Inadmissible Hearsay Under the
      Guise of "State of Mind" Evidence................................................................... 18

VI.   The Motion to Force the Government To Select a "Theory of Fraud" Should Be Denied 21

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

*Crawford v. Franklin Credit Mgmt. Corp.*, No. 08 Civ. 6293 (KMW),
  2015 WL 1378882 (S.D.N.Y. Mar. 26, 2015) ................................................................. 7

*Crawford v. Tribeca Lending Corp.*, 815 F.3d 121 (2d Cir. 2016) ................................................. 7

*In re Reserve Fund Sec. Litig.*, No. 09 Civ. 4346 (PGG),
  2012 WL 12354233 (S.D.N.Y. Oct. 3, 2012) ............................................................... 3

*Miltland Raleigh-Durham v. Myers*, 807 F. Supp. 1025 (S.D.N.Y. 1992) ..................................... 4

*Parker v. Reda*, 327 F.3d 211 (2d Cir. 2003) ................................................................. 6

*Richardson v. United States*, 526 U.S. 813 (1999) ......................................................... 23

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................................. 24

*United States v. Annabi*, No. S1 10 Cr. 7 (CM),
  2012 WL 489111 (S.D.N.Y. Feb. 14, 2012).................................................................. 19

*United States v. Applins*, 637 F.3d 59 (2d Cir. 2011) ....................................................... 24

*United States v. Aracri*, 968 F.2d 1512 (2d Cir. 1992)....................................................... 22

*United States v. Blake*, 195 F. Supp. 3d 605 (S.D.N.Y. 2016) ................................................. 18

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000).................................................... 13

*United States v. Cardascia*, 951 F.2d 474 (2d Cir. 1991)........................................................ 7, 18

*United States v. Concepcion*, 139 F.4th 242 (2d Cir. 2025) .......................................... 24

*United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) ...................................... 24

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991).................................................. 9

*United States v. Cote*, 615 F. App'x 39 (2d Cir. 2015)............................................... 24

*United States v. Cuti*, No. 08 Cr. 972 (DAB),
  2009 WL 3154310 (S.D.N.Y. Sept. 24, 2009)......................................................... 23

*United States v. Daniel*, 749 F.3d 608 (7th Cir. 2014) .................................................. 24

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999)........................................................ 10

*United States v. Gentile*, No. 21 Cr. 54 (RPK),
  2025 WL 777090 (E.D.N.Y. Mar. 11, 2025) ................................................................. 24

*United States v. Harwood*, 998 F.2d 91 (2d Cir. 1993) .................................................. 18

*United States v. Kozeny*, 667 F.3d 122 (2d Cir. 2011) ............................................... 23, 24

*United States v. Kuthuru*, 665 F. App'x 34 (2d Cir. 2016) ............................................... 2

*United States v. LaPlante*, 714 F.3d 641 (1st Cir. 2013) ................................................ 24

*United States v. Lyons*, 472 F.3d 1055 (9th Cir. 2007) ................................................... 24

*United States v. Nachamie*, 101 F. Supp. 2d 134 (S.D.N.Y. 2000) ................................ 11

*United States v. Netschi*, 511 F. App'x 58 (2d Cir. 2013) ............................................... 18

*United States v. O'Sullivan*, No. 20 Cr. 272 (PKC),
  2021 WL 1979074 (E.D.N.Y. May 18, 2021) ............................................................... 9

*United States v. Pipola,* 83 F.3d 556 (2d Cir. 1996) ....................................................... 10

*United States v. Rice*, 699 F.3d 1043 (8th Cir. 2012) ..................................................... 24

*United States* v. *Rioux*, 97 F.3d 648 (2d Cir. 1996) ......................................................... 3

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) ......................................................... 11

*United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001) ................................................. 21

*United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989) ............................................... 21, 22

*United States v. Vargas*, 702 F. Supp. 70 (S.D.N.Y. 1998) .......................................... 13, 15

*United States v. Vilar*, No. 05 Cr. 621 (RJS),
  2008 WL 4298545 (S.D.N.Y. Sept. 5, 2008) ............................................................... 23

The Government respectfully submits this memorandum in opposition to the motions *in limine* of defendant Bradley Heppner.

## ARGUMENT

### I.    The Court Should Deny the Motion Concerning Bondholder Loss as Moot

The defendant moves to preclude the Government from offering evidence of GWG investor losses. (Mot. 6). While the Government intends to offer evidence that GWG sold L Bonds over the relevant period, as well as limited evidence that GWG filed for bankruptcy, it does not intend to offer evidence concerning the identities or losses of the bondholders. (*See* Government Motions in Limine, Dkt. 44 at 30 n.6. (hereinafter "Gov't MIL")). The Court can deny this motion as moot.

### II.    The Government Exhibits Are Admissible

The defendant argues that certain of the Government's exhibits should be precluded as inadmissible hearsay. (Mot. 3-5). The motion should be denied. The defense moves to preclude at least five exhibits the Government will not offer during its case-in-chief.[1] The defense is mistaken, however, as to the remainder, as each of the below exhibits is either non-hearsay, or excepted from the rule against hearsay.

#### A. Agent Statements

The majority of the emails to which the defendant objects are statements of the defendant's agents, and therefore are non-hearsay, pursuant to Rule 801(d)(2)(D).

Government Exhibits 1113, 1209, 1261, 1290, 1308, 1353, and 1353A are emails written by Jamie Crable (GX 1113 and 1209), Bruce Topott (GX 1209, 1261, 1290, 1308), and Kevin Mackenroth (GX 1353 and 1353A), three individuals employed by the defendant at Beneficient

---

[1] The Government does not intend to offer Government Exhibits 1313, 1314, 1315, 1322, and 1337 during its case-in-chief. Those exhibits are thus not addressed herein.

who worked, at least in part, for the defendant's "family office."[2] These emails were all sent in the context of that employment. In each, the declarants track the defendant's expenses, ensure his bills are paid, and move money between entities the defendant controlled with the understanding that they were doing so for the benefit of the defendant and his family.

