**quinn emanuel** trial lawyers | washington, dc

555 13th Street NW, Suite 600, Washington, District of Columbia 20004-1109 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8101**

WRITER'S EMAIL ADDRESS
**benoneil@quinnemanuel.com**

May 1, 2026

**BY EMAIL**
The Honorable Jed S. Rakoff
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007

> Re:    *United States v. Bradley Heppner*, No. 25 Cr. 503 (JSR)

Dear Judge Rakoff:

Mr. Heppner respectfully requests that the Court enter an order admitting the following exhibits that are relevant, authentic, admissible, and critical to Mr. Heppner's defense.   The exhibits and bases for admission are set forth below:

**A.    Hinkle Z**

*Background*:   Hinkle Z is an October 6, 2015 email from Bradley Heppner to Jeffrey Hinkle, James Silk, and three employees of Paul Capital: Randall Schwed; Phil Jensen; and Debbie Wong.  (Ex. 1.)  In particular, Mr. Heppner seeks to admit into evidence the excerpt of the email where he states the following:

> Jeff & Mark recognized that we have been referencing the wrong trust that is the Harmon Trust which has been the lender.  We keep referring to the HBHT (Highland Business Holdings Trust). The Harmon's trust is the Highland Investment Holdings Trust (HIHT). It has a subsidiary Highland Consolidated, LP. (HCLP) that has been the lender all along and will remain the lender. We have it correct now.  (*Id.* at 1.)

*Authenticity*:   The exhibit was produced by the Government from Beneficient's files.   The exhibit therefore is authentic.

*Relevance*:   This exhibit is relevant to rebut evidence admitted by the Government that tended to show that Mr. Heppner lied and caused others—including Mr. Hinkle—to lie to Paul

quinn emanuel urquhart & sullivan, llp

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DUBAI | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEW YORK | PARIS | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

Capital in 2015 and after about the true ownership and nature of the "Harmon Trust"—in an attempt to defraud Paul Capital.  (*See, e.g.*, Tr. (Hinkle) at 431:18-432:11, 433:06-16, 439:15-23).

*Admissibility*:  The exhibit is admissible for the non-hearsay purpose of demonstrating what information Mr. Heppner actually provided to Paul Capital about the "Harmon Trust" and the effect that information would have on Paul Capital—i.e., to demonstrate that Paul Capital was informed of the true nature of the "Harmon Trust" and thus could not have been defrauded.  *See, e.g.*, *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 126 (2d Cir. 2016) (holding that loan documents were properly admitted to demonstrate that party had notice of and received mandated disclosures); *United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) (noting a "statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice"); *United States v. Kurland*, 2022 WL 2669897, at *16 (S.D.N.Y. July 11, 2022) (admitting evidence of defendant's disclosures to alleged victims because the out-of-court statements put the alleged victims "on notice of facts the government maintains he did not").

### B.    DX-1525

*Background*:  DX-1525 is an October 24, 2014 email from Bradley Heppner to Phil Jensen of Paul Capital.  (Ex. 2.)  In particular, Mr. Heppner seeks to admit into evidence the excerpt of the email where he states the following:

> Heritage Highland would hold my ownership in the Advisor since it has upstream owners which include a trust established by Mrs. Harmon from the estate of Charles M. Harmon - my mentor and long serving GP of Goldman.  They are a wealthy family office which operates out of D.C.  I control that trust's ownership, but it has a significant equity participation through Heritage Highland – this also explains why Heritage Highland holds 50.5% of the Advisor.  I have a long and rewarding relationship with that trust.  (*Id.* at 2.)

*Authenticity*:  The exhibit was produced by the Government from Beneficient's files.  The exhibit therefore is authentic.

*Relevance*:  This exhibit is relevant to rebut evidence admitted by the Government that tended to show that Mr. Heppner lied and caused others—including Mr. Hinkle—to lie to Paul Capital in 2015 and after about the true ownership and nature of the "Harmon Trust"—in an attempt to defraud Paul Capital.  (*See, e.g.*, Tr. (Hinkle) at 431:18-432:11, 433:06-16, 439:15-23).

