

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 38th Floor*
*New York, New York 10278*

May 3, 2026

**BY EMAIL**

Honorable Jed S. Rakoff
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

> **Re:**   ***United States v. Bradley Heppner*, 25 Cr. 503 (JSR)**

Dear Judge Rakoff:

The Government respectfully writes to preclude the defendant from offering into evidence more than 400 exhibits, including what appears to be hundreds of general ledgers from unexplained businesses, some of which date back to 2003, as well as confusing and misleading summary charts, which the defendant first produced to the Government earlier this evening. As explained below, these exhibits run afoul of the Federal Rules of Evidence. Many contain hearsay for which there is no exception, leaving the defendant to argue that the exhibits are not offered for the truth of the matters asserted therein. With that concession, all are irrelevant and likely to mislead the jury. Many have already been ruled inadmissible by this Court. For the reasons set forth below, each exhibit should be excluded.

### A.  Paul Capital Records

The defendant seeks to admit five documents as proof that he disclosed to Paul Capital the "true nature" of the Harmon Trust. Ltr. 2-4 (seeking to admit exhibits marked as Hinkle Z, DX-1525, Hinkle K, DX-500, and Schwed B). These documents, if not offered for their truth, are otherwise irrelevant. The defendant asserts that these documents should be admitted for "the non-hearsay purpose of demonstrating what information Mr. Heppner actually provided to Paul Capital" about HCLP and the so-called Harmon Trust. Ltr. 2. But, as detailed below, each record either was not sent to the Paul Capital witnesses who testified, or they did not recall receiving it. Proof that some information *may* have been disclosed to a different Paul Capital employee cannot help the jury evaluate the misstatements made to testifying witnesses, and whether those misstatements were material. *See United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (holding a "false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the [decisionmaker] to which it was addressed.").

The defense faces a separate hurdle in trying to admit these records. Each appears designed to improperly suggest that those witnesses who did testify should have done more to uncover the truth about the defendant's lies through further investigation. Such blaming the victim is not permitted. *See, e.g.*, *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 6283509,

May 3, 2026
Page 2

at *3 (S.D.N.Y. Sept. 26, 2023) (quoting *Weaver*, 860 F.3d at 95). That risk is particularly great where there is no proof that the testifying victims received the defendant's exhibits—DX-525, Hinkle K, DX-500—and where the purported disclosures were made over a year before the misrepresentations—*compare* GX 1108 (Heppner lie to Schwed and Muno in July 2017) *with* Hinkle Z (October 2015), DX-1525 (October 2014), Hinkle K (January 2016), Schwed B (March 2016).

Finally, to the extent the defendant attempts to argue that these exhibits should be admitted because they evince his lack of intent to defraud, he must take the witness stand and so testify. The defendant cannot hide behind snippets of various documents that he has pulled together from the past decade. If the defendant wants to claim that these documents prove he lacked the requisite mens rea, he should be required to testify and explain how these records could possibly have borne on his intent at the time of his misstatements.

In addition to those general objections, the Court should preclude each exhibit from trial for the following reasons.

1. Hinkle Z

Hinkle Z is an October 6, 2015 email from the defendant to Jeff Hinkle, James Silk, and Randall Schwed, Phil Jensen, and Debbie Wong of Paul Capital. The defendant writes, among other things, "the Harmon's trust is the Highland Investment Holdings Trust (HIHT). It has a subsidiary Highland Consolidated, LP. (HCLP) that has been the lender all along and will remain the lender."

Hinkle Z should be excluded as irrelevant and far more prejudicial than probative, particularly because it is not being offered for its truth, as the Court already ruled. Tr. 630-31, 637-41. This email lacks probative value because it does not contradict the testimony of Hinkle or Schwed that Paul Capital was lied to about the "Harmon Trust." *See* Tr. 641 (with respect to Hinkle Z, "I don't think this materially, or even immaterially, impeaches his prior testimony"). The Government does not allege that the defendant used the misnomer "Harmon Trust" to conceal the name of the actual underlying trust, but instead to leave the misimpression that the Harmon family was involved in the lending to Beneficient when they were not. Thus, Hinkle Z should be excluded.

2. DX-1525

DX-1525 is an October 24, 2014 email from the defendant to Jensen in which he writes, among other things, that "Heritage Highland has upstream owners which include a trust established by Mrs. Harmon…They are a wealthy family office…I control that trust's ownership, but it has a significant equity participation through Heritage Highland—this also explains why Heritage Highland holds 50.5% of the Advisor. I have a long and rewarding relationship with that trust."

