UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRADLEY HEPPNER,<br>Defendant. | No. 1:25-CR-00503 |

**DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL**


Benjamin A. O'Neil
Robert Zink
John ("Fritz") Scanlon
Clare Reardon
Nithya Pathalam
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, DC 20005
(202) 538-8151
benoneil@quinnemanuel.com
robertzink@quinnemanuel.com
fritzscanlon@quinnemanuel.com
clarereardon@quinnemanuel.com
nithyapathalam@quinnemanuel.com

Christopher J. Clore
295 5th Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
christopherclore@quinnemanuel.com

*Counsel for Defendant Bradley Heppner*

## TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ........ 1

LEGAL STANDARD ........ 1

ARGUMENT ........ 2

I. NO RATIONAL JURY COULD HAVE CONVICTED MR. HEPPNER OF SECURITIES FRAUD OR CONSPIRACY TO COMMIT SECURITIES FRAUD. ........ 2

II. NO RATIONAL JURY COULD HAVE CONVICTED MR. HEPPNER OF WIRE FRAUD OR CONSPIRACY TO COMMIT WIRE FRAUD. ........ 7

III. NO RATIONAL JURY COULD HAVE CONVICTED MR. HEPPNER OF FALSE STATEMENTS TO AUDITORS. ........ 11

A. Beneficient's Financials Were Not Required to Be Filed with the SEC. ........ 11

B. Venue Is Improper in this District ........ 13

C. Beneficient Is Not an Issuer for Purposes of Rule 13b2-2. ........ 15

D. Count Four Is Time-Barred ........ 16

IV. THE COURT SHOULD ACQUIT MR. HEPPNER OF ALL CHARGES OR GRANT HIM A NEW TRIAL BECAUSE INSTRUCTIONAL AND EVIDENTIARY ERRORS COMPROMISED THE RELIABILITY OF THE VERDICT AND RESULTED IN MANIFEST INJUSTICE. ........ 19

A. Errors in the Jury Instructions Entitle Mr. Heppner to a New Trial. ........ 19

1. Count 1: The Jury Instruction for Count 1 Was Improper. ........ 19

2. Count 2: The Jury Instruction for Count 2 Was Improper. ........ 21

3. Count 4: The Jury Instruction for Count 4 Was Improper. ........ 22

4. The Jury Instruction for Venue Was Improper. ........ 23

B. The Court's Ruling that Mr. Heppner's Written Exchanges with an AI Platform Are Not Privileged Deprived Him of a Fair Trial. ........ 24

1. The Court Erred in Ruling that the Documents Are Not Privileged. ........ 25

2. The Government's Access to the AI Documents Constituted an Invasion of the Defense Camp That Warrants a New Trial. ........ 28

C. Errors in Evidentiary Rulings Entitle Mr. Heppner to a New Trial. ........ 29

1. The Court's Refusal to Admit Key Evidence Warrants a New Trial. ........ 29

2. The Court's Limitation on Impeachment Warrants a New Trial. ........ 31

3. The Court's Admission of the Government's Improper Summary Chart Warrants a New Trial. ........ 33

4. The Court's Admission of Voluminous Evidence Regarding the Defendant's Wealth Warrants a New Trial. ....... 34

5. The Court's Admission of Voluminous Evidence Regarding Misrepresentations Other than the Misrepresentations that Were Charged Constitutes a Material Variance that Warrants a New Trial. ....... 35

6. The Court's Admission of Unnoticed 404(b) Evidence Warrants a New Trial. ....... 37

CONCLUSION ....... 39

## TABLE OF AUTHORITIES

**Page**

### Cases

*Abouammo v. United States*,
608 U.S. ___, 2026 WL 1686084 (2026) .......... 13, 14, 24

*Alford v. United States*,
282 U.S. 687 (1931) .......... 32

*Bamco 18 v. Reeves*,
675 F. Supp. 826 (S.D.N.Y. 1987) .......... 3, 6

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .......... 7

*Bridges v. United States*,
346 U.S. 209 (1953) .......... 17

*Crane v. Kentucky*,
476 U.S. 683 (1986) .......... 30

*Ciminelli v. United States*,
598 U.S. 306 (2023) .......... 8

*In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*,
293 F.3d 289 (6th Cir. 2002) .......... 27

*Crawford v. Franklin Credit Mgmt. Corp.*,
2015 WL 1378882 (S.D.N.Y. Mar. 26, 2015) .......... 9

*Davis v. Alaska*,
415 U.S. 308 (1974) .......... 32

*Frazier v. Manson*,
651 F.2d 1078 (5th Cir. 1981) .......... 3, 6

*Hickman v. Taylor*,
329 U.S. 495 (1947) .......... 25

*Highland Cap. Mgmt., L.P. v. Schneider*,
551 F. Supp. 2d 173 (S.D.N.Y. 2008) .......... 33

*Mayer v. Oil Field Sys. Corp.*,
721 F.2d 59 (2d Cir. 1983) .......... 3

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
229 F.R.D. 441 (S.D.N.Y. 2004) ........................................................................................27

*Sec. & Exch. Comm'n v. Elliott*,
2025 WL 562507 (S.D.N.Y. Feb. 20, 2025)..................................................................15

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946) ..........................................................................................................3

*Sharkey v. Lasmo*,
55 F. Supp. 2d 279 (S.D.N.Y. 1999) ..................................................................................34

*Steinhardt Group Inc. v. Citicorp*,
126 F.3d 144 (3d Cir. 1997) .........................................................................................3, 6

*Sullivan v. Louisiana*,
508 U.S. 275 (1993) ........................................................................................................20

*Toussie v. United States*,
397 U.S. 112 (1970) ........................................................................................................18

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ..........................................................................................................18

*United States v. Adlman*,
134 F.3d 1194 (2d Cir. 1998) ..........................................................................................25

*United States v. Am. Tel. & Tel. Co.*,
642 F.2d 1285 (D.C. Cir. 1980)...................................................................................26, 27

*United States v. Archer*,
977 F.3d 181 (2d Cir. 2020) ..............................................................................................2

*United States v. Cassese*,
428 F.3d 92 (2d Cir. 2005)...........................................................................................1, 2

*United States v. Crop Growers Corp.*,
954 F. Supp. 335 (D.D.C. 1997)............................................................................ 13, 14, 24

*United States v. Curley*,
639 F.3d 50 (2d Cir. 2011)...............................................................................................37

*United States v. Davis*,
588 U.S. 445 (2019) ........................................................................................................18

*United States v. Doost*,
2019 WL 1560114 (D.D.C. Apr. 10, 2019) .........................................................................18

*United States v. Dupre*,
462 F.3d 131 (2d Cir. 2006) ........................................................................ 22, 35

*United States v. Dupree*,
706 F.3d 131 (2d Cir. 2013) ........................................................................ 9

*United States v. Ferguson*,
246 F.3d 129 (2d Cir. 2001) ........................................................................ 2

*United States v. Gaudin*,
515 U.S. 506 (1995) ........................................................................ 15

*United States v. Ginsberg*,
758 F.2d 823 (2d Cir. 1985) ........................................................................ 28

*United States v. Glenn*,
312 F.3d 58 (2d Cir. 2002) ........................................................................ 2

*United States v. Grainger*,
346 U.S. 235 (1953) ........................................................................ 17

*United States v. Haggett*,
438 F.2d 396 (2d Cir. 1971) ........................................................................ 32

*United States v. Harvey*,
547 F.2d 720 (2d Cir. 1976) ........................................................................ 32

*United States v. Heppner*,
820 F. Supp. 3d 292 (S.D.N.Y. 2026) ........................................................................ 25

*United States v. Johnson*,
718 F.2d 1317 (5th Cir. 1983) ........................................................................ 20

*United States v. Levy*,
577 F.2d 200 (3d Cir. 1978) ........................................................................ 29

*United States v. Litvak*,
889 F.3d 56 (2d Cir. 2018) ........................................................................ 7

*United States v. Lopez Castro*,
2024 WL 3983339 (S.D.N.Y. Aug. 29, 2024) ........................................................................ 2

*United States v. McKye*,
734 F.3d 1104 (10th Cir. 2013) ........................................................................ 20, 23

*United States v. Miller*,
808 F.3d 607 (2d Cir. 2015) ........................................................................ 13, 23, 24

*United States v. Nobles*,
422 U.S. 225 (1975) .......... 25, 26, 27

*United States v. Quattrone*,
441 F.3d 153 (2d Cir. 2006) .......... 34

*United States v. Riccardi*,
620 F. App'x 11 (2d Cir. 2015) .......... 22, 23

*United States v. Rigas*,
490 F.3d 208 (2d Cir. 2007) .......... 35

*United States v. Rodriguez-Moreno*,
526 U.S. 275 (1999) .......... 13, 24

*United States v. Rogers*,
9 F.3d 1025 (2d Cir. 1993) .......... 20, 23

*United States v. Sakoc*,
115 F. Supp. 3d 475 (D. Vt. 2015) .......... 35, 36

*United States v. Salmonese*,
352 F.3d 608 (2d Cir. 2003) .......... 35

*United States v. Scharton*,
285 U.S. 518 (1932) .......... 18

*United States v. Schlei*,
122 F.3d 944 (11th Cir. 1997) .......... 21

*United States v. Serrano*,
224 F. Supp. 3d 248 (S.D.N.Y. 2016) .......... 19

*United States v. Stahl*,
616 F.2d 30 (2d Cir. 1980) .......... 34

*United States v. Truman*,
688 F.3d 129 (2d Cir. 2012) .......... 2

*United States v. Vilar*,
530 F. Supp. 2d 616 (S.D.N.Y. 2008) .......... 38

*United States v. Vilar*,
729 F.3d 62 (2d Cir. 2013) .......... 7

*United States v. Wilson*,
2001 WL 798018 (S.D.N.Y., July 13, 2001) .......... 14

