UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

BRADLEY HEPPNER,

                Defendant.

**25 Cr. 503 (JSR)**


**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO THE DEFENDANT'S RULE 29 AND RULE 33 MOTIONS**


 

JAY CLAYTON
United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278


Daniel G. Nessim
Alexandra Rothman
Kyle A. Wirshba
Assistant United States Attorneys
- Of Counsel -

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ...................................................................................................................... 2

    I.    Procedural History ........................................................................................... 2

    II.    The Government's Case at Trial ....................................................................... 2

        A.    The Defendant Manufactured a $141 Million Debt Owed to HCLP ........................... 3

        B.    The Defendant Lied to Prospective Investors .................................................. 4

        C.    The Defendant Lied to the GWG Special Committee ........................................ 5

        D.    The Defendant Lied to Beneficient's Auditors ................................................. 9

        E.    The Defendant Falsified Board Minutes .......................................................... 11

    III.    The Defense Case ........................................................................................... 12

ARGUMENT ............................................................................................................................ 12

    I.    Applicable Law ............................................................................................... 12

        A.    Rule 29 Motions ........................................................................................... 12

        B.    Rule 33 Motions ........................................................................................... 13

    II.    The Evidence Amply Supported the Defendant's Convictions ........................ 14

        A.    The Evidence Proved that GWG Acquired Beneficient Securities ..................... 14

        B.    The Evidence Proved the Defendant Made Material Misrepresentations ........... 17

        C.    The Evidence Established the Defendant Made False Statements to Auditors ......... 19

    III.    The Defendant Is Not Entitled to a New Trial ............................................... 25

        A.    The Court's Jury Instructions Do Not Entitle the Defendant to a New Trial ............... 25

        B.    The Court Properly Ruled that the AI Documents Were Not Privileged ..................... 29

        C.    The Court Properly Excluded Defense Exhibits .............................................. 32

        D.    The Court Properly Ruled Concerning Bias Evidence ...................................... 33

        E.    The Government's Summary Chart Was Appropriately Admitted ...................... 34

        F.    The Evidence Concerning the Defendant's Wealth Was Appropriately Received ....... 37

        G.    There Was No Variance .................................................................................. 38

        H.    The Court Did Not Admit Unnoticed Rule 404(b) Evidence ............................. 39

CONCLUSION.......................................................................................................................... 41

**TABLE OF AUTHORITIES**

**Cases**                                                                                      **Page(s)**

*Abouammo v. United States*, 146 S. Ct. 1571 (2026) .............................................................. 25, 26

*Bamco 18 v. Reeves*, 675 F. Supp. 826 (S.D.N.Y. 1987) ............................................................. 18

*In re von Bulow*, 828 F.2d 94 (2d Cir. 1987) ............................................................................... 31

*Frazier v. Manson*, 651 F.2d 1078 (5th Cir. 1981) ..................................................................... 17

*Highland Cap. Mgmt. L.P. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008) .......................... 36

*In re OpenAI, Inc., Copyright Infringement Litig.*, No. 25-md-3143 (SHS) (S.D.N.Y. Jan. 5,
    2026) ....................................................................................................................................... 36

*Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013) ................................................ 36

*Mayer v. Oil Field Systems Corp.*, 721 F.2d 59 (2d Cir. 1983) .............................................. 15, 16

*McNabb v. SEC*, 298 F.3d 1126 (9th Cir. 2002) .......................................................................... 27

*Neder v. United States*, 527 U.S. 1 (1999) .................................................................................. 27

*Paneros v. Barnes & Noble Inc.*, 332 F.R.D. 482 (S.D.N.Y. 2019) .............................................. 31

*Reeves v. Ernst & Young*, 494 U.S. 56 (1990) ............................................................................. 27

*Richardson v. United States*, 526 U.S. 813 (1999) ...................................................................... 28

*Schaafsma v. Morin Vt. Corp.*, 802 F.2d 629 (2d Cir. 1986) ....................................................... 27

*SEC v. Edwards*, 540 U.S. 389 (2004) ........................................................................................ 27

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) .............................................................................. 15

*Steinhardt Grp. Inc. v. Citicorp*, 126 F.3d 144 (3d Cir. 1997) .................................................... 17

*Stoiber v. SEC*, 161 F.3d 745 (D.C. Cir. 1998) ........................................................................... 27

*United States v. Aiyer*, 470 F. Supp. 3d 383 (S.D.N.Y. 2020) .............................................. *passim*

*United States v. Aleskerova*, 300 F.3d 286 (2d Cir. 2002) ........................................................... 13

*United States v. Archer*, 977 F.3d 181 (2d Cir. 2020) ...................................................... 14, 15, 37

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) ................................................................ 13

ii

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) ................................................................. 41

*United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) ........................................................ 28

*United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012) ............................................................. 39

*United States v. Daniel*, 749 F.3d 608 (7th Cir. 2014) ............................................................... 28

*United States v. Desena*, 287 F.3d 170 (2d Cir. 2002) ............................................................... 12

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999) ...................................................................... 13

*United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979) .................................................................. 32

*United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006) ................................................................. 29

*United States v. Espaillet*, 380 F.3d 713 (2d Cir. 2004) ............................................................. 12

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) ............................................................ 14

*United States v. Finazzo*, 682 F. App'x 6 (2d Cir. 2017) ............................................................ 31

*United States v. Florez*, 447 F.3d 145 (2d Cir. 2006) ................................................................. 13

*United States v. Frank*, 156 F.3d 332 (2d Cir. 1998) .................................................................. 38

*United States v. Gambino*, 59 F.3d 353 (2d Cir. 1995) ............................................................... 14

*United States v. Gentile*, No. 21 Cr. 54 (RPK),
2025 WL 777090 (E.D.N.Y. Mar. 11, 2025) ...................................................................... 29, 36

*United States v. Ginsberg*, 758 F.2d 823 (2d Cir. 1985) ............................................................. 32

*United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999) ........................................................... 13

*United States v. Heppner*, No. 25 Cr. 503 (JSR),
2026 WL 923078 (S.D.N.Y. Apr. 6, 2026) ......................................................................... *passim*

*United States v. Ho*, 984 F.3d 191 (2d Cir. 2020) ........................................................... 35, 36, 37

*United States v. Hoey*, No. 15 Cr. 229 (PAE),
2016 WL 270871 (S.D.N.Y. Jan. 21, 2016) ............................................................................ 32

*United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008) .................................................................. 13

*United States v. Johnson*, 718 F.2d 1317 (5th Cir. 1983) ........................................................... 27

*United States v. Kozeny*, 667 F.3d 122 (2d Cir. 2011) ........................................................... 18, 28

iii

*United States v. Landesman*, 187 F.4th 298 (2d Cir. 2021)..................................................... 15

*United States v. Lange*, 834 F.3d 58 (2d Cir. 2016) .............................................................. 24

*United States v. LaPlante*, 714 F.3d 641 (1st Cir. 2013)...................................................... 28

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008).......................................................... 26

*United States v. Lyons*, 472 F.3d 1055 (9th Cir. 2007).......................................................... 28

*United States v. Macklin*, 927 F.2d 1272 (2d Cir. 1991)........................................................ 12

*United States v. Matthews*, 20 F.3d 538 (2d Cir. 1994)......................................................... 13

*United States v. McCourty*, 562 F.3d 458 (2d Cir. 2009)....................................................... 14

*United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001)..................................................... 13

*United States v. McKye*, 734 F.3d 1104 (10th Cir. 2013)....................................................... 27

*United States v. Menendez*, 759 F. Supp. 3d 460 (S.D.N.Y. 2024) ....................................... 36

*United States v. Miller*, 954 F.3d 551 (2d Cir. 2020) ...................................................... 35, 37

*United States v. Morgan*, 385 F.3d 196 (2d Cir. 2004) ......................................................... 13

*United States v. Morrison*, 153 F.3d 34 (2d Cir. 1998) ......................................................... 12

*United States v. Mucciante,* 21 F.3d 1228 (2d Cir. 1994) ..................................................... 39

*United States v. O'Connor*, 650 F.3d 839 (2d Cir. 2011)....................................................... 13

*United States v. Parnas*, No. 19 Cr. 725 (JPO),
   2022 WL 669869 (S.D.N.Y. Mar. 7, 2022) .................................................................. 36, 37

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011) ............................................................ 12

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) ............................................................. 19

*United States v. Rice*, 699 F.3d 1043 (8th Cir. 2012)............................................................. 28

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007).............................................................. 38

*United States v. Rogers*, 9 F.3d 1025 (2d Cir. 1993).............................................................. 27

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008)............................................................. 29

*United States v. Sakoc*, 115 F. Supp. 3d 475 (D. Vt. 2015)................................................... 39

*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) ..................................................... 39

iv

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) .................................................... 14

*United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991) ................................................. 32

*United States v. Snow*, 462 F.3d 55 (2d Cir. 2006) .......................................................... 13

*United States v. Teman*, 465 F. Supp. 3d 277 (2d Cir. 2020) ........................................ 14

*United States v. Thomas*, 54 F.3d 73 (2d Cir. 1995) ...................................................... 26

*United States v. Tramunti*, 513 F.2d 1087 (2d Cir. 1975) ............................................ 13

*United States v. Walker*, 254 F. App'x 60 (2d Cir. 2007) .............................................. 28

*United States v. Yeaman*, 194 F.3d 442 (3d Cir. 1999) ................................................. 28

*Warner v. Gilbarco, Inc.*, 820 F. Supp. 3d 629 (E.D. Mich. 2026) ......................... 30, 31

**Statutes**

15 U.S.C. § 78aa ........................................................................................................... 24, 30

15 U.S.C. § 78c(a)(10) ........................................................................................................ 15

**Regulations**

17 C.F.R. § 210.1-02 ........................................................................................................... 21

17 C.F.R. § 210.3-09 ........................................................................................................... 21

17 C.F.R. § 240.12b-20 ........................................................................................................ 23

17 C.F.R. § 240.13b2 ................................................................................................... *passim*

## PRELIMINARY STATEMENT

A jury convicted Bradley Heppner following a three-week trial. The trial evidence featured the testimony of two of the defendant's co-conspirators with direct knowledge of the defendant's crimes; expert analysis of the defendant's use of funds looted from GWG Holdings, Inc.; and hundreds of contemporaneous documents, including emails, text messages, board minutes, and recordings, reflecting the defendant's material misrepresentations to GWG and prospective investors. The jury deliberated for less than a day before returning a unanimous verdict.