Government Exhibits 1130 and 1131 are email chains involving Peter Williams, an employee of Beneficient, who sent emails as an agent of the defendant and, in certain cases, at his specific direction. As an initial matter, much of these chains include questions, either from potential investors in Beneficient, or from Williams, which do not assert any facts and thus are non-hearsay. *See United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) ("Questions and commands are ordinarily not hearsay because they are not offered for the truth of the matter asserted."). To the extent, however, that Williams's emails contain statements that the Government offers for their truth, Williams made those statements as the defendant's agent. Indeed, he writes, "please see the language below which Brad Heppner prepared." (GX 1130 and 1131; *see also* GX 1129 (noting "I was ok with the edit made in red" by Heppner)). And Williams is expected to testify that he in fact sent these emails at the defendant's direction.

Government Exhibit 1332 is an email from an associate at the law firm Willkie Farr & Gallagher containing the associate's notes from a meeting between the defendant, other GWG personnel, their counsel, and the SEC. The associate's notes of the meeting, which include many statements attributed directly to the defendant, were taken in furtherance of Willkie's representation of the defendant and the companies he controlled and, therefore, as his agent. (*See*

---

[2] Heppner's "family office" managed his personal wealth, and the evidence will show that Heppner exploited Beneficient to pay for it. Among other things, Heppner's family office paid $30,000 a year for Beneficient employees to provide accounting and other services for the family office. That nominal fee did not cover the employee salaries or other costs associated with the work.

Gov't MIL at 18-19 (summarizing the law holding attorneys to be agents under the hearsay rules)). With respect to the content of the notes, statements of the defendant and his counsel are admissible as statements of a party opponent and those of his agent, respectively. See Fed. R. Evid. 801(d)(2)(A), 801(d)(2)(D). Similarly, as set forth in the Government's motions *in limine*, Government Exhibit 1346 is an email from Beneficient's in-house attorney Art Damoulakis and is admissible as the statement of an agent. (*Id.*)

Government Exhibits 1276, 1281, 1296, 1298, 1312, and 1320 are emails from Tim Evans, an employee at various times of Beneficient and GWG, both as GWG's Chief Integration Officer and later its Chief Financial Officer. As described in detail in the Government's motions *in limine*, Evans was an agent of the defendant both by virtue of his employment (at GWG where the defendant was Chairman of the Board and exercised de facto control) and as evidenced by the defendant's actual direction of him. (*See* Gov't MIL at 16-18). "Where an individual defendant controls the entity that employs the declarant, and is the declarant's ultimate supervisor, the employee is an agent of the defendant for purposes of Fed. R. Evid. 801(d)(2)(D), and his statements are admissible against that individual defendant." *In re Reserve Fund Secs. & Derivs. Litig.*, 2012 WL 12354233, at *7 (S.D.N.Y. Oct. 3, 2012) (citing *United States* v. *Rioux*, 97 F.3d 648, 660 (2d Cir. 1996)). For example, in Government Exhibit 1312, Evans forwarded to the Special Committee a memorandum from GWG's management requesting that the Special Committee approve a further investment of GWG funds in Beneficient, a document which conveniently did not reference payments to Beneficient's lenders. The agency relationship between the defendant and Evans is further evident when Evans passed information about the "Senior Lender" to the Special Committee. For example, in May 2019, Evans inquired of the defendant whether he could share a chart that purported to show the relationship between various

3

entities that held Beneficient's debt. The defendant replied, "I am ok with sharing it . . . ." (GX 1194), and Evans thereafter shared the chart with the Special Committee's counsel. In Government Exhibit 1320, Evans shared much of the same information with members of a newly constituted GWG Special Committee, including information that "Mr. Heppner (along with various other parties) is in the class of permissive beneficiaries of the Harmon trust . . . ").[3] Similarly, in Government Exhibits 1276, 1281, and 1298, Evans updated GWG's Special Committee about the terms of ongoing negotiations between GWG, Beneficient, and the Senior Lender. He did so as an agent of the defendant and his co-conspirators, who used Evans to pass information to the Special Committee. *See Miltland Raleigh-Durham v. Myers*, 807 F. Supp. 1025, 1054 (S.D.N.Y. 1992) ("[T]he exhibits constitute statements by an agent of a co-conspirator and are admissible."). Finally, these exhibits are also admissible for their effect on their recipients—here, the Special Committee members who the defendant sought to defraud. In Government Exhibit 1298, for instance, Evans noted that "the Senior Lender's counsel has had phone calls with the companies over the last week regarding its extreme displeasure with the current status of Ben's ability to make the extension payment due on July 15 (And future payments)." Whether or not counsel for the Senior Lender had conveyed the message, the Special Committee was under the impression that it had, which is probative of its rationale for authorizing additional funding for Beneficient.

## B. Co-Conspirator Statements

The defendant also objects to the admission of correspondence by Jeff Hinkle and Bill Banowsky. As set forth in the Government's motions *in limine*, Hinkle and Banowsky conspired with the defendant to advance his fraud schemes, and their statements in furtherance of those

---

[3] The Government also believes these statements are false and is, therefore, not offering them for their truth.

schemes are non-hearsay pursuant to Rule 801(d)(2)(E). In addition, because both Hinkle and Banowsky made the challenged statements while acting as agents of the defendant—as his employee and attorney, respectively—they are also non-hearsay pursuant to Rule 801(d)(2)(D).