*Admissibility*:  The exhibit is admissible for the non-hearsay purpose of demonstrating what information Mr. Heppner actually provided to Paul Capital about the "Harmon Trust" and the effect that information would have on Paul Capital—i.e., to demonstrate that Paul Capital was informed of the true nature of the "Harmon Trust" and thus could not have been defrauded.  *See, e.g.*, *Crawford*, 815 F.3d at 126; *Dupree*, 706 F.3d at 137; *Kurland*, 2022 WL 2669897, at *16.

### C.    Hinkle K & DX-500

*Background*:  Hinkle K is a January 20, 2016 memo by Mayer Brown to Mr. Heppner and Mr. Jensen, of Paul Capital.  (Ex. 3.)  DX-500 is a July 6, 2017 memo by Mayer Brown to Mr.

Heppner and Mr. Jensen, of Paul Capital. (Ex. 4.) In particular, Mr. Heppner seeks to admit into evidence the excerpts of those memos that state the following (in similar language):

> Hinkle K: Highland Consolidated, LP. ("HCLP"), a Delaware limited partnership, loaned approximately $145 million to BEN for, among other purposes, to develop and trademark its intellectual property. This loan is a recourse loan, that is, repayment of the loan is not limited to specific assets of BEN. This loan is outstanding as of the date hereof. Heritage Highland Investment Holdings Trust (the "Investment Trust"), a Delaware trust, owns a limited partnership interest in HCLP. Highland Consolidated Investments L.L.C. ("HCI") holds the general partnership interest in HCLP. HCI is owned by Brad Heppner. (Ex. 3 at 5-6.)

> DX-500: HCLP loaned approximately $145 million to BEN for, among other purposes, to develop and trademark its intellectual property. This loan is a recourse loan, that is, repayment of the loan is not limited to specific assets of BEN. This loan is outstanding as of the date hereof. Heritage Highland Investment Holdings Trust (the "Investment Trust"), a Delaware trust, owns a limited partnership interest in HCLP. Highland Consolidated Investments LLC, ("HCI") holds the general partnership interest in HCLP. HCI is owned by Brad Heppner. (Ex. 4 at 6.)

*Authenticity*: The exhibits were produced by the Government from Beneficient's files. The exhibits therefore are authentic.

*Relevance*: These exhibits are relevant to rebut evidence admitted by the Government that tended to show that Mr. Heppner lied and caused others to lie to Paul Capital in 2016 and after about who controlled HCLP and its affiliates, which held the loan to Beneficient. (*See, e.g.*, Tr. (Muno) at 1058:04-1059:05).

*Admissibility*: The exhibits are admissible for the non-hearsay purpose of demonstrating what information Mr. Heppner actually provided to Paul Capital about HCLP and his control over it, as well as the effect that such information would have on Paul Capital—i.e., to demonstrate that Paul Capital was informed that Mr. Heppner controlled HCLP and its affiliates and thus could not have been defrauded. *See, e.g.*, *Crawford*, 815 F.3d at 126; *Dupree*, 706 F.3d at 137; *Kurland*, 2022 WL 2669897, at *16.

### D.    Schwed B

*Background*: Schwed B is a March 4, 2016 email from Randall Schwed of Paul Capital to Mr. Hinkle, attaching a document entitled: "Beneficient Master Q&A." (Ex. 5.) The "Beneficient Master Q&A" was "prepared by Paul Capital Advisors." (*Id.* at 4.) In particular, Mr. Heppner seeks to admit into evidence the excerpt of "Beneficient Master Q&A":

**31. Who are BEN's founders?**

BEN was formed by Highland Consolidated, L.P. ("Heritage Highland") which was founded in 1996 by Mr. Brad K. Heppner and is in partnership with a trust established by the family of one of the longest serving general partners of Goldman Sachs & Co. and long-time business partner of Mr. Heppner. Heritage Highland acquires and establishes operating companies principally in the financial services, investment and insurance sectors, each with a common business purpose of providing highly specialized products and solutions for alternative asset owners. Under Mr. Heppner's 20 years of leadership, Heritage Highland has successfully completed profitable realizations from seven of its ten companies which have returned an aggregate 8.8 multiple on invested capital through mergers and transactions with Fortune 50 companies or institutionally backed management teams. (*Id.* at 21.)