DX-1525 should be excluded under Rule 403 as lacking in probative value and likely to confuse the jury. Jensen did not testify at trial, and thus his knowledge of the Harmon Trust is irrelevant. There is no proof that Jensen sent this information to anyone else as Paul Capital. The email also predates the relevant Paul Capital misrepresentations by several months. Most glaring,

2

May 3, 2026
Page 3

the email does not even disclose the truth about the Harmon Trust; if anything, it reflects the beginning of the defendant's fabrication that the "Harmon Trust" was something separate from himself ("I have a long and rewarding relationship with that trust."). DX-1525 should be excluded.

### 3.  Hinkle K and DX-500

Hinkle K is an excerpt from a 55-page tax opinion from Mayer Brown dated January 20, 2016. DX-500 is an excerpt from a 65-page tax opinion from Mayer Brown dated July 6, 2017.

Hinkle K and DX-500 are filled with complicated and legalistic out of court statements that, if not being offered for their truth, are irrelevant and sure to confuse the jury. The tax opinions are also irrelevant. The defense presented these tax opinions (often under different exhibit labels) to no fewer than three witnesses at trial, each time inquiring if the witness recalled reviewing the tax opinions. Tr. 634 (Hinkle; Hinkle L); 1080-81 (Muno; Muno 1); 1371 (Schwed; Schwed A). Time and again, and even after being shown portions of the opinions, each witness was unable to recall having reviewed the opinions. There is thus no probative value from these opinions, and even if there were some, it would be substantially outweighed by the risk of unfair prejudice and likelihood of confusion. Fed. R. Evid. 403. Hinkle K and DX-500 should be excluded.

### 4.  Schwed B

Schwed B is an excerpt from a 69-page document entitled "Beneficient Master Q&A" attached to a March 4, 2016 email from Schwed to Hinkle. The defense asserts the document was "prepared by Paul Capital Advisors," but from the entire email chain and the information contained in the document, it appears the document may have been prepared by Beneficient for Paul Capital to circulate to its limited partners. The defendant seeks to admit the portion of the document that reflects that "BEN was formed by Highland Consolidated, L.P. ("Heritage Highland") which was founded in 1996 by Mr. Brad K. Heppner and is in partnership with a trust established by the family of one of the longest serving general partners of Goldman Sachs & Co. and long-time business partner of Mr. Heppner."

Schwed B should be excluded as irrelevant and prejudicial, as the Court already ruled. Tr. 1372-74, 1379-84. The defense tried to admit this document through Schwed's cross-examination, but Schwed testified that he did not "recall reading that specific sentence." Tr. 1384 (noting "So I think that's the problem you face, counsel"). Absent any such recollection by testifying victims, the document lacks probative value. In addition, the information the defense seeks to admit is confusing, possibly incorrect (as Schwed testified, Tr. 1383), and not necessarily inconsistent with the lies the defendant later told about the Harmon Trust (noting that HCLP is in "partnership with a trust established by the family of one of the longest serving general partners of Goldman Sachs & Co. and long-time business partner of Mr. Heppner"). Schwed B should be excluded.

### B.  GWG Records

The defendant seeks to admit two documents, not for the truth of the matters asserted, but as proof that he disclosed to GWG his control over HCLP. Ltr. 5-6. Like the Paul Capital records, these (i) cannot be offered to prove the defendant's mens rea absent his testimony; (ii) were not

May 3, 2026
Page 4

sent to testifying witnesses from GWG, leaving scant if any probative value; and (iii) risk confusing the jury. The Court should preclude each from trial.

        1.  <u>DX-2000</u>

Exhibit DX-2000 is a December 22, 2017 email from Brian Dobie to Hinkle, which Hinkle forwarded to the defendant. In the email, Dobie writes, "P.47 last paragraph re Brad's company (Highland Consolidated, LP.) contributing alternative assets to BEN Group Partnership."