*Warner v. Gilbarco, Inc.*,
820 F. Supp. 3d 629 (E.D. Mich. 2026) ........ 27

*Wultz v. Bank of China Ltd.*,
304 F.R.D. 384 (S.D.N.Y. 2015) ........ 26

**Statutes**

15 U.S.C. § 77x ........ 17

15 U.S.C. § 77yyy ........ 17

15 U.S.C. § 78c ........ 20

15 U.S.C. § 78ff(a) ........ 17

15 U.S.C. § 80a-48 ........ 17

15 U.S.C. § 80b-17 ........ 17

18 U.S.C. § 1343 ........ 8

18 U.S.C. § 1348 ........ 17

18 U.S.C. § 2311 ........ 20

18 U.S.C. § 2314 ........ 20

18 U.S.C. § 3282 ........ 16

18 U.S.C. § 3287 ........ 18

18 U.S.C. § 3301 ........ 17, 18, 19

Investment Advisers Act of 1940, ch. 696, 54
Stat. 847 (1940), 15 U.S.C. 80b-1 et seq ........ 19

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002) ........ 16

Securities Act of 1933, ch. 38, 48 Stat. 74 (1933), 15 U.S.C. 77a et se ........ 19

Securities Exchange Act of 1934, ch. 404, 48
Stat. 881 (1934), 15 U.S.C. 78a et seq ........ 3, 19, 20

Trust Indenture Act of 1939, ch. 411, 53 Stat. 1149 (1939), 15 U.S.C. 77aaa et seq ........ 19

**Other Authorities**


17 C.F.R. § 210.02(n) ..... 12

17 C.F.R. § 210.3-09 ..... 12, 23

17 C.F.R. § 240.13b2-2 ..... *passim*

Federal Rule of Criminal Procedure 16 ..... 25, 26

Federal Rule of Criminal Procedure 18 ..... 13

Federal Rule of Evidence 29 ..... 1, 2, 6, 9

Federal Rule of Evidence 33 ..... 1, 2, 9, 19

Federal Rule of Evidence 403 ..... 32, 33, 34

Federal Rule of Evidence 404(b) ..... 37, 38

Federal Rule of Evidence 1006 ..... 33, 34

U.S. Const. Amend. VI ..... 13, 28

U.S. Const. art. iii, § 2, cl. 3 ..... 13

Defendant Bradley K. Heppner respectfully submits this memorandum in support of his motions for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure or, in the alternative, for a new trial pursuant to Rule 33.

## PRELIMINARY STATEMENT

The Government charged Mr. Heppner with one count each of (1) securities fraud, (2) wire fraud, (3) conspiracy to commit securities fraud and wire fraud, (4) making false statements to auditors, and (5) falsifying records with an intent to obstruct an SEC investigation. *See* ECF 3. After the close of evidence but before the jury was charged, the Court dismissed Count 5 pursuant to Rule 29, finding that venue was not proper in this district. Trial Tr. ("Tr.") at 1941:15-23. The jury returned a verdict convicting Mr. Heppner of the four surviving counts.

As argued at the close of evidence in a motion for a judgment of acquittal under Rule 29(a), the evidence at trial was insufficient to sustain a conviction with respect to Count 1, Count 3 (the securities-fraud object), and Count 4. Tr. at 1902:13-1938:11. Specifically, Mr. Heppner must be acquitted of Count 1, as well as the securities-fraud object of Count 3, because the limited partnership interests at issue in this case do not constitute "securities." Tr. at 1915:24-1938:11. And Mr. Heppner must be acquitted of Count 4 due to lack of venue. Tr. at 1909:08-1915:9.

## LEGAL STANDARD

Under Rule 29, a district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Although a defendant's burden to demonstrate the insufficiency of the evidence is a heavy one, it is "not insurmountable." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005). Courts set aside guilty verdicts when "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt," and "a reasonable jury must necessarily entertain a reasonable doubt" when the evidence at trial, viewed in the light most favorable to the prosecution, provides "equal or nearly equal circumstantial

support to a theory of guilt and a theory of innocence . . . ." *Id.* at 98–99 (citations omitted); *see also United States v. Glenn*, 312 F.3d 58, 63, 69–70 (2d Cir. 2002). Because "few events in the life of an individual assume the importance of a criminal conviction," district courts must "take the 'beyond a reasonable doubt' requirement with the utmost seriousness." *Cassese*, 428 F.3d at 103. Testimony that is "incredible on its face" does not meet the threshold for sufficiency. *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (quotation omitted).

District courts' authority under Rule 33 is even broader than under Rule 29. Rule 33 provides a district court with "broad discretion" to set aside a jury verdict and order a new trial to "avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quotation omitted). The court's broad discretion empowers it to grant this relief based on a "contrary view" of the jury verdict "after weighing the evidence." *Id.* at 136. Although a district court typically must "defer to the jury's resolution of conflicting evidence," it need not do so where an "evidentiary or instructional error compromised the reliability of the verdict." *United States v. Archer*, 977 F.3d 181, 188–89 (2d Cir. 2020). "A motion for a new trial may be premised on errors in evidentiary rulings or instructions to the jury, or the verdict being against the weight of the credible evidence." *United States v. Lopez Castro*, 2024 WL 3983339, at *4 (S.D.N.Y. Aug. 29, 2024).

## ARGUMENT

### I. NO RATIONAL JURY COULD HAVE CONVICTED MR. HEPPNER OF SECURITIES FRAUD OR CONSPIRACY TO COMMIT SECURITIES FRAUD.

The Court must acquit Mr. Heppner of Count 1 (securities fraud) and the securities-fraud object of Count 3 because (a) the only alleged "securities" at issue in this case are limited partnership interests in Beneficient (the "Beneficient Units"), and (b) the evidence at trial was

insufficient to show that those limited partnership interests constitute "securities" under Section 10(b) of the Securities Exchange Act of 1934.

The Second Circuit has recognized that "limited partnership interests are securities" where "the investing limited partners exercised no managerial role in the partnership's affairs" and where "there were a considerable number of limited partners." *Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59, 65 (2d Cir. 1983). In such a situation, the limited partnership interest constitutes an investment contract under the test promulgated in *Howey* because, among other things, the limited partnership "interest involves investment 'in a common enterprise with profits to come solely from the efforts of others.'" *Id.* (quoting *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301 (1946)).

Where, however, a limited partnership interest comes with managerial or operational control over the limited partnership, the limited partnership interest does not qualify as a security. *See, e.g.*, *Bamco 18 v. Reeves*, 675 F. Supp. 826, 830 (S.D.N.Y. 1987) (dismissing federal securities fraud claims because holder of limited partnership interest "had some control over the subject of its investment"); *Steinhardt Group Inc. v. Citicorp*, 126 F.3d 144, 145 (3d Cir. 1997) (finding that the "securitization transaction . . . does not constitute an investment" and affirming dismissal of securities fraud claims and because "the limited partner retained pervasive control over its investment in the limited partnership"); *Frazier v. Manson*, 651 F.2d 1078, 1080 (5th Cir. 1981) ("The District Court properly concluded that Frazier's managerial rights negated the possibility that his limited partnership interests were securities."). In such a situation, the limited partnership fails the *Howey* test and therefore does not constitute an investment contract because it does not satisfy *Howey*'s requirement that the profits are to come "solely from the efforts" of others. *Steinhardt*, 126 F.3d at 151, 153; *see Frazier*, 651 F.2d at 1080.

Here, the indictment and undisputed evidence demonstrate that the first alleged purchase or sale of Beneficient Units by GWG occurred in December 2019. ECF 3 ¶ 13(c). That transaction was governed by a "Preferred Series A Unit Account and Common Unit Investment Agreement," dated December 31, 2019 (the "Investment Agreement"). GX 3602. The Investment Agreement specified that, in exchange for GWG making capital contributions totaling $69,030,000, GWG would receive interests in two limited partnerships: The Beneficient Company Group, L.P. ("Beneficient"); and Beneficient Company Holdings, L.P. ("BCH"). GX 3602 at 1-3. The Investment Agreement also described the "2019 Year-End Transactions" that were part of the Agreement: (a) issuance of the limited partnership interests in Beneficient and BCH to GWG in accordance with the terms of the Agreement; and (b) "the effectiveness of a Third Amended and Restated Limited Liability Company Agreement of Beneficient Management granting to [GWG] the right to appoint a majority of the board of directors of Beneficient Management." GX 3602 at 3. Thus, as part of the transaction, GWG took control of "Beneficient Management." *Id.*

GWG's control of Beneficient Management gave GWG control over both limited partnerships in which GWG gained an interest in the late-2019 transaction (Beneficient and BCH). As specified in the Investment Agreement, Beneficient Management was the general partner of Beneficient (and thus controlled Beneficient), and Beneficient was the general partner of BCH (and thus controlled BCH). GX 3602 at 1. A diagram below illustrates the control structure:




The fact that the late-2019 transaction was designed to give GWG control over Beneficient is confirmed by the GWG Special Committee Resolution approving it. GX 120. The Resolution states that "the Special Committee also believes it is desirable and in the best interests of the [GWG] and its stockholders to negotiate for, and obtain, control of the board of directors of the general partner of [Beneficient], which control would, among other things, (a) enhance [GWG]'s influence over the execution of the [Beneficient] Group's business plan and (b) permit the consolidation of the [Beneficient] Group and [GWG] for financial reporting purposes." *Id.* at 1.

All further purchases of Beneficient securities by GWG occurred pursuant to the "Preferred Series C Unit Purchase Agreement," dated July 15, 2020 (the "UPA"). GX 3603; ECF 3 ¶ 13(e). Just like the Investment Agreement, the UPA conveyed to GWG only interests in a limited partnership that GWG controlled (BCH). GX 3603 at 1.

Thus, the undisputed evidence shows that (a) the only alleged securities that GWG purchased were interests in two limited partnerships (Beneficient and BCH), and (b) GWG had managerial and operational control over the two limited partnerships. As such, the limited

partnership interests are not "securities" under Section 10(b) of the Securities Exchange Act. *Bamco 18*, 675 F. Supp. at 830; *Steinhardt*, 126 F.3d at 145; *Frazier*, 651 F.2d at 1080.