The defendant now moves for judgment of acquittal and for a new trial based on purported gaps in the Government's trial proof, and alleged errors in the Court's instructions, pretrial rulings, and evidentiary rulings. None of the defendant's claims have any merit, and they certainly do not entitle the defendant to an acquittal or new trial. The Court should deny the defendant's motions.

*First*, the Government's trial evidence was easily sufficient to support the jury's verdict on each of the counts of conviction. As to the securities fraud count, the defendant claims that the Government did not prove the fraudulent conduct was in connection with a security, but the evidence was overwhelming, and in fact uncontroverted, that GWG acquired Beneficient securities. As to the wire fraud count, the defendant asserts that he did not make any material misrepresentations, but the evidence was equally overwhelming that the defendant made material misrepresentations to prospective investors and the GWG board. The defendant's attack on his conviction for making false statements to auditors fares no better. There was ample evidence for the jury to find that Beneficient's financials were required to be filed with the SEC, that venue was proper, that Beneficient was an issuer for purposes of Rule 13b-2, and that the Count was timely.

*Second*, the defendant cannot come close to establishing that he is entitled to a new trial under Rule 33. There was no manifest injustice in the jury's verdict, nor a credible concern that an innocent person was convicted. The Court's jury instructions properly instructed the jury on each

count of conviction, and the Court was well within its discretion to decline to provide the instructions requested by the defense. The Court also properly ruled that the defendant's self-initiated use of an AI tool in advance of trial was not protected by any privilege. Finally, the Court's evidentiary rulings to preclude certain defense exhibits and lines of cross-examination, and to admit testimony and exhibits offered by the Government, were all proper, and none of which entitle the defendant to a new trial. The motions should be denied.

## BACKGROUND

### I.    Procedural History

The defendant was charged in Indictment 25 Cr. 503 (JSR) (the "Indictment") in five counts. Count One charged him with securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b5, and 18 U.S.C. § 2. Count Two charged him with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Count Three charged him with conspiracy to commit securities and wire fraud, in violation of 18 U.S.C. § 371. Count Four charged him with making false statements to auditors, in violation of 15 U.S.C. § 78ff, 17 C.F.R. § 240.13b2-2(a), and 18 U.S.C. § 2. Count Five charged him with falsifying records, in violation of 18 U.S.C. §§ 1519 and 2. (Dkt. 2). Following a three-week trial, the jury returned guilty verdicts on Counts One through Four.[1]

### II.    The Government's Case at Trial

The defendant was convicted of orchestrating a fraudulent scheme to enrich himself by looting GWG, a public company, through a series of misrepresentations to GWG's board of directors. For years, the defendant made, and caused to be made, misrepresentations to GWG's board and to prospective investors concerning a debt that Beneficient, a private company the defendant controlled, owed to a purported third-party lender, HCLP and its subsidiaries. In truth,

---

[1] The Court granted the defendant's Rule 29 motion to dismiss Count Five for lack of venue at the close of the Government's case-in-chief. (Tr. 1941:15-23).

and unbeknownst to his victims, the defendant controlled and financially benefitted from payments to HCLP. Through this scheme, the defendant obtained approximately $300 million, of which he personally received nearly $150 million. The defendant spent these funds on his extravagant lifestyle, including more than $40 million to renovate and furnish his Dallas mansion and more than $10 million to pay for personal credit card and private air travel expenses.

The evidence at trial included twenty-four witnesses, among them two co-conspirators who aided the defendant in his fraudulent scheme, other current and former employees of Beneficient, members of the GWG and Beneficient boards of directors, a financial expert who traced the defendant's use of funds from GWG, an SEC supervisor, and two FBI Special Agents who testified as summary witnesses. The Government also presented documentary evidence including emails, financial records, recordings, board minutes, records provided to GWG's auditor and to the SEC, and private messages between the defendant and his co-conspirators.

### A. The Defendant Manufactured a $141 Million Debt Owed to HCLP

The origin of the defendant's fraud scheme dates back to the early 2000s when the defendant sold a private equity business named The Crossroads Group to Lehman Brothers for approximately $170 million. (Tr. 359:22-362:5). The defendant deposited the proceeds from the sale into HCLP, a partnership that was controlled by the defendant and owned by the defendant's trust. (Tr. 362:8-18). The defendant used the proceeds to start a family office, and to pay for personal expenses, including the purchase and development of a large ranch in East Texas. (Tr. 362:23-363:21, 384:11-13, 394:23-395:18; *see* GX 1057, 1053, 1055). By 2017, the defendant had depleted nearly all the funds in HCLP. (Tr. 364:1-9).

Over time, the defendant developed the idea for a new business, Beneficient, which was marketed as a way to offer liquidity to holders of illiquid private equity assets. (Tr. 431:1-9). In 2013, the defendant began to seek outside investors for Beneficient. (Tr. 400:4-10). Before doing

3

so, the defendant schemed to get back the millions he had spent out of HCLP. The defendant directed his long-time employee, Jeff Hinkle, to tally up his personal and business expenses from HCLP, including payments for the defendant's ranch, and paper these expenditures as debts that Beneficient owed to HCLP, the partnership the defendant controlled. (Tr. 400:4-407:16).

Then, in 2017, shortly before Beneficient purchased the assets of Paul Capital, a private equity firm that was winding down, the defendant directed Hinkle to formalize this "debt" into a $141 million credit agreement between Beneficient and a newly created subsidiary, HCLP Nominees. (Tr. 447:7-449:23; GX 209). The "debt" underlying the credit agreement was a repackaging of the amounts paid out of HCLP over the years. (Tr. 459:1-14). But by entering into this credit agreement, the defendant thought he had concocted a way to make the underlying "debt" enforceable, thereby enabling him to get paid back under the guise that Beneficient owed money to HCLP, a purported third-party lender. (Tr. 449:5-9).

### B. The Defendant Lied to Prospective Investors

As the defendant began to seek outside investors for Beneficient, he directed Hinkle to tell additional lies about the "debt" on Beneficient's books. Specifically, the defendant instructed Hinkle to convey that the debt came from a third-party, the Harmon Family, that had made a seed investment in Beneficient, and that repayment on the debt would go to that family's trust, the Harmon Trust. (Tr. 432:2-439:3; *see* GX 1105, 1106, 1107). This was false. Among other things, the trust was not named the "Harmon Trust;" it was the "Highland Investment Holding Trust." (Tr. 439:18-23). And the defendant, not the Harmon Family, was the trust's beneficiary. (Tr. 437:13-24). At the defendant's direction, Hinkle conveyed these lies to Paul Capital, and to other prospective investors as well. (Tr. 443:23-445:19).

In 2018, for instance, the defendant sought investments in Beneficient from at least two private equity firms, Oaktree Capital and Infinedi. (Tr. 277:15-20). Both firms questioned the

4

defendant about whether he controlled HCLP and would benefit from repayment of the debt. (Tr. 278:22-281:9, 297:14-19; GX 1130). The defendant misled both firms about his control over, and the extent to which he would benefit from repayments on, the debt.

With respect to Infinedi, in 2018, the defendant and Peter Williams, who worked for Beneficient, attended a meeting with Jay Hegenbart of Infinedi at the Loews Hotel in Manhattan. (Tr. 289:5-15). There, Hegenbart asked the defendant for background on the Harmon Trust, and for confirmation that, if Infinedi chose to invest in Beneficient, none of the money would go to the defendant or his family. (Tr. 290:18-21). The defendant swore that none of the funds from HCLP would go to him or his family and even offered to sign an attestation to the same. (Tr. 291:10-23).

At the defendant's direction, Hinkle also signed a letter that was provided to Infinedi (the "Infinedi Letter") that contained further misrepresentations regarding HCLP and the Harmon Trust. (Tr. 491:17-492:12; GX 1390). In that letter, Hinkle falsely represented, among other things, that a representative of the Harmon Family served as an independent trustee of the Harmon Trust, and that members of the Harmon Family were beneficiaries of the trust. (Tr. 493:5-494:21; GX 1390). Ultimately, neither Infinedi nor Oaktree decided to invest in Beneficient.

### C. The Defendant Lied to the GWG Special Committee

As noted above, in 2017, Beneficient acquired the private equity assets of Paul Capital. To pay for those assets, the defendant turned to GWG, a public company that was in the life settlement business. (Tr. 49:23-50:6, 272:9-273:3). Through a series of transactions in 2018 and 2019, Beneficient, and the defendant, took control of GWG. (Tr. 50:23-51:2). The defendant became the chairman of the board of GWG, (Tr. 51:7), and Beneficient board members became board members of GWG. (Tr. 52:8-11). In addition, a special committee of the GWG board was created to consider any transactions between GWG and Beneficient. (Tr. 52:25-53:12). Dave Chavenson and Kathleen

5

Mason served on the first special committee, which was advised by lawyers from Foley & Lardner—principally Evan Stone. (Tr. 53:15-16, 114:7-8).

In February 2019, the defendant enlisted the help of his childhood friend, Keith Martens, to obscure his control over HCLP. The defendant contacted Martens and asked him to sign several documents to serve as "manager" of HCLP Nominees, a subsidiary of HCLP. (Tr. 127:5-12; GX 701A). The signature pages the defendant provided were backdated to July 2017, designed to make it appear that Martens had been serving in the role since then. (Tr. 138:19-25, 140:6-10; GX 1156). Martens did not have any experience serving in the role. (Tr. 128:10-14). Nor did he exercise any actual control over HCLP. (Tr. 127:25-128:5). Rather, he was a rubber stamp deployed by the defendant to make HCLP appear independent when, in truth, it was not.

With Martens in place, the defendant turned his attention to GWG. In the spring of 2019, the defendant told the GWG special committee that Beneficient needed an immediate capital infusion. (Tr. 729:14-25). The defendant represented that the debt on Beneficient's books was owed to a third-party lender, which Heppner referred to as the "senior lender." (GX 1191). The defendant further represented that Martens was the manager of HCLP Nominees. (GX 1194, 1195). Based on those representations, in May 2019, the GWG special committee authorized a $65 million unsecured loan to Beneficient. (GX 119).