Government Exhibits 1111, 1114, 1116, and 1137 are emails written by Hinkle, a Beneficient and Heppner family office employee, who is expected to testify pursuant to a non-prosecution agreement with the Government. Hinkle will testify that he took the steps described in the emails at the defendant's direction and in furtherance of criminal schemes for which, he acknowledges, the Government could have prosecuted him.

Government Exhibits 1145, 1321, and 1326 are emails of GWG employees forwarding letters from Banowsky—an attorney at Thompson & Knight and a conspirator in the defendant's fraud schemes—to members of GWG's Special Committee. The Government will not offer, for its truth, the substance of the cover emails, instead relying on the fact of transmission and the content from the attachments, which are letters on Banowsky's law firm letterhead. Those attached letters are undoubtedly admissible as non-hearsay. Testimony will show that Banowsky was not only the defendant's personal lawyer for many years, but also that Banowsky held himself out as the attorney for the Harmon Trust and its associated entities, including HCLP. The Court will easily be able to conclude by a preponderance that, while Banowsky and the defendant attempted to make the Harmon Trust and HCLP appear independent, those entities were controlled by the defendant, and thus Banowsky's statements furthered the alleged conspiracy.

Government Exhibit GX 1282 is an email chain between Banowsky and David Wickline, the alleged independent manager of certain of the entities actually controlled by the defendant, about Banowsky's work on behalf of those entities. Because Banowsky is a co-conspirator, his

5

statements about his negotiations with GWG regarding the entities that the defendant controlled are admissible as non-hearsay.

### C. Past Recollection Recorded

The defendant next objects to an exhibit the Government does not intend to admit into evidence, but only to have the relevant portion read into evidence as a past recollection recorded, pursuant to Rule 803(5).

Government Exhibit 1183 contains the notes of Jon Sabes, founder and former CEO of GWG, about a conversation he had with the defendant. Sabes will testify that while he cannot recall the defendant's statement well enough to testify about it fully and accurately, he took these notes shortly after his conversation, did so to memorialize what the defendant said, and intended them to be accurate at the time. In other words, these statements meet the criteria for admission pursuant to the past recollection recorded hearsay exception. *See* Fed. R. Evid. 803(5); *Parker v. Reda*, 327 F.3d 211, 213 (2d Cir. 2003). The Government will, upon laying this foundation, ask Sabes to read a portion of the email into the trial record.

### D. Verbal Acts

The defendant also challenges the admission of Government Exhibit 1140: an email by one of the defendant's co-conspirators forwarding a trust document the defendant's sister signed purporting to remove the independent trustee of the Highland Investment Holdings Trust, referred to by the defendant as the Harmon Trust. As an initial matter, the Government will offer a version of this exhibit in which the defendant himself sends the signed document he received from his sister, proving his knowledge of it and confirming it is not hearsay (GX 1375).

In addition, the Government is not offering the notarized document attached to Government Exhibit 1140 for the truth of the matter asserted. Indeed, the Government's theory is that the

defendant's myriad trust documents are part of his scheme to defraud investors, auditors, and the SEC through opportunistic alterations to trust and corporate entities as well as trustee and corporate roles irrespective of the real structure and governance of those trusts and corporations. To the extent such documents do come into evidence at trial, the Court should admit only the portion of them as non-hearsay that gives rise to legal consequences and is thus a "verbal act." *See Crawford v. Franklin Credit Mgmt. Corp.*, No. 08 Civ. 6293 (KMW), 2015 WL 1378882, at *3 (S.D.N.Y. Mar. 26, 2015), *aff'd sub nom. Crawford v. Tribeca Lending Corp.*, 815 F.3d 121 (2d Cir. 2016) ("'[V]erbal acts that give rise to legal consequences' are typically not considered hearsay." (quoting *United States v. Cardascia*, 951 F.2d 474, 486-87 (2d Cir. 1991)). Other parts of the same legal documents that do not give rise to legal consequences, such as the "whereas" clauses purporting to recite facts, should not be admitted for their truth, absent application of another hearsay exception.

### E. Effect on the Listener

The defendant also objects to an email chain that the Government does not seek to offer for the truth of the matter asserted, but instead for their effect on the recipients of those emails and to explain subsequent actions.

Government Exhibit 1294 is an email chain to members of the GWG Special Committee in which Pete Cangany (a member of the GWG Special Committee) and Edward Sopher (counsel to the Special Committee), recount conversations they had with members of GWG management: Murray Holland (GWG's CEO) and Evans (GWG's CFO).[4] Among other things, Holland and Sopher recount that GWG management told them the "Senior Lender" was threatening to call its

---

[4] As described in the Government's motions *in limine*, Holland was the defendant's co-conspirator, while Evans was the defendant's agent. (Gov't MIL at 15-18).

note unless GWG acted quickly to fund Beneficient. This false pressure was part of the defendant's scheme to force the Special Committee to approve GWG's expenditure of funds for Beneficient before the Committee could fully vet the defendant's relationship with the "Senior Lender." These statements are not being offered for their truth, but instead for their effect on the GWG Special Committee which, in fact, felt constrained to approve funding as a result of what they understood to be an impending event of default.

## III.    The Evidence Objected to As Purported Improper Other Acts Evidence Is Admissible

The defendant moves *in limine* to preclude the Government from offering four categories of evidence at trial, each of which is admissible as probative of the charges in the case, the relationship of trust among coconspirators, and the defendant's knowledge and intent. (Mot. 7-16). While the defendant may prefer to proceed to trial with the jury ignorant of these facts, the Federal Rules of Evidence do not endorse such an approach. Rather, the evidence described below is relevant to the core issues of the case, and the defendant has failed to articulate what, if any, unfair prejudice he will suffer if the evidence is admitted. The defendant's motion should be denied.