*Authenticity*:  The exhibit was produced in response to a grand jury subpoena and was authenticated by Government witness Randall Schwed at trial on April 30, 2026. (Tr. (Schwed) at 1380:22-1381:09.)  The exhibit therefore is authentic.

*Relevance*:  This exhibit is relevant to rebut evidence admitted by the Government that tended to show that Mr. Heppner lied and caused others—including Mr. Hinkle—to lie to Paul Capital in 2015 and after about the true ownership and nature of the "Harmon Trust"—in an attempt to defraud Paul Capital. (*See, e.g.*, Tr. (Hinkle) at 431:18-432:11, 433:06-16, 439:15-23). This exhibit is also relevant to rebut evidence admitted by the Government that tended to show that Mr. Heppner lied and caused others to lie to Paul Capital in 2016 and after about who controlled HCLP and its affiliates, which held the loan to Beneficient. (*See, e.g.*, Tr. (Muno) at 1058:04-1059:05).

*Admissibility*:  The exhibit is admissible for the non-hearsay purpose of demonstrating what information Mr. Heppner actually provided to Paul Capital about the "Harmon Trust" and HCLP and the effect that information would have on Paul Capital—i.e., to demonstrate that Paul Capital was informed of the true nature of the "Harmon Trust" and control of HCLP, and thus could not have been defrauded. *See, e.g.*, *Crawford*, 815 F.3d at 126; *Dupree*, 706 F.3d at 137; *Kurland*, 2022 WL 2669897, at *16.

E.    **DX-3**

*Background*:  DX-3 is the September 1, 2017 Transaction Agreement Between Paul Capital and Beneficient. (Ex. 6.)  In particular, Mr. Heppner seeks to admit into evidence the following excerpts of the Transaction Agreement:

Capitalization of BCC

(6) (i) BEN makes a capital contribution to Beneficient Company Holdings, L.P. ("BCH") in an amount representing 77% times the sum of the Initial NA V of the Exchange Fund Portfolio Interests

4

(the "BEN 77% Loan Proceeds") minus the amount borrowed by BCC in Step 7, and (ii) BCH makes a capital contribution to Beneficient Capital Company, L.L.C. ("BCC") in an equal amount.

(7) BCC borrows a term loan from HCLP Nominees, L.L.C. in an amount equal to $141,000,000 pursuant to a credit agreement in substantially the form attached hereto as Exhibit 4.2.12. (Ex. 6 at 42.)

\*\*\*

3.3.7 <u>Tax Opinion</u>. To the PCA Parties, the Mayer Brown LLP opinion of Mayer Brown LLP attached hereto as Exhibit 3.3.7, dated as of July 6, 2017, as the same may be revised in form and substance reasonably satisfactory to PCA LLC to include appropriate references to and analysis concerning the transactions described herein and attached hereto as Exhibit A, provided that no changes thereto shall result in a material change in the conclusions expressed therein (the "<u>Tax Opinion</u>" at 15).

**Authenticity**:  The exhibit was produced by the Government from Beneficient's files.  The exhibit therefore is authentic.

**Relevance**:  The exhibit is relevant to establish that the $141 million loan from HCLP Nominees to Beneficient was established in connection with the Paul Capital transaction.  This evidence is relevant to rebut evidence admitted by the Government suggesting that the loan was fabricated or not real, and was simply a compilation of past spending by Mr. Heppner. (*See, e.g.*, Tr. (Hinkle) at 432:12-433:05, 437:03-12, 490:05-490:25).  The exhibit is also relevant to show that Paul Capital received, reviewed, and incorporated into the Transaction Agreement the "Tax Opinion," which is DX-500 discussed above.