DX-2000 should be excluded under Rules 401 and 403. First, it is not relevant. To be probative the defendant would need to lay a foundation establishing that *a disclosure to Dobie* would tend to show that he was not trying to conceal facts *from GWG's board*. But based on his email address, while Dobie appears to be an employee of GWG, there is no testimony in the record to that effect, and it is entirely unclear what, if any, contact Dobie had with GWG's Board and Special Committee, let alone what he did with this email. In other words, there is nothing in the trial record to establish the relevancy of the document. At the same time, this email will only confuse the jury and present more questions than it answers. DX-2000 should be excluded.

        2.  <u>DX-502</u>

DX-502 is an excerpt from a tax opinion prepared by Mayer Brown for GWG dated August 10, 2018. This document is inadmissible for the same reasons as Hinkle K and DX-500. The tax opinion contains hearsay and, even if not, should be excluded under Rule 403. The document contains two layers of hearsay: first it is an out of court statement by Mayer Brown, and second its conclusions are plainly based on the out of court statements or records of other people. As to the first level of hearsay, there has been no testimony or other evidence in the record that any of the defendant's victims on the GWG Special Committee or Board of Directors were aware of this opinion, and therefore the document lacks a relevant non-hearsay purpose because the defendant cannot show it could have effected GWG's board. And in any event, the defendant cannot solve the second hearsay layer involving the facts imbedded in the document. For the same reasons, the document's relevance is conditioned on a showing that it was transmitted to GWG's board—a showing not yet made by the defense. The absence of probativeness is also outweighed by the risk of prejudice. The document is likely to confuse and mislead the jury notwithstanding its tangential connection to the trial. DX-502 should be excluded.

### C.  Verbal Acts

The defendant seeks to admit DX-3, DX-19, GX 206 and GX 217 as "verbal acts," a type of non-hearsay. But none of these documents is the type of contract that would be admissible as a "verbal act." If not verbal acts, and not otherwise falling within a hearsay exception, the documents like those above, cannot be offered as proof of the defendant's scienter absent his testimony and have no other relevance to the issues in the trial if not offered for their truth. Because these exhibits are irrelevant and far more prejudicial than probative under Rule 403, they should be excluded.

May 3, 2026
Page 5

### 1. Applicable Law

Verbal acts are those for which a "statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights." Fed. R. Evid. 801(c) Advisory Committee Notes; *see also Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 126 (2d Cir. 2016) ("statements that in themselves affect the legal rights of parties are not hearsay" (describing *United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013)). As the Court noted earlier in this trial:

> documents like contracts come into evidence for the fact that the parties had a contract but not for the truth of any statement made in there that does not have legal significance between the parties. So, the statement that was just referred to that so-and-so appointed so-and-so for such-and-such a purpose is not necessarily admissible for its truth, even if it's contained in a contract, to put the matter more generally. You can offer a contract to show that there's a contract to the parties to a lawsuit; you can't offer a contract to prove some recitation within the contract that is not part of the bargain between the parties.

Tr. 579.

### 2. DX-3

DX-3 is a September 1, 2017 agreement between Beneficient, HCLP, and Paul Capital as well as their related entities. The defendant highlights from this contract certain terms outlining the debt from HCLP, and a provision describing the July 6, 2017 Mayer Brown tax opinion marked as DX-500. The defendant seeks to offer the document to prove that "the $141 million loan from HCLP Nominees to Beneficient was established in connection with the Paul Capital transaction" and that the loan was "real." Ltr. 5.

DX-3 should be excluded. The document may be a contract, but the substance the defense seeks to rely upon is not a verbal act but instead hearsay offered for its truth. As the Court previously held, "contracts come into evidence for the fact that the parties had a contract but not for the truth of any statement made in there that does not have legal significance between the parties." Tr. 579. The cases cited by the defense only confirm the Court's prior ruling. In each, the contracting parties were either the litigants or a litigant's employer. *See Crawford v. Franklin Credit Mgmt. Corp.*, No. 08 Civ. 6293 (KMW), 2015 WL 1378882, at *3 (S.D.N.Y. Mar. 26, 2015), *aff'd sub nom. Crawford v. Tribeca Lending Corp.*, 815 F.3d 121 (2d Cir. 2016) (admitting, in fraud and Truth in Lending Act case, loan documents signed by plaintiff); *Porter v. United States*, No. 13 Civ. 7332 (NRB), 2015 WL 1004953, at *1 (S.D.N.Y. Mar. 3, 2015) (admitting, in Federal Tort Claims Act case, contract between U.S. Department of Veterans Affairs and plaintiff's employer); *Spencer v. City of New York*, No. 06 Civ. 2852 (KMW), 2011 WL 13257640, at *1 (S.D.N.Y. July 18, 2011) (admitting, in employment action, contract between the New York City Department of Education and the teacher's union).