The Court's decision to deny Mr. Heppner's earlier Rule 29 motion was based on the mistaken belief that the late-2019 transaction was actually two transactions: "one was to purchase securities and one was to have the right to obtain control thereafter." Tr. at 1940:14-21. But the Investment Agreement and GWG Special Committee Resolution approving it both show that everything occurring at closing was part of a single, indivisible transaction that would not have occurred unless both (a) the limited partnership interests and (b) control of the limited partnerships were conveyed to GWG. *See* GX 3602, GX 120. Moreover, case law emphasizes that a purchaser's obtaining of control over a limited partnership, no matter how denominated, results in the purchaser's interests in that limited partnership being excluded from the definition of security for purposes of Section 10(b); and in making a determination of whether the purchaser obtained control over the limited partnership, the court examines "the transaction as a whole." *See, e.g.*, *Steinhardt*, 126 F.3d at 153 ("To resolve the issue of whether Steinhardt's involvement in the Bristol Oaks Limited Partnership was limited to that of a passive investor, we must look at the transaction as a whole, considering the arrangements the parties made for the operation of the investment vehicle in order to determine who exercised control in generating profits for the vehicle."); *Frazier*, 651 F.2d at 1080 ("Frazier's managerial rights negated the possibility that his limited partnership interests were securities . . . An investor does not always need the extensive protection of the federal securities laws when he or she has partial control of an enterprise."); *Bamco 18*, 675 F. Supp. at 831 ("Bamco had a say in at least the operation of the Townhouse. Thus, plaintiffs have failed to state a claim under the federal securities laws.")

The Court should accordingly acquit Mr. Heppner of Count 1 and the securities-fraud object of Count 3.

## II. NO RATIONAL JURY COULD HAVE CONVICTED MR. HEPPNER OF WIRE FRAUD OR CONSPIRACY TO COMMIT WIRE FRAUD.

The government alleges that Mr. Heppner committed wire fraud and conspiracy to commit wire fraud by, among other things, making material misrepresentations and/or omissions to three entities: Oaktree Capital; Infinedi Partners; and GWG. Tr. at 2122:19-22. But the evidence at trial was insufficient to show that (a) Mr. Heppner made any misrepresentations or omissions at all to certain of these entities and/or (b) any misrepresentations or omissions were material.

A misrepresentation or omission "is material [in a securities transaction] so long as there is 'a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision.'" *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) (quoting *United States v. Vilar*, 729 F.3d 62, 89 (2d Cir. 2013)). "A misrepresentation is important if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

***Oaktree Capital***. The government did not call any witnesses from Oaktree Capital, and therefore no evidence exists as to whether the entity cared about Mr. Heppner's alleged misrepresentations or omissions, let alone found them important. In addition, the government did not admit evidence showing that Mr. Heppner made or caused anyone else to make *any* misrepresentations or omissions to Oaktree Capital. When Oaktree Capital asked questions about the HCLP loan, no one responded. Tr. at 300:17-18, 302:21-23, 642:25-643:10; GX 1131. It is also undisputed that Oaktree Capital did not invest money in Beneficient. Tr. at 303:02-04.

***Infinedi Partners***. As with Oaktree Capital, the government did not call any witnesses from Infinedi Partners, and therefore no evidence exists as to whether the entity cared about Mr. Heppner's alleged misrepresentations. In addition, not only is it undisputed that Infinedi Partners did not invest any money in Beneficient, Tr. at 303:02-04, but it is also undisputed that Infinedi Partners did not have any money or property to invest, *see* Tr. at 340:20-341:01, thus negating any possibility that Mr. Heppner would obtain from Infinedi Partners "money or property," *see* 18 U.S.C. § 1343 (requiring that the scheme or artifice be "for obtaining money or property"); *Ciminelli v. United States*, 598 U.S. 306, 312 (2023) ("[W]e have consistently understood the 'money or property' requirement to limit the 'scheme or artifice to defraud' element.").

And finally, the alleged misrepresentations by Mr. Heppner to Infinedi Partners that the government discussed repeatedly at trial could not possibly be the basis for a wire fraud conviction. Those alleged misrepresentations were that (a) at an in-person meeting, Mr. Heppner assured the head of Infinedi Partners "not a single dollar [Infinedi Partners] would be investing in the business would go to [Mr. Heppner] or his family," Tr. at 2030:14-2031:14, and (b) in a letter written by Mr. Heppner, Mr. Hinkle stated that "the independent trustee [of the Harmon Trust] was a member of the Harmon family," Tr. at 2031:10-12. The former alleged statement could not be a material misrepresentation because no one could ever know what would have happened with money invested by Infinedi Partners—Infinedi never invested any money in Beneficient. The latter alleged misrepresentation could not be material for two independent reasons. First, the letter in which the statement was made about the Harmon descendant being an independent trustee of the Harmon Trust *also specified* that Mr. Heppner controlled HCLP: "HCLP is owned by three parties: . . . . 3. Highland Consolidated Investments, LLC ("HCILLC"), which owns 1% and serves as HCLP's general partner. *Mr. Heppner is the manager of HCILLC*." GX 1141 at 2 (emphasis

added). Second, evidence admitted at trial showed that Timothy Harmon *was* the independent trustee of the Harmon Trust at the time (or at least that Mr. Heppner believed he was):[1]

> Q. Do you know if Mr. Heppner -- do you know if Mr. Heppner appointed Mr. Harmon as the independent trustee of the Harmon Trust? Do you know?
>
> A. (Hinkle) I believe there was a document in 2002 to that regard.

Tr. at 577:07-10. As such, the alleged misrepresentation about a Harmon descendant being a trustee of the Harmon Trust either was not material or was not a misrepresentation at all.

***GWG***. Despite the indictment's focus on GWG being the primary victim of Mr. Heppner's alleged fraud, the government called only one witness from GWG's Special Committee (the committee that needed to approve any transactions between GWG and Beneficient): David Chavenson. Tr. at 53:03-16. And Mr. Chavenson's testimony that Mr. Heppner's alleged misrepresentations were important to him—particularly that it was important that Mr. Heppner not get any benefit from the proceeds of GWG's investments in Beneficient—was not credible.

First, Mr. Chavenson's testimony that he believed HCLP was not affiliated with Mr. Heppner, *see* Tr. 893:12-19, is contradicted by GWG's public filings that he signed. Both the 2018

[1] Despite Mr. Hinkle admitting at trial that he (a) signed a paper resigning as independent trustee of the Harmon Trust and (b) sent an email to Mr. Heppner *in 2013* attaching (i) Hinkle's resignation as independent trustee of the Harmon Trust and (ii) Mr. Heppner's appointment of Tim Harmon as the independent trustee, the Court still refused to admit the email or attachments as evidence. Tr. at 576:02-586:19 (refusing to admit Hinkle Y). This document should have been admitted, at the very least, to show what Mr. Heppner believed about who the independent trustee of the Harmon Trust was at the time. *United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) (noting a "statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."). The document also should have been admitted as proof of the matters asserted because the resignation/appointment documents have independent legal significance. *See Crawford v. Franklin Credit Mgmt. Corp.*, 2015 WL 1378882, at *3 (S.D.N.Y. Mar. 26, 2015) (citing cases). Regardless of the document's admission, the government's insistence on arguing that Mr. Heppner lied about Tim Harmon being the independent trustee of the Harmon Trust when it knew that reliable, admissible evidence contradicted that argument underscores why Mr. Heppner should be acquitted or granted a new trial under Rules 29 and 33.

and 2019 GWG Form-10Ks stated that Mr. Heppner and HCLP were related parties. *See, e.g.*, GX 503 at 163 (GWG 2018 Form 10-K signed by Mr. Chavenson: "The Senior Lenders (i.e., HCLP and BHI) are directly or indirectly associated with Brad K. Heppner, who is Chairman of the Company's Board of Directors."); DX 420 at 108 (GWG 2019 Form 10-K signed by Mr. Chavenson: "The Senior Lenders (i.e., HCLP and BHI) are directly or indirectly associated with one of Beneficient's founders, who is also Chairman of the Company's Board of Directors.").

Second, at the time of the late-2019 transaction where GWG invested tens of millions of dollars into Beneficient, GWG had no choice but to enter into the transaction or else GWG would have defaulted on its loan covenants and gone out of business. As described in the Special Committee Resolution approving the transaction, the late-2019 transaction would "assist [GWG] in maintaining compliance with its debt covenants while expanding its financing alternatives." GX 120 at 2; *see also* GX 109 ("[T]he Consolidation was still seen as very important to [GWG] and the [Special] Committee to improve control of [Beneficient], *improve debt capacity* and increase transparency for [GWG] investors with respect to [Beneficient]." (emphasis added)). The fact of the matter is that GWG's Special Committee would have approved the transaction no matter what, thus negating the materiality of Mr. Heppner's alleged misrepresentations and/or omissions.

Third, Mr. Chavenson's statements that (a) any money going to Mr. Heppner "would not have benefitted the shareholders" of GWG and therefore (b) knowing that Mr. Heppner was behind the senior lender would have been important to Mr. Chavenson—are belied by the actual evidence. Tr. at 881:07-882:15. In May 2019, Mr. Chavenson approved GWG's entry into an intercreditor agreement between GWG and BHI—a company that was publicly reported as affiliated with Mr. Heppner—in which BHI would be repaid in full before GWG could recoup anything on its May

2019 loan to Beneficient. *See* DX 420 at 108, 159-60 (describing the intercreditor agreement with BHI and describing BHI as "directly or indirectly associated with Brad K. Heppner").

Fourth, and critically, Mr. Chavenson refused to testify that he would have rejected the transactions between GWG and Beneficient, had he known Mr. Heppner was behind the HCLP loan. Tr. at 918:25-919:23. Rather, Mr. Chavenson stated: "It depends on what the auditors had to say and all sorts of other things." Tr. at 919:05-06. Even more importantly, when Mr. Chavenson and others were informed of all the details of Mr. Heppner's borrowing from HCLP, neither Mr. Chavenson nor anyone else on GWG's Special Committee took any adverse action against Mr. Heppner; instead, GWG's Special Committee simply "had meetings and . . . asked questions," and then disclosed the borrowing in public filings with the SEC. Tr. at 937:02-938:10; DX 439 at 258. Such inaction negates any possibility that, at the time, Mr. Chavenson or anyone else at GWG believed that Mr. Heppner's alleged misrepresentations or omissions were material.