After this first transaction, GWG's and Beneficient's directors began asking escalating questions about the purported debt on Beneficient's books. (Tr. 57:22-59:17). Those questions led the Enterprise Risk Committee ("ERC") of the Beneficient board to hire Glenn West, an attorney from the law firm of Weil Gotshal, to investigate who controlled and owned the Harmon Trust. (Tr. 64:15-16). The defendant, in turn, enlisted his personal lawyer and co-conspirator, Bill

6

Banowsky, from the law firm of Thompson & Knight, to provide false information to West about HCLP. (GX 1208, 1210, 1215, 1371, 1224, 1372; *see* GX 982, 944).

At the defendant's direction, Banowsky prepared a letter for West regarding the Harmon Trust, which was circulated to the Beneficient and GWG directors. (GX 1239). The letter contained multiple false assertions: that the defendant had no control over HCLP; that most of payments would go to the Harmon Family's trust; that the defendant was only a minor contingent possible beneficiary; and that the defendant had only an extremely minimal possibility of receiving any payments from HCLP. (GX 1239). Behind the scenes, the defendant had heavily edited the letter. (GX 1228, 1229, 1234, 1232, 1233; *see* GX 982). West presented the letter at an October 10, 2019 meeting of the ERC. (GX 1243).

Around the same time, recognizing the transparency of the Martens decoy in the face of increasing pressure from his directors, the defendant arranged for an old colleague from Goldman Sachs, David Wickline, to take over the role of managing HCLP. (GX 1225). Like Martens, Wickline's role was "ministerial;" he did not "exercise any meaningful discretion;" and the defendant remained in control of HCLP. (Tr. 1207:17-18, 1306:8-11).

In late 2019, the defendant sought the GWG special committee's approval for an additional $79 million cash infusion, including $50 million earmarked specifically to pay down the HCLP debt. (GX 1360). Again, the defendant misrepresented, and caused others to misrepresent, that the defendant did not control HCLP and would not receive repayments on the debt; that the defendant had an arm's length relationship with Wickline; and that Wickline had demanded that HCLP receive a $50 million payment to waive a default provision under the credit agreement. (GX 1254).

For example, around the time of the second funding request, the defendant told Chavenson that "[h]e was not affiliated or related to the senior lender." (Tr. 888:14). Chavenson testified that

7

this representation mattered to him as a member of the GWG special committee because it would not "benefit the [GWG] shareholders" if the money "was to go to someone's personal account or pocket." (Tr. 893:24-894:3; *see* Tr. 942:8-10).

Around the same time, Banowsky participated in a conference call with Stone. Stone asked for more details about the Harmon Trust, and Banowsky assured him "unequivocally, that [the defendant] would not receive any of the funds that would be paid to the senior lender." (Tr. 782:6-783:17). After the call, Banowsky updated the defendant, informing him "Call is over. Very high level like the minutes [ . . .] They wanted to know more details about the Harmon trust, but I told them I not them and the Harmon's valued their financial privacy like most wealthy people." (GX 1247). The defendant and Banowsky made similar and repeated misrepresentations to the GWG special committee, as reflected in the committee's board minutes. (GX 108, 109).

In late December 2019, the GWG special committee authorized the transfer of $79 million to Beneficient. In exchange, GWG acquired "units" or "equity" in Beneficient in the form of limited partnership interests. (Tr. 275:11-16, 749:3-7; GX 3602, 3110). The limited partnership interests were no different than stock; they were "just a different structure." (Tr. 275:14-15). As Evan Stone explained, "for those classes of equity of Beneficient, for an investor in that equity . . . somebody else is making the efforts [] to run the business and generate the returns." (Tr. 749:3-750:2). In the case of Beneficient, the "management team" was making the efforts to run the business and generate the returns, and the management team was led by the defendant. (*Id.*).

On the same day the funds were transferred from GWG to Beneficient, supposedly for the "senior lender," the defendant urgently directed Beneficient employee Bruce Topott to sweep $50 million into his personal investment or "stay rich" account. (Tr. 1102:4-1106:2; GX 1261).

In 2020, a new GWG special committee was formed, now advised by counsel at Gibson

8

Dunn, principally Ed Sopher. In the summer of 2020, in exchange for additional Beneficient "units" or equity, the GWG special committee approved an additional $61 million investment in Beneficient, at least approximately $28 million of which was specifically for HCLP debt repayment. (GX 3110, 1330, 1299). As before, the Beneficient units were "not really . . . different than stock;" they were "just an evidence of a share or a security." (Tr. 1424:9-14). Again, the defendant gave the misimpression that these demands originated with Wickline when the demands originated with the defendant. (GX 1299). The special committee approved the cash transfer from GWG to Beneficient upon this misimpression, as well as the understanding that HCLP was independent of Heppner and he would not benefit. Those misrepresentations mattered. As Sopher explained, "what good does it do to GWG to give money to Beneficient, for Beneficient to give it, in turn, to Bradley Heppner . . . [T]hat wouldn't have been a great idea for GWG." (Tr. 1434:1-5).

Between July 2020 and March 2021, GWG made additional investments in Beneficient. The defendant continued to misrepresent his control over HCLP. Recordings captured certain of these misrepresentations in which the defendant stated, for instance, that the "senior lender [was] amenable to extending the repayment terms." (GX 601). Of course, there was no "senior lender;" it was just the defendant.

In total, the defendant personally received nearly $150 million from GWG, which flowed from Beneficient through HCLP to several entities and trusts under the control of the defendant, and which the defendant used to pay his personal expenses. (GX 904).

### D.  The Defendant Lied to Beneficient's Auditors

By the end of 2018, because GWG held a large interest in Beneficient, Beneficient's audited financials were required to be incorporated into GWG's 2018 Form 10-K. (Tr. 1443:3-8; GX 503). Deloitte, Beneficient's auditor, had to consider whether HCLP was independent of Heppner and Beneficient, and whether one of the people the defendant had installed to run trusts

9

associated with Beneficient, Murray Holland, a co-conspirator and the CEO of GWG, was also independent. (Tr. 1449:1-1456:7). Neither was true. But revealing the defendant's control over Holland and HCLP risked disfavored accounting conclusions, and exposing the defendant's fraud would have prevented him from demanding payments on the HCLP debt. To avoid that result, the defendant made false and misleading statements and prepared false documents to deceive Deloitte.

As noted above, in February 2019, the defendant enlisted Martens to serve as manager of HCLP. The defendant then falsified and backdated documents, and created fake emails and fraudulent letters to make it appear that Martens had been acting as the independent manager since July 2017. (GX 1166, 1163, 1159, 1161, 1363, 701B, 3104, 3111).[2] The defendant also prepared a false letter purportedly sent by Holland to Randall Schwed at Paul Capital to demonstrate the supposed independence of Holland. (Tr. 1353:1-1357:25; GX 1167, 1173, 1363, 3106). Schwed never received, or even asked for the letter, and the representations contained in the letter regarding Holland's independence were false. (Tr. 1353:7-8, 1354:1-1355:3).

The defendant caused Beneficient employees to send these false and misleading materials and information to Deloitte. (GX 1363). The audit partner, Frank Fumai, was based out of New York and worked on the Beneficient audit from Deloitte's offices in 30 Rockefeller Center in Manhattan. (Tr. 1446:16-1448:1; GX 3401, 3404). The defendant also corresponded with Deloitte while he was in New York City. (GX 1396). In June 2019, as a condition of finalizing the audit, the defendant signed a representation letter that had false statements, including that the defendant "ha[d] no knowledge of any fraud or suspected fraud affecting the Company." (GX 3107).

---

[2] Defense counsel conceded as much. (Tr. 2097:24-2098:3 (MR. ZINK: "You would have to have no eyes and no brain to believe that Mr. Heppner did not falsify and backdate documents and create fake emails. It happened. One hundred percent, it happened. And they went auditors. There is absolutely no denying it. It's a fact, and he is not disputing it, period.")).

10

### E.  The Defendant Falsified Board Minutes

In late 2020 and early 2021, GWG received SEC subpoenas in connection with the SEC's investigation of GWG. (GX 507, 508, 509). The SEC requested information and documents concerning HCLP, including the defendant's relationship with HCLP and HCLP's use of funds. On April 15, 2021, the SEC held a meeting with GWG and its lawyers at Willkie Farr, which the defendant attended. SEC supervisor Timothy Tatman attended the meeting as well. (Tr. 1499:11-17). At that meeting, the defendant made a series of false statements regarding HCLP including that "he was not in control of HCLP" and there "has never been a distribution," other than "taxes," from HCLP. (Tr. 1500:25-1501:12; GX 1332). The defendant's statements were memorialized in notes of the meeting prepared by a Willkie attorney. (GX 1332).

After the meeting, the SEC sent a list of questions to GWG, including a request for GWG to describe any and all compensation, incentive payments, loan repayments, or other payments of any kind which the defendant or his family received from HCLP, among other entities. (GX 1334). In response, the defendant informed certain Beneficient employees, for the first time, that he had received millions as part of what he described as a longstanding lending relationship with HCLP.

To give the impression that the defendant had previously disclosed this receipt of funds from HCLP, in May 2021, the defendant falsified minutes from the October 10, 2019 meeting of the ERC, adding language to make it appear that he had disclosed a "long-time financial relationship" with HCLP. (GX 1338, 1338B). The defendant then caused the doctored minutes to be circulated to members of the Beneficient's and GWG's boards. (GX 1341, 1345). In truth, the defendant had never disclosed this information and the original minutes and related contemporaneous notes from the October 2019 ERC meeting did not reflect any language about that lending relationship. (GX 1243). In the fall of 2022, the defendant caused the falsified minutes to be submitted to the SEC. (Tr. 1515:7-1519:15).

11

### III.    The Defense Case

The defense did not call any witnesses at trial. Instead, the defense bulk admitted into evidence approximately 50 of GWG's SEC filings that offered an assortment of incomplete and misleading "disclosures" about the defendant's control over HCLP. (DX 400-448; Tr. 1899:16-18).