### A. The Defendant's Solicitation of an Investment From Dallas Police & Fire Department Pension System Is Admissible

Evidence that the defendant and Hinkle solicited an investment from Dallas Police & Fire Department Pension System ("DPFPS"), which decided not to invest upon learning that HCLP was controlled by the defendant, is direct evidence of the charged offenses and also admissible under Rule 404(b). As set forth in the Government's Rule 404(b) notice, (Dkt. 45-3), in 2013, the defendant solicited an investment from DPFPS, disclosing that Beneficient owed a debt to HCLP, and that HCLP was controlled by the defendant. DPFPS did not invest because they wanted the defendant to have less debt and more equity or "skin in the game." Thereafter, the defendant began lying about HCLP and, upon doing so, secured hundreds of millions of dollars in investments. This

8

evidence helps explain the origins of and reasons for the defendant's lie that HCLP was owned by a third-party and thus "furnish[es] an explanation of the understanding or intent with which certain acts were performed." *United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991). It is also admissible under Rule 404(b) to prove the defendant's lack of mistake, knowledge and intent.

The defendant argues that evidence of the DPFPS solicitation is "wholly separate, distinct and far removed in time from the charged conduct." (Mot. 11). It is not. As the defendant concedes, both the DPFPS solicitation and the charged conduct involved HCLP and, more specifically, representations regarding a purported hundred-million-dollar debt on Beneficient's books. With DPFPS, the defendant disclosed that he was the lender associated with HCLP, and DPFPS passed on the deal. To prevent that from happening again, the defendant began masking the truth, relying on the complexities of trust structures to make it appear that he would not financially benefit from any repayment on the debt. The defendant has given notice that he plans to argue to the jury that HCLP's "affiliation to Mr. Heppner, was disclosed to GWG." (Mot. 2). The Government should be permitted to introduce evidence that contradicts that claim.

Moreover, the probative value of this testimony is not substantially outweighed by any risk of unfair prejudice. The defendant claims the admission of this evidence would be "substantially more prejudicial than probative." (Mot. 12). But the defendant fails to articulate what, if any, prejudice he will suffer from the DPFPS incident, which, by his own admission, had "no victim, no loss, and no completed transaction." (Mot. 12). Nor will this evidence result in a "mini-trial." (Mot. 12-13). The Government expects to present this evidence through brief testimony from Hinkle. If the defense wishes to contest the Government's allegations, the defense can cross-examine Hinkle or call their own witness, neither of which will result in a "sideshow [] on collateral issues." (Mot. 13 (citing *United States v. O'Sullivan*, No. 20 Cr. 272 (PKC), 2021 WL 1979074,

at *12 (E.D.N.Y. May 18, 2021), where the court excluded evidence from a civil trial that would have "spanned two weeks" of testimony)). The evidence should be admitted.

### B. The Defendant's Theft of Confidential Information From Lehman Brothers Is Admissible

Evidence that the defendant enlisted his co-conspirator Jeff Hinkle to steal confidential information from Lehman Brothers for the defendant's financial gain is direct evidence of the charged offenses. Hinkle will testify that in 2009, he provided the defendant with information about balances in accounts controlled by Lehman, which the defendant used to extract millions of dollars from Lehman. After Hinkle was terminated for this breach, the defendant hired him, and he promised Hinkle significant financial compensation once Beneficient secured outside funding. This promise of future compensation, along with Hinkle's deep sense of loyalty to the defendant, caused Hinkle to mislead prospective investors, at the defendant's direction, over the next several years. Evidence of the Lehman incident touches upon multiple elements of the charged offenses, including the criminal agreement and relationship of trust between Hinkle and the defendant, and should be admitted.

The thrust of the defendant's argument to exclude this evidence is that the misconduct is different than the type of conduct charged in the Indictment. (*See* Mot. 9 (the conduct "bears no meaningful connection to the charged conduct"); *id.* at 10 (the schemes "bear none of the same features")). That is a strawman. The Lehman evidence is not offered to prove that the defendant and Hinkle engaged in the same type of fraud over the course of many years. It instead is offered to provide the jury with the relevant background on the charged conspiracy and the relationship of trust between Hinkle and the defendant. *See, e.g.*, *United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999); *United States v. Pipola,* 83 F.3d 556, 566 (2d Cir. 1996) ("The evidence of prior illicit activities involving Pipola and his co-conspirators explained to the jury how the relationship between Pipola

and his underlings evolved."); *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993) ("[T]he evidence of Rosa's prior dealings with Melendez was properly admitted to explain how the illegal relationship between the two had developed and to explain why Melendez had appointed Rosa to a leading position in the Organization."). To that end, the distinction that the defense seeks to draw concerning the manner of deception is meaningless.

The defendant separately argues that there is no "direct link" between this prior act and the "co-conspirator dynamics of the charged scheme." (Mot. 10). He is wrong. As explained above, Hinkle will testify that, after he was fired from Lehman, the defendant immediately hired him—an offer designed to ingratiate Hinkle to the defendant and to make it more likely that he would go along with the defendant's next scheme. The incident is so inextricably bound up with Hinkle's willingness to join the conspiracy that the two cannot be separated. Moreover, to the extent the defendant has concerns about any unfair prejudice from the admission of this evidence, the Court can easily deliver an appropriate limiting instruction.[5]

### C. The Defendant's Statements Regarding Lying in Business Are Admissible

Evidence that the defendant recounted statements from Charlie Harmon about the need to lie in business is admissible as direct proof of the charged conspiracy or, in the alternative, as proof of the defendant's knowledge and lack of mistake. As set forth in the Government's 404(b) notice, (Dkt. 45-3), Hinkle is expected to testify that the defendant would often share that his professional mentor, Charlie Harmon, taught the defendant that, in business you need to "lie lie lie," and if that does not get the deal done, you need to "lie some more." This evidence proves the existence of a

---

[5] The defendant's reliance on *United States v. Nachamie*, 101 F. Supp. 2d 134, 143 (S.D.N.Y. 2000), is misplaced. (Mot. 10). There, the court precluded the Government from introducing evidence of a defendant's "25-year-old prior conviction" where there was "availabl[e] other, less prejudicial evidence that makes the same points." *Id.* at 142. The same is not true here.

relationship of trust and confidence between Hinkle and the defendant, and will counter any arguments from the defense that the defendant acted in good faith.