**Admissibility**:  The exhibit is admissible because it is a contract, which is a form of verbal act that gives rise to legal consequences.  As such it is admissible as non-hearsay. *See, e.g.*, *Crawford v. Franklin Credit Mgmt. Corp.*, 2015 WL 1378882, at *3 (S.D.N.Y. Mar. 26, 2015) (citing cases); *Porter v. United States,* 2015 WL 1004953, at *1 n.2 (S.D.N.Y. Mar. 3, 2015) ("[A] contract is 'a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay.'") (quoting *Mueller v. Abdnor,* 972 F.2d 931, 937 (8th Cir. 1992)); *Spencer v. City of New York*, 2011 WL 13257640, at *1 & n.3 (S.D.N.Y. July 18, 2011).

F.    **DX-2000**

**Background**:  DX-2000 is a December 22, 2017 email from Brian Dobie of GWG to Mr. Hinkle and Bill Acheson of GWG. (Ex. 7.) In particular, Mr. Heppner seeks to admit into evidence the excerpt of the email where Mr. Dobie states the following:

P.47 last paragraph re Brad's company (Highland Consolidated, LP.) contributing alternative assets to BEN Group Partnership in

5

return for a NPC-B Unit Account equal to value of NAV. What is this and how much? This does not appear to be reflected in the proformas (I assume this is not part of the existing NPC-B in the equity rollforward). This also doesn't appear consistent with NPC-B coming in only via cash.  (*Id.* at 1.)

*Authenticity*:  The exhibit was produced by the Government from Beneficient's files.  The exhibit therefore is authentic.

*Relevance*:  The exhibit is relevant to rebut evidence admitted by the Government that tended to show that Mr. Heppner lied and caused others to lie to GWG in 2017 and after about who controlled HCLP and its affiliates, which held the loan to Beneficient.  (*See, e.g.*, Tr. (Stone) at 757:22-25, 771:05-06, 773:01-09).

*Admissibility*:  The exhibit is admissible for the non-hearsay purpose of demonstrating what information was actually provided to GWG about HCLP and his control over it, as well as the effect that such information would have on GWG—i.e., to demonstrate that GWG was informed that Mr. Heppner controlled HCLP and its affiliates and thus could not have been defrauded.  *See, e.g.*, *Crawford*, 815 F.3d at 126; *Dupree*, 706 F.3d at 137; *Kurland*, 2022 WL 2669897, at *16.

### G.    DX-502

*Background*:  DX-502 is an August 10, 2018 memo by Mayer Brown to GWG.  (Ex. 8.) In particular, Mr. Heppner seeks to admit into evidence an excerpt of this memo that states the following:

> HCLP Nominees. L.L.C., a Delaware limited liability company ("HCLP") loaned approximately $145 million to BEN for, among other purposes, to develop and trademark its intellectual property. This loan is a recourse loan, that is, repayment of the loan is not limited to specific assets of BEN. This loan is outstanding as of the date hereof.  Heritage Highland Investment Holdings Trust (the "Investment Trust"), a Delaware trust, owns a membership interest, treated for tax purposes as a partnership interest, in HCLP.  Highland Consolidated Investments L.L.C. ("HCI") holds membership interest in HCLP. HCI is owned by Brad Heppner.  (Ex. 8 at 3.)

*Authenticity*:  The exhibit was produced by the Government from GWG's files.  The exhibit therefore is authentic.

*Relevance*:  The exhibit is relevant to rebut evidence admitted by the Government that tended to show that Mr. Heppner lied and caused others to lie to GWG in 2017 and after about who controlled HCLP and its affiliates, which held the loan to Beneficient.  (*See, e.g.*, Tr. (Stone) at 757:22-25, 771:05-06, 773:01-09).

*Admissibility*:  The exhibit is admissible for the non-hearsay purpose of demonstrating what information was actually provided to GWG about HCLP and his control over it, as well as

the effect that such information would have on GWG—i.e., to demonstrate that GWG was informed that Mr. Heppner controlled HCLP and its affiliates and thus could not have been defrauded.  *See, e.g.*, *Crawford*, 815 F.3d at 126; *Dupree*, 706 F.3d at 137; *Kurland*, 2022 WL 2669897, at *16.