5

May 3, 2026
Page 6

DX-3 is also irrelevant to the issues at trial. The defendant asserts that DX-3's purported relevance is that it "rebut[s] evidence admitted by the Government suggesting that the loan was fabricated or not real." But the Government does not allege that the debt was never formalized, but instead that defendant lied about the expenses that comprised the debt. The defendant claimed such expenses were business related, when they were in fact largely personal. *Compare* Tr. 1056 (Muno testifying the debt was comprised of "business costs to start businesses") *with* Tr. 490 (Hinkle testifying the debt included money spent on the defendant's ranch). The defendant's claimed relevance for the portion of DX-3 about the Mayer Brown tax opinion is even further afield. The defendant asserts that the cited portion on the tax opinion "show[s] that Paul Capital received, reviewed, and incorporated into the transaction the Tax Opinion," Ltr. 5, but it does no such thing. Among other things, there is no evidence in the record that any testifying witnesses received or reviewed it, leaving practically no probative value. In addition, the defense had the opportunity to cross-examine multiple witnesses associated with Paul Capital to attempt to establish that some part of the transaction with Paul Capital established the propriety of HCLP Nominees debt. They chose not to do so. DX-3 should be excluded.

3. DX-19

DX-19 is the defendant's termination and release agreement with GWG, Beneficient, and related entities. Again, the defendant claims this document is a verbal act, but he is mistaken. In addition, this document is irrelevant, highly prejudicial, and likely to confuse the jury. The defense claims that DX-19 will "rebut" evidence that GWG Special Committee members cared about whether the defendant would receive money from repayment of the loan. Ltr. 8. But absent testimony about the specific reason for the release—and there is none in the record—there is no indication of why GWG entered into this release, and who decided to offer it. Indeed, the signatory for GWG is Murray Holland, one of the defendant's co-conspirators in perpetrating the charged schemes. There are many reasons that GWG may have entered into such a release that have nothing to do with the defendant's fraud on GWG, including avoidance of bad press, fear of some unrelated claim against GWG, or concern about expenditures against directors and officers (D&O) insurance policies. The release is also a general release and does not identify any particular action or misconduct. As a result, it has no relevance to the importance of the defendant's particular actions concerning HCLP. To allow DX-19 to be admitted would invite the jury to speculate on why this contract was entered, and is likely to confuse. DX-19 should be excluded.

4. GX 206 and GX 217

GX 206 and GX 217 are documents that purport to nominate Timothy Harmon as the Independent Trustee of the Highland Investment Trust after Hinkle's "resignation" in October 2022, and designate him a beneficiary under the Trust in October 2018, respectively. The defense argues these documents are admissible, not for the truth, but as verbal acts. The defense is wrong, as the Court previously held when denying an earlier attempt to offer Hinkle Y, which appears to be a near identical version of GX 206.[1] In rejecting the admission of Hinkle Y, the Court noted "it's not between the parties" and that "I think either side may call Mr. Harmon and then this may

---

[1] To the extent these documents are signed by the defendant, they would be admissible if offered by the Government, but not the defendant, pursuant to Rule 801(d)(2)(A).

May 3, 2026
Page 7

come into evidence at that point, but I don't think it comes in under this witness under the verbal act exception or anything else." Tr. 580-82.[2]

The Court should adhere to its ruling and preclude GX 206 and GX 217, which are not contracts between the parties to the matter on trial. The danger of admitting legal documents affecting the rights of anything other than both parties to an action is particularly acute for trust documents like GX 206 and GX 217. These purported legal documents have no counterparties, and so are easily manipulated through selective disclosure. Case in point, Hinkle testified on cross-examination that, with respect to the appointment and acknowledgement of Harmon in GX 206,

> those documents didn't go anywhere. They didn't go to our administrative trustee, to my knowledge. And when we opened up the – changed the administrative trustee to U.S. Trust and company, all the documents that established that trust as a customer on U.S. Trust account did not include Tim Harmon as the independent trustee, they included me as the independent trustee. So, as a point of operation, I acted as the independent trustee.