The Court should acquit Mr. Heppner of Count 2 and the wire-fraud object of Count 3.

## III. NO RATIONAL JURY COULD HAVE CONVICTED MR. HEPPNER OF FALSE STATEMENTS TO AUDITORS.

### A. Beneficient's Financials Were Not Required to Be Filed with the SEC.

At trial, the government made clear that it was proceeding under Rule 13b2-2(a)(1)(ii), which prohibits a director or officer of an issuer from making or causing to be made a materially false or misleading statement to an accountant "in connection with . . . the preparation or filing of any document or report required to be filed with the [SEC]." 17 C.F.R. § 240.13b2-2(a)(1)(ii); Tr. at 1977:21-24. The "document or report" that the government alleged was required to be filed with the SEC was Beneficient's financial statements. ECF 64 at 4-5. According to the government, Beneficient's financial statements were required to be filed along with GWG's Form 10-K as a result of the operation of (a) 17 C.F.R. § 210.3-09 and (b) 17 C.F.R. § 240.12b-20. ECF 64 at 4-5.

However, neither of these regulations required GWG to file Beneficient's financial statements along with GWG's Form 10-K.

***17 C.F.R. § 210.3-09***. 17 C.F.R. § 210.3-09, also known as Regulation S-X Rule 3-09, requires a registrant (like GWG) to file separate audited financial statements of an entity in which the registrant has an ownership interest in two situations: (1) for certain majority-owned subsidiaries of the registrant that are not consolidated with the registrant or with a subsidiary of the registrant; and (2) for certain entities in which the registrant has an ownership interest of 50% or less. *See* 17 C.F.R. § 210.3-09(a). Beneficient meets neither of those criteria, and therefore GWG was not required to file Beneficient's financial statements with the SEC. *First*, Beneficient was not a majority-owned subsidiary of GWG. The term "majority-owned subsidiary" is defined in 17 C.F.R. § 210.02(n) as "a subsidiary more than 50 percent of whose outstanding *voting shares* is owned by its parent and/or the parent's other majority-owned subsidiaries." 17 C.F.R. § 210.02(n) (emphasis added). When GWG filed the relevant Form 10-K, GWG did not own 50% or more of Beneficient's *voting shares*; to the contrary, in that very same Form 10-K, GWG stated that GWG "forfeit[ed] all voting rights associated with all of its common units and such common units may not be voted on any matter." GX 503 at 125. *Second*, Beneficient was not an entity in which GWG had an ownership interest of 50% or less. According to the same Form 10-K, GWG's total ownership interest in Beneficient was 89.9%. GX 503 at 125. Thus, 17 C.F.R. § 210.3-09 did *not* require GWG to file Beneficient's audited financial statements with the SEC.

***17 C.F.R. § 240.12b-20.*** 17 C.F.R. § 240.12b-20 states: "In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading." There was absolutely no evidence

admitted at trial about this Rule, let alone evidence even suggesting that it required GWG to file Beneficient's audited financial statements along with GWG's Form 10-K. As such, it offers no support for the proposition that Beneficient's audited financial statements were "required to be filed with the [SEC]," as is necessary to support a conviction under Rule 13b2-2(a)(1)(ii).

The Court should accordingly acquit Mr. Heppner of Count Four.

### B. Venue Is Improper in this District

Both the Sixth Amendment and Federal Rule of Criminal Procedure 18 require that defendants be tried in the district where their crime was "committed." U.S. Const. amend. VI; Fed. R. Crim. P. 18; *see also* U.S. Const. art. iii, § 2, cl. 3. When the relevant statute does not specify how to determine the location of the crime, the court conducts a two-part analysis to find the *locus delicti* of the crime. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999). First, the court must determine the "essential conduct elements" of the crime—that is, the actions a defendant must take to violate the statute. *Id.* Second, the court must pinpoint the location of those actions. *Id*. at 280. This analysis is narrowly confined to the statute's proscribed conduct, and the *mens rea* elements are not relevant. *Abouammo v. United States*, 608 U.S. ___, 2026 WL 1686084, at *4 (2026); *see United States v. Miller*, 808 F.3d 607, 615 (2d Cir. 2015).

Rule 13b2-2 makes it a crime to "[m]ake or cause to be made a materially false or misleading statement to an accountant in connection with . . . the preparation or filing of any document or report required to be filed with the [SEC]." 17 C.F.R. § 240.13b2-2(a) (1979). The central conduct that must occur to prove a violation is the actual making of a materially false statement. *See United States v. Crop Growers Corp.*, 954 F. Supp. 335, 353 (D.D.C. 1997) (finding the "locus" of a violation of Rule 13b2-2 is the district where the statement was made or omitted). Applying this "conduct-focused analysis," *Abouammo*, 2026 WL 1686084, at *5, it follows that

venue is proper in the district where the false statements were made. *See, e.g.*, *Crop Growers*, 954 F. Supp. at 353.

The continued transmission of information that contains the misrepresentation to other districts does not extend venue to those districts. *See, e.g.*, *Abouammo*, 2026 WL 1686084, at *5 (finding that the obstructive effects of false documents were not elements of the crime and therefore, were not considered in determining where the crime was committed); *United States v. Wilson*, 2001 WL 798018, at *7-8 (S.D.N.Y., July 13, 2001) (finding that venue for a Rule 13b2-2 charge lies where the false statements are made to auditors and rejecting the argument that venue could be "continued" from the location where the false statements were made through to the Southern District of New York, where falsified report duplicates were filed). Indeed, the recent Supreme Court decision in *Abouammo* forecloses any argument that the "effects test" applies to obstruction charges like 13b2-2, which do not require "that falsifying a document have any impact at all on" the preparation or filing of the report with the SEC. *See Abouammo*, 2026 WL 1686084, at *5 ("Section 1519 does not require that falsifying a document have any impact at all on an investigation—that it in fact obstruct or impede an investigation, present or future.")

Here, the evidence at trial showed that Mr. Heppner backdated documents regarding Mr. Martens's role at HCLP in Dallas, Texas, and then sent those documents from Dallas to Deloitte auditor Frank Fumai, on February 23, 2019. GX 1363. The evidence at trial further showed that Mr. Fumai received this information in Texas, as he was at Deloitte's Texas office on February 23, 2019. GX 3404 (business records showing Mr. Fumai was in Texas providing services for Beneficient on February 23, 2019); *see also* Tr. at 1489:01-25 (Ms. Ivory confirming Mr. Fumai was in Texas at the time he received the false statements). Critically, there was no evidence at trial that the misrepresentations were made in this district.

The only shreds of evidence relied upon by the government to show that venue is proper in this district consist of Mr. Fumai swiping in and out of Deloitte's New York office at other times, Tr. at 1911:04-13, and an April 12, 2019 email chain between Mr. Heppner and Mr. Fumai in which the two individuals appear to both be in New York and discussing a "Funding Trust" that is unrelated to HCLP or its manager HCI—the two entities relevant to the backdated Keith Martens documents. Tr. 1986:09-1987:20; GX 1396. Neither of these events relates to the misrepresentation by Mr. Heppner to Deloitte, and therefore they offer no basis for finding that venue is proper in this district. Thus, even under the preponderance standard, the Court should acquit Mr. Heppner of Count Four because there was no evidence showing that venue was proper.

**C. Beneficient Is Not an Issuer for Purposes of Rule 13b2-2.**

The Court should acquit Mr. Heppner of Count Four because no rational trier of fact could have found that Beneficient is an "issuer" within the meaning of Rule 13b2-2(a), and without that finding, the conviction on Count Four cannot stand.

Rule 13b2-2(a) provides that "[n]o director or officer *of an issuer* shall, directly or indirectly . . . [m]ake or cause to be made a materially false or misleading statement to an accountant in connection with . . . [t]he preparation or filing of any document or report required to be filed with the [SEC]." 17 C.F.R. § 240.13b2-2(a) (emphasis added). Whether the defendant is a director or officer of an "issuer" is an element of the offense. *See Sec. & Exch. Comm'n v. Elliott,* 2025 WL 562507, at *8 (S.D.N.Y. Feb. 20, 2025) ("To succeed on a Rule 13b2-2 claim, the Government must show that "(1) the [defendant] [was] a director or an officer of an issuer . . . .") (alterations in original). Thus, to be convicted under Rule 13b2-2(a), the government is required to prove beyond a reasonable doubt that the defendant was a director or officer *of an issuer*. *See* 17 C.F.R. § 240.13b2-2(a); *see also United States v. Gaudin,* 515 U.S. 506, 510 (1995) ("We have held that these provisions require criminal convictions to rest upon a jury determination that the

defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.”). The government failed to meet that burden.

As discussed in Mr. Heppner’s prior motion to dismiss (ECF 24, 25, 35), Rules 13b2-2(b) and (c) were adopted in direct response to Section 303 of the Sarbanes-Oxley Act of 2002, *see* ECF 35 at 10. The Sarbanes-Oxley Act limits the term “issuer” to companies (a) whose securities are registered under Section 12 of the Exchange Act, (b) that are required to file reports under Section 15(d), and/or (c) that have filed registration statements not yet effective. *Id.* (citing Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002) (“Sarbanes-Oxley Act”); SEC Release No. 26050, 2003 WL 21148349, at *2 & n.9)). Consistency demands that Rule 13b2-2 be interpreted the same way across all subsections. The SEC has acknowledged that the definition would not “extend the scope of the rule to all private issuers of securities.” *Id.* at *2.

The evidence at trial established that Beneficient is a private company with no SEC filing obligations, and thus, it is not an issuer. *See* Tr. 48:13-20 (Beneficient described as “a private company” with “no public shareholders,” and “[y]ou couldn’t buy stock in it.”). No witness testified, and no exhibit established, that Beneficient (1) had securities registered under Section 12, (2) was obligated to file reports under Section 15(d), or (3) filed registration statements not yet effective. The government presented no facts establishing that Beneficient satisfied the definition of “issuer” applicable to Rule 13b2-2. The Court should acquit Mr. Heppner of Count Four.