### ARGUMENT

### I.    Applicable Law

#### A.  Rule 29 Motions

When seeking a judgment of acquittal after conviction at trial, "a defendant making an insufficiency claim bears a very heavy burden." *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002); *United States v. Macklin*, 927 F.2d 1272, 1277 (2d Cir. 1991). A jury verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (internal quotation marks omitted). A "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004).

In considering the sufficiency of the evidence supporting a guilty verdict, the Court views all the evidence in the light most favorable to the Government. *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002); *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998). "[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). The Court must analyze the pieces of evidence "not in isolation but in conjunction." *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994); *see also United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). Doing so entails applying the test for sufficiency of the evidence "to the totality of the government's case and not to each element, as each fact may gain color from others." *United States v. Guadagna*, 183

F.3d 122, 130 (2d Cir. 1999). The credibility of a testifying witness is particularly within the province of the jury. *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011). The Second Circuit has repeatedly held that "a federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (quotation marks omitted). "Any lack of corroboration of an accomplice's or co-conspirator's testimony goes merely to the weight of the evidence, not to its sufficiency, and a challenge to [t]he weight is a matter for argument to the jury, not a ground for reversal on appeal." *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) (quotation marks omitted).

A defendant's burden is even heavier in the case of a conspiracy conviction, where "deference to a jury's findings is especially important . . . because a conspiracy is by its very nature a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)). A defendant may be guilty of conspiracy "even if he knows only one other member of the conspiracy, and a single act may be sufficient for an inference of involvement in a criminal enterprise . . . if the act is of a nature justifying an inference of knowledge of the broader conspiracy." *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1112 (2d Cir. 1975)).

### B.  Rule 33 Motions

"Rule 33 motions are granted only in extraordinary circumstances." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (alterations and internal quotation marks omitted); *see also United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (noting that such motions are granted "sparingly and in only the most extraordinary circumstances"); *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) ("[M]otions for a new trial are disfavored in this Circuit."). In

13

order for such a motion to have merit, the district court must conclude, taking into account all of the facts and circumstances of the case, that there is "a real concern that an innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). "The test is whether it would be a manifest injustice to let the guilty verdict stand." *Id.*.

"[A] district court may not grant a Rule 33 motion based on the weight of evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be a 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020). Under this standard, the Second Circuit has "emphasized" that the remedy of a new trial should be granted "sparingly and in the most extraordinary circumstances." *Id*. A district court "must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless exceptional circumstances can be demonstrated." *Teman*, 465 F. Supp. 3d at 292. Exceptional circumstances are limited to situations where, "for example, the evidence was patently incredible or defied physical realities, where an evidentiary or instructional error compromised the reliability of the verdict, or where the government's case depends upon strained inferences drawn from uncorroborated testimony." *United States v. Landesman*, 187 F.4th 298, 331 (2d Cir. 2021) (citing *Archer*, 977 F.3d at 187).

## II.    The Evidence Amply Supported the Defendant's Convictions

### A.  The Evidence Proved that GWG Acquired Beneficient Securities

The defendant first seeks an acquittal on Count One and the securities-fraud object of Count Three arguing that the Government failed to offer proof that the limited partnerships interests in Beneficient that GWG acquired were "securities" under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). (Mot. 2-5). The Court previously rejected this argument, correctly finding that the evidence overwhelmingly established that GWG acquired Beneficient "securities," and in fact, that no reasonable juror could have concluded otherwise.

14

The Exchange Act defines "security" to include, among other things, "stock" and an "investment contract." 15 U.S.C. § 78c(a)(10). To determine whether limited partnership units are "investment contract[s]," courts apply the test of *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). In *Howey*, the Supreme Court held an investment contract to be "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." In *Mayer v. Oil Field Systems Corp.*, 721 F.2d 59 (2d Cir. 1983), the Second Circuit held that a limited partnership interest "generally is a security because such an interest involves investment in a common enterprise with profits to come solely from the efforts of others." (citations omitted). The Court in *Mayer* continued, "[w]here the investing limited partners exercised no managerial role in the partnership's affairs, courts have held that limited partnership interests are securities, at least when, as here, there were a considerable number of limited partners." *Id*.

Here, and as the Court recognized, the trial evidence, both documentary and otherwise, overwhelmingly established that GWG acquired "securities" when it obtained limited partnership interests in Beneficent. (Tr. 1958). Starting first with the documents: the Government admitted several of Beneficient's financial statements, which described Beneficient's various classes of equity. (*E.g.*, GX 502 at 31-32). The Government also admitted GX 3602, which was the December 2019 investment agreement for GWG. That document provided that, in exchange for a $79 million investment in Beneficient, GWG obtained "(1) the issuance of a Preferred Series A unit account and common units to the investor in accordance with the terms of this agreement [] [a]nd (2) the effectiveness of a third amended and restated limited liability company agreement of Beneficient Management granting to the investor, GWG, the right to appoint a majority of the board of directors of Beneficient Management." (GX 3602). The Court correctly found that GX 3602

15

reflected "two agreements [] or two parts of an agreement; one was to purchase securities and the second was to have the right to obtain control." (Tr. 1940). In other words, the limited partnership interests did not afford GWG control of Beneficient, thus making them "securities" under *Mayer*.

GX 120, the GWG Special Committee Resolution approving the December 2019 transaction, is in accord. As the Court observed, the Resolution notes that the "Special Committee *also* believes it is desirable and in the best interests of the [GWG] and its stockholders to negotiate for, and obtain, control of the board of directors of the general partner of [Beneficient]. . . ." (emphasis added). As the Court recognized, the inclusion of the word "also" demonstrates that "control" was something GWG separately negotiated for and was not inherent in the purchase of the underlying limited partnership interests. (Tr. 1935:11-12 (THE COURT: "I think the key word in the paragraph you just read was 'also.'")). The Government also offered the capitalization table into evidence, GX 3110, which established that, with each investment, GWG gained additional equity in Beneficient, but remained one of several limited partners. (GX 3110).

Turning next to the witnesses: the witness testimony also established that GWG acquired Beneficient securities. Peter Williams, Evan Stone, and Ed Sopher each testified that the limited partnership interests that GWG obtained were no different than equity. (Tr. 275 (Williams); Tr. 747 (Stone); Tr. 1424 (Sopher)). Stone further testified that, with respect to this equity, "somebody else [is] making efforts to generate a return." (Tr. 749:13-14). Stone continued that the "management team of Beneficient" was responsible for generating the returns that would allow the equity holders to realize profits or losses, and that the defendant was "leading the management team." (Tr. 749:18-21). When pressed by the defense as to whether GWG had "control" over Beneficient, Stone disagreed, explaining that GWG may have had "accounting control" over Beneficient, but only had "limited partnership interests" through its investments. (Tr. 856:13).

16

The defense rehashes the same arguments that the Court previously rejected in seeking an acquittal. (Mot. 4). The defense argues that the Court erred by separating GWG's purchase of limited partnership interests from its right to appoint the majority of the board of directors, asserting that the Court should have examined the "transaction as a whole." (Mot. 6). But none of the cases cited suggest the limited partnership interests were not securities, let alone that no reasonable juror could have found they were. In *Steinhardt Grp. Inc. v. Citicorp*, 126 F.3d 144, 155 (3d Cir. 1997), the Third Circuit observed that Steinhardt, while a limited partner, held "98.79%" of the interests and further that the Limited Partnership Agreement afforded him "significant control" over the investment vehicle. The limited partnership interests here did nothing of the sort. Likewise, in *Frazier v. Manson*, 651 F.2d 1078, 1081 (5th Cir. 1981), the Fifth Circuit noted that Frazier was a "general partner with managerial duties" before he obtained his limited partnership interests. *See also Bamco 18 v. Reeves*, 675 F. Supp. 826, 830 (S.D.N.Y. 1987) (finding that "Bamco invested as, in effect, the only limited partner in a one project endeavor"). Here, GWG may have obtained some control, but that was in a separate bargain struck at the same time.

### B.  The Evidence Proved the Defendant Made Material Misrepresentations

The defense next seeks an acquittal on Count Two and the wire-fraud object of Count Three, arguing that the trial evidence failed to establish that the defendant made material misrepresentations to any of its victims—Oaktree Capital, Infinedi Partners, or GWG. That claim is belied by the record.

Most implausibly, the defendant argues that there is insufficient evidence the defendant made material misrepresentations to GWG and, in particular, to Dave Chavenson. All but acknowledging that the elements of conspiracy and wire fraud could be made out from Chavenson's testimony alone, the defense insists that his testimony was not credible. But the jury credited Chavenson, who was corroborated by other evidence, (GX 1258), and on a Rule 29, the

17

reviewing court must "draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). The testimony of Chavenson alone is a sufficient basis to deny the defendant's motion.

With respect to Infinedi and Oaktree, the defendant made additional misrepresentations that evidence a scheme to defraud. Regarding Infinedi, the defendant asked his employee to orchestrate a meeting in which the defendant, in response to a question about who would benefit from the proposed transaction, "swore none of the capital invested would go to him or his family or for the benefit of him or his family," and instead would go the "Harmon Trust." (Tr. 291:10-25). Later, the defendant helped draft the Infinedi Letter that misleadingly indicated that HCLP was owned 89.1% by the "Harmon Trust," (GX 1390), even though that trust was—unbeknownst to Infinedi—merely, "a trust for Brad," (GX 205 at 7). To both Infinedi and Oaktree, the defendant caused Williams to send a misleading email describing how HCLP Nominees is owned by the "Harmon Trust" and how it "advanced $141m to the Company under a credit agreement," (GX 1127 (Infinedi); GX 1130 (Oaktree)), when in reality the Harmons had nothing to do with the trust and the credit agreement was conceived after the defendant already spent the money. While neither Infinedi nor Oaktree ultimately invested, the emails, meeting, and letter demonstrate Heppner's scheme to defraud, the use of wires in furtherance of the scheme, and Heppner's intent.