None of the defendant's proffered reasons to exclude this evidence is persuasive. *First*, the defendant argues the evidence is "double hearsay." (Mot. 13). But the statement is not hearsay, let alone double-hearsay, because the Government is not offering it for the truth of the matter asserted. Whether Charlie Harmon lied in business, or was an honest businessman, or even made these remarks to the defendant, is of no moment. What matters is that the defendant went around telling Hinkle, his co-conspirator, about the importance of lying. *Second*, the defendant argues the statement's relevance cannot even be assessed because "[i]t is undated, uncorroborated, and lacks any factual or temporal anchor connecting it to the charged scheme." (Mot. 14). But Hinkle remembers the context for the defendant's oft-repeated phrase, and even memorialized these statements in contemporaneous notes he made while he worked for the defendant and became increasingly frustrated by the defendant's deceitful behavior. (*See* 3504-022 at 2 ("lie, lie, lie"), at 4 ("BKH likes to say 'lie, lie, lie….'")). *Third*, the defendant argues the statement is "propensity evidence." It is not. The statement is probative of the defendant's knowledge of the falsity of his statements regarding HCLP.

Finally, the probative value of this testimony is not substantially outweighed by any unfair prejudice. The defendant claims there are "less prejudicial" ways to prove the relationship of trust between Hinkle and the defendant, but the evidence is also direct proof of the defendant's mens rea, which the defense will be contesting at trial. The defendant may not want the jury to hear that he shared stories with his coconspirator about lying in business, but the fact that "evidence was

'damning' does not render it inadmissible." *United States v. Vargas*, 702 F. Supp. 70, 73 (S.D.N.Y. 1998) (citation omitted). The evidence should be admitted.

### D.  The Defendant's Lies to Paul Capital in 2018 Are Admissible

Evidence of the defendant's lies to Paul Capital in 2018, during the time period of the charged conspiracy, is admissible, both as direct evidence and under Rule 404(b). In late 2018, Beneficient owed Paul Capital a $35 million cash payment. To avoid making the payment, the defendant enlisted the help of co-conspirator, Bill Banowsky, to threaten Paul Capital that the "Senior Lender" (i.e., HCLP Nominees) would call the note and all but bankrupt Beneficient unless Paul Capital agreed to a forbearance. Based on Banowsky's representations that the "senior lender is real and acting independently," among other things, Paul Capital acceded to the "Senior Lender's" demands.

The defendant claims there is no "similarity or connection" between the charged conduct and the defendant's misrepresentations to Paul Capital in 2018. (Mot. 15). He is mistaken. The lies to Paul Capital are "inextricably intertwined" with evidence of the charged offense and are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). As an initial matter, this incident is proof of the charged conspiracy; it occurred during the time period of the conspiracy and involved members of the conspiracy, including the defendant and Banowsky. Moreover, the incident is linked to other proof the Government will offer at trial. As alleged in the Indictment, in February 2019, the defendant backdated documents and faked emails to make it appear that Keith Martens, his childhood friend and cousin, had been serving as manager for the Senior Lender since 2017. The defendant then sent the emails and a related letter to Beneficient's auditors. The 2018 Paul Capital incident showcases that the defendant was the person in charge of HCLP in 2018, and that he and Banowsky worked together

13

in furtherance of their conspiracy to lie to others concerning HCLP's independence. It serves to disprove the representations that Heppner and Banowsky made in February 2019—that Martens was the independent manager of HCLP and had been since July 2017. Their conduct toward Paul Capital just two months earlier proves the lie that is core to the Government's case.

In addition, the specific December 2018 deception of Paul Capital is directly referenced in the defendant's falsified emails. One of the faked emails purports to be a December 12, 2018 email from Martens to the defendant with the subject line, "Paul Capital Situation," a direct reference to the incident the defendant seeks to preclude from trial. The purported email reflects, "I trust Bill [Banowsky] will do everything he can to collect the loan if Paul Capital submits a demand for their last payment." (GX 1162A). The lengths the defendant went to align fabricated emails with specific incidents is compelling proof of his scienter. To prove the falsity of the representations concerning Martens, the fake emails, the nature of the conspiracy, and to complete the story, the Paul Capital incident is properly admissible as direct evidence.

This evidence is also admissible under Rule 404(b) as proof of the defendant's lack of mistake, plan, and modus operandi. *See* Fed. R. Evid. 404(b). The defendant had an unusual pattern of threatening investors with foreclosure and default by the "senior lender" unless his demands were met. He did this in December 2019 and stole $79 million from GWG. He did it again in July 2020 and stole $61 million from GWG. And he did the same in late 2018 when he extorted Paul Capital out of millions it was owed. Given the overlap in the manner in which the defendant exploited his control over the "Senior Lender" for his personal financial gain, the Government should be permitted to introduce evidence of the 2018 Paul Capital lies at trial.