### H.    DX-19

***Background***:   DX-19 is a November 15, 2021 Termination and Release Agreement between GWG, Beneficient, and their related parties. (Ex. 9.)  In particular, Mr. Heppner seeks to admit into evidence the following excerpts of the Termination and Release Agreement:

> 2.  <u>Mutual Release</u>. Effective as of the Effective Date:
>
> (a) Each Party hereby voluntarily, unconditionally and irrevocably absolutely, finally and forever waives, releases and discharges each other Party and each of their respective affiliates and each of the present or former directors, officers, members or managers of the foregoing and (ii) GWGH hereby unconditionally and irrevocably waives, releases, and discharges any of its present or former directors, officers, members or managers who also serve or served as directors, members or managers of any Ben Party ( defined below) (each releasing Person under (i) or (ii), a "Releasing Party" and collectively, the "Releasing Parties" and each Person released under (i) or (ii), a "Released Party" and collectively, the "Released Parties"), from any and all claims, demands, rights, actions, suits, proceedings, charges, complaints, agreements, damages, costs, losses, expenses, liabilities, obligations and causes of action, of whatever kind or nature whatsoever, fixed or contingent, known or unknown (including whether disclosed, hidden or concealed), liquidated or unliquidated, in Law, equity or otherwise, arising from, connected or related to, caused by or based on any facts, conduct, activities, omissions, agreements, transactions, events or occurrences known or unknown (including whether disclosed, hidden or concealed), of any type that existed, occurred, happened, arose or transpired from the beginning of time through the Effective Date, whether arising in contract, tort (including breach of fiduciary or other duty), statute, or any other theory of liability of any other type or nature whatsoever including, without limitation, any of the foregoing arising under or otherwise in connection with any of the Terminated Agreements and/or the termination of any Terminated Agreement ( each, a "Released Claim" and collectively, the "Released Claims"). (Ex. 9.)

***Authenticity***:   The exhibit was produced by the Government from Beneficient's files.  The exhibit therefore is authentic.

*Relevance*:    The exhibit is relevant to rebut evidence admitted by the Government suggesting that it was "important" to members of the GWG Special Committee, including David Chavenson, that Mr. Heppner not obtain any financial benefit from GWG's investments.  (*See, e.g.*, Tr. (Chavenson) at 928:14-22.)  Specifically, in November 2021, GWG filed a Schedule 14A Proxy Statement with the SEC that detailed (a) GWG's investments in Beneficient in 2019 and 2020, (b) Beneficient's use of a portion of those GWG-investment funds to pay down Beneficient's loan from HCLP, and (c) HCLP's use of those loan repayments to lend over $100 million to trusts and entities controlled by Mr. Heppner.  At the time, Mr. Chavenson and other Government witnesses were members of GWG's Special Committee.  Far from taking any action against Mr. Heppner for his alleged prior misrepresentations about not being able to access the GWG-investment funds used to pay down the HCLP debt, GWG granted Mr. Heppner a full release of all claims. (*See* Ex. 9 at 2 (releasing Beneficient and its director, which included Mr. Heppner).)  Such evidence directly rebuts Mr. Chavenson's and others' statements that they considered Mr. Heppner's alleged misrepresentations about Mr. Heppner's inability to access HCLP's money to be important.

*Admissibility*:  The exhibit is admissible because it is a contract, which is a form of verbal act that gives rise to legal consequences.  As such it is admissible as non-hearsay. *See, e.g.*, *Crawford*, 2015 WL 1378882, at \*3 (citing cases); *Porter,* 2015 WL 1004953, at \*1; *Spencer*, 2011 WL 13257640, at \*1.

I.    **GX-206 & GX-217**

*Background*:  GX-206 is an October 22, 2002 document appointing Timothy B. Harmon to be the Independent Trustee of the Highland Investment Trusts, which was later renamed the Highland Investment Holding Trust.  (Ex. 10.)  GX-217 is an October 29, 2018 document appointing Timothy B. Harmon as a beneficiary of the Highland Investment Holding Trust.  (Ex. 11.)  In particular, Mr. Heppner seeks to admit into evidence the excerpts of these documents that state the following:

> GX-206: NOW, THEREFORE, BRADLEY K. HEPPNER hereby nominates and appoints TIMOTHY B. HARMON as successor Independent Trustee of the Trust, such appointment to be effective as of the date TIMOTHY B. HARMON acceptance the Trust and the position of Independent Trustee.  (Ex. 10.)