Tr. 584.[3]

Moreover, admission of GX 206 and GX 217 would have little to no relevance if not offered for the truth of the matters asserted therein. While there may be relevance to the history of removals and appointments for the Highland Investment Holdings Trusts, these exhibits' recitations of facts do not come in for their truth even under the verbal acts doctrine. *See Crawford*, 2015 WL 1378882, at *3 ("[V]erbal acts that give rise to legal consequences are typically not considered hearsay.").

And even if somehow potentially relevant, admission of GX 206 and GX 217 would violate Rule 403 absent additional context. These exhibits are purported trust documents supposedly signed by the defendant and Harmon, and notarized by various notaries, including the defendant's personal assistant Jamie Crable. As described above, while Harmon would testify that he may have signed the acknowledgement at GX 206, Hinkle testified that he and the defendant kept these

---

[2] While the Government had included Harmon on its witness list, it informed the defense last week that it did not intend to call him, and the defense has since informed the Government it does not intend to do so either. That decision is not surprising, as Harmon's Jencks Act material reflects that he would testify, in sum, that while he may have signed GX 206 (or Hinkle Y), he never performed any work for the trust, does not understand he or anyone in his family is a beneficiary of the trust, and had no idea that Mr. Heppner was making statements indicating otherwise. Indeed, he doubts he has spoken to the defendant in the last ten years.

[3] In precluding these documents, the Court noted that, while the Court had also rejected the Government's attempt to enter legal documents as verbal acts, "I don't see how the government can oppose it, since they took the position that similar documents were verbal acts, so there may not be any objection." Tr. 538-39. Since that time, the Government has not attempted to offer any evidence through the verbal acts doctrine.

May 3, 2026
Page 8

signed documents concealed from others. Tr. 584. Doing so allowed Hinkle to continue serving as independent trustee at the defendant's direction, while secreting the documents signed by Harmon just in case. GX 217 is even less reliable. That document, purporting to exercise the power of appointment in 2018 to make Harmon a potential beneficiary has only the defendant's signature, and that of Crable, who backdated documents, including for Keith Martens. Tr. 138. Given this lack of reliability, admission of this document without additional context of when it was signed and who, if anyone, it was ever sent to would be far more prejudicial than probative.

### D.  General Ledgers

The defense also seeks to admit what appears to be more than 400 general ledgers purportedly drawn from unnamed "entities affiliated with Brad Heppner" over a 19-year period, DX-1100-1435, as well as a three-page summary chart that purports to depict the flow of funds among various of these entities between 2019 and 2021, DX-3001 (attached as Ex. A). The Court should preclude both.

DX-3001 fails on its face to satisfy Federal Rule of Evidence 1006. That rule permits summary charts only where the proponent makes the underlying originals or duplicates available to other parties at a reasonable time and place. The 2024 amendment to Rule 1006 confirms that the trial judge "must ensure that all parties have a fair opportunity to evaluate the summary," drawing an explicit analogy to the advance-notice requirements of Rules 404(b)(3) and 807(b). No such opportunity exists here. The defense first produced DX-3001 to the Government at 8:18 p.m. this evening,[4] less than twenty-four hours before the defense case may begin. Less than 24 hours' notice for complicated fund-flow charts is unreasonable under the circumstances. The problem is compounded by the defense's own admission since producing the exhibit that there is no underlying analysis, leaving the Government with no basis to trace how the chart was constructed, which transactions were included or excluded, or whether the depicted fund flows are accurate. Where a proponent cannot produce the materials Rule 1006 requires to be made available, the summary is inadmissible.

DX-3001 also warrants exclusion on an independent ground: it reflects undisclosed expert analysis. Synthesizing and mapping fund flows across many excel files is not a mechanical tabulation—it is expert work. The Government moved *in limine* to avoid the precise situation it finds itself in now (Dkt. 44 at 21-23); the defense has put together a complicated chart that reflects financial analysis, presumably conducted by as-yet unnoticed expert witness Michael Petron, who has no first-hand knowledge of the underlying transactions. The defense cannot launder expert analysis through a purported Rule 1006 summary, particularly where the Government has had no opportunity to examine the analyst's methodology. Admitting DX-3001 on this record would be a plain end-run around Fed. R. Crim. P. 16(b)(1)(C) and the Court's pretrial scheduling order.