### D. Count Four Is Time-Barred

The evidence at trial showed that the offense conduct supporting Count Four occurred in February and June of 2019. Tr. at 2047:17-2050:15; GX 3107. Because the general statute of limitations for criminal offenses is 5 years, 18 U.S.C. § 3282, an indictment charging Count Four would have needed to be brought by June 2024. But the Indictment was not returned until October 28, 2025. ECF 3. Even with an additional one year of tolling provided under the government’s

tolling agreement with Mr. Heppner—which does not apply because it was executed in December 2024, after the five-year limitations period had expired—the government had until June 2025 to initiate criminal charges. It failed to do so, and, as a result, Count Four is time-barred.

As explained in Mr. Heppner's earlier motion to dismiss, the six-year statute of limitations set forth in 18 U.S.C. § 3301 does not save the charge because Section 3301 does not apply to violations of Rule 13b2-2. ECF 25 at 27-30. Section 3301 applies only to a "securities fraud offense," which it defines as a "violation of, or a conspiracy or attempt to violate" the following: (a) 18 U.S.C. § 1348 ("Securities and Commodities Fraud"); (b) 15 U.S.C. § 78ff(a) (the criminal penalty provision of the Securities Exchange Act of 1934); (c) 15 U.S.C. § 77x (the criminal penalty provision of the Securities Act of 1933); (d) 15 U.S.C. § 80b-17 (the criminal penalty provision of the Investment Advisers Act of 1940); (e) 15 U.S.C. § 80a-48 (the criminal penalty provision of the Investment Company Act of 1940); and (f) 15 U.S.C. § 77yyy (the criminal penalty provision of the Trust Indenture Act of 1939). But a criminal violation of Rule 13b2-2(a) does not qualify as a "securities fraud offense" under Section 3301 because Rule 13b2-2(a) does not require "fraud."

Rule 13b2-2 is, by its plain terms, a false statements offense and not a fraud-based offense. The specific provision with which Mr. Heppner has been charged—subsection (a)—renders unlawful the making of (or causing to be made) "a materially false or misleading statement to an accountant" or omitting to state, or causing another person to omit to state to an accountant, "any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading." 17 C.F.R. § 240.13b2-2(a). The U.S. Supreme Court has clearly distinguished false statements offenses from fraud offenses. *See United States v. Grainger*, 346 U.S. 235, 243–44 (1953); *Bridges v. United States*, 346 U.S. 209, 221 (1953)

(holding that the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287, which tolls the statute of limitations over "fraud or attempted fraud" against the United States, applies only to offenses "involving defrauding the United States in any pecuniary manner or in a manner concerning property"); *see also United States v. Doost*, 2019 WL 1560114, at *13 (D.D.C. Apr. 10, 2019) (finding that the Wartime Suspension of Limitations Act did not operate to toll the statute of limitations over violations of 18 U.S.C. § 3287—"Making False Statements on a Loan Application"—because this criminal offense "required proof of fraud to secure a conviction"). Here, Count Four is merely a false statements offense, not a "securities fraud offense," and therefore is not subject to the six-year limitations period contained in 18 U.S.C. § 3301.

The plain reading of Section 3301 shows that it applies only to a "securities fraud offense," and the Court must give meaning to every word in a statute. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). The only construction that gives the word "fraud" effect is one in which the statute applies only to fraud-based offenses—for example, violations of Exchange Act Rule 10b-5—and not those predicated on a non-fraud provision such as Rule 13b2-2. And, to the effect the statute is ambiguous, the rule of lenity militates in favor of an interpretation that reduces, rather than expands, the statute's scope. *See United States v. Davis*, 588 U.S. 445, 464 (2019). Such an interpretation is also consistent with "'the principle that criminal limitations statutes are 'to be liberally interpreted in favor of repose.'" *Toussie v. United States*, 397 U.S. 112, 115 (1970) (quoting *United States v. Scharton*, 285 U.S. 518, 522 (1932)).

Indeed, every reported case (other than the Court's earlier ruling on this issue) in which Section 3301 has been successfully charged and relied upon by the government to extend the statute of limitations to six years involve plainly criminal fraud violations. *See* ECF 25 at 29-30.

Finally, if a criminal violation of Rule 13b2-2(a) is a "securities fraud offense" and thereby subject to Section 3301's six-year statute of limitations, every willful violation of any federal securities law, rule, or regulation that exists under the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, and the Trust Indenture Act of 1939 is a qualifying "securities fraud offense" and thereby subject to a six-year statute of limitations under 18 U.S.C. § 3301. This is not, and cannot, be the case, particularly in light of the rule of lenity.

Thus, the Court should acquit Mr. Heppner of Count Four because it is time-barred.

## IV. THE COURT SHOULD ACQUIT MR. HEPPNER OF ALL CHARGES OR GRANT HIM A NEW TRIAL BECAUSE INSTRUCTIONAL AND EVIDENTIARY ERRORS COMPROMISED THE RELIABILITY OF THE VERDICT AND RESULTED IN MANIFEST INJUSTICE.

### A. Errors in the Jury Instructions Entitle Mr. Heppner to a New Trial.

A court may grant a new trial under Rule 33 based on errors in jury instructions. *See, e.g.*, *United States v. Serrano*, 224 F. Supp. 3d 248, 255–57 (S.D.N.Y. 2016) (granting a Rule 33 motion and ordering a new trial based on erroneous jury instructions). The various errors in how the jury was instructed in this case warrant a new trial.[2]

#### 1. Count 1: The Jury Instruction for Count 1 Was Improper.

The Court erred in its Count 1 jury instruction by (a) instructing the jury that Beneficient's Preferred Series A Subclass 1 Units and Common Units were securities; and (b) refusing to instruct the jury that it must be unanimous as to which transaction constituted securities fraud.

[2] Mr. Heppner incorporates by reference (a) all arguments he made at the charge conference held on May 5, 2026, Tr. at 1942:01-2001:13, and (b) his arguments that the Court should have given the jury instructions in his Requests to Charge, ECF 50, and in his Supplemental Requests to Charge, ECF 64.

***The Instruction Regarding "Securities."*** The Court erred in instructing the jury that Beneficient's Preferred Series A Subclass 1 Units and Common Units (the "Beneficient Units") were securities in two respects. First, as discussed above, the Beneficient Units (both of which were limited partnership interests) were not "securities" because GWG had substantial managerial and operational control over Beneficient (the limited partnership). *See supra* § I. Second, the Court erred by not submitting to the jury the question of whether the Beneficient Units constituted securities. The question of whether an investment constitutes a security is an element of the securities fraud charge and therefore the Court was required to submit it to the jury. *See United States v. Rogers*, 9 F.3d 1025, 1033 (2d Cir. 1993) (holding, in the context of a charge under 18 U.S.C. § 2314,[3] that the defendant "was entitled to have the judge instruct the jury on what a security is and to let the jury decide whether the items at issue were securities"); *United States v. McKye*, 734 F.3d 1104, 1107-1110 (10th Cir. 2013) (holding that "the question of whether a note is a security has both factual and legal components" and therefore it must be submitted to the jury because "the question of whether the alleged fraud involved a security is an element of the crime of securities fraud"); *United States v. Johnson*, 718 F.2d 1317, 1321 n.13 (5th Cir. 1983) ("Whether a particular piece of paper meets th[e] definition [of a security] . . . is for the jury to decide."). Where, as here, a court instructs a jury that a specific investment is a security, the defendant "suffer[s] a 'structural error' in the trial process" and "his conviction . . . must be reversed." *Rogers*, 9 F.3d at 1033 (citing *Sullivan v. Louisiana,* 508 U.S. 275, 281-82 (1993)).

[3] The definition of "security" for purposes of 18 U.S.C. § 2314 (set forth in 18 U.S.C. § 2311) is similar to the definition of "security" under Securities Exchange Act of 1934 (set forth in 15 U.S.C. § 78c). Critically, both enumerate "investment contract," which is the only type of security the Beneficient Units could possibly constitute.

The Court must therefore either (a) acquit Mr. Heppner of Count 1 or (b) grant him a new trial based on the structural error created by the erroneous instruction.

***The Lack of a Unanimity Instruction.*** The Court further erred in refusing to instruct the jury that it must be unanimous as to the specific securities transaction that was undertaken in connection with the allegedly fraudulent conduct. As recognized by the Second Circuit in *United States v. Dioguardi*, "each transaction in a securities fraud case constitutes a separate offense." 492 F.2d 70, 83 (2d Cir. 1974). Therefore, the Court was required to give a unanimity instruction (a) to avoid the possibility of the jury convicting on securities fraud despite not being unanimous on any single offense, and (b) to avoid the charge being multiplicitous. *See United States v. Schlei*, 122 F.3d 944, 978-79 (11th Cir. 1997) ("[T]o avoid the vices of multiplicity in securities fraud cases, each count of the indictment must be based on a separate purchase or sale of securities and each count must specify a false statement of material fact—not a full blown scheme to defraud—in connection with that purchase or sale" and concluding that "where one of the charged [transactions] provides an improper basis for prosecution in the district, and no unanimity charge was given, a count containing two securities offenses is duplicitous"). The Court's refusal to give a unanimity instruction warrants a new trial on Count 1.

**2. Count 2: The Jury Instruction for Count 2 Was Improper.**

The Court erred in its jury instruction for Count 2 by refusing to instruct the jury that it must be unanimous as to (a) the specific transaction that serves as a basis for the scheme to defraud and (b) the specific wire communication that was used to further or assist in carrying out the alleged scheme to defraud.

As recognized in *United States v. Walker*, Second-Circuit law "clearly signals courts and parties (including defendants) to the 'sound practice' of charging unanimity with particularity when multiple transactions serve the basis for a fraud conviction." 254 Fed. Appx. 60, 62 (2d Cir.