The defendant's arguments to the contrary—that neither firm invested nor testified at trial—are but a rehashing of arguments the jury rejected. (*See* Tr. 2072:21-2073:9). Even discounting witness testimony, the jury could reasonably infer that the defendant's misrepresentations regarding HCLP mattered. The defendant also argues that his lies to Infinedi could not be part of the wire fraud because he lied in person. But that argument ignores the subsequent letter sent by email to Infinedi (not to mention all the other wires in furtherance of the

scheme) and the fact that "the wire communication itself [need not] have been false; even innocent transmissions, *i.e.,* ones that contain no false information—may supply the transmission element." *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006) (cleaned up). The defendant finally argues that the Infinedi Letter was truthful because (i) it disclosed that the defendant owned one percent of HCLP and was the general manager of HCLP; and (ii) Tim Harmon was, in fact, the trustee of the "Harmon Trust." (Mot. 8). But this too was raised by the defense at trial to no avail and ignores the testimony from Hinkle that the letter contained "false statements." (Tr. 491:24-25).

### C. The Evidence Established the Defendant Made False Statements to Auditors

Heppner next moves for an acquittal on Count Four, which charges him with making false statements to auditors. (Mot. 11-19). Heppner asserts that no rational juror could have concluded that (a) Beneficient is an issuer within the meaning of the regulation; (b) the offense falls within the statute of limitations; (c) Beneficient's financial statements were required to be filed with the SEC, and (d) venue is proper in the District. On each argument, the defendant is wrong.

#### 1. *Beneficient Is An Issuer*

As the Court properly ruled pretrial, Rule 13b2-2 uses the Exchange Act's definition of "issuer." *United States v. Heppner*, No. 25 Cr. 503 (JSR), 2026 WL 923078, at *7-8 (Apr. 6, 2026). The Court's prior ruling was correct, and the Government incorporates its pretrial arguments here. (Dkt. 29 at 24-26). As the defendant himself conceded pretrial, Beneficient satisfies the Exchange Act's definition, and the jury was presented with more than sufficient evidence to conclude Beneficient is an issuer. (Mar. 19, 2026 Tr. 41 ("MR. ZINK: "Under [the Exchange Act] definition, [Beneficient] is an issuer."); Trial Tr. 275, 747-49, 1424; GX 502, GX 504).

#### 2. *The Prosecution of Count Four Is Timely*

Similarly, as the Court properly ruled pretrial, criminal violations of Rule 13b2-2, as prosecuted under 15 U.S.C. § 78ff(a), are subject to the six-year statute of limitations of 18 U.S.C.

19

§ 3282. *Heppner*, 2026 WL 923078, at *4-6. Again, the Court's prior ruling was correct, and the Government incorporates its pretrial arguments here. (Dkt. 29 at 26-29).

### 3.  *Beneficient's Financials Were Required to Be Filed With the SEC*

The defendant also argues that Beneficient's financials were not required to be filed with the SEC, as is required under Rule 13b2-2. Not so. The jury was presented with ample evidence to conclude that Beneficient's financials were required to be filed as part of GWG's Rule 10-K filing. Laura Ivory, who served as Beneficient's auditor, testified that "GWG had concluded that Beneficient was a significant equity method investment for them, and so, as a result, [GWG] had to attach Beneficient's financial statements as an exhibit to their 10-K." (Tr. 1443:7-8). Ivory also testified that "under the specific SEC rules where you have an investment in a company and if it exceeds certain significant thresholds, you are required to attach the financials." (Tr. 1445). By the close of 2018, GWG owned approximately 89.9 percent of Beneficient. (GX 503 at 127). GWG's own 10-K filing stated that it was required to file Beneficient's financials. (*Id*. ("As a result of the significance of our investment in Beneficient, we have attached the audited consolidated financial statements . . . .")). This evidence is more than sufficient to support the jury's verdict.

The defendant argues that two federal regulations requiring that Beneficient's financial statements be filed with the SEC do not apply. First, the defendant attacks the applicability of 17 C.F.R. § 210.3-09, which requires separate financial statements be filed with the SEC for certain non-consolidated subsidiaries and sizable equity investments. That provision requires a registrant to file separate financial statements of an entity that is a "majority-owned subsidiary not consolidated by the registrant or by a subsidiary of the registrant" and a "50 percent or less owned person accounted for by the equity method either by the registrant or a subsidiary of the registrant" as long as, in relation to the given entity, the registrant owns at least 20 percent of the "aggregate

market value of the registrant's voting and non-voting common equity." *See* 17 C.F.R. §§ 210.3-09(a), 210.1-02(w). "Majority-owned subsidiary" is defined as a "subsidiary more than 50 percent of whose outstanding voting shares is owned by" a registrant. 17 C.F.R. § 210.1-02(n).

According to Heppner, because Beneficient's limited partnership agreement purported to forfeit the voting rights of any common unit holder holding in excess of 20 percent of common units, Beneficient did not qualify as a majority-owned subsidiary of GWG. And, because GWG owned such a huge portion of Beneficient's common equity (89.9 percent), Beneficient was not a 50 percent or less owned person. The defendant asserts that this quirk in status places GWG's investment in Beneficient outside of Section 210.3-09's reach.

In promulgating Rule 210.3-09, however, the SEC made clear that the filing requirement should extend to any entity in which a registrant owned in excess of 20 percent of the common stock. As the SEC rulemaking notes:

> These rules are based on the Commission's view that summarized financial information may be adequate for disclosure purposes up to the point where the financial impact of a subsidiary or person becomes so significant that more detailed disclosure becomes necessary to an evaluation of the overall financial condition of a reporting entity. While recognizing that quantifying that level of significance may be an arbitrary determination, the Commission concluded that the proposed 20 percent level is a reasonable standard for determining when the more detailed disclosures provided by complete financial statements are necessary in filings with the Commission.

SEC Release No. AS-302, Separate Financial Statements Required by Regulation S-X (Nov. 6, 1981), 1981 WL 29913, at *8. The rule was designed to ensure that separate financial statements be filed for any entity in which a registrant owned in excess of 20 percent of common shares, without splitting hairs as to whether it was a "majority-owned subsidiary" or a less than 50 percent

21

person. The rule encompass all possible situations where a company's ownership interest in another entity or person satisfies the 20 percent test.

As GWG properly concluded and as is consistent with the jury's verdict, Rule 210.3-09 required GWG to file Beneficient's financials.  Beneficient's limited partnership agreement does not alter the conclusion that Beneficient's common units are "voting shares" within the definition of a "majority-owned subsidiary." If they were transferred in smaller tranches to another holder, they would suffer no forfeiture. And, even if the limited partnership agreement interferes with the definition of "majority-owned subsidiary," a "50 percent or less owned person" must be read in context to extend to 50 percent or less of voting shares. Otherwise, it would be an absurd result and the purpose of Rule 210.3-09 would be obstructed. Where, as is the case here, a registrant owns in excess of 20 percent of an entity's voting and non-voting common units, it must file audited financial statements with the SEC.

Heppner also attacks a second basis for filing Beneficient's financial statements with the SEC—17 C.F.R. § 240.12b-20, which requires that a 10-K filing include "such further information . . . as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading." There was substantial evidence that GWG's position in Beneficient was material to its financials. As reported in GWG's 10-K, GWG had $584.17 million exposure to loss from Beneficient. (GX 503 at 125-26). This constituted more than a third of GWG's assets. (*Id*. at 94). GWG's own financial statements acknowledged it was filing Beneficient's financials due to the significance of its investment. (*Id*. at 127). And the evidence at trial established the materiality and importance of GWG's investment in Beneficient. (*See, e.g.*, Tr. 791; GX 503, 505). The filing of Beneficient's financials was also required under this section.

22

### 4. *Venue for Count Four Is Proper*

Contrary to the defendant's arguments, substantial evidence supported the jury's conclusion—by a preponderance of the evidence—that venue for Count Four is proper in this District. The defendant advances an artificially cabined view of the conduct at issue, construing it as a single set of falsified documents on a single date. But Count Four charges, and the trial evidence showed, the defendant's making of numerous materially false statements and omissions to Deloitte in connection with, and throughout the course of, Deloitte's preparation of Beneficient's financials in 2019. These statements were made to and received and used by numerous Deloitte employees in several jurisdictions, including audit partner Frank Fumai, who was based in Deloitte's Manhattan office and lived in New York.

A Title 15 prosecution "may be brought in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. As relevant here, Rule 13b2-2 prohibits the "direct[] or indirect[] mak[ing] or caus[ing] to be made a materially false or misleading statement . . .; or omit[ing] to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made not misleading to an accountant in connection with . . . the preparation or filing of any document or report . . . ." 17 C.F.R. § 240.13b2-2(a). Because the statute reaches the making of a statement to an accountant, venue is proper in any district where a false statement or omission was made, caused to be made, or received by an accountant in connection with the audit. This reading is confirmed by the Second Circuit's construction of Section 78aa in the analogous securities fraud context. In *United States v. Lange*, 834 F.3d 58 (2d Cir. 2016), the Circuit held that venue for securities fraud under § 78aa is proper both in the district where a fraudulent communication originates and the district where it is received. *Id.* at 72. The Court there sustained venue in the

23

Eastern District of New York based on nothing more than cold calls and emails reaching a handful of residents there, notwithstanding that the defendants operated almost entirely outside of the state. *Id.* That is because Section 78aa's text is not confined to where a statement is *made*; it reaches "any act or transaction constituting the violation." Fumai's receipt of Heppner's misrepresentations in New York is accordingly sufficient to establish venue here.

There is a substantial basis in the record to support the jury's venue conclusion. As to the conduct, Heppner made and caused to be made a wide variety of false statements and omissions to its Deloitte auditors. These include (a) misrepresentations concerning control of HCLP and Martens's service as HCLP's manager and control person (e.g., Tr. 1441-42, 1449-67, 1473-76; GX 3104, 3111, 1363); (b) misrepresentations concerning Holland's role as trustee of the various Beneficient trusts (*e.g.*, Tr. 1441-42, 1449-67; GX 1363, 3106); (c) misrepresentations and omissions concerning the true nature and relationships of those trusts in order to induce Deloitte to adopt Beneficient's preferred consolidation conclusion (*e.g.*, Tr. 1441-42, 1449-67; GX 1363, 1396, 3111); and (d) misrepresentations in Beneficient's management representation letter in order to induce Deloitte to issue a required opinion on the financial statements (*e.g.*, Tr. 1471-73; GX 3107). And substantial components of this conduct occurred within this District. This includes evidence that the Deloitte audit partner, Fumai, was based in Deloitte's Manhattan office (Tr. 1446-47); Fumai was present in New York during numerous occasions during the course of the audit, including, among other times on June 14, 2019 when the Beneficient management representation letter was signed and submitted (GX 3404, 3107); Deloitte worked with Beneficient to analyze the contested consolidation question over the course of many months, including its consideration of and questions concerning the false representations and omissions the defendant made and caused to be made (Tr. 1449-67); and the defendant was himself present in Manhattan

24

when he corresponded with Fumai in April 2019 concerning the structure of funding trusts central to the disputed consolidation question and the misrepresentations concerning Holland (GX 1396).