The probative value of this testimony is not substantially outweighed by any unfair prejudice. The defendant claims in conclusory fashion that this testimony would "cause substantial

14

unfair prejudice and confuse the jury." (Mot. 15). But the defendant fails to articulate the prejudice or confusion that would result. To be sure, the jury learning that after the defendant and Banowsky met for breakfast to "eat, laugh, and plot," (GX 1143), Banowsky lied about the "Senior Lender" to extort concessions from Paul Capital is unhelpful to the defense. But that does not make the evidence inadmissible. *See Vargas*, 702 F. Supp. at 73. The defendant also claims this evidence is "cumulative." (Mot. 16). But just because the Government has other proof of the defendant and Banowsky conspiring, that is not a basis to exclude this powerful proof of conspiracy from trial. And finally, the Court should reject the defendant's warnings of a "mini-trial" as a reason to exclude the evidence. The defendant's lies about HCLP are central to the Government's case. The Government should be permitted to introduce the evidence it needs to fairly prove its case, and the defense should have the opportunity to "contest the facts" as the defense sees fit. (Mot. 16). The evidence should be admitted.

## IV.    Evidence of False Statements to Auditors and Falsification of Board Minutes Is Admissible for All Counts

The defendant seeks a limiting instruction to cabin the jury's consideration of the defendant's falsification of records in the course of Beneficient's 2018 audit and his 2021 falsification of minutes. (Mot. 16-17). Evidence relating to both instances is part of, and direct evidence of, the defendant's fraud scheme targeting GWG and other potential investors. The defendant's request for a limiting instruction should be denied.

Beginning in at least 2018, the defendant formed a scheme to defraud investors into funneling money to the defendant. The scheme turned on a series of lies concerning a loan held by HCLP. Although HCLP and related entities were formed by the defendant for his benefit, he lied about HCLP's true association with him, casting it as an independent third-party lender with a valid claim for repayment and wielding what were presented as genuine threats of foreclosure. As

15

the defendant faced questions about HCLP—from investors, directors, auditors, and regulators—he lied. He disclaimed and minimized any association with HCLP. He falsely claimed he would not receive funds from payments on the HCLP debt. Based on these false representations, GWG authorized more than $100 million in payments on the HCLP debt. These funds were used by the defendant to renovate his mansion, expand his ranch, pay his credit card bill, and otherwise support his lifestyle.

Evidence of the defendant's falsification of records and false statements to Deloitte in the course of Beneficient's 2018 audit is direct evidence of the fraud scheme. Beneficient's successful production of audited financials was a contractual condition of Beneficient's agreement with GWG. It was also required for the issuance of GWG's own financials. It was essential for Beneficient's solicitation of future investments, funds the defendant intended to use to enrich himself. In service of completing the audit, and as described above, in February 2019, the defendant lied and directed lies concerning HCLP to the auditors. Specifically, he backdated documents making it appear that Martens, a childhood friend, had served as the manager of HCLP beginning in 2017. (In reality, the defendant had occupied this role.) The defendant also created fake emails purporting to show Martens's active management of HCLP at various points between 2017 and 2018. He also helped draft a letter setting forth these and other false facts. Without these lies, the defendant could not have secured the later funding for Beneficient because, without a clean audit, there would be no opportunity to do so. Moreover, in addition to directing these lies toward Deloitte, the defendant directed similar falsehoods concerning Martens's role and independence to GWG's Special Committee during the Special Committee's consideration of a $65 million loan to Beneficient in May 2019. He used the same fraudulent documents to deceive Beneficient officers concerning HCLP's management and the defendant's relationship with

16

HCLP. Evidence of the February 2019 false statements to the auditors is direct evidence of the defendant's fraud scheme and part of proving the falsity of representations the defendant made to GWG.

Evidence of Heppner's falsification of meeting minutes in 2021 is similarly direct evidence of the fraud scheme. In late 2020, the defendant learned the SEC had opened an investigation into GWG, Beneficient, and the defendant. In the spring of 2021, the SEC asked questions concerning the financial benefits the defendant received from HCLP, GWG, and Beneficient. In response to these inquiries, the defendant, for the first time, disclosed to directors and officers of GWG and Beneficient that his personal entities had recently received what he characterized as "loans" from HCLP. In order to continue his fraud scheme, the defendant falsified a set of minutes from an October 2019 meeting of Beneficient's Enterprise Risk Committee of the Board of Directors (the "ERC"). The ERC was composed of dual Beneficient and GWG directors, had been working to understand Heppner's relationship with HCLP, and was tricked into believing Heppner did not control HCLP and would not receive funds from any debt repayments. In May 2021, Heppner added language to the minutes in a section referencing the ERC's October 2019 review of HCLP. This additional language made it seem Heppner had disclosed an ongoing lending relationship with HCLP as of October 2019. These falsified minutes were used by Heppner to trick Beneficient and GWG officers and directors, and the SEC, into concluding this lending relationship had been disclosed and somehow approved. This was a lie, and the lie was used in furtherance of the defendant's continued fraud scheme. Indeed, the defendant still possessed millions in unspent funds that he had taken from HCLP, and continued spending that money well into 2022.

As a result, both sets of conduct are direct evidence of the defendant's fraud scheme charged in Counts One through Three. A limiting instruction that tells the jury they may not

17

consider this evidence for Counts One through Three would be improper. To be sure, the jury must conclude that misrepresentations were directed to the victims of the fraud scheme and cannot find the defendant guilty by merely lying to Deloitte or the SEC, but the Court's jury instructions will adequately convey the elements of the fraud offenses and ensure a proper verdict. Because the jury should be permitted to consider evidence of the defendant's lies to Deloitte and the SEC in determining whether a scheme to defraud or conspiracy to commit fraud existed, this evidence should be admitted without limitation.

## V.    The Defendant Should Be Precluded From Offering Inadmissible Hearsay Under the Guise of "State of Mind" Evidence

The defendant seeks to offer inadmissible and irrelevant hearsay statements under the guise of state-of-mind evidence. (Mot. 17-18). The motion should be denied.