> GX-217: NOW, THEREFORE, I do hereby exercise the Power of Appointment as follows:

> During the Applicable Term, the Family Trustee may, in its sole and absolute discretion distribute so much of the net income of the trust to TIMOTHY B. HARMON as the Family Trustee deems appropriate, taking into consideration the purpose of the Trust and the respective needs of the beneficiaries.  (Ex. 11.)

*Authenticity*:  GX-206 was produced by the Government from Beneficient's files.  GX-217 was produced by the Government from Derek Fletcher's files.  The exhibits are authentic.

8

*Relevance*:  The exhibits are relevant to rebut evidence admitted by the Government suggesting that the Harmon family had nothing to do with the Highland Investment Holding Trust and to rebut evidence that Mr. Heppner falsely informed others that Timothy B. Harmon was a beneficiary of the Highland Investment Holding Trust.  (*See, e.g.*, Tr. (Hinkle) at 380:08-11.)

*Admissibility*:  The exhibits are admissible because they are legally operative instruments, which are forms of verbal acts that give rise to legal consequences.  As such the exhibits are admissible as non-hearsay.  *See, e.g.*, *Crawford*, 2015 WL 1378882, at *3 (citing cases); *Porter,* 2015 WL 1004953, at *1; *Spencer*, 2011 WL 13257640, at *1.

### J.    General Ledgers

*Background*:  Mr. Heppner intends to offer into evidence general ledgers from thirty-one entities affiliated with Brad Heppner for the years 2003 through 2022.

*Relevance*:  The exhibits are relevant to support various financial analyses relating to the loan between HCLP Nominees and Beneficient, as well as historical lending practices at the various entities.

*Admissibility*:  We expect the exhibits will be supported by a 902(11) certification by the appropriate custodian of records, and therefore they will be admissible as business records.

### K.    SEC Filings

*Background*:  Mr. Heppner intends to offer into evidence excerpts of several SEC filings that contain disclosures about, among other things, Mr. Heppner's affiliation with HCLP Nominees.  The SEC filings are marked as Defense Exhibits 400-448.

*Authenticity*:  The exhibits are either produced by the Government from Beneficient's files or were downloaded from the SEC's web site.  The exhibits are authentic.

*Relevance*:  The exhibits are relevant to rebut evidence admitted by the Government that tended to show that Mr. Heppner's affiliation with HCLP Nominees was hidden from GWG and potential investors in Beneficient.  In addition, the exhibits are relevant to impeaching Government witnesses who testified that it was "important" to them that Mr. Heppner not obtain any financial benefit from GWG's investments.  (*See, e.g.*, Tr. (Chavenson) at 928:14-22.)  The exhibits will show that, in 2019, public disclosures stated that "the Senior Lenders (including HCLP) are directly or indirectly associated with Brad K. Heppner, who is Chairman of the Company's Board of Directors."   The SEC filings will also show that Beneficient disclosed Mr. Heppner's borrowings in 2021, but the members of GWG's Special Committee and Board of Directors did not take any actions against him in response.  Such evidence directly rebuts any statements that the Government witnesses considered Mr. Heppner's alleged misrepresentations about his inability to access HCLP's money to be important.

*Admissibility*:  The exhibits are admissible for the non-hearsay purpose of demonstrating what information was actually provided to GWG and others about HCLP and Mr. Heppner's

9

relation to it, as well as the effect that such information had on GWG and prospective investors in Beneficient. *See, e.g.*, *Crawford*, 815 F.3d at 126; *Dupree*, 706 F.3d at 137; *Kurland*, 2022 WL 2669897, at *16.

Mr. Heppner therefore respectfully requests that the Court grant his requests in this letter to admit evidence.

*/s/ Benjamin O'Neil*
Benjamin A. O'Neil