Even setting those deficiencies aside, Rule 403 independently requires exclusion. A chart depicting fund flows, presented without supporting documentation will not assist the jury—it will mislead it. The jury would have no basis to evaluate how the chart was built or whether it

---

[4] At 9:28 p.m., defense counsel emailed the Government a "slightly revised version of DX-3001."

May 3, 2026
Page 9

accurately reflects the underlying records. The risk of confusion and unfair prejudice substantially outweighs any probative value.[5] Trial should not be one of surprise and yet, when it comes to these ledgers and DX-3001, the defense has kept the Government in the dark.

Finally, even if the defense abandoned its summary chart, the underlying ledgers themselves should be precluded. More than 400 general ledgers from unnamed entities cannot be admitted without proper foundation, and the defense has proffered no such witness to offer this foundation. Moreover, the admission of these general ledgers without DX-3001 to organize them would serve only to confuse the jury and waste time. The Court should preclude the defense from offering both the ledgers and DX-3001 at trial.

### E. SEC Filings

The defense seeks to introduce "excerpts of several SEC filings" from a set of 48 filings marked as possible exhibits. As with DX-3001, at 8:18 p.m. this evening, the defense first produced an 18-page summary chart, DX-3000, that purports to compile these excerpts into a single document (attached as Ex. B). Both the SEC filings and DX-3000 should be precluded under Rules 401, 403 and 1006.

First, the underlying SEC filings are irrelevant. The defendant asserts that, even though not offered for their truth, the SEC filings are "relevant to rebut evidence admitted by the Government that tended to show that Mr. Heppner's affiliation with HCLP Nominees was hidden from GWG and potential investors in Beneficient" and to "impeach[] Government witnesses who testified that it was 'important' to them that Mr. Heppner not obtain any financial benefit from GWG's investments." Ltr. 9. But neither is true.

The marked SEC filings do not, as a factual matter, disclose the defendant's relationship with HCLP Nominees. Specifically, these filings have a variety of confusing and ambiguous statements that might be identified as disclosures concerning HCLP, including:

- In filings made in December 2018, HCLP Nominees was identified as a company affiliated with an affiliate, and HCLP is identified as "controlled by affiliates of BEN, including our founder" (DX 402, 408, 409, 410).

- In the June 2019 filing of Beneficient's 2018 financials, HCLP was identified as "controlled by affiliates of BEN, the limited partners of which includes trusts for which BEN's CEO and founder serves as investment trustee or which he or his

---

[5] The defense's last-minute disclosure of DX-3001 bears no resemblance to the Government's production of five spreadsheets covering four years, which made up the source material for GX 1347A, a summary chart prepared by Bruce Topott at the direction of Greg Ezell (not the Government) and produced in Rule 16 discovery. Among other things, the Government initially sought to admit Topott's chart on another basis and, in any event, the Government first marked GX 1347A as an exhibit on March 23, 2026, nearly a month before trial. Thus, unlike the situation the Government now finds itself in, the defense had ample time to ask questions about and verify the accuracy of GX 1347A.

9

May 3, 2026
Page 10

family are in the class of possible beneficiaries, contributed certain of its alternative assets to BEN in return for $10,000 worth of Class S Ordinary Units." The same filing noted, that HCLP Nominees "is an indirect subsidiary of [HCLP] the limited partners of which includes trusts for which BEN's CEO and founder serves as investment trustee or which he or his family are in the class of possible beneficiaries. (DX 413)

- In filings made between July 2019 and May 2020, HCLP Nominees (and another lender controlled by Heppner ("BHI")) were identified as "directly or indirectly associated with Brad K. Heppner, who is Chairman of the Company's Board of Directors" or "directly or indirectly associated with one of Beneficient's founders, who is also Chairman of the Company's Board of Directors." (DX 412, 414, 415, 416, 417, 418, 419).

- In filings made between March 2020 and September 2020, HCLP Nominees and BHI were identified as "directly or indirectly associated with one Brad K. Heppner, who is Chairman of the Company's Board of Directors. HCLP is not considered a related party of GWG Holdings or Beneficient" or "directly or indirectly associated with one of Beneficient's founders, who is also Chairman of the Company's Board of Directors. HCLP is not considered a related party of Beneficient." (DX 420, 421, 422, 428, 429, 433, 434, 435).[6]

- In filings made between May 2020 and August 2020, HCLP Nominees was identified as "indirectly associated with one of Beneficient's founders, who is also Chairman of the Board of Directors of GWG Holdings." (DX 423, 424, 430, 431, 432).