2007) (unpublished); *United States v. Dupre*, 462 F.3d 131, 144 (2d Cir. 2006) ("[I]t would be sound practice for a trial judge to charge a jury that it must be unanimous as to what specific transaction serves as the basis of a conviction for wire fraud, but it is not reversible error if a trial judge fails to do so and provides a standard instruction as to unanimity."). Here, there were multiple transactions and potential transactions involving at least three alleged victims, and the structure of each transaction was vastly different—some involving loans, others involving limited partnership interests. In such a situation, the Court erred by declining to instruct the jury that it must be unanimous as to the specific transaction that serves as a basis for the scheme to defraud, particularly in light of the fact that the Court gave no general instruction that the jury must be unanimous as to each element of each crime. *See* ECF 66. (The Court instead simply instructed that the overall verdict must be unanimous. ECF 66 at 24.) For the same reasons, the Court erred in not instructing the jury that it needed to be unanimous with regard to which specific wire communication formed the basis for its verdict—an essential element of wire fraud. The instruction for Count 2 was accordingly erroneous and warrants a new trial.

**3. Count 4: The Jury Instruction for Count 4 Was Improper.**

The Court erred in its instruction for Count 4 by (a) not instructing the jury that it must find that Mr. Heppner was a director or officer of an issuer, and (b) instructing the jury that GWG was required to file Beneficient's financial statements with the SEC.

First, as discussed above, Mr. Heppner was not a director or officer of an "issuer" because Beneficient was not an issuer for purposes of Rule 13b2-2. *See supra* at § III.C. And, even if there were some debate on the issue, the question of whether Mr. Heppner was a director or officer of an issuer should have been submitted to the jury because it is an element of the crime. *See* 17 C.F.R. § 240.13b2-2(a); *United States v. Riccardi*, 620 F. App'x 11, 14 (2d Cir. 2015) ("A jury instruction is erroneous if it fails to convey to the jury an essential element of the charged

offense."); *cf. Rogers*, 9 F.3d at 1033; *McKye*, 734 F.3d at 1107-1110. The Court's decision not to do so warrants a new trial. *Cf. Rogers*, 734 F.3d at 1033.

Second, as also discussed above, GWG was not required to file Beneficient's financial statements with the SEC. *See supra* § III.A. The Court therefore erred in instructing the jury that a "public company is required to file the financial statements of the subsidiary company with the SEC" where the public company owns more than "twenty percent of the subsidiary's common equity." ECF 66 at 21. This instruction relies on an incorrect interpretation of 17 C.F.R. § 210.3-09, which the government provided in its supplemental requests to charge. *See* ECF 64. A proper interpretation of 17 C.F.R. § 210.3-09 shows that GWG was *not* required to file Beneficient's financial statements because Beneficient was not (a) a majority-owned subsidiary of GWG, or (b) an entity in which GWG had less than a 50% ownership stake. *See supra* § III.A.

And, finally, even if there were some debate as to whether GWG was required to file Beneficient's financial statements, the question should have been submitted to the jury because it is an element of the crime. *See* 17 C.F.R. § 240.13b2-2(a); *Riccardi*, 620 F. App'x at 14; *cf. Rogers*, 9 F.3d at 1033; *McKye*, 734 F.3d at 1107-1110. The Court's decision not to do so warrants a new trial. *Cf. Rogers*, 734 F.3d at 1033.

#### 4. The Jury Instruction for Venue Was Improper.

The Court erred in its instruction for venue by (a) instructing the jury that the same standard for venue applied to all counts, despite venue being charge-specific, and (b) refusing to instruct the jury on a specific and different venue standard for Count Four.

First, the Court erred in instructing the jury that venue is proven if "any act in furtherance of the count you are considering occurred in [this district], regardless of whether it was the act of the defendant or anyone else." ECF 66 at 22. Such a blanket venue instruction is improper because venue is charge-specific. *See Miller*, 808 F.3d at 615. To determine venue, a court must apply "a

two-part analysis": first, it must "examine the 'nature of the crime alleged,' seeking to identify the crime's 'essential conduct elements'"; and second, it must "identify the locations where the criminal acts were committed." *Id.* (quoting *United States v. Rodriguez–Moreno,* 526 U.S. 275, 279–80 (1999)). This Court took neither of those two steps, and therefore the venue instruction was improper.

Second, the Court erred in refusing to provide a charge-specific instruction for venue that correctly articulates the venue standard for the crime of false statements to auditors: that the jury must find that Mr. Heppner made or caused to be made false statements to auditors in this district. *See* ECF 50 at 50–51. As discussed above, the central conduct that must occur for the government to prove a violation of Rule 13b2-2 is the actual making of a materially false statement. *See Crop Growers*, 954 F. at 353 (finding the "locus" of a violation of Rule 13b2-2 is the district where the statement was made or omitted). Applying this "conduct-focused analysis," *Abouammo*, 2026 WL 1686084, at *5, it follows that venue is proper only in the district where the false statements were made. *See, e.g.*, *Crop Growers*, 954 F. Supp. at 353. The court's error in refusing to provide a specific venue instruction for Count Four, coupled with its blanket venue instruction that conflicts with the proper venue standard for Count Four, warrants a new trial.

### B. The Court's Ruling that Mr. Heppner's Written Exchanges with an AI Platform Are Not Privileged Deprived Him of a Fair Trial.

Mr. Heppner used the generative AI platform Claude to prepare thirty-two documents (the "AI Documents") analyzing the facts and legal issues he anticipated would bear on a potential prosecution. *See* Exhibits A-AF. He created these materials after receiving a grand jury subpoena and retaining counsel, for the purpose of preparing to consult with his counsel about defense strategy; he subsequently shared the AI Documents with them.

On February 6, 2026, the Government moved for a ruling that the AI Documents were not protected work product. ECF 22. The Court granted the motion and issued a written opinion on February 17, 2026. *United States v. Heppner*, 820 F. Supp. 3d 292 (S.D.N.Y. 2026). In that opinion, the Court erred by concluding that no privilege attached to the AI Documents, ECF 27, and the resultant disclosure of those AI Documents to the government deprived Mr. Heppner of a fair trial because the documents allowed the government to see Mr. Heppner's defenses and defense strategy. The government's pre-trial access to Mr. Heppner's litigation-preparation materials requires a new trial in the interest of justice.

**1. The Court Erred in Ruling that the Documents Are Not Privileged.**

The work-product doctrine protects materials prepared in anticipation of litigation from disclosure to adversaries, preserving a "zone of privacy in which a lawyer can prepare and develop legal theories and strategy." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (citing *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947)). Federal Rule of Criminal Procedure 16(b)(2) codifies this protection, shielding from discovery "reports, memoranda, or other documents made by the defendant, or the defendant's attorney or agent, during the case's investigation or defense." The protection is especially vital in criminal proceedings. *See United States v. Nobles*, 422 U.S. 225, 238 (1975) ("The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case.").

The AI Documents fall within this protection. They are documents that were prepared by Mr. Heppner after he received a grand jury subpoena, signed a tolling agreement with the Government enumerating the federal statutes that the United States Attorney's Office for the Southern District of New York was investigating, and had retained counsel. Indeed, the Court assumed *arguendo* that the AI Documents satisfied the anticipation-of-litigation requirement. 820

F. Supp. 3d at 298. And the documents were prepared by Mr. Heppner himself, the defendant, for the purpose of preparing to consult with defense counsel about anticipated charges. They do not merely compile underlying facts; they are Mr. Heppner's own analysis: his evaluation of the facts and legal theories bearing on his anticipated defense and judgments about what to emphasize consider, recorded to prepare himself and his counsel for the expected charges.[4]

The work-product doctrine protects materials prepared by a defendant during the investigation or defense of his case, not solely materials prepared at counsel's direction. Rule 16(b)(2) reflects this, shielding documents "made by the defendant, or the defendant's attorney or agent." The same principle holds for materials prepared by non-attorneys. *See, e.g.*, *Wultz v. Bank of China Ltd.,* 304 F.R.D. 384, 394 (S.D.N.Y. 2015) (internal quotation marks omitted) (interpreting the work-product doctrine in the civil context[5] and concluding that "it is not in fact necessary that the material be prepared by or at the direction of an attorney"; "[A]ll cases of which the Court is aware that have specifically addressed this question afford protection to materials gathered by non-attorneys even where there was no involvement by an attorney.").

In addition, Mr. Heppner's use of Claude to prepare the AI Documents does not waive work-product protection. Work-product protection is not waived by sharing information with a third party in the ordinary sense; it requires disclosure in a manner "inconsistent with the maintenance of secrecy from the disclosing party's adversaries." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980). Mr. Heppner did not disclose the AI Documents' contents to adversaries; he only disclosed them to his own counsel and the Claude platform. *See*

---

[4] Mr. Heppner will file the AI Documents under seal to preserve his claims of work-product protection and so that the Court may see the content of the AI Documents.

[5] The Supreme Court has held that the work-product doctrine applies in both the civil and criminal contexts. *See Nobles*, 422 U.S. at 238.

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441, 445 (S.D.N.Y. 2004) ("The work product privilege should not be deemed waived unless disclosure is inconsistent with maintaining secrecy from possible adversaries.") (quotation omitted).

Other courts that have addressed the issue of whether work-product protections extend to documents like the AI Documents have reached the conclusion that it does. On the same day the Court issued its opinion, the Eastern District of Michigan denied a motion to compel a party's AI-generated litigation materials, holding that work-product protection applies without any showing of attorney direction and that the contrary argument "would nullify work-product protection in nearly every modern drafting environment." *Warner v. Gilbarco, Inc.*, 820 F. Supp. 3d 629, 636–37 (E.D. Mich. 2026) (citations omitted). The court reasoned that generative AI platforms "are tools, not persons," and that the work product doctrine, unlike the attorney-client privilege, is not waived by voluntary disclosure to a third party but only by disclosure "to an adversary or in a way likely to get in an adversary's hand." *Id.* at 636 (citing *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 306 n.28 (6th Cir. 2002); *Am. Tel. & Tel. Co.*, 642 F.2d at 1299.

Although those decisions arose in civil proceedings, they confirm that the doctrine extends to materials prepared by a party for litigation purposes, and the Supreme Court has stated that the work-product doctrine applies in both the civil and criminal contexts:

> Although the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital. The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case.

*Nobles*, 422 U.S. at 238. Mr. Heppner respectfully submits that this Court erred in concluding that the AI Documents are not protected by the work-product doctrine.

### 2. The Government's Access to the AI Documents Constituted an Invasion of the Defense Camp That Warrants a New Trial.