Contrary to the defendant's arguments, *Abouammo v. United States*, 146 S. Ct. 1571 (2026), does not disturb this analysis, and if anything confirms it. *Abouammo* addressed venue for 18 U.S.C. § 1519, a statute that criminalizes a discrete act—falsifying a document—and for which Congress enacted no special venue rule, thus triggering the default *Rodriguez-Moreno* inquiry into where that act was completed. The government there argued that venue also lay wherever the falsification's intended effects were felt, that is, where the obstructed investigation was based, even though nothing about receipt or transmission of the document is an element of § 1519. The Supreme Court rejected that theory precisely because the offense was complete the moment the defendant finished falsifying the document in Seattle; what happened to the document afterward, including its receipt by agents in San Francisco, was not "essential conduct" within the statute. Two things distinguish that holding from this case. First, Rule 13b2-2, unlike § 1519, criminalizes making or causing to be made a false statement to an accountant; the offense is defined by reference to a communication to another person, not a unilateral act of falsification. Second, and independently, § 1519 has no special venue provision, which is why *Rodriguez-Moreno*'s default test applied at all. Title 15 offenses do, and *Abouammo* had no occasion to address, and did not address, § 78aa or any comparable statutory venue provision. Its holding is confined to statutes silent on venue; it does not narrow venue where, as here, Congress has spoken.

## III.    The Defendant Is Not Entitled to a New Trial

### A.  The Court's Jury Instructions Do Not Entitle the Defendant to a New Trial

#### 1.  *There Was No Instructional Error Concerning Securities*

The defendant argues that the Court erred in instructing the jury that GWG's investments in Beneficient's Preferred Series A Subclass 1 Units and Common Units were securities

25

transactions as a matter of law. As described above, Beneficient's units comfortably fit within the Exchange Act's definition of "security," and the Court's instructions that the units are securities were not error and certainly do not constitute a manifest injustice warranting a new trial.

The Court's instructions left for the jury the determination of whether there was fraud in connection with the purchase or sale of a security, but correctly informed the jury that Beneficient units as "investment contracts" and/or "stock" were, as a matter of law, a "security." Despite the cases the defense cites in other statutory contexts, the Second Circuit has never held that the jury must conclude as a factual matter that units are securities. *See United States v. Leonard*, 529 F.3d 83, 87 n.4 (2d Cir. 2008).[3] To the contrary, there is ample authority in this Circuit and others that whether an instrument is a security is a question of law. *See, e.g.*, *McNabb v. SEC*, 298 F.3d 1126, 1130 (9th Cir. 2002) ("Whether a note is a security under the 1934 act is a question of law."); *Stoiber v. SEC*, 161 F.3d 745, 749 (D.C. Cir. 1998) ("Whether a note is a security is a question of law.") *United States v. Thomas*, 54 F.3d 73, 78 (2d Cir. 1995) (where an instrument is included in the relevant definition of security "is not a jury question" and can be determined as a "matter of law"); *Schaafsma v. Morin Vt. Corp.*, 802 F.2d 629, 637 (2d Cir. 1986) ("It was error to submit to the jury the question of whether the federal securities laws should apply. The Instruments here were 'securities' . . . as a matter of law."). The Supreme Court has repeatedly held that a particular instrument is or is not a security without suggesting the matter is a question of fact. *See, e.g.*, *SEC v. Edwards*, 540 U.S. 389, 394-97 (2004); *Reeves v. Ernst & Young*, 494 U.S. 56, 64-70 (1990).

---

[3] The cases the defendant cites deal with prosecutions under a distinct statute, 18 U.S.C. § 2314, where finding a security is an element itself, *see United States v. Rogers*, 9 F.3d 1025, 1033 (2d Cir. 1993); *United States v. Johnson*, 718 F.2d 1317, 1321 (5th Cir. 1983); or are otherwise not binding on this Court, *see United States v. McKye*, 734 F.3d 1104, 1107-10 (10th Cir. 2013).

The Court was correct to inform the jury, based on the undisputed nature of the instruments in question, that they were securities as a matter of law.

Even if the Court's instruction was error, and it was not, there was no injustice requiring a new trial. Although the defendant cites *United States v. Rogers* for the proposition that an instruction that a particular instrument is a "security" constitutes structural error (Mot. 20), the Supreme Court has abrogated this holding. In *Neder v. United States*, decided approximately six years after *Rogers*, the Supreme Court made clear, distinguishing the authority on which *Rogers* relies, that only a "very limited class of cases" involve structural error and the omission of an entire element from the jury instructions is subject to harmless error review. 527 U.S. 1, 10 (1999). To the extent the Court's instruction was error, it would be subject to harmless error review. As described above (*see supra* § II.A), there was overwhelming evidence the Beneficient units were securities and any error was harmless.

### 2.    *No Specific Unanimity Instructions Were Required for Counts One and Two*

Nor did the Court commit error warranting a new trial in declining to give specific unanimity instructions for Counts One and Two. Both Counts charged the defendant with a scheme to commit fraud. The Court's instructions were correct and adequately advised the jury that its verdict must be unanimous and the Government must prove each element of every offense beyond a reasonable doubt. (Tr. 2134-35, 2140, 2153).

The defendant's contrary arguments are unavailing. The law is clear that "a federal jury need not always decide unanimously which of several possible sets of brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999); *see also Kozeny*, 667 F.3d at 131-32. There is no "duplicity" issue, or need to charge or instruct concerning specific

27

transactions, when the Government has "charged a single scheme and which the government argued as such." *United States v. Walker*, 254 F. App'x 60, 62 (2d Cir. 2007). Nor must the jury unanimously agree as to which means of fraud a defendant committed in determining, unanimously, that the charged scheme to defraud existed. *See United States v. Daniel*, 749 F.3d 608, 613 (7th Cir. 2014) (holding that a single false statement or misrepresentation is a means of executing a scheme to defraud and is not an element); *United States v. LaPlante*, 714 F.3d 641, 647 (1st Cir. 2013) (same); *United States v. Rice*, 699 F.3d 1043, 1048 (8th Cir. 2012) (same); *United States v. Lyons*, 472 F.3d 1055, 1068 (9th Cir. 2007), *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (same); *United States v. Yeaman*, 194 F.3d 442, 455 (3d Cir. 1999) (alternative means of committing securities fraud do not require separate jury finding); *United States v. Gentile*, No. 21 Cr. 54 (RPK), 2025 WL 777090, at *32-33 (E.D.N.Y. Mar. 11, 2025) (same). And the jury need not be unanimous as to the specific wire that was used to further or carry out the scheme. *See United States v. Dupre*, 462 F.3d 131, 143 (2d Cir. 2006).

### 3.   *There Was No Instructional Error Concerning Count Four*

Heppner asserts instructional error as to Count Four, arguing that the Court erred by (a) not instructing the jury that it must find Heppner was an officer or director an issuer, and (b) instructing the jury that GWG was required to file Beneficient's financial statements. As to the legal requirements, the defendant is wrong on the law. (*See supra* § II.C). He is also wrong on the facts. The jury was asked to, and did, find that, "Mr. Heppner was an officer and/or a director of Beneficient." (Tr. 2149). The jury was also asked to find that the false statements "would be included in audited financial statements that GWG was required to file by law with the SEC." (Tr. 2149). That the Court instructed the jury as to one aspect of these filing requirements—

28

language to which the defense did not object—did not disturb the jury's ability to make a factual finding that the element was satisfied.

### 4.  *There Was No Instructional Error Concerning Venue*

The defendant argues that the Court's venue instruction was erroneous generally and also specifically as to Count Four. The Court's venue instructions were an accurate statement of the law and not error. *See, e.g.*, *United States v. Royer*, 549 F.3d 886, 894 (2d Cir. 2008). As to Counts One through Three, the instruction was also broadly consistent with that requested by the defense. (*Compare* Tr. 1259 ("Venue is proven if any act in furtherance of the count you are considering occurred in any of these counties, regardless of whether it was the act of the defendant or anyone else"), *with* Dkt. 50 at 50 ("you must find it more likely than not that Mr. Heppner intentionally or knowingly caused an act in furtherance of these alleged offenses to take place in the Southern District of New York"); *see also* Tr. 1914 (defense counsel affirming that test for venue for securities and wire fraud are location where any act in furtherance of scheme occurred)). And, as described above, the Court's venue instruction as to Count Four was accurate and consistent with Title 15's venue provision, *see* 15 U.S.C. § 78aa.

### B.  The Court Properly Ruled that the AI Documents Were Not Privileged

The defendant argues that the Court's pretrial ruling that the AI Documents were not privileged entitles him to a new trial. He argues, first, that the Court erred in finding that the documents were not privileged, and second, that the Government's access to these materials violated his Sixth Amendment right to counsel. (Mot. 24-25). He is wrong at each turn.

*First*, the Court correctly held that the AI Documents were not privileged. As the Court explained in its written opinion, it was undisputed that the AI Documents "were prepared by the defendant on his own volition." (Dkt. 27 at 12). The Court went on, "[b]ecause the AI Documents were not prepared at the behest of counsel, and did not disclose counsel's strategy, they do not

29

merit protection as work product." (Dkt. 27 at 12).[4] This ruling was correct, and nothing in the defendant's Rule 33 motion presents any basis for the Court to reconsider its prior analysis.