A statement of a "declarant's then-existing state of mind (such as motive, intent or plan)" can be offered as an exception to the hearsay rule, but such a statement cannot include "a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3). For a hearsay statement to be admissible under Rule 803(3), "the statement must face forward, rather than backward." *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993). "In addition, 'the reasons for the state of mind exception focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation.'" *Id.* (quoting *Cardascia*, 951 F.2d at 487). "Thus, to fall within Rule 803(3)'s 'state of mind' hearsay exception, the statements sought to be introduced must relate to the declarant's state of mind *during* the [illegal conduct]" and not what the declarant "said or did *after* the [illegal conduct] had taken place and as the scheme itself was being discovered." *United States v. Netschi*, 511 F. App'x 58, 61 (2d Cir. 2013) (affirming district court's exclusion of statements the defendant "made and reactions he had concerning the unraveling of the scheme"). For that reason, "self-serving explanation[s] of past events" are not

18

admissible under Rule 803(3). *United States v. Blake*, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) (refusing to admit a defendant's self-exculpatory statements about his past conduct); *see also United States v. Annabi*, No. S1 10 Cr. 7 (CM), 2012 WL 489111, at *2 (S.D.N.Y. Feb. 14, 2012) (holding "*ex post facto* justifications for payments" that were made previously were inadmissible hearsay).

The defendant identifies three exhibits he asserts are admissible under the state-of-mind exception. None qualify. All three exhibits are emails written by coconspirators in late-September and early-October 2019, as the defendant planned additional lies concerning HCLP for Beneficient's ERC. Initially, the defendant resisted providing information in response to the ERC inquiries but ultimately resolved to provide misrepresentations to the ERC. These misrepresentations were the subject of an October 8, 2019 letter that the defendant, his attorney Banowsky, and his employee Derek Fletcher helped draft. These misrepresentations were also discussed at an October 10, 2019 ERC meeting, the minutes of which the defendant falsified in May 2021.

The three exhibits include:

- DX 1502: A September 25, 2019 email from Banowsky to the defendant presenting various rationales through which the defendant could avoid responding to the ERC's questions, mostly by referring the ERC to the Deloitte audit. The email is explicitly drafted as "just talking points to push back on further disclosure or details."

- DX 1503: A September 25, 2019 email from Banowsky to the defendant that "I started looking at accounting definitions of control and it circles back to the consolidation issue you spent so much time on with Deloitte. This was exhaustively looked at already. This review is so unnecessary."

- DX 1504: An October 3, 2019 email thread between Banowsky, Fletcher, and the defendant concerning the drafting of what became Banowsky's October 8, 2019 letter sent to the ERC. The email thread concludes with a message from Fletcher reading, in relevant part, that "All the statements made about the inability of Brad and his family to change the managers of [HCLP-associated entities] are still correct."

19

*First*, these exhibits are largely inadmissible hearsay. For example, DX 1502 involves Banowsky's advice concerning how to avoid further inquiry concerning HCLP. It is explicitly drafted as "talking points to push back on further disclosure." There is no indication that any statement in the email is a reflection of any person's state of mind; it is, rather, a set of obfuscations to avoid additional disclosure. The lengthy email also includes numerous examples of prohibited backward-looking impressions. *See, e.g.*, DX 1502 ("The point is that these disclosures were sufficient for SEC disclosure purposes and approved (by the Board) to be released to the public. Deloitte did not deem it necessary to explain who controlled HCLP Nominees because it satisfied itself that Brad Heppner did not control HCLP Nominees. . . . I am not a CPA but I would think that if Deloitte concluded that Brad Heppner did control indirectly or directly HCLP Nominees, then further disclosure would have been necessary.") DX 1503 similarly includes backward-looking statements offered for the truth of the matter asserted—"This has been exhaustively looked at already." And DX 1504 includes a statement that, if not offered for the truth and in light of the defendant's involvement in prior lies, has no value at all: that the prior lies the co-conspirators told were "still correct."

*Second*, all three exhibits should be precluded on relevancy grounds. The exhibits include statements, not from the defendant, but that others made to the defendant. There is no basis to conclude they reflect the defendant's own state of mind. And even if any portion of DX 1502 and 1503 included statements falling within the state-of-mind exception, they have no bearing on the defendant's state of mind when he made and directed misrepresentations to others. Both emails reflect Banowsky's views that the ERC review was unnecessary. But the defendant ultimately decided—contrary to Banowsky's views—to provide information and make representations to the ERC. Any subjective belief he held concerning the necessity of sharing this information is

20

irrelevant to his state of mind when he chose to provide false and misleading information to the ERC.

*Third*, the identified defense exhibits should be excluded under Rule 403. To the extent there is any admissible forward-looking state-of-mind material in these documents they are inextricably intertwined with hearsay statements and would result in confusing and misleading the jury. The jury would be unable to distinguish any limited proper purpose of the exhibits from the improper hearsay. In addition, both Banowsky and Fletcher are attorneys. Offering these statements would allow the defendant to improperly shoehorn an advice-of-counsel defense he has disclaimed.

The Court should preclude the defendant from offering DX 1502, 1503, and 1504, as well as any other exhibits that are similarly inadmissible.

## VI.    The Motion to Force the Government To Select a "Theory of Fraud" Should Be Denied

The defendant argues that the Government should be required to choose between proving the defendant defrauded GWG or other "prospective investors in Beneficient." (Mot. 19). The defendant again argues that, in light of these two purportedly distinct theories, Counts Two and Three are duplicitous. They are not.