- In filings made in November 2021, HCLP Nominees was identified as "indirectly associated with Ben Founder" and it was referred to as a related party. These filings also stated that an indirect parent entity of HCLP Nominees had loans outstanding to entities associated with the defendant and what it characterized as a "long-standing lending and investment relationship of 25 years" between HCLP and entities associated with the defendant. (DX 438, 439, 440, 441, 442, 443, 444, 445, 446).[7]

This is not a case where the Government's theory of fraud involves a fraud on the market on the basis of public corporate disclosures. Rather, the defendant, his conspirators, and his agents, made specific misrepresentations to victims concerning the defendant's relationship with HCLP and the likelihood of him obtaining funds from HCLP. These victims were aware the defendant

---

[6] In approximately September 2020, GWG was also added to the clause concerning HCLP not being a related party.

[7] DX 401, 403-05, 411, 425-27, 436-37, and 447 do not appear to have relevant language, but without the defendant's proposed summary chart, the Government cannot be sure what the defendant is seeking to admit.

May 3, 2026
Page 11

had *some* association with HCLP, but they received representations that the association, was slight, remote, and contingent. As a result, the vast majority of the disclosures in the SEC filings are irrelevant because they are consistent with what these victims understood—that the defendant had some association with HCLP—but based on more specific representations they understood he did not control HCLP and related entities and would not benefit financially from HCLP funds.

Only the first batch of filings, from December 2018, and the last batch of filings, from November 2021, contain a different nature of representations. For the November 2021 group of filings, these representations postdate the misrepresentations to the victims and are, as a result, irrelevant. For the three December 2018 filings that identify HCLP as "controlled by affiliates of BEN, including our founder," they might arguably be relevant to materiality of the subsequent misrepresentations as part of the mix of information available. However, these filings cannot be credited because by February 2019, Beneficient disclaimed this disclosure, telling Deloitte that this disclosure "misstated the founder's control over that entity." (*See* GX 1363 at 5). Admitting these unreliable statements, which were disclaimed by Beneficient would confuse the issues and mislead the jury under Rule 403.

Moreover, the admission of excerpts from every disclosure would be needlessly cumulative. As indicated above, there appear to be six iterations of language bearing on HCLP Nominees. Examples of four of those six iterations are already in evidence: (i) GX 502, in evidence, is the same as DX 413; (ii) GX 503, in evidence, is the same as DX 412; (iii) DX 420 is in evidence; and (iv) DX 439 is in evidence. While the defendant might be able to offer the language from the other two categories if they overcome the other impediments to admissibility, they should not be permitted to do more. Admission of a large quantity of filings that make substantially the same (incomplete) disclosure concerning HCLP is needlessly cumulative and further supports the improper conclusion among the jury that there is a fact of consequence to draw from the number of securities filings in the record.

The admission of these exhibits further highlights the impropriety of a blame-the-victim defense that was a subject of the Government's motions in *limine* and was discussed during the April 16, 2026 conference. Admitting these exhibits only furthers the improper argument that the victims should have done more diligence to avoid falling prey to the defendant's scheme. The defendant may not assert a victim's negligent failure to discover the fraud. *See United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004). The admission of these SEC filings would support the improper arguments that the answers to the victims' questions were available in the public disclosures and they did not receive misrepresentations. Such evidence or argument only serves as an improper invitation for the jury to blame the victims for the crimes of the defendant. *United States v. Carton*, No. 17 Cr. 680 (CM), 2018 WL 5818107, at \*4, \*6 (S.D.N.Y. Oct. 19, 2018) (evidence that victim hedge fund did not exercise sufficient oversight of its investment inadmissible; "[w]hether the Hedge Fund performed due diligence or is a sophisticated investor in the ticket market is wholly irrelevant to these charges, and is merely a facile attempt to blame the victim—which is an impermissible strategy in a fraud case"); *United States v. Nekritin*, No. 10 Cr. 491 (KAM), 2011 WL 2462744, at \*7 (E.D.N.Y. June 17, 2021) ("It is well settled that a fraud victim's negligence in failing to discover the fraudulent scheme is not a defense to a defendant's criminal conduct.").