The Second Circuit has observed that a Sixth Amendment violation may occur when the government obtains a defendant's litigation-preparation materials, even inadvertently. *See United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985). Here, the AI Documents addressed the very issues at the heart of the defense's case-in-chief, for example: the legitimacy of the $141 million HCLP loan; the disclosure of Mr. Heppner's relationship to HCLP; and other facts and legal questions Mr. Heppner anticipated would bear on a potential prosecution. Those topics tracked the government's trial strategy. *See, e.g.*, Tr. 21:25-22:10 (Government opening: "The defendant used his control of Beneficient to make it look like money was owed to an outside lender, someone separate from the defendant. . . . The lender was independent, the lender was real, and he wasn't in control. Those were lies. There was no outside lender, it was just the defendant."); Tr. at 773:8-9 (Stone: "We understood that HCLP was an independent party and that Heppner did not have a relationship with HCLP."); Tr. at 2128:01-09 (Government Rebuttal: "the defendant controlled HCLP, he benefited from HCLP, and that is what he didn't want the Special Committee to know"). They also identify evidence on which the defense would build its theory of the case. *See, e.g.,* DX 3 (September 1, 2017 Transaction Agreement which is establishes that the $141 million loan from HCLP Nominees to Beneficient was established in connection with the Paul Capital transaction); DX 500 (July 6, 2017 Mayer Brown Tax Opinion which is relevant to rebut evidence admitted by the Government that showed that Mr. Heppner lied and caused others to lie to Paul Capital in 2016 and after about who controlled HCLP and its affiliates).

The AI Documents reflect Mr. Heppner's analysis of these issues and his anticipated arguments concerning them. The AI Documents therefore gave the government insight into how Mr. Heppner would frame and contest the loan's legitimacy and the disclosure questions.

The government obtained Mr. Heppner's own written analysis of the facts, his anticipated defenses, his cross-examination and impeachment strategies, and his assessment of his exposure. Because Mr. Heppner prepared, revised, and updated those documents over time, the government received not a static printout but his evolving account of the events and his mental impressions about them. No court can reconstruct whether or how the government's months of advance access to the AI Documents shaped its witness preparation, exhibit selection, examination strategy, or closing themes. *See United States v. Levy*, 577 F.2d 200, 208–09 (3d Cir. 1978). Indeed, because the AI Documents contained Mr. Heppner's own analysis of the facts and his candid assessment of his exposure, the government's possession of them affected his decision of whether to testify lest he risk being impeached by his own protected work product about the case. A new trial is the only adequate remedy: the government's knowledge gained from the AI Documents permeated the proceeding and cannot be cabined to any discrete trial ruling.

**C. Errors in Evidentiary Rulings Entitle Mr. Heppner to a New Trial.**

**1. The Court's Refusal to Admit Key Evidence Warrants a New Trial.**

Mr. Heppner submitted two letters to the Court identifying sixteen exhibits that were authentic, relevant, and admissible as non-hearsay. *See* ECF 60, 62. These exhibits included key agreements, tax opinions, and disclosure documents that were directly relevant to, among other things, whether Mr. Heppner had concealed his relationship with HCLP from the parties the government claimed he had defrauded. *See id.* The Court admitted only the proffered SEC filings (DX 400–448), excluding the remaining exhibits without any on-the-record rationale. The excluded exhibits satisfied every prerequisite for admissibility: they were authentic (produced from the government's own files); relevant (offered to rebut, among other things, the government's central claim that disclosures about HCLP's ownership were never made); and not hearsay (offered not for the truth of any assertion, but for the effect on the listener, to show what Paul Capital,

GWG, and others were told and thus what they knew). As the government indicated in its closing statement, a number of government witnesses testified that Mr. Heppner's representations about HCLP were "important" to them. *See* Tr. 2041:2-13. The excluded documents directly undercut that testimony. Their exclusion without explanation denied Mr. Heppner a fair opportunity to present his defense and warrants a new trial. *C.f. Crane v. Kentucky*, 476 U.S. 683, 690–91 (1986) (Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense"; reversing where state court "advanced [no] rational justification for the wholesale exclusion of [a] body of potentially exculpatory evidence") (quotations omitted).

The Court also excluded relevant, admissible evidence at other points in the trial that prevented Mr. Heppner from putting on a complete defense. For example, during the cross-examination of Mr. Hinkle, the Court excluded a 2013 email from Mr. Hinkle to Mr. Heppner attaching (a) Mr. Hinkle's resignation as independent trustee of the Harmon Trust and (b) Mr. Heppner's appointment of Tim Harmon as the independent trustee. Tr. at 576:02-586:19 (refusing to admit Hinkle Y). This document should have been admitted (i) to show what Mr. Heppner believed about who the independent trustee of the Harmon Trust was at the time, and (ii) as proof that Tim Harmon was the independent trustee of the Harmon Trust. *See supra* at __. The exhibit would have directly rebutted the government's argument that Mr. Heppner lied about a Harmon Family descendant being the independent trustee of the Harmon Trust. Tr. at 2031:10-14. Similarly, during the cross-examination of Randall Schwed of Paul Capital, the Court excluded an email to Mr. Schwed attaching a tax opinion that disclosed Mr. Heppner's control of HCLP. Tr. at 1364:13-1372:01 (excluding Schwed A). This document would have rebutted Mr. Schwed's testimony that he and Paul Capital believed that the senior lender was an independent third party. Tr. at 1383:12-15.

### 2. The Court's Limitation on Impeachment Warrants a New Trial.

The Court's limitation on Mr. Heppner's ability to impeach Sheldon Stein for bias warrants a new trial.

One of Mr. Heppner's core defenses was that Mr. Stein (the government's first witness) and others harbored deep biases against Mr. Heppner. In its opening statement, the defense told the jury that Mr. Stein did not like Mr. Heppner, believed him unfit to lead the company, and wanted to take his place as CEO. *See* Tr. 33:10-34:1.

When cross-examined on these topics, Mr. Stein directly denied that he disliked Mr. Heppner or wanted Mr. Heppner's job as CEO of Beneficient. *See* Tr. 104:02-104:032 ("Q. You didn't like Brad Heppner? A. I didn't care one way or another."); *id.* at 104:11-104:20 ("Q. You wanted to be the CEO of Beneficient? A. Is that a joke -- Q. No, it's not a joke, sir. A. – or is that a serious question? Q. It's a serious question. A. I had the best job in the world paying me a fortune with a ten-year contract . . . . Why in the world would I want to be CEO of a company that I didn't believe in and didn't feel it had any business?") Mr. Stein also denied ever calling Mr. Schnitzer and saying that Mr. Stein wanted to be CEO of Beneficient. Tr. at 104:23-105:02 ("Q. And so you never had a conversation with Bruce Schnitzer where you told Bruce Schnitzer, I want to be the CEO of GWG instead of Brad? A. No. Bruce Schnitzer was Brad's crony. No, that conversation – I never called Bruce Schnitzer in my life.")

Later in the trial, Mr. Heppner sought to admit evidence that directly contradicted that denial and showed Mr. Stein's bias: the testimony of Mr. Schnitzer about the conversation. If Mr. Schnitzer denied that the conversation happened, Mr. Heppner would have sought to admit a 2023 deposition of Mr. Schnitzer taken in connection with an arbitration brought by Mr. Stein, during which Mr. Schnitzer testified under oath that Mr. Stein had called him in 2019, told him Mr. Heppner was an incompetent CEO, and proposed that Mr. Stein, not Mr. Heppner, should be

running the company. Tr. at 1399:01-1401:05. The Court excluded this evidence on Rule 403 grounds. That ruling was error.

Evidence of bias is always relevant and is never collateral. *Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony.") (quotations omitted). And bias may be proven through extrinsic evidence, including through the testimony of third-party witnesses. *United States v. Harvey*, 547 F.2d 720, 722 (2d Cir. 1976) ("The law is well settled in this Circuit, as in others, that bias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely . . . *including the testimony of other witnesses*, to prove the facts showing a bias in favor of or against a party.") (emphasis added).

Indeed, the Second Circuit has emphasized the importance of allowing cross-examination into the bias of key government witnesses because "it is rarely proper to cut off completely a probative inquiry that bears on a feasible defense." *Id.* at 723 (citing *Alford v. United States*, 282 U.S. 687, 694 (1931)). As the court explained:

> [A] defendant should be afforded the opportunity to present facts which, if believed, could lead to the conclusion that a witness who has testified against him either favored the prosecution or was hostile to the defendant. Evidence of all facts and circumstances which 'tend to show that a witness may shade his testimony for the purpose of helping to establish one side of a cause only,' should be received.

*Id.* (quoting *United States v. Haggett*, 438 F.2d 396, 399-400 (2d Cir. 1971)).

Here, Mr. Stein's bias was not a peripheral matter; it was a core defense theory communicated to the jury from the first moments of trial. The exclusion of this evidence under Rule 403 left the defense unable to confront Mr. Stein's denials with corroborating extrinsic evidence, and left the jury to hear only Mr. Stein's self-serving account of his motivations. Its exclusion warrants a new trial.

### 3. The Court's Admission of the Government's Improper Summary Chart Warrants a New Trial.

The Court's admission of Government Exhibit 982 ("GX 982")—a lengthy chart containing excerpts from the government's key documentary evidence—violated Federal Rules of Evidence 1006 and Rule 403, and it was prejudicial to the outcome of the trial.

Rule 1006 permits a summary only to prove the content of "voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006(a). GX 982 satisfied neither requirement. The chart was a nine-page, single-spaced compilation of about 130 individually selected excerpts from approximately 75 exhibits, mostly e-mails. Seventy-five documents are not voluminous, and they certainly were not records that "cannot be conveniently examined in court." *See* Fed. R. Evid. 1006. The underlying exhibits were admitted into evidence. *See Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 190 (S.D.N.Y. 2008) (admission under Rule 1006 is generally inappropriate where content is "relatively straightforward"). This Court acknowledged the problem, stating that "it is not self-evident to me that this falls within Rule 1006." Tr. 1198:6–8. As defense counsel observed during trial, GX 982 is "a summary of their case," and "there is a proper way to summarize their case and their evidence and that is at summation . . . which is essentially what this is." Tr. 1195:21–24.