In response, the defense again relies on Rule 16(b)(2) of the Federal Rules of Criminal Procedure to argue that these materials are privileged. But, as the Court already found, "Rule 16(b)(2)(A) is inapplicable on its face" because it involves a defendant's obligation to produce materials in discovery, not the Government's ability to access materials seized pursuant to a search warrant. (Dkt. 27 at 10). For this reason, the defendant's citation to *Warner v. Gilbarco, Inc.*, 820 F. Supp. 3d 629 (E.D. Mich. 2026), a civil decision issued the same day as the Court's opinion, is also misplaced. (Mot. 27). In *Warner*, the court held that, under Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure, the plaintiff was not required to turn over to the defense materials prepared using an AI tool. But again, what may, or may not, be part of a party's discovery obligations does not control whether materials lawfully seized by the Government that were prepared by a defendant, and not counsel, are protected by the work product doctrine. Moreover, as the Court recognized, to extend work product protections to the AI Documents would run afoul of the "policy animating the work product doctrine, which [] is to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation." (Dkt. 27 at 11 (citing *Paneros v. Barnes & Noble Inc.*, 332 F.R.D. 482, 492 (S.D.N.Y. 2019))).

The defendant also challenges the Court's finding that the defendant's use of Claude would constitute a waiver even assuming some privilege attached to the AI Documents. (Mot. 26). The Court need not reach this question, because there is no work product protection in the first place. In any event, the Court correctly found that by sharing information with Claude, an AI tool created

---

[4] The Court also held the AI Documents were not protected by the attorney-client privilege. (Dkt. 27 at 4-8). The defense has not re-raised this argument in its Rule 33 motion.

by a third-party, and in light of Claude's privacy policy, the defendant "had no reasonable expectation that the inputs would not be shared with other third parties." (Dkt. 27 at 8). *See In re von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987) (holding it is "the client's responsibility to ensure that privileged information remains confidential"); *United States v. Finazzo*, 682 F. App'x 6, 16 (2d Cir. 2017); *In re OpenAI, Inc., Copyright Infringement Litig.*, No. 25-md-3143 (SHS) (S.D.N.Y. Jan. 5, 2026) (Dkt. 1021 at 3).

*Second*, the Government's access to the AI Documents did not infringe on the defendant's Sixth Amendment rights. Because the materials were not privileged, there is no violation. But even if the materials were privileged, the defense has not made out a Sixth Amendment violation.

To establish a Sixth Amendment violation based on Government interference with the attorney-client relationship, a defendant must demonstrate "'that privileged information [was] passed to the government or that the government . . . intentionally invaded the attorney client relationship, and resulting prejudice.'" *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985); *United States v. Dien*, 609 F.2d 1038, 1043 (2d Cir. 1979); s*ee United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991). Absent a Government intrusion into the attorney-client relationship that is "manifestly and avowedly corrupt," "a defendant must ordinarily demonstrate prejudice stemming from the Government's conduct." *United States v. Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871, at *6 (S.D.N.Y. Jan. 21, 2016); *see Schwimmer*, 924 F.2d at 447 (same).

Here, the defendant cannot make either showing. Nothing in the record reflects "manifestly and avowedly corrupt" behavior. Rather, before viewing the AI Documents, the Government sought a ruling from the Court to authorize its access. Nor can the defendant show prejudice. The defense offers little more than conclusory claims that the AI Documents "addressed the very issues at the heart of the defense's case-in-chief," and that the "government's trial strategy" "tracked" the

documents. (Mot. 28). That the defendant asked Claude about some of the most obvious issues of the case, including whether the $141 million HCLP loan was legitimate and the disclosure of the defendant's relationship with HCLP, in no way establishes that the defense was prejudiced from disclosure of these materials to the Government. Nor can the defense credibly argue that the Government's access to the AI Documents "affected his decision of whether to testify." (Mot. 28). There were many other reasons the defendant chose not to testify, including that, had he testified, he would have been subject to cross-examination on other bad acts, including that he enlisted Hinkle to steal confidential information from Lehman Brothers. (*See* Tr. 712-13).

### C. The Court Properly Excluded Defense Exhibits

The defendant next argues that the Court's refusal to admit certain defense exhibits warrants a new trial. "[T]o the extent that the defendant objects now to evidentiary rulings made by the Court prior to and during trial . . . , those arguments are improper on a Rule 33 motion absent 'manifest injustice.'" *United States v. Aiyer*, 470 F. Supp. 3d 383, 410 (S.D.N.Y. 2020), *aff'd,* 33 F.4th 97 (2d Cir. 2022).

None of the Court's rulings constituted an injustice, let alone manifest injustice. The defendant first asserts that the Court should have admitted "sixteen exhibits that were authentic, relevant, and admissible as non-hearsay," (Mot. 29), without engaging in any individualized analysis of those exhibits. Instead, the defendant cites only to his original letter seeking to admit the exhibits, and makes general statements about their collective admissibility. (*Id*.). The Government, however, fully responded to the defendant's letter, (Dkt. 61), and the Court considered and ultimately rejected the defense's arguments at the time (Tr. 1744). Just as before, the defendant's assertion that the exhibits were "offered not for the truth of any assertion, but for the effect on the listener," (Mot. 29-30), ignores that the documents were either not sent to

witnesses who testified or the witness did not recall receiving the exhibits. In that circumstance, there is hardly any probative value when not offered for the truth of the matters asserted.

The defendant also argues that the Court should have admitted "Hinkle Y" and "Schwed A." Hinkle Y is an email from Hinkle to Heppner attaching a trust document signed by Hinkle, marked as GX 207, and a trust document signed by Harmon, marked as GX 206. While GX 207 was admitted by the Government, the defendant unsuccessfully attempted to offer GX 206 on multiple occasions. According to the defendant, Hinkle Y "should have been admitted (i) to show what Mr. Heppner believed about who the independent trustee of the Harmon Trust was at the time, and (ii) as proof that Tim Harmon was the independent trustee of the Harmon Trust." (Mot. 30). Neither is true. First, such an argument about the defendant's scienter would have been at most of miniscule probative value and at worst completely inadmissible absent Heppner's testimony, which he elected not to provide. Moreover, through GX 207 and the testimony of Hinkle, the facts underlying such an argument were already before the jury. In particular, Hinkle testified that he resigned from the "Harmon Trust," and that "Mr. Heppner appointed Mr. Harmon as the independent trustee." (Tr. 577-78; *see* GX 206). Hinkle Y was thus redundant. Second, the argument that Hinkle Y supported that Harmon was the independent trustee required the admission of Hinkle Y for its truth, but the defendant did not and cannot offer a hearsay exception.

Similarly, Schwed A is an email with a lengthy tax opinion equally inadmissible because the defendant could not offer the tax opinion for its truth, and Schwed did not recall reviewing it. In that circumstance, it is unclear—and the defense does not explain—how the document would have contradicted Schwed's testimony about his understanding of the "senior lender" at the time.

### D.  The Court Properly Ruled Concerning Bias Evidence

Heppner also argues that the Court erred in denying his motion to impeach Beneficient and GWG director Sheldon Stein with extraneous inadmissible hearsay. The Court ruled correctly.

33

In an attempt to show Stein's purported bias, the defendant proposed to call fellow director Bruce Schnitzer to testify about Stein's out-of-court statements. The Court precluded this testimony, not because the proffered "bias" evidence was "irrelevant" or "collateral," (Mot. 32), but under Rule 403. As the Court explained in precluding Schnitzer's testimony, "The defense agreed that it would not be admissible as for its truth in light of various evidentiary rules relating to hearsay." (Tr. 1397:14-17). Instead, the defense argued, "even if Mr. Stein didn't mean it, the very fact that he would even say it indicated a bias towards Mr. Heppner." (Tr. 1397:19-21). But, on this record, the Court was right to conclude that whatever scant relevance the purported bias evidence might have would be far outweighed by the confusion the jury would suffer, even if properly instructed. Indeed, in his brief, the defendant confusingly does not even acknowledge the limited nature of the evidence being offered: not for its truth of what Stein supposedly said but just the fact that he said it. In any event, the failure to admit this testimony was no "manifest injustice" requiring a new trial. *Aiyer*, 470 F. Supp. 3d at 410.[5]

### E. The Government's Summary Chart Was Appropriately Admitted

The defense next argues that admission of GX 982, a summary chart compiling hundreds of pages of emails, messages, toll records, and other materials in chronological order entitles him to a new trial. The Court properly admitted GX 982.

As the Court explained, the Second Circuit has taken a "generous inclusive approach" to Rule 1006. (Tr. 1320). Summary charts, including chronological summaries of communications,

---

[5] While the defendant's motion focuses on arguments and precedent regarding bias, it also references the defendant's "ability to impeach" Stein. But as the Court—and during trial, the defense—recognized, bias and impeachment by contradiction are different, and, at the time, the defendant disclaimed any intent to impeach Stein with a prior inconsistent statement. (Tr. 1400:2:6 (THE COURT: "[M]y memory is that you expressly agreed that the statement was not admissible for impeachment of Mr. Stein.")). If, however, the defense is now arguing that it offered Schnitzer's testimony to impeach Stein, that testimony would be precluded by Rule 613. (*See* Dkt. 62 at 1-4).

are regularly admitted. *See, e.g.*, *United States v. Ho*, 984 F.3d 191, 209-10 (2d Cir. 2020) (hundreds of pages of texts, emails, and other documents "merited the use of summary charts in a complex fraud trial"); *United States v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020) (affirming admission of summary chart of "hundreds of calls and text messages" and noting "this information would have been difficult for the jury to synthesize and evaluate without the aid of a summary").

To be admissible, summary charts need not include all evidence the opposing party may wish. *See, e.g.*, *United States v. Menendez*, 759 F. Supp. 3d 460, 521 (S.D.N.Y. 2024) ("The fact that the government omitted documents and communications that the defense preferred be added to the chart does not mean that the summary is inaccurate or argumentative."); *United States v. Gentile*, No. 21 Cr. 54 (RPK) (PK), 2024 WL 3046193, at *3 (E.D.N.Y. June 18, 2024) (rejecting argument that slides improperly "cherry-pick" certain transactions, holding "these are the sort of summary slides that Rule 1006 permits"). "A summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case." *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 333 (E.D.N.Y. 2013) (internal quotation marks and brackets omitted); *see also, e.g.*, *United States v. Parnas*, No. 19 Cr. 725 (JPO), 2022 WL 669869 (S.D.N.Y. Mar. 7, 2022) (rejecting argument that charts "took evidence out of context," and holding it was "well within the government's right" to present evidence to support its narrative).