An indictment is impermissibly duplicitous if (1) it combines two or more distinct crimes into one count, in contravention of Federal Rule of Criminal Procedure 8(a), and (2) the defendant is thereby prejudiced. *See, e.g.*, *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001). "[A]cts that could be charged as separate counts of an indictment," however, "may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989). Substantive charges as well as conspiracy charges will not be found impermissibly duplicitous merely because they aggregate multiple

21

crimes together into a single count. *See United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989) ("As long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible."); *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992) ("[T]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and that is one, however diverse its objects.").

Having lost his first attempt to dismiss Counts Two and Three as duplicitous, (*see* Dkt. 42 at 4-5), the defendant now seeks a second bite of the apple. This time, however, the defendant relies on a mischaracterization of the Government's theory. Counts Two and Three charge a scheme to defraud investors in Beneficient. The defendant sought funds for Beneficient from many investors—any investors—all the while making misstatements about Beneficient's debts that he thought would allow him to secure funding and realize his payday. He made those misrepresentations to, for example, Infinedi Partners, Oaktree Capital Management, and GWG. Though the defendant gained more involvement and control over GWG over time, his scheme remained the same: obtain money through misstatements and omissions about his relationship to HCLP.

As a result, the defendant made many of the same misstatements to Infinedi and Oaktree investors that he made to GWG. For example, he claimed that a member of the Harmon Family remained involved in independently managing the Harmon Trust, which owned HCLP. That scheme required continuous lies, to investors, to board members, to Special Committee members, to GWG's auditors, and to the SEC. *See supra* section III. The consistency between the defendant's conduct when dealing with potential investors and actual investors is evident in the process the defendant undertook each time he sought more money. Whether going to Infinedi or to GWG's independent board members, the defendant and his co-conspirators continued to obfuscate the

22

defendant's relationship with the "Senior Lender." These lies evolved as the defendant was forced to respond to questions. He created new trust documents, directed the drafting of new opinion letters, and circulated additional and escalating lies—all in service of his scheme. The defendant's fraud against GWG was merely a part of the same scheme that he also directed toward prospective investors. Counts Two and Three are not duplicitous, and the Government should not be forced to artificially declare and pursue a "theory of fraud" at trial; the Government should be entitled to offer evidence and pursue arguments consistent with the charges returned by the grand jury. *See, e.g.*, *United States v. Cuti*, No. 08 Cr. 972 (DAB), 2009 WL 3154310, at *3-4 (S.D.N.Y. Sept. 24, 2009) (single conspiracy and securities fraud charges not duplicitous because properly charged jury could reasonably find "that a single conspiracy underlies the entire course of conduct of Defendants," regardless of whether "there were multiple schemes to accomplish the goals of the overall conspiracy"); *United States v. Vilar*, No. 05 Cr. 621 (RJS), 2008 WL 4298545, at *1-2 (S.D.N.Y. Sept. 5, 2008) (singular conspiracy charge not duplicitous because while "the Defendants employed a variety of means to carry out their conspiracy," the "overarching scheme alleged was a unified one: to defraud ... clients by inducing them, on the basis of similar misrepresentations, to invest in a variety of investment products").

Nor should the jury be presented with a special verdict form. The law is clear that "a federal jury need not always decide unanimously which of several possible sets of brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999); *see also United States v. Kozeny*, 667 F.3d 122, 131-32 (2d Cir. 2011). For example, in conspiracy cases, there is no requirement that the jury unanimously agree on which overt act has been proven to find that the overt act requirement has been satisfied. *See id.*; *United States v. Cote*, 615 F. App'x 39, 40 (2d

23

Cir. 2015). Nor must the jury unanimously agree as to which means of fraud a defendant committed in determining, unanimously, that the charged scheme to defraud existed. *See United States v. Daniel*, 749 F.3d 608, 613 (7th Cir. 2014) (holding that a single false statement or misrepresentation is a means of executing a scheme to defraud and is not an element); *United States v. LaPlante*, 714 F.3d 641, 647 (1st Cir. 2013) (same); *United States v. Rice*, 699 F.3d 1043, 1048 (8th Cir. 2012) (same); *United States v. Lyons*, 472 F.3d 1055, 1068 (9th Cir. 2007), *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (same); *United States v. Gentile*, No. 21 Cr. 54 (RPK), 2025 WL 777090, at *32-33 (E.D.N.Y. Mar. 11, 2025) (same).

In addition, the Second Circuit, outside of certain limited contexts, "ha[s] emphasized the criminal law's historical preference for general verdicts and traditional distaste for special interrogatories." *United States v. Concepcion*, 139 F.4th 242, 252 (2d Cir. 2025) (internal quotations omitted). Thus, "a 'district court's refusal to require a special verdict' cannot 'provide an independent basis for reversing an otherwise valid conviction.'" *Id* (quoting *United States v. Applins*, 637 F.3d 59, 83 (2d Cir. 2011). The defendant has not cited a wire fraud or Section 371 case to the contrary.[6]

The motion should be denied.

---

[6] The defendant's argument about sentencing loss does not counsel otherwise. First, loss amount must be found by the Court to a different (and lower) standard. *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) ("[A] district court is obligated to add such points where, on a preponderance standard, they are supported by the evidence."). And, as the Court knows better than anyone, the Court's practice is "to focus its primary attention on the non-guidelines factors set forth in § 3553(a)." *Id.* at 512.

## CONCLUSION

For the foregoing reasons, the defendant's motions *in limine* should be denied.

Dated:  New York, New York
        April 14, 2026

                                Respectfully submitted,

                                JAY CLAYTON
                                United States Attorney

                        By:  *Daniel Nessim*
                                Daniel G. Nessim
                                Alexandra Rothman
                                Kyle A. Wirshba
                                Assistant United States Attorneys
                                Tel.: (212) 637-2486/-2580/-2493

25