11

May 3, 2026
Page 12

The defense had the opportunity to cross-examine the Government's witnesses about these public disclosures and whether they really cared. The Court permitted them to do so, at times over the Government's objection. *See* Tr. 106 (cross of Stein about GX 502, 2019 financial statements); 308 (cross of Williams about GX 502, the 2019 Beneficient financial statements); 931-37 (cross of Chavenson about DX 439, the 2021 GWG Form 10-K); 1539 (cross of Tatman about GX 503, the 2018 GWG Form 10-K); and 1541 (cross of Tatman about DX 420, the 2020 GWG Form 10-K). The Court should preclude exhibits offered without context to suggest that testifying witnesses—who were never confronted with public language they may not have known about, remembered, or understood to be relevant—must have lied.

Finally, even if the underlying SEC filings were admissible (and they are not), the Court should exclude DX-3000 as unduly argumentative and improper under Rules 403 and 1006. The 2011 Advisory Committee Notes to Rule 1006 provide that a summary chart should be precluded under Rule 403 if it is "too argumentative." As the defense has previously argued to the Court, improper argument can come in the form of "labels, captions, highlighting techniques or otherwise." (*See* Apr. 30, 2026 Em. to J. Rakoff, citing *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998)). But that is precisely what the defense has done in DX-3000, presenting certain words in bright red text and placing bright red boxes around other language. The Court should preclude the defense from offering DX-3000 in its entirety but, if admitted, the defense should be required to modify its proposed chart to comply with the requirements of Rules 403 and 1006.

### F.   The Defendant's Supplemental Exhibits

On May 3, 2026, the defense filed a supplemental letter seeking to admit three additional exhibits. Suppl. Ltr. 1-3 (seeking to admit Petron A, B, and C). These exhibits consist of a set of minutes from the December 29, 2019 meeting of the GWG Special Committee (Petron A), and the case captions from two civil actions filed against certain GWG Board members, including David Chavenson, and Foley & Lardner (Petron B and C, respectively). All three exhibits should be excluded.

#### 1.   Petron A

Petron A should be excluded as inadmissible hearsay and, if offered by the defense for a non-hearsay purpose, as substantially more prejudicial than probative under Rule 403. The defense seeks to admit Petron A to establish that the GWG Special Committee "was focused on issues other than alleged misrepresentations by [the defendant] about [his] control over HCLP." Suppl. Ltr. 2. The defense claims the minutes are business records and thus not hearsay. That is wrong. There are two levels of hearsay within Petron A, and so even if the minutes were business records (a position the defense has seemingly rejected as recently as last Friday, (Tr. 1557 (objecting to the Government's offer of GX 101, Beneficient Board minutes, as "hearsay")), the defense still must overcome the hearsay statements by Foley contained within the document. The defense cannot.

If not offered for the truth, Petron A should be excluded under Rule 403. The minutes are confusing and likely to mislead the jury. The defense intends to use the minutes to suggest the Special Committee did not care about the senior lender because they were receiving advice on other matters to consider in connection with the pending funding request. But that argument

May 3, 2026
Page 13

ignores that these minutes take place *after* the Special Committee had received countless misrepresentations from the defendant and his co-conspirators regarding the senior lender's independence. The minutes thus are entirely lacking in probative value and will only be used to mislead and confuse the jury. Petron A should be excluded.

　　　　　　　　2.　Petron B and C

　　　　Petron B and C should also be excluded under Rules 401 and 403. The case captions from the civil matters filed against certain directors, including Chavenson, and Foley are utterly lacking in probative value and highly prejudicial. This is particularly so as to Chavenson, who the defense did not even question about the since settled lawsuit. To introduce the existence of the civil action now, without any context and without giving Chavenson the opportunity to answer questions about how the matter had no bearing whatsoever on his testimony, is extremely prejudicial and entirely improper. Nor does the existence of the case caption against Foley make any "fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. These exhibits are nothing more than clip art for the defense's upcoming summation. The Court should exclude Petron B and C.

### Conclusion

　　　　For the reasons set forth above, the Government respectfully requests that the Court preclude the defendant from offering the above-listed exhibits.

　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　JAY CLAYTON
　　　　　　　　　　　　　　　　　United States Attorney for the
　　　　　　　　　　　　　　　　　Southern District of New York


By: _Daniel Nessim_____
　　　　Daniel G. Nessim
　　　　Alexandra Rothman
　　　　Kyle A. Wirshba
　　　　Assistant United States Attorneys
　　　　(212) 637-2486