The Government's use of GX 982 also resulted in improper inferences. Here, the Government did not engage in routine compilation. It selected specific exhibits from the universe of evidence, excerpted only the portions favorable to its theory, and arranged them so that FBI Special Agent Avery could read them chronologically in a sequence implying a narrative the government should have properly presented in summation.

In addition, GX 982 should have been excluded under Federal Rule of Evidence 403. The 2024 advisory committee note to Rule 1006 makes clear that a summary "must also pass the

balancing test of Rule 403" and that a chart that "is argumentative" may be excluded because "its probative value may be substantially outweighed by the risk of unfair prejudice or confusion." Fed. R. Evid. 1006 advisory committee's note to 2024 amendment. GX 982 was argumentative in precisely that sense: it was prepared entirely by the prosecution, reflected the government's selection of which exhibits and which excerpts within those exhibits to include, and was structured to imply connections between the documents described on it. The Government admitted approximately 275 exhibits at trial, and approximately 75 of them, nearly thirty percent, were referenced in GX 982 alone. GX 982 constituted a summary of the government's case, not a summary of voluminous records that cannot be conveniently examined in court. A new trial is warranted due to the prejudicial impact the inclusion of this exhibit had on the trial. *See Sharkey v. Lasmo*, 55 F. Supp. 2d 279, 289 (S.D.N.Y. 1999), *aff'd*, 214 F.3d 371 (2d Cir. 2000) ("[A] court may grant a new trial if substantial errors were made in admitting or excluding evidence.").

#### 4. The Court's Admission of Voluminous Evidence Regarding the Defendant's Wealth Warrants a New Trial.

While evidence of wealth "may be admitted where other safeguards are employed such as limiting instructions or restrictions confining the government's references to that wealth," *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006), a new trial is warranted where the nature of the prosecution's strategy is a persistent appeal to class prejudice, *see United States v. Stahl,* 616 F.2d 30, 32–33 (2d Cir. 1980) (overturning conviction where "the nature of the prosecutor's trial strategy ... obviously included a persistent appeal to class prejudice"). Here, the amount of evidence that the government admitted regarding Mr. Heppner's wealth, particularly when juxtaposed against the dearth of evidence of misrepresentations to the primary victim (GWG), shows that the case falls into the latter category. A new trial is therefore warranted.

As discussed above, the government called only a single witness from GWG's Special Committee, which is the committee that needed to approve any transactions between GWG and Beneficient (Mr. Heppner's company). By contrast, the government called several witnesses who testified either largely or solely about Mr. Heppner's wealth: Bruce Topott (who made cash transfers for Mr. Heppner's family office); Thomas Corey Ford (the general contractor for the home where Mr. Heppner lived and had renovated); Kevin Mackenroth (an accountant for Mr. Heppner's family office); and Nicole Boyson (an expert who testified about the flow of funds to Mr. Heppner's personal expenditures). This imbalance on its face shows that the government was focused on appealing to class prejudice, rather than proving motive and commission of the actual charged crimes. And any doubt about these motivations is resolved by a review of the numerous pictures that the government admitted, showing Mr. Heppner's lavish lifestyle and homes. *See, e.g.*, GX 1023, 1053, 1057. The government's repeated appeals to class prejudice through its admission of copious amounts of evidence of Mr. Heppner's wealth warrants a new trial.

#### 5. The Court's Admission of Voluminous Evidence Regarding Misrepresentations Other than the Misrepresentations that Were Charged Constitutes a Material Variance that Warrants a New Trial.

A variance occurs when "the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Sakoc*, 115 F. Supp. 3d 475, 484 (D. Vt. 2015) (quoting *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003)). A defendant alleging variance must show "substantial prejudice" to warrant reversal. *Id.* (quoting *United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007)). A variance is "prejudicial and thus fatal to the prosecution" when it "infringes on the substantial rights that indictments exist to protect, namely to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy." *Id.* (quoting *United States v. Dupre*, 462 F.3d 131, 140 (2d Cir. 2006)). Substantial prejudice exists when the defendant could not have

known from the indictment what theories the government would advance at trial, such that he "might have chosen a different trial strategy." *Sakoc*, 115 F. Supp. 3d at 487–88.

Here, the indictment identified specific victims, time period, and subjects of alleged misrepresentation. *See* ECF 3. Counts One through Three of the indictment charge fraud from 2018 through 2021 through misrepresentations to GWG and two prospective investors, Oaktree Capital and Infinedi Partners. ECF 3. The charged fraud concerns three subjects: the origins of the Beneficient debt; the extent to which Mr. Heppner would personally benefit from debt repayments; and the extent to which Mr. Heppner directed entities controlling the debt, including HCLP. ECF 3 ¶¶ 24, 26, 29. Count Four charges false statements to auditors in 2019. ECF 3 ¶ 33.

At trial, however, the government presented evidence of a far broader case. Indeed, the government's evidence strayed from the indictment in at least four distinct and material ways:

First, the government devoted much of the first week of trial to an alleged fraud on Paul Capital, an entity that is not named a single time in the indictment. The government elicited from Mr. Hinkle, for example, that he provided false information to Paul Capital, including "information related to the loan and the trust," "[a]t Brad's direction." Tr. 431:25–432:7.

Second, the government introduced extensive testimony about false statements not charged in the indictment related to the Harmon family, including that the Harmon family was the true owner and beneficiary of the trust holding the HCLP debt, and that the debt originated from a lending relationship with the Harmons. None of this appears in the indictment, which concern misrepresentations about the origins of the debt, Mr. Heppner's benefit from repayments, and his control over HCLP.

Third, while the indictment did not charge any false statement made directly to the SEC, the government called SEC examiner Timothy Tatman to testify that Mr. Heppner told SEC staff

on April 15, 2021 that he "was not in control of HCLP or not a decision-maker for HCLP," and that "over time, HCLP made loans to different entities of his." Tr. 1500:4–12.

And fourth, the government introduced detailed evidence of alleged fraud in the composition of the family office expenses that predates the charged period by years and is wholly uncharged. Mr. Hinkle testified that the expenses reflected in GX 1102, totaling approximately $59 million, were inflated at Mr. Heppner's direction. Tr. 404:8–13. Specifically, Mr. Hinkle testified that the ledger included fees paid to an entity controlled by Mr. Heppner, which were recorded as professional fees because Mr. Heppner "didn't want to create a tax liability for the income." Tr. 404:16–24.

The variance between the indictment and the evidence presented at trial was prejudicial to Mr. Heppner because it deprived him of notice of the charges he would face at trial and exposed him to the risk of conviction, and future prosecution, on theories the grand jury never considered. Based on the indictment as written, Mr. Heppner had no reason to anticipate that the government would advance these theories at trial. The indictment did not clearly indicate that an uncharged fraud on Paul Capital would consume the first week of trial, that statements at an April 2021 SEC meeting would be offered as evidence of fraud, or that Mr. Heppner allegedly committed tax fraud. Each of these theories is unconnected to the charging terms of the indictment. The Court should accordingly grant Mr. Heppner a new trial where the evidence is confined to the charges in the indictment.

#### 6. The Court's Admission of Unnoticed 404(b) Evidence Warrants a New Trial.

Rule 404(b) prohibits the admission of evidence of crimes, wrongs, or acts other than those charged in the indictment to prove a defendant's character or propensity. *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011). Critically, the prosecution must also "provide reasonable notice of

any such evidence that the prosecutor intends to offer at trial . . . ." Fed. R. Evid. 404(b)(3)(a). That notice requirement is fundamental to fairness: without it, a defendant cannot prepare to rebut evidence of uncharged acts that may be just as damaging as the charged conduct itself. *See United States v. Vilar*, 530 F. Supp. 2d 616, 640 (S.D.N.Y. 2008) ("The purpose of Rule 404(b)'s notice provision is to reduce surprise and promote early resolution of any challenge to admissibility of the proffered evidence.").

The government violated that notice requirement twice, thus warranting a new trial. First, the government elicited testimony from Mr. Hinkle that Mr. Heppner directed him to record professional fees as expenses in family office ledgers in order to avoid creating taxable income, and that Mr. Heppner further directed that the dates column in those ledger printouts be hidden. *See* Tr. at 404:8-407:17; GX 1102. This was uncharged conduct: nowhere in the indictment is Mr. Heppner accused of tax manipulation or directing the falsification of family office ledgers. Evidence that Mr. Heppner manipulated ledger entries to generate fictitious income for tax purposes is the kind of other-acts evidence Rule 404(b) is designed to regulate, as it portrays Mr. Heppner as someone who routinely falsifies financial records for personal gain. Had proper notice been given, the defense could have challenged admissibility pretrial and prepared to rebut the testimony at trial. Instead, the evidence reached the jury without any of those safeguards.

Second, the government elicited from Mr. Tatman that Mr. Heppner made misrepresentations at an April 15, 2021 meeting with SEC staff—specifically, that Mr. Heppner told the SEC that HCLP "is a private lending entity" from which "[Mr. Heppner] said there has never been a distribution," aside from "taxes." Tr. 1530:7-14; GX 1332. These were uncharged false statements to the SEC, offered to establish Mr. Heppner's knowledge and consciousness of guilt. By introducing this evidence without notice and without a limiting instruction, the

Government denied the defense any pretrial opportunity to investigate or challenge the admissibility of this evidence. The admission of this unnoticed 404(b) evidence was prejudicial and warrants a new trial.

## CONCLUSION

For the reasons set forth above, Mr. Heppner respectfully requests that the Court acquit him of all charges or grant him a new trial.

Respectfully submitted,

Dated: June 22, 2026

/s/ *Benjamin A. O'Neil*

Benjamin A. O'Neil
Robert Zink
John ("Fritz") Scanlon
Clare Reardon
Nithya Pathalam
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, DC 20005
(202) 538-8151
benoneil@quinnemanuel.com
robertzink@quinnemanuel.com
fritzscanlon@quinnemanuel.com
clarereardon@quinnemanuel.com
nithyapathalam@quinnemanuel.com

Christopher J. Clore
295 5th Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
christopherclore@quinnemanuel.com

*Counsel for Defendant Bradley Heppner*