Here, after reviewing Rule 1006 and Circuit precedent,[6] the Court correctly admitted GX 982. FBI Special Agent Jordan Avery provided clear foundational testimony. GX 982 was in a

---

[6] In its motion, the defense latches on to an early remark from the Court prior to its review of Circuit precedent. (Mot. 33 (citing Tr. 1198)). But, as the Court later explained, "I think it is reasonably clear from the cases that I have now had a chance to review, that the Second Circuit has taken a generous inclusive approach to what can be presented." (Tr. 1321). The Court went on, "[H]aving expressed many misgivings, let me say in support of the inclusive view that the Second

format that courts routinely admit. *See Ho*, 984 F.3d at 209-10 (visual timelines); *Menendez*, 759 F. Supp. 3d at 521 (same). And the defendant had a full opportunity to cross-examine Agent Avery, which further undercuts any motion for a new trial. *See Archer*, 977 F.3d at 198 n.4 (reversing grant of new trial where "threat of prejudice was mitigated by the cross-examination").

The defense registers three objections to the chart, none of which is persuasive. *First*, he argues the underlying records in GX 982 were not sufficiently "voluminous." (Mot. 33). But GX 982 compiled hundreds, if not thousands, of pages of records, including toll records and bank statements. (*See* GX 982, 4002, 944, 945; *see also* Tr. 1574:10-12 (Avery testifying he reviewed "approximately 400 to 500 pages")). The Second Circuit has held that "it was clearly not an abuse of discretion for the district court to conclude that hundreds of pages of evidence merited the use of summary charts in a complex fraud trial." *Ho*, 984 F.3d at 210 (2d Cir. 2020); *see also Miller*, 954 F.3d 551, 565 (2d Cir. 2020) (approving charts for "hundreds of calls and text messages.

*Second*, the defendant argues that GX 982 resulted in improper inferences because the Government "selected specific exhibits from the universe of evidence, excerpted only the portions favorable to its theory, and arranged them" in a "sequence implying narrative the Government should have properly presented in summation." (Mot. 33). But it was "well within the government's right" to select and present evidence that would support its narrative. *See Parnas*, 2022 WL 669869, at *7. The Court also "closely monitor[ed] the testimony" of Agent Avery to ensure that he did "not draw inferences or do[] anything that might be only properly left for

---

Circuit has taken … is that when you have a complex case with many documents or many phone calls or many nuances, it is helpful to the jury to place them in chronological order…." (Tr. 1322). The defense also cites to *Highland Cap. Mgmt. L.P. v. Schneider*, 551 F. Supp. 2d 173, 190 (S.D.N.Y. 2008), but not only did that case involve a chart that was unlike GX 982, the decision predated the most recent amendments to Rule 1006. *See* Fed. R. Evid. 1006, Adv. Comm. Notes ("Summaries that are otherwise admissible under Rule 1006 are not rendered inadmissible because the underlying documents have been admitted, in whole or in part, into evidence.").

summation." (Tr. 1323; *see* Tr. 1589 (limiting the Government's questioning of Agent Avery to "what time did that call end, and then[] what time did that call begin" without further inferences)).

*Third*, and relatedly, the defense argues that GX 982 ran afoul of Rule 403 because GX 982 was "argumentative." (Mot. 34). But the Court evaluated any potential Rule 403 concerns, and found the chart was "helpful to the jury []." (Tr. 1320-22; *see also* Tr. 1323 (noting "I understand what's been highlighted and what has been italicized and so forth, I find it totally appropriate")).

### F. The Evidence Concerning the Defendant's Wealth Was Appropriately Received

The defense next faults the Court for allowing the admission of "voluminous" evidence of wealth, despite the Court's careful weighing of possible prejudice and preclusion of much of the Government's evidence.

In support the defense cites three witnesses who described how funds stolen as part of the defendant's scheme were converted to his personal use—an accountant, a family office employee, and a funds tracing expert—as well as a general contractor who worked on the defendant's primary residence. For the witnesses who testified about the movement of funds, the relevance of these witnesses is self-evident: proof that the funds that the defendant represented would not be received by him were, in fact, spent by him and his family was highly probative of the fraud scheme.

For the general contractor, the Court precluded nearly all of the exhibits that the Government offered depicting the construction that the defendant paid for with fraud proceeds. The Court ruled that the amounts the defendant spent were relevant but precluded all but one photograph of the defendant's home renovations, over the Government's requests to admit twelve such photographs. (Tr. 1023:8-14). In light of the Court's careful weighing—and rejecting—of much of the Government's evidence under Rule 403, the admission of the limited evidence allowed by the Court was no "manifest injustice" requiring a new trial. *Aiyer*, 470 F. Supp. 3d at 410.

### G.  There Was No Variance

The defendant argues that the Government's trial proof "strayed from the indictment" in at least four ways, resulting in a material variance and warranting a new trial. (Mot. 35-37).

A variance occurs when "the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) (quoting *United States v. Frank*, 156 F.3d 332, 337 n. 5 (2d Cir. 1998)). A variance in proof offends the constitution only if it infringes on the notice and double jeopardy provisions of an indictment. *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012). A defendant alleging variance must show "substantial prejudice" to warrant reversal. *United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007). Such substantial evidence cannot be shown "where the pleading and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Id.* at 621-22 (quoting *United States v. Mucciante,* 21 F.3d 1228, 1236 (2d Cir. 1994)). None of these conditions are met here.

As an initial matter, the Indictment put the defendant on notice of the Government's trial proof. The Indictment described the defendant's scheme to defraud GWG and "prospective investors," including with respect to the purported debt owed to HCLP, and to deceive the SEC. (Ind. ¶¶ 21-23, 26). The defendant argues that the Government devoted too much time to (i) a fraud on Paul Capital—an investor in Beneficient; (ii) the Harmon Family—who the defendant claimed controlled the "debt"; (iii) false statements made directly to the SEC (as compared to in written form in the doctored minutes); and (iv) the composition of the HCLP debt, including that the defendant wanted to avoid a "tax liability." But each of these pieces of testimony was either

38

previewed in the Indictment (i.e., Paul Capital, the Harmon Family, the HCLP debt), or was not of a character that could have misled the defendant or result in "substantial prejudice."[7]

Moreover, even if the defendant was not on notice of this proof from the Indictment, he surely was by the time of trial. The Government described these components as its intended proof in its motions *in limine* and opposition to the defendant's motion to dismiss. (Dkt. 29 at 2-8; Dkt. 44 at 15). And, indeed, the defendant even sought to preclude some of the evidence they claim to have been a surprise in their pretrial motions (Dkt. 25 at 16; Dkt. 45 at 14).

The defendant's reliance on *United States v. Sakoc*, 115 F. Supp. 3d 475 (D. Vt. 2015), is misplaced. (Mot. 35). There, prosecutors—for the first time in summation—identified additional false statements from which the jury might have been able to convict the defendant. According to the *Sakoc* court, "The government gave Mr. Sakoč no indication that it would rely on false statements other than those related to the night of July 9, 1992. . . . The government's new theories in closing were not included in the Indictment and therefore broadened the possible bases for conviction." *Id.* By contrast, the Government here gave the defendant many indications pretrial that it intended to rely on the evidence and arguments it did.

### H.  The Court Did Not Admit Unnoticed Rule 404(b) Evidence

The defendant finally argues that he is entitled to a new trial because the Court twice admitted what he describes as unnoticed Rule 404(b) evidence, first during the testimony of Jeff Hinkle and then during the testimony of Tim Tatman. (Mot. 37). This argument is meritless. Not only did the Court properly admit the challenged testimony, but the admission of this testimony—which amounts to a few lines in a three-week trial—in no way warrants a new trial.

---

[7] The defendant focuses on the testimony that the defendant tried to avoid a "tax liability" and made misrepresentations to the SEC during the April 15 meeting. (Mot. 36-37). But this testimony was so minimal, and not argued to the jury, that it does not give rise to a variance. See *infra* § III.H.

*First*, the Court properly admitted testimony from Jeff Hinkle that, in the course of inflating HCLP's expenses at the defendant's direction, certain of the fees Hinkle added "weren't actually recorded [because the defendant] didn't want to create a tax liability for the income." (Tr. 404). As the Court found, the defendant waived any challenge to this "modest" tax testimony by failing to object to the question or to Hinkle's answer until it was mostly complete. (Tr. 404-05). At the same time, the testimony was properly admitted as direct evidence because it explained the manner in which Hinkle inflated HCLP's expenses. *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). In any event, the admission of this testimony, even if in error, was no "manifest injustice" requiring a new trial, *Aiyer*, 470 F. Supp. 3d at 410; among other things, the Government did not revisit this testimony, let alone argue to the jury the defendant engaged in tax evasion, (*see* Tr. 415 ("I don't think the Government is going to suggest in summation that [the defendant] was engaged in tax evasion or anything like that, and I would cut them off if they did.")).

*Second*, the Court properly admitted testimony from Tim Tatman of the defendant's additional misrepresentations regarding HCLP during an April 15, 2021 meeting with the SEC. (*See* Tr. 1500:25-1501:12; GX 1332). As the Court found, this testimony was admitted, not under Rule 404(b), but as a "necessary predicate" to explain the defendant's later falsification of the Board minutes charged in Count Five. (Tr. 1501-05). In any event, the admission of this testimony, even if in error, was no "manifest injustice" requiring a new trial. *Aiyer*, 470 F. Supp. 3d at 410, given the overwhelming other proof of the defendant's misrepresentations regarding HCLP.[8]

---

[8] To the extent the defendant's complaint is that this testimony infected Count Five, the defendant was not convicted on that Count.

**CONCLUSION**

For the foregoing reasons, the defendant's motions should be denied.

Dated:  New York, New York
        July 24, 2026

                            Respectfully submitted,

                            JAY CLAYTON
                            United States Attorney

                    By:     _Daniel Nessim_____
                            Daniel G. Nessim
                            Alexandra Rothman
                            Kyle A. Wirshba
                            Assistant United States Attorneys
                            Tel.: (212) 637-2486/-2580/-